# DECLARATION OF CHRISTY L. WILLIAMS

1.      My name is Christy L. Williams.  I am over twenty-one (21) years of age, and I am competent to make this Declaration.  I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.      I am qualified by education, training, and experience to teach writing.  In May 1990, I received a bachelor's degree in English from University of Texas at Arlington.  During the years after that, I taught English as a substitute teacher in the Fort Worth Independent School District, and later in Grapevine schools.  I also worked as a technical writer and/or editor for more than 14 years at different jobs, including four-and-a-half years as a technical writer and editor at Lockheed Martin.

3.      In February 2009, Tarrant County College District ("TCCD") hired me as a full-time Instructional Assistant.  My job was to work as a writing tutor.  I worked in the Writing Lab on TCCD's Northwest Campus, helping students with their writing assignments and teaching them how to be better writers and communicators – that, in a nutshell, was my job. Most of the students were in their late teens or their twenties.

4.      The Writing Lab was part of the Academic Foundations Department, which in turn was part of the Humanities Division.  When I began my employment, the Writing Lab Manager was Vera Ornelas, and she was my immediate supervisor. At the start of the Fall 2010 semester, Conrad Herrera became the Writing Lab Manager and my supervisor.  At the start of the Fall 2012 semester, Anita Biber became Chair of the Academic Foundations Department.  From then on, Biber was Herrera's immediate supervisor, and Biber's immediate supervisor was Dr. Christine Hubbard, Dean of the Humanities Division.

5.      During the entire term of my employment with TCCD, the Writing Lab had a firm policy that students were required to make an appointment to schedule a tutoring session, and they

1

were also required to drop off a typed draft of their written assignment at least 24 hours before the session so the tutor had time to read it and prepare for the tutoring session. Attached hereto as Exhibit 1 is a true and correct copy of an email I received from Herrera on October 11, 2012, along with a true and correct copy of the attachment to the email. On the first page of the attachment next to "F," it refers to the *Making the Most Out of the Writing Lab* brochure. This refers to the brochure attached as an exhibit to Dr. Fukuchi's declaration, and that brochure was the most up-to-date version that was in effect during the Fall 2012 semester before I was fired. The brochure states the policy about making an appointment and dropping off a typed draft of the paper 24 hours in advance.

6.     Of course, students regularly came in seeking immediate assistance without an appointment, and if I was available I would do my best to help. If I was not immediately available, I would sometimes remind him/her of the policy and ask the student to either wait or to make an appointment and return later. Most students were understanding, but sometimes a student had a pressing deadline and did not react well to being told that he/she could not be seen immediately, ahead of everyone else. I nevertheless tried my best to be pleasant and professional. On September 20, 2012, Herrera sent me an email commenting on the way I greeted students as they came into the Lab; he wrote: "I also wanted to say that during the few hours I spent in the Lab last week, I was really impressed with your pleasant greetings to students as they walked in looking for help." A true and correct copy of this email that I received from Herrera is attached hereto as Exhibit 2.

7.     During the Fall 2011 semester, I worked several times with a student named Cynthia Earls. I saw her two or three times without incident; she made appointments, and I helped her with various developmental stages of the writing assignment she was working on. Her next appointment was for us to go over the supporting reference materials she had obtained at the library. However,

2

when she arrived for our appointment, she had a fully completed draft of her paper that she wanted me to help finalize.  She had not given me the draft in advance, so I explained to her that I was not fully prepared to critique her paper, and I was expecting to focus the session on her research.  She became angry.

8.      I therefore offered to look at her essay and comment on it as much as possible during the available time we had, and I did that, but she remained upset.  I suggested that it might be better if we met again later after I had time to read her essay and prepare my comments, but that only seemed to make her angrier.  I had another appointment immediately after hers, and as we were wrapping up, I gave her an official tutoring form to fill out.  This was a form we used when making an appointment to go over a completed essay with a student. On the front of the form, the student would describe the writing assignment (student's name, what class it was for, who the teacher was, what the assignment was, etc.).  The tutors used the back of the form to write comments about the student's work and our summary of the tutoring session. Then we gave the completed forms to the student's teacher to show what transpired during the tutoring session.   Some professors even awarded extra credit to a student who spent the time to visit the Writing Lab.  In short, these were important forms, and I had been instructed to keep the forms in the Lab and to not allow students to take them out of the Writing Lab.

9.      Before she left I asked Earls for her form, but she angrily claimed she didn't have it. Herrera happened to be in the Lab at the time working on a computer, and I decided maybe it would be better if he handled the situation, so I asked him to talk to her.  For several minutes, he refused because he said he was busy, but then after my repeated requests, he eventually came over and said he would handle the situation.  I never "confronted" the student or spoke in a loud or angry tone.

3

10.     Regarding the September 12, 2012, student complaint mentioned on page 4 of TCCD's motion, the student was Jessica Bermudez, and she had come in the night before seeking immediate assistance without an appointment. As usual between 5 and 8 p.m., I was the only person working in the Lab.  There were already 4 students waiting for me to help them, one of whom had an appointment.  Bermudez was angry that I couldn't help her immediately, and she accused me of being rude.  She said she was going to file a complaint, and she left.  The next day, I sent an email with the subject line "Heads up" to Herrera, Biber, and the other two tutors (Lynnelle Brown and Margaret Levy) to let them know what had happened.   A true and correct copy of this email is attached hereto as Exhibit 3 (on the second page).

11.     My "Head's up" email triggered a series of emails discussing the Writing Lab's ongoing staffing problem.  I was regularly the only employee on duty in the Lab four nights a week from 5-8 p.m., and on Saturdays.  My co-worker, Lynnelle Brown, replied to my email and pointed out that "with only one person working in the evenings, the evenings are especially in need of additional staff."  A true and correct copy of this email from Brown is attached as Exhibit 4.  Dr. Hubbard replied to my email stating, "I have always thought we should have at least two people on duty at all times to serve students and also to allow for breaks and to increase safety."  This email is on the first page of Exhibit 3, attached.

12.     Anita Biber went a step further.  She sent an email asking a man named David Pearse (Director of Academic Affairs and Weekend College) to check in with me during the evenings for safety purposes (which he ultimately did only twice).  A true and correct copy of this email is attached as Exhibit 5.  After I spoke with Herrera and Hubbard about the incident and gave them four unsolicited witness statements from the students who were waiting for me to help them that night and who were aghast at Bermudez's words and behavior toward me, Biber sent an email

4

stating, "We are all in agreement that the situation was handled appropriately by Christy." A true and correct copy of this email is attached as Exhibit 6.  Biber's email also mentions that TCCD was in the process of trying to hire another person to work in the Writing Lab during the evenings so we would not always be short-staffed.

13.     The student-worker who complained about me was Mark Smith.  I was having a conversation with coworker Margaret Levy, and he must have overheard us because he came over and started commenting negatively and antagonistically on what we had been discussing.  When he would not stop, I decided to step away from the situation, but Smith sidled up alongside me as I exited the Writing Lab, getting so close to me that I felt physically intimidated by him.  I therefore walked towards Conrad Herrera's office to get his help, and when we got there I told Herrera that I believed Smith was behaving inappropriately.  I did not say the things TCCD quotes me as saying, but I was agitated because of Smith's physical intimidation.

14.     Regarding what Lily Calzada reported, I had seen a student park in faculty parking, and I questioned the student about it.  It was the student who started yelling at me as I gathered my work materials out of my car, so I called campus police.  I didn't yell at the student, and I certainly did not say I was "sick of you students."

15.     Regarding Helen Yakub and the what took place when she came into the Writing Lab unannounced, at that time I was in a tutoring session with a student named Dominique Campos. I have reviewed the declaration Ms. Campos signed dated August 19, 2016, which is being submitted to the Court along with my response to the motion for summary judgment. Her description regarding the group of people who came into the Writing Lab unexpectedly without an appointment is describing what happened when Helen Yakub brought her class and the other class into the Lab.

16.     I did have some conflicts with Herrera starting in March 2012.  During the prior month, at the end of February 2012, I had been assaulted during a date with a soldier who had PTSD (unbeknownst to me at the time).  It wasn't something I wanted to talk about at work, but I needed to get some counseling, and I was also dealing with an investigation of the incident.  After a week or two it became clear that I couldn't do these things without asking for some time off work, so in March 2012 (a Friday) I told Herrera I had been assaulted and I showed him some of the bruises.  I explained that I would need some time off from work to deal with the medical, psychological, and legal issues resulting from the assault.  I told him that I understood he might need to let others, like Dr. Hubbard, know what was going on, but I asked him to let me know first before he told anyone.  He said that he would.

17.     The following Wednesday, Herrera asked me to meet with him and Dr. Hubbard to discuss the Writing Lab's short-staffing issue.  In that meeting Herrera told Dr. Hubbard I had taken some time off a few days before, and he said he wasn't okay with that.  This was very awkward for me, and I reminded Herrera that I had told him I would need time off.  Herrera didn't say anything, so I felt I had to explain things to Dr. Hubbard.  I told her I had been the victim of a violent crime recently, and that I had explained to Herrera why I needed time off.  Then I asked her, "I have sick leave for these kinds of things, don't I?"  She replied, "Yes, you do."

18.     The next day I went to Herrera's office to discuss what had happened during the meeting with Dr. Hubbard.  I reminded him of our talk the Friday before and his agreement to let me know before bringing this up with Dr. Hubbard, but given what he'd said in our meeting with Dr. Hubbard, there was no way to explain my time off without telling Hubbard about the assault, which was embarrassing.  Herrera then started yelling at me.  He said I talked too much at meetings; he also said, "You're supposed to help people with their writing, but what have you written lately?!"

As he yelled at me, I had a flashback to the assault I had suffered mere weeks before, and I began shaking and crying. It was just the two of us in his office, and after his loud outburst, I didn't feel comfortable meeting one-on-one with him, so in subsequent meetings we always had someone else present.

19.     Regarding the courses I was assigned, these were Element K courses.  Each year, we were required to complete a certain number of Professional Development hours, and one of the ways to do this was by taking Element K courses.  It was normal to be assigned classes like this, and I was never told that these assignments were linked to any inappropriate behavior.  Some of these exact same courses were also assigned to the other writing tutors, Brown and Levy.

20.     At no time during my employment with TCCD was I ever disciplined in any way or given a performance improvement plan.  I have reviewed TCCD's Motion for Summary Judgment and its supporting documents, which include a Performance Improvement Plan dated March 28, 2012.  That document has signature lines for the Division Dean (Hubbard) and for the employee (me) to sign, but it is not signed by anyone.  I never saw this document until it was produced by TCCD during the discovery in this lawsuit.

21.     As a matter of fact, rather than being criticized for my performance at TCC, I received a promotion and a pay raise at the start of the Fall 2012 semester.  Attached as Exhibit 7 are true and correct copies of four Earnings Notification documents from TCCD.  The first three pages show that in September 2009, 2010, and 2011, I was an Instructional Assistant for the coming school year.  The fourth page of Exhibit 7 is an Earnings Notification dated September 1, 2012, confirming my position as an Instructional Associate with a monthly salary of $2,808.25 (up from $2,656.83 as shown on the prior page, P 850, for the prior year).

22.     I continuously received positive comments from professors who saw improvement in the writing abilities of their students as a result of my tutoring sessions with them.  For example, attached to this declaration as Exhibit 8 and incorporated herein by reference are true and correct copies of some emails that I received from and sent to professors who were complimenting me on my work with their students.

23.     I also received overwhelmingly positive comments from the students I tutored. Starting in Fall 2011, the Writing Lab used a software system called TutorTrac, in which students could type in their comments about their tutoring session.  Attached as Exhibit 9 is a true and correct copy of an email I received from Herrera dated November 19, 2012, plus the attachment to the email, which were the TutorTrac comments for three semesters (Fall 2011, Spring 2012, and Fall 2012 to date).

24.     On October 25, 2012, I sent an email to Biber and Hubbard with a subject line "Continuing Concerns" to share my thoughts about the Writing Lab's ongoing short-staffing problems.  A true and correct copy of this email is attached as Exhibit 10 and incorporated herein by reference.  In this email, I stated that the long-term short-staffing situation in the Writing Lab was taking a toll on me "physically, mentally, and emotionally."  I also suggested some possible changes that would help alleviate the stress and negative effects the situation was causing me, but no changes were made.

25.     Regarding conflicts with Herrera, during the Fall 2012 semester things improved greatly.  During the meeting he and I had with Biber on November 13, 2012, he commented that things were better between us, and he looked forward to being able to meet one-on-one with me, without a third person present.

8

26.     During my employment with TCC, I was experiencing several medical conditions.  I know that I told Biber and/or Herrera about my depression, anxiety, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD).  I told Herrera about my ADHD, anxiety, depression, and PTSD on at least two occasions; one of these occasions was in the Spring of 2012.  I told Biber about my ADHD during the Fall 2011 semester.  In September 2012 during a meeting with Biber and Herrera, I talked about my anxiety and ADHD. In October 2012 during a meeting with Herrera and Biber, I told them both about the fact that I had anxiety issues, ADHD, and PTSD. I also had a thyroid condition that I mentioned to Biber's supervisor, Christine Hubbard, in an email (described below).

27.     The ADHD relates back to my early childhood.  When I was about 5 years old, a teacher at my school suggested that I be tested for hyperactivity (which was the name for ADHD at that time). The testing confirmed that I had this disorder, and I began taking Ritalin.  Ritalin calmed me down and helped me focus better.  It also helped with my anxiety, blurting (saying whatever pops into your head), anger, and frustration.  Plus, I got better at keeping up with what was going on in class.

28.     I continued taking Ritalin through eighth grade. Back then, doctors believed you eventually grew out of hyperactivity, so they discontinued treatment.  But in 1997, while I was working as a technical editor and production coordinator for a publishing company, I began to struggle with pronounced ADHD symptoms.  I was fighting to focus and concentrate on work.  I had feelings of great anxiety and edginess, as though I had too much adrenaline pumping through me, and I could not stay still and focus on my work.  My thoughts jumped around, and my thinking was nonlinear.  These feelings seemed familiar, and I recognized that was how I felt when I was a child before I started taking Ritalin.

29.     My suspicion grew after I saw a television show where two ADHD experts were talking about an ADHD book they had authored.  The symptoms they described fit me perfectly, so I bought and read their book.  After that I went to see a doctor, Duane Selman.  He confirmed a diagnosis of ADHD, and he prescribed Cylert and Desipramine to treat it. That helped with my symptoms greatly, and I continued taking medication for ADHD until 1999.

30.     My PTSD relates back to some very traumatic experiences from my childhood. From ages 3 to 12, I was sexually abused by a relative who was also verbally and emotionally abusive.  When I was 23, in 1988, I was attending the University of Texas at Arlington. I felt very down emotionally, but I didn't have health insurance, so I began seeing a clinical psychologist, Dr. James Shadduck, at the campus health center. I was experiencing regular nightmares about the man who sexually abused me, flashbacks of the abuse, active avoidance of anything that would remind me of the abuse, and I was easily startled. Dr. Shadduck diagnosed me with PTSD stemming from the childhood abuse.  Thereafter, Dr. Shadduck treated me for depression and PTSD with counseling and education; we talked about the disorders and how they were affecting me. Dr. Shadduck also suggested things for me to read to better understand what I was experiencing.

31.     Then in 1993 while I was working at several jobs, my mood and emotional state deteriorated significantly to the point where I could barely function.  I had trouble falling and staying asleep, so I would be exhausted in the morning.  The physical fatigue and emotional drain made it almost impossible just to perform the basic tasks needed to get out the door and go to work, such as getting showered and dressed.  I lost all interest in things I'd previously enjoyed. I felt like I was in a deep dark emotional pit with a black cloud over me, isolated from the rest of the world above.

32.     I didn't have insurance, so I struggled daily in my emotional pit until 1995, at which time I heard about a study on depression that was getting underway at St. Paul Medical Center in Dallas.  They were marketing the study and seeking volunteers to participate, and in the marketing they described the symptoms of depression and invited people who were experiencing these symptoms to contact them.  I definitely had the symptoms they described, and I wanted to help myself, so I volunteered for the study.

33.     At St. Paul I went through about seven hours of diagnostics, including written tests, assessments, and oral interviews with doctors.  After completing these diagnostics, the doctors told me I had major depressive disorder.  The diagnosis very much fit with what I had been experiencing, and in a way I was relieved to know that it had a name and maybe it could be treated.

34.     Before advancing to the next stage of the study, however, I first had to complete some physical exams and blood work.  The results of the blood tests showed that my thyroid was not functioning adequately, which was termed hypothyroidism.  They told me this disqualified me from participating in the study because hypothyroidism can cause depression, and that I should see a doctor to get treatment for the hypothyroidism.  I therefore went to see Dr. Duane Selman.

35.     Dr. Selman prescribed Synthroid for the hypothyroidism, and after taking the medicine for a few weeks, I experienced a dramatic improvement. It was as if the sun broke out, the dark cloud went away, and I came out of the emotional pit I had been trapped in. The symptoms of my depression improved to the point where it seemed not to be an issue any longer, but there was no cure or permanent fix for the thyroid condition, and I would have to treat it with medication for the rest of my life.

36.     I did well with the depression for the next couple of years until 1997, when I began experiencing a depressed mood and a feeling that something was wrong again. I was experiencing an emotional darkness and an out-of-balance feeling. Dr. Selman had me tested and determined my thyroid was out of balance again, and he adjusted my thyroid medication to treat it. Again, after a couple of weeks, the symptoms of my depression dramatically improved, and I was able to resume a mostly normal life. After this recurrence of the thyroid issue, I began having my thyroid checked every year.

37.     In 1999 or 2000, the symptoms of the depression came back again. I broke into tears easily. I had a hard time getting out of bed and functioning well enough to manage even the most basic tasks, like getting dressed and ready for work, and the black clouds were back. I was seeing a different doctor by this time, Karen Spetman, who first confirmed that my thyroid condition was being managed effectively. She therefore decided to treat the depression with medication. After trying several antidepressants without good results, we tried Zoloft, and that helped a great deal. But thereafter, even though I was taking the Zoloft, the symptoms of the depression would get worse every now and then. Since I'd had so many bouts of depression over the years, Dr. Spetman said I had dysthymia (long-term depression), and that I would need to be on antidepressives for the rest of my life. I continued to see Dr. Spetman for depression, and she eventually changed me from taking Zoloft to taking Wellbutrin, which I continued to take until 2005.

38.     In 2005 I began seeing Dr. Thomas Leavens for debilitating migraine headaches. He changed my antidepressant medication to Lyrica because he said it was effective for both migraines and depression. I was on that until 2010 when a new migraine specialist I started

12

App. 014

seeing, Dr. Shirley Molenich, changed my prescription to Cymbalta, which was another dual-purpose drug for treating migraines and depression.

39.     My depression was pretty well managed until February 2012 when the soldier I was on a date with assaulted me, leaving me with bruises and other wounds.  After that, the ADHD symptoms I'd been managing to cope with fairly well intensified.  I was struggling to focus and concentrate, my thoughts were jumping around, and the adrenaline-rush edginess returned.  After discussing this with the psychiatrist I had been seeing for 6 years, Dr. Raju Indukuri, he prescribed Strattera. I continued taking Strattera to manage the symptoms of ADHD until I was fired from TCC and could no long afford this expensive medication.

40.     For 6 years prior to the assault, I had been getting counseling and treatment from a therapist, Lisa Haram-Atkinson.  During the four weeks after the assault, I saw Atkinson for frequent counseling sessions.  I was depressed and upset, I was having flashbacks of the assault, and my overall anxiety level was extremely high.  I was frequently on the verge of tears for no real reason, and these symptoms persisted for about four weeks, during which time it was very difficult for me to function and go to work.  Lisa said I was experiencing Acute Traumatic Stress. After about four weeks, my anxiety was lower, and I felt less emotional. However, I was still suffering a great deal from the trauma of the assault. Based upon what I shared with Lisa at that time, she said that my PTSD had progressed to PTSD Complex.

41.     The post-assault trauma symptoms I was experiencing lingered and would not go away.  From late March 2012 through November 13, 2012, it was hard to make myself put on a smile and go to work, but I did it.  During this time, I was also bothered by irritable bowel syndrome and acid reflux, and the physical pain and discomfort caused by these conditions made it more difficult for me to manage and maintain my emotions and my overall mood.

42.    For months the symptoms of my depression, PTSD Complex, ADHD, and other conditions were constantly with me, weighing me down like a very heavy suit of clothes that I had on at all times and couldn't take off. I stopped doing things that I had enjoyed before, like going to lunch with friends, attending painting classes, going out on dates, singing, and dancing. I had trouble forming thoughts and communicating, so I chose not to put myself in situations where I would have to do these basic things. When I was forced to run errands or go to the grocery store, I planned a strategy in advance so I would not be out any longer than absolutely necessary, and then I would have to psych myself up to get in the car and get started, all of which was emotionally taxing and exhausting.  Before February 2012 I could do these things easily; afterwards these simple tasks of everyday living were a great challenge.

43.    On November 13, 2012, something happened and I simply could not hold myself together any longer.  I was in a meeting with Herrera and Biber.  Biber told me that a faculty member named Helen Yakub had complained to her that I had been rude and not helpful when she'd visited the Writing Lab a couple of weeks before.  But I had talked to Yakub about what had happened, and we had cleared the air; she even apologized to me for her behavior toward me that day.  So when Biber told me that Yakub had recently complained about me, I felt betrayed. Hearing this complaint just caused me to crack emotionally.  In the greater scheme of things, it should not have been a big deal, but it was just the last straw, and I could not hold myself together emotionally.  I began to cry uncontrollably and ramble, talking openly about a lot of things that had been bothering me.  It was at least a couple of hours before I could regain enough composure to walk out to my car and drive home.

44.    After this incident, I knew something was wrong with me.  I had a nagging feeling that something wasn't right – similar to what I had experienced in 1995 when I tried to

get into the depression study at St. Paul – and I knew I had to get to one or more doctors to get checked out.

45.     On the evening of November 13, 2012, Biber called and told me Hubbard had approved a week of paid leave for me.  I expressed my sincere appreciation to Biber, and I asked her to thank Hubbard for me.  I told Biber I knew it wasn't good that I felt so overwhelmed, and I added, "I need to get to the doctor and figure out what's going on with me." She supported my plan to see the doctor, and then we ended our call.

46.     On November 14, 2012, I saw Atkinson and told her what happened at work the day before.  Atkinson wanted me to check into a hospital right away, and I would have done it except I knew I didn't have the money to pay for it, and I knew I didn't have anyone who could take care of my house and my pets on such short notice.  Atkinson told me that if I wasn't going to follow her advice and be hospitalized, she couldn't be responsible for me, and she wouldn't treat me any longer, so on top of everything else I was dealing with, I now had to find a new therapist.

47.     On November 19, 2012, I had an appointment with my psychiatrist, Dr. Raju Indukuri.  Attached as Exhibit 11 is a true and correct copy of a letter I wrote to give Dr. Indukuri at this appointment so he would know what was going on.  By the time I went for this appointment, I had received some paperwork from TCC relating to FMLA leave and short-term disability (STD) benefits.  Attached as Exhibit 12 is a disability claim form that Dr. Indukuri and I completed on or about November 19, 2012, and I returned to TCCD on or about that date.

48.     Also on November 19, 2012, I had an appointment with my primary care doctor, Steven Childers.  He had some blood work done, and the test results showed that my thyroid condition had once again gone out of control.  A true and correct copy of the test results is

attached as Exhibit 13.  The last line at the bottom of the page shows my TSH (thyroid-stimulating hormone) was low.  When that had happened in the past, even if it was only slightly low, it had consistently caused the symptoms of my depression to get worse until the thyroid problem was treated and stabilized.  The symptoms of my recurring depression had been a problem for the last several months, but after Childers saw the test results and changed the dosage of my thyroid medication, I began to feel much better and the symptoms of my depression improved significantly after a couple of weeks.

49.     On or about November 21, 2012, I sent TCCD a certification form they had given me to confirm my eligibility for FMLA leave, which Dr. Indukuri completed and signed.  A true and correct copy of this document is attached as Exhibit 14 and incorporated herein by reference.

50.     On December 13, 2012, I sent an email to Herrera, Biber, and Hubbard informing them that I had been diagnosed with a biological imbalance in my body (low TSH), that it was being treated, and that I was feeling much better.  A true and correct copy of this email is attached hereto as Exhibit 15.  By this time, I was feeling better and stronger, and I was looking forward to going back to work and resuming my duties on January 2, 2012, when I was scheduled to return to work, if cleared to do so by Dr. Indukuri (as I mentioned to them in the email).

51.     During my FMLA leave, I did not refuse to communicate with Sharion Marshall or anyone else, but I was on leave and emotionally unable to come to campus for a face-to-face meeting.  Dr. Indukuri concurred that I was not in a good place emotionally to put myself in a possibly stressful situation.  Therefore, I spoke to Marshall by phone, we communicated by email, and we agreed to meet on January 2, 2013, with the head of Human Resources, Dr. Ricardo

Coronado, before I returned to work. Attached as Exhibit 15-A are true and correct copies of emails between Marshall and me about setting up this meeting.

52.     In anticipation of my return to work, I had an appointment scheduled with Dr. Indukuri for the morning of January 2, 2013.   TCCD had sent me a form, a Certification for Fitness of Duty, and I took this with me to my appointment.   Dr. Indukuri completed and signed the form, and I took it with me to TCC's District Offices where I was meeting with Dr. Coronado before going back to work in the Writing Lab.   When I got to Dr. Coronado's office, I gave the Certification form to a lady at the desk outside his office so she could give it to Dr. Coronado.   A true and correct copy of the two-page form I gave her is attached hereto as Exhibit 16.   After a few minutes, I went into Dr. Coronado's office where he was waiting for me, along with Sharion Marshall.

53.     As soon as I entered, I saw that Dr. Coronado had the Certification for Fitness of Duty form – the one I had given the receptionist – on his desk.   At one point during the meeting he said something like: "I see here (gesturing to the Certification of Fitness for Duty) you are requesting reasonable accommodations."   What followed was a brief discussion about the stress of the position, how the Lab had become much busier over the time I had been working there, and that we had not hired any new tutors; consequently, we were extremely short-staffed, and I was often there alone when the demands of the job were more than one person could reasonably handle.

54.     Coronado then asked me what kind of reasonable accommodations I was talking about.   I said that I hoped we could discuss that together. He said, "Well, it seems like you're saying that additional staff would be a reasonable accommodation." I replied, "Yes, that would definitely help, and it's definitely reasonable."

17

55.     The meeting lasted about twenty minutes, and at the end of the meeting Dr. Coronado told me to consider myself "still on leave" and that he would be getting back to me. This surprised me because I was expecting to go back to work in the Writing Lab after the meeting, but instead I went home.

56.     I expected that there would be some further discussion about reasonable accommodations, but I heard nothing more from TCCD until January 7, 2013, when I got a phone call from Sharion Marshall.   The call was very short, and she simply stated that I was being terminated for past performance.   A day or two after that I received a letter signed by Coronado stating the same thing.   A true and correct copy of this letter is attached as Exhibit 17.

57.     As of January 7, 2013, I was dealing with multiple conditions.   As discussed elsewhere in this declaration, I had thyroid disease, which required regular blood tests and regular medication.   Without medication, my thyroid gland would not produce a sufficient amount of a hormone needed for my body to function properly.   This is a permanent condition, and before it was diagnosed and I began taking medication for it, the condition caused me to also suffer from major depression, and the depression would return whenever the thyroid-stimulating hormone levels were out of the normal range.   I have been taking medication for the condition continuously since 1995, and without the medication I would be unable to think well, concentrate, take care of myself, sleep normally, or live a normal life.

58.     I was also still coping with depression as of January 7, 2013.   Without taking medication to manage my depression, I was unable to think clearly, and I felt intensely sad and hopeless.   Functioning in daily life was nearly impossible, and I was incredibly fatigued; all I wanted to do was sleep. I also was unable to form cogent thoughts and communicate normally with others, and I limited social contacts and lost interest in activities I had enjoyed before.

18

Overall, my depressed state presented multitudinous symptoms, which seem too numerous to list.

59.    Another issue I was dealing with as of January 7, 2013, was ADHD.  I was taking medication for it, but without the medication I battled racing thoughts and feelings of physical edginess, among many other symptoms such as difficulty concentrating, being easily distracted, and talking too much.

60.    Also at that time I was being treated by Dr. Indukuri for anxiety disorder.  My anxiety could be part of my ADHD or PTSD, but regardless, it was overpowering to me at times.

At those times, I would break out in heavy sweating, particularly on my chest, under my arms, and behind my neck. My hands would begin shaking, and my heart would begin pounding. I would feel unable to breathe, as if unseen hands were enclosing my neck. Then I would feel overly warm, nauseous, and dizzy. This would give way to headaches and aching body pains (particularly in my neck, shoulders, and back). Dr. Indukuri prescribed Valium for my anxiety, which helped to reduce my anxiety, but it didn't cure it.

61.    PTSD or PTSD Complex was also haunting me. I avoided talking or thinking about the Spring 2012 assault, but then flashbacks of the attack would rush into my thoughts without warning and create a sense of fear and panic inside me. I felt unjustifiably ashamed of what had happened to me during the attack and an increased distrust in everyone around me. I also felt a deep, immediate threat and nearly immobilizing fear if someone became angry or hostile toward me. I stopped dating because I was afraid of it since that was the environment in which I was attacked. But most troubling of all, I lost faith in God, which had previously been my greatest source of strength and hope.

62.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2016.

Christy L. Williams

19

App. 022

| | |
|---|---|
| **From:** | HERRERA, CONRAD |
| **Sent:** | Thursday, October 11, 2012 12:58 PM |
| **To:** | WILLIAMS, CHRISTY; LEVY, MARGARET; BROWN, LYNNELLE; MCELREE, KAYLEE; BIBER, ANITA; ROW, MAGGIE |
| **Subject:** | Writing Lab Guide Feedback |
| **Attachments:** | Writing Lab Employee Guide.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello, everyone. I am glad we got to meet today. I am attaching the guide we went over. Please let me know if I should reword or reorder anything.

Regards,

**Conrad Herrera**
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office: WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu | www.tccd.edu

Office hours: 9:00 a.m. to 11:00 a.m., Monday - Friday

# Williams Declaration
# Ex. 1

1

TCCD 00832

Writing Lab Employee Guide
TCCD – NW Campus
Fall 2012

A.  Phone Number
   - 817-515-7147
   - To check messages and use other phone feature, pick up the handset and press the Message button. After you enter 7147, you will be prompted to enter your password.
   - Please call the Help Desk at 817-515-6411 to have someone give you a temporary password.
   - Once you have your password, please set up a voicemail greeting.

B.  Work Station / Desk
   - WCTS 1151
   - There is a key request form in your mailbox for you to fill out and turn in.
   - If you ever lose your key and do not have it, call campus police at 817-515-8911 to have an officer open the door for you.

C.  Mailbox
   - WTLO 4308A
   - Your mail is above your name
   - Check your box at least once a day

D.  Photocopies
   - For small jobs, use the machine in WCTS 1151. Enter your Colleague ID minus first digit for access.
   - For large jobs, use the Copy Center/Mailroom in WTLO 3101A. Depending on the time of year, the turnaround time can be up to 24 hours.

E.  Job Description
   - Refer to
     - http://org.tccd.edu/opweb/publishedcharts/jobdesc/Instructional%20Assistant.pdf
     - http://org.tccd.edu/opweb/publishedcharts/jobdesc/Instructional%20Associate.pdf

→ F.  Writing Lab Services
   - Refer to the Making the *Most of the Writing Lab* brochure.

G.  Work Hours and Expectations
   - Post your work hours on WebAdvisor (wa.tccd.edu). Login and click on Employees and then the Personal Information Form link in the Employee Profile section.

H.  Lunch Periods and Breaks
   - Post your work and lunch hours on your door
   - If you take lunch at times other than indicated on your door, please write a message on your door. You can use post-it notes or a dry-erase board, which Vanita Weithers could help you order.

TCCD 00833

I.   Notifying supervisor for Absences and Tardies
- If you are going to be late to work or absent, call and talk to a live team member instead of sending an email or leaving a voice message.
- Ask a team member to post a note on your door saying you will be late or absent.
- First contact me (Conrad) at 817-515-7697 or 817-729-4646.  If I cannot be reached, try contacting one of the following team members in this order:
  - Margaret Levy
  - Vanita Weithers
  - Teri Tooley
  - Anita Biber

J.   Key Team Members
- Writing Lab Staff, x7147, WCTS 1151
  - Margaret Levy
  - Christy Williams
  - Lynnelle Brown
- Kaylee McElree, Academic Foundations/ESOL Tutoring, x7316, WCTS 1214
- Conrad Herrera, Writing Lab Manager, STSC Campus Coordinator, x7697, WCTS 1206
- Vanita Weithers, Administrative Assistant, x7739, WTLO 4310
- Anita Biber, Academic Foundations Department Chair, Instructor of Reading, x7302, WCTS 1204
- Maggie Row, Instructor of English, x7223, WCTS 1208
- Peggy Ford, Professor of Reading, x7218, WFAB 2620
- Christine Hubbard, Dean of Humanities, x7782, WTLO 4306
- Teri Tooley, Administrative Assistant, x7781, WTLO 4306
- Visit http://org.tccd.edu/opweb/publishedcharts/TCCDOrgChart.htm to find contact information for every employee in the district.

K.   Performance Evaluation Form
- Evaluations take place every fall semester.
- This year covers Sep. 1, 2011 to Aug. 31, 2012.
- To access the form, login to WebAdvisor (wa.tccd.edu), click on Employees, and click on the Evaluation/Appraisal link in the Employee Profile section.

L.   Professional Development
- Your Professional Development Plan must be finalized by Oct. 26, 2012.
- Sign on to http://10.162.90.132/PDP to begin working on it.
- The goal is to complete a minimum of 24 hours related to writing tutoring or instruction between Aug. 1,  2012 and May 10, 2013.
- The department chair and learning lab manager will recommend several PD activities and tutors can select the rest for approval.

TCCD 00834

M.   Campus Map
     www.tccd.edu/Campuses_and_Centers/Northwest_Campus/Map_NW.html
     Students and visitors often ask directions to:
     - Advising and Counseling -
     - Registrar -
     - Math Lab and Testing -
     - Writing Lab -
     - Testing Center -
     - Horticulture -
     - Science labs and classrooms -
     - Library -
     - Bookstore -
     - Cafeteria -

N.   How the Academic Foundations Department fits into the College Structure
     We are one of six departments in the Humanities Division. There are four
     divisions at NW Campus, all of which are under the supervision of the VP for
     Academic Affairs, Dr. Leann Ellis, whose immediate supervisor is the campus
     president, Dr. Elva LeBlanc.  TCCD has five campuses and five presidents,
     who, along with district-level administrators (associate vice chancellors and
     vice chancellors), form the Chancellor's Executive Leadership Team (CELT).

O.   Work flow of the Academic Foundations Department
     Our department prepares students for academic success in reading and
     writing.  The students we serve in RDNG 0361/0363 Reading and ENGL
     0324/0325 Writing Techniques classes have either failed reading or writing
     sections of the Accuplacer exam.  Students in STSC 0111 Transition to
     College Success are first-time-in-college students.  Writing Lab and ESOL
     tutoring services offer support for students during all phases of the writing
     process.

P.   The Academic Foundations Department's Standard Operating Procedures
     - Check your Outlook email frequently throughout the day.
     - Turn in your timecard to me on the last Friday of every month. You
       can place it in an envelope and slide it under my door if I am out of the
       office.

Q.   Sites to bookmark or add as desktop icons
     - www.tccd.edu/x2453.xml -(Faculty and Staff link from the homepage)
     - wa.tccd.edu – WebAdvisor
     - org.tccd.edu/opweb/publishedcharts/TCCDOrgChart.htm
     - 10.162.90.132/PDP
     - tutortrac.tccd.edu

TCCD 00835

| | |
|---|---|
| **From:** | HERRERA, CONRAD |
| **Sent:** | Thursday, September 20, 2012 11:04 AM |
| **To:** | BIBER, ANITA; WILLIAMS, CHRISTY; HUBBARD, CHRISTINE |
| **Cc:** | LOUNSBURY, MARY (LIZ); LEVY, MARGARET; BROWN, LYNNELLE; PIERCE, WENDI |
| **Subject:** | RE: More kudos! |

That is wonderful to hear.  Thank you for sharing this, Christy. I also wanted to say that during the few hours I spent in the Lab last week, I was really impressed with your pleasant greetings to students as they walked in looking for help.

**Conrad Herrera**
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office:  WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu | www.tccd.edu

Office hours:  9:00 a.m. to 11:00 a.m., Monday - Friday

**From:** BIBER, ANITA
**Sent:** Thursday, September 20, 2012 10:42 AM
**To:** WILLIAMS, CHRISTY; HUBBARD, CHRISTINE
**Cc:** HERRERA, CONRAD; LOUNSBURY, MARY (LIZ); LEVY, MARGARET; BROWN, LYNNELLE; PIERCE, WENDI
**Subject:** RE: More kudos!

How wonderful to be recognized! :0)

**Anita Biber, M.Ed.**
Department Chair and Instructor of Reading| Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office:  WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu | www.tccd.edu

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

**From:** WILLIAMS, CHRISTY
**Sent:** Wednesday, September 19, 2012 2:08 PM
**To:** HUBBARD, CHRISTINE
**Cc:** HERRERA, CONRAD; BIBER, ANITA; LOUNSBURY, MARY (LIZ); LEVY, MARGARET; BROWN, LYNNELLE; PIERCE, WENDI
**Subject:** More kudos!

Margaret attended a customer service workshop today, and upon her return to the Lab, she happily recounted the positive words that were spoken about the Writing Lab at the workshop. Liz Lounsbury was the presenter, and during

1

Williams Declaration
App. 027

Ex. 2

TCCD 00936

the workshop, she frequently used the Writing Lab as an example of superior customer service. That was a wonderful surprise for Margaret. Furthermore, Lynnelle and I were so happy to hear that our services are respected and appreciated.

**Christy Williams**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu | www.tccd.edu

Fall/Spring Office Hours: 11:30 a.m. to 8:30 p.m., Monday-Thursday; 8 a.m. to 5 p.m., Friday

TCCD 00937

App. 028

From:         HERRERA, CONRAD
Sent:         Wednesday, September 12, 2012 5:13 PM
To:           HUBBARD, CHRISTINE; BIBER, ANITA
Subject:      Confidential: Heads up
Attachments:  student complaint.docx

Hello, Christine and Anita.

I am attaching my notes from a phone call with the student in question. I would like to work with both of you on how I should address this with Christy. Please keep this confidential.

Regards,

**Conrad Herrera**
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office: WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu | www.tccd.edu

Office hours: 9:00 a.m. to 11:00 a.m., Monday - Friday

**From:** HUBBARD, CHRISTINE
**Sent:** Wednesday, September 12, 2012 2:26 PM
**To:** WILLIAMS, CHRISTY; HERRERA, CONRAD
**Cc:** BIBER, ANITA; LEVY, MARGARET; BROWN, LYNNELLE
**Subject:** RE: Heads up

Hi, Christy—

Thanks for the information. This will also be important for evaluating staffing needs during the evening. I have always thought we should have at least two people on duty at all times to serve students and also to allow for breaks and to increase safety.

Best regards,

**Christine Hubbard, Ph.D.**
Dean | Humanities Division
Tarrant County College Northwest Campus | Office: WTLO 4306A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7782 | Fax 817-515-7007
christine.hubbard@tccd.edu | www.tccd.edu

Office hours: 8:00 a.m. to 5:00 p.m., Monday - Friday

**Williams Declaration
Ex. 3**

**From:** WILLIAMS, CHRISTY
**Sent:** Wednesday, September 12, 2012 12:01 PM
**To:** HERRERA, CONRAD
**Cc:** HUBBARD, CHRISTINE; BIBER, ANITA; LEVY, MARGARET; BROWN, LYNNELLE
**Subject:** Heads up

I need to apprise you all a situation that occurred last night. I had 4 students waiting for me to help them, one of whom had an appointment. All students were willing to wait their appropriate turn except for one student. She wanted help immediately, and no one else was here to help her. She said she would be filing a complaint. I wanted to let you all know now, but I plan to follow this email with a detailed account of what transpired.

**Christy Williams**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu | www.tccd.edu

Fall/Spring Office Hours: 11:30 a.m. to 8:30 p.m., Monday-Thursday; 8 a.m. to 5 p.m., Friday

TCCD 01046

App. 030

| | |
|---|---|
| **From:** | BROWN, LYNNELLE |
| **Sent:** | Wednesday, September 12, 2012 1:49 PM |
| **To:** | BIBER, ANITA |
| **Subject:** | RE: Heads up |

It is pretty hard to predict when the lab is busiest. It just depends on when the students are coming in and we really don't always know why or when that will happen.   Sometimes this will be before a particular assignment is due for teachers that tend to encourage their students to come to the lab. Other times there will be a "rush" of students who are all coming for different reasons. Of course, with only one person working in the evenings, the evenings are especially in need of additional staff.

Thanks,

**Lynnelle Brown**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office:  WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
lynnelle.brown@tccd.edu | www.tccd.edu

Office hours: 9 a.m. to 2 p.m., Monday-Thursday

**From:** BIBER, ANITA
**Sent:** Wednesday, September 12, 2012 12:19 PM
**To:** HERRERA, CONRAD; WILLIAMS, CHRISTY
**Cc:** HUBBARD, CHRISTINE; LEVY, MARGARET; BROWN, LYNNELLE
**Subject:** RE: Heads up

Hi-

Also, could you please send me your work hours and specifically when the lab is at its busiest.  This will assist with staffing.

**Anita Biber, M.Ed.**
Department Chair and Instructor of Reading | Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office:  WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu | www.tccd.edu

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

**From:** HERRERA, CONRAD
**Sent:** Wednesday, September 12, 2012 12:12 PM

Williams Declaration
Ex. 4

TCCD 01076

| | |
|---|---|
| **From:** | BIBER, ANITA |
| **Sent:** | Friday, September 14, 2012 2:09 PM |
| **To:** | PEARSE, DAVID |
| **Subject:** | Writing Lab WCTS 1151 |

Hi, David-

Currently, we have one instructional assistant who works in the lab in the evenings.  You mentioned that you often walk the campus in the evenings, and we'd love to invite you make it a "stop".  She had a student who popped in last week  who was irritated that she couldn't be seen immediately.  (Our tutor was helping a student with an appointment.)  We were brainstorming some options, and thought one possibility is to bring awareness that the lab is staffed in the evening and how she'd love someone to occasionally check in on her- for additional safety awareness.

We just lost our second evening person, and we are waiting on a position id code to finish up the posting.

Her name is Christy Williams, and she plans to email you herself.

**Anita Biber, M.Ed.**
Department Chair and Instructor of Reading| Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office:  WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu | www.tccd.edu

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

Williams Declaration
Ex. 5

1

| From: | BIBER, ANITA |
|---|---|
| Sent: | Friday, September 14, 2012 2:13 PM |
| To: | WILLIAMS, CHRISTY; HUBBARD, CHRISTINE |
| Cc: | HERRERA, CONRAD; TOOLEY, TERI |
| Subject: | RE: 9-11-12 Incident Report |

Thank you, Christy,

We are all in agreement that the situation was handled appropriately by Christy. The student was upset with the TCC-NW procedures since she only had TCC-NE experience. In addition, the lab was short staffed.

I am still waiting on the position id code to proceed. I had hoped to have it this morning.

**Anita Biber, M.Ed.**
Department Chair and Instructor of Reading| Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office: WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu | www.tccd.edu

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

**From:** WILLIAMS, CHRISTY
**Sent:** Friday, September 14, 2012 2:08 PM
**To:** HUBBARD, CHRISTINE
**Cc:** HERRERA, CONRAD; BIBER, ANITA
**Subject:** 9-11-12 Incident Report

Christine,

I have already given Conrad and Anita a paper copy of my report. I thought you might also wish to read it, so I'm attaching it to this email.

**Christy Williams**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu | www.tccd.edu

Fall/Spring Office Hours: 11:30 a.m. to 8:30 p.m., Monday-Thursday; 8 a.m. to 5 p.m., Friday

1

TCCD 00959


Williams Declaration
App. 033
Ex. 6


Tarrant
County
College

Tarrant County College District
Earnings Notification

September 1, 2009

Ms. Christy Williams                                    REF:    301WLRMC-SS009
7808 Arnold Terrace                                     Colleague ID:  0156094
North Richland Hills TX 76180

Your employment as:

Instructional Assistant

with Tarrant County College District has been approved effective September 1, 2009
at the rate of $2,554.67 per month.

The dates of employment will be scheduled by your supervisor in accordance with
college policy.  This is an earnings notification only and is not a contract.

Annual Benefits Summary

Primary earnings amount:    $30,656
Full-time hire date:    02-23-2009

The benefit values shown in this report are based on information in your records as of
09-01-2009 and assume that all eligibility requirements for each benefit have been or
will have been met.  Statements for new employees reflect basic benefits.

Annual value of your benefits:

| Paid Benefits | Your Contribution | TCCD Contribution |
|---|---|---|
| Holidays | | 2417 |
| Vacation | | 1180 |
| Sick Leave | | 1415 |
| Health Insurance | | 4598 |
| Dental Insurance | 270 | |
| Basic Life Insurance | | 27 |
| Optional Life Insurance | 67 | |
| Dependent Life Insurance | | |
| Accidental Death & Dismemberment | 48 | |
| Disability Insurance | 303 | |
| Supplemental Health Insurance | | 355 |
| Teacher's Retirement | 1962 | 1962 |
| Social Security | 2346 | 2346 |
| Worker's Comp/Unemployment | | 21 |
| TCC Insurance Contribution | | 384 |
| Total | $4,996 | $14,705 |

The annual value of your compensation-based benefits contributed by the College District adds
an additional 48% above and beyond your primary earnings.

Total primary earnings amount                          $30,656
Total compensation-based benefits amount               $14,705

Grand total of your salary and benefits        ** $45,361 **

An Equal Opportunity Employer

P 847

Williams Declaration
App. 034
Ex. 7



Tarrant
County
College

Tarrant County College District
Earnings Notification

September 1, 2010

Ms. Christy Williams
7808 Arnold Terrace
North Richland Hills TX 76180

REF:    301WHUMN-SS021
Colleague ID:  0155094

Your employment as:

Instr Asst

with Tarrant County College District has been approved effective September 1, 2010
at the rate of $2,656.83 per month.

The dates of employment will be scheduled by your supervisor in accordance with
college policy.  This is an earnings notification only and is not a contract.

---

Annual Benefits Summary

Primary earnings amount:   $31,882
Full-time hire date:    02-23-2009

The benefit values shown in this report are based on information in your records as of
09-01-2010 and assume that all eligibility requirements for each benefit have been or
will have been met.  Statements for new employees reflect basic benefits.

Annual value of your benefits:

| Paid Benefits | Your Contribution | TCCD Contribution |
|---|---|---|
| Holidays | | 2514 |
| Vacation | | 1227 |
| Sick Leave | | 1471 |
| Health Insurance | | 4598 |
| Dental Insurance | 270 | |
| Basic Life Insurance | | 27 |
| Optional Life Insurance | 67 | |
| Dependent Life Insurance | | |
| Accidental Death & Dismemberment | 48 | |
| Disability Insurance | 303 | |
| Supplemental Health Insurance | | 355 |
| Teacher's Retirement | 2040 | 2118 |
| Social Security | 2439 | 2439 |
| Worker's Comp/Unemployment | | 22 |
| TCC Insurance Contribution | | 384 |
| Total | $5,167 | $15,155 |

The annual value of your compensation-based benefits contributed by the College District adds
an additional 48% above and beyond your primary earnings.

Total primary earnings amount              $31,882
Total compensation-based benefits amount   $15,155

Grand total of your salary and benefits    ** $47,037 **

An Equal Opportunity Employer

P 848

App. 035



Tarrant
County
College

Tarrant County College District
Earnings Notification

September 1, 2011

REF:    301WHUMN-SS121
Colleague ID:  0155094

Ms. Christy Williams
7808 Arnold Terrace
North Richland Hills TX 76180

Your employment as:

Instructional Assistant

with Tarrant County College District has been approved effective September 1, 2011
at the rate of $2,656.83 per month.

The dates of employment will be scheduled by your supervisor in accordance with
college policy.  This is an earnings notification only and is not a contract.

---

Annual Benefits Summary

Primary earnings amount:     $31,882
Full-time hire date:    02-23-2009

The benefit values shown in this report are based on information in your records as of
09-01-2011 and assume that all eligibility requirements for each benefit have been or
will have been met.  Statements for new employees reflect basic benefits.

Annual value of your benefits:

| Paid Benefits | Your Contribution | TCCD Contribution |
|---|---|---|
| Holidays | | 2514 |
| Vacation | | 1227 |
| Sick Leave | | 1471 |
| Health Insurance | | 5233 |
| Dental Insurance | 283 | |
| Basic Life Insurance | | 27 |
| Optional Life Insurance | 100 | |
| Dependent Life Insurance | | |
| Accidental Death & Dismemberment | 48 | |
| Disability Insurance | 284 | |
| Supplemental Health Insurance | | 312 |
| Teacher's Retirement | 2040 | 1913 |
| Social Security | 1801 | 2439 |
| Worker's Comp/Unemployment | | 22 |
| TCC Insurance Contribution | | 931 |
| Total | $4,556 | $15,589 |

The annual value of your compensation-based benefits contributed by the College District adds
an additional 49% above and beyond your primary earnings.

Total primary earnings amount                 $31,882
Total compensation-based benefits amount      $15,589

Grand total of your salary and benefits     ** $47,471 **

An Equal Opportunity Employer

P 850


Tarrant
County
College

Tarrant County College District
Earnings Notification

September 1, 2012

Ms. Christy Williams                                    REF:    301WHUMN-SS022
7808 Arnold Terrace                                     Colleague ID:   0155094
North Richland Hills TX 76180

Your employment as:

Instructional Associate

with Tarrant County College District has been approved effective September 1, 2012
at the rate of $2,808.25 per month.

The dates of employment will be scheduled by your supervisor in accordance with
college policy.  This is an earnings notification only and is not a contract.

---

Annual Benefits Summary

Primary earnings amount:    $33,699
Full-time hire date:    02-23-2009

The benefit values shown in this report are based on information in your records as of
09-01-2012 and assume that all eligibility requirements for each benefit have been or
will have been met.  Statements for new employees reflect basic benefits.

Annual value of your benefits:

| Paid Benefits | Your Contribution | TCCD Contribution |
|---|---|---|
| Holidays | | 2657 |
| Vacation | | 1297 |
| Sick Leave | | 1555 |
| Health Insurance | | 5818 |
| Dental Insurance | 283 | |
| Basic Life Insurance | | 27 |
| Optional Life Insurance | 56 | |
| Dependent Life Insurance | | |
| Accidental Death & Dismemberment | 48 | |
| Disability Insurance | 300 | |
| Supplemental Health Insurance | | 312 |
| Teacher's Retirement | 2157 | 2157 |
| Social Security | 1904 | 2578 |
| Worker's Comp/Unemployment | | 24 |
| TCC Insurance Contribution | | 429 |
| Total | $4,730 | $16,654 |

The annual value of your compensation-based benefits contributed by the College District adds
an additional 49% above and beyond your primary earnings.

Total primary earnings amount                    $33,699
Total compensation-based benefits amount         $16,654

Grand total of your salary and benefits      **  $50,353  **

An Equal Opportunity Employer

P 851

| | |
|---|---|
| **From:** | WILLIAMS, CHRISTY |
| **Sent:** | Monday, November 05, 2012 7:14 PM |
| **To:** | BROWN, TEENA |
| **Cc:** | HERRERA, CONRAD; BIBER, ANITA; LEVY, MARGARET |
| **Subject:** | RE: Greetings! |

You're welcome. I'm glad we were able to chat. I won't hesitate to contact you in the future if I have any questions.

Christy Williams
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu | www.tccd.edu

Fall/Spring Office Hours: 11:30 a.m. to 8:30 p.m., Monday-Thursday; 8 a.m. to 5 p.m., Friday

-----Original Message-----
From: BROWN, TEENA
Sent: Monday, November 05, 2012 1:17 PM
To: WILLIAMS, CHRISTY
Cc: HERRERA, CONRAD; BIBER, ANITA; LEVY, MARGARET
Subject: RE: Greetings!

Christy,

Thank you for accommodating my drop-in on Friday. I'm glad we had a chance for discussion, especially over the 3 students who came to you with confusion early on in the semester. It seems anyone visiting past the 2nd class meeting has needed writing assistance in general with no subsequent confusion over directions. That was a mess in the beginning. I had no idea students couldn't see the instructions, and it took me a while to realize what was going on--not one student mentioned the directions being a bunch of symbols. My instructor/student version was perfectly visible. At least now I know and can help other instructors to know that the "save as a reusable object" option shouldn't be used or students won't be able to see what's written.

It was good chatting with you. Thank you for all you do to help students.

Teena


TEENA BROWN, MEd
Instructor of Writing | Academic Foundations Department | Humanities Division Tarrant County College Northwest Campus | Office: WCTS 2312A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7739 | Fax 817-515-7157
teena.brown@tccd.edu | www.tccd.edu

Office hours:
2:45 - 4:15 p.m., Thursday (Fall 2012)

1

Williams Declaration
Ex. 8

TCCD 00755

## Monica Chandler

| | |
|---|---|
| **From:** | WILLIAMS, CHRISTY |
| **Sent:** | Tuesday, November 20, 2012 3:58 PM |
| **To:** | HUBBARD, CHRISTINE; BIBER, ANITA; HERRERA, CONRAD |
| **Subject:** | FW: Writing center feedback. |

Hello, Christine, Anita, and Conrad. I just figured out how to check my work email from home, and I saw this email, which gave me a smile. Anyway, I wanted to share it with y'all. The "feedback" the instructor is referencing is the feedback I wrote on the back of the Lab Tutoring Form.

Christy

P.S. I'm not sure if I have the proper TCC signature appearing when I access my email this way. I hope you'll overlook its absence if it's not showing when I use my work email from home.

**From:** WILLIAMSON, ANGELA
**Sent:** Thursday, November 15, 2012 3:13 PM
**To:** WILLIAMS, CHRISTY
**Subject:** Writing center feedback.

Hi Christy,
I just received the feedback you had provided (I hope you are the right Christy Williams ☺) for one of my students and I have also graded her final copy of her paper. Judy Benjamin-Tucker was so worried about this paper, and I know she planned ahead and worked hard on getting to the writing center. I think you helped to make her so much more confident in her ability to complete the paper …. And the thing is…her paper was EXCELLENT. The content was good, her writing was good, her source citations were perfect. I loved it! I absolutely cannot wait for her to get her paper back and see her grade. Thank you so much for helping her.

Angela Williamson

**Angela Williamson, Ph.D.**
Professor of Psychology
Tarrant County College Northwest Campus | Office: WTLO 4.207b
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7617
angela.williamson@tccd.edu | www.tccd.edu

TCCD 002642

Subject:    FW: Informational: Dominique Campos/Charisse Vigil, Jamie Moreno

From:    WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To:    christyaddress@yahoo.com;

Date:    Thursday, December 13, 2012 10:40 PM

From: HERRERA, CONRAD
Sent: Tuesday, October 23, 2012 10:22 AM
To: FUKUCHI, CURTIS
Cc: BIBER, ANITA; WILLIAMS, CHRISTY
Subject: RE: Informational: Dominique Campos/Charisse Vigil, Jamie Moreno

Thank you for copying me to this, Curtis. This serves as testimonial of Christy's commitment to our students at TCC. I am glad that she has helped your students to significantly improve.

Best regards,

Conrad Herrera
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office: WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu<mailto:conrad.herrera@tccd.edu> | www.tccd.edu<http://www.tccd.edu/>

Office hours: 9:00 a.m. to 11:00 a.m., Monday - Friday

From: FUKUCHI, CURTIS
Sent: Friday, October 19, 2012 10:41 AM
To: WILLIAMS, CHRISTY
Cc: HERRERA, CONRAD; BIBER, ANITA
Subject: Informational: Dominique Campos/Charisse Vigil, Jamie Moreno

Hi Christy,

I've read Dominique's literary analysis essay for 1302, and it's easily her best organized so far. I know you spent many hours over several days taking her through the entire writing process, from initial brainstorming to clustering ideas to selecting a topic to narrowing her focus to formulating a thesis, none of which are reflected in the report on the formal tutorial session, which focused on the actual completed draft. Her conclusion resembles a summary outline, so I assume she tried my suggestion of working from a rough outline to help with her earlier organization issues. I see that you helped guide her through thinking about the overall structure, and making sure that each paragraph had a clear topic sentence that related to her thesis. This paper has received her best grade so far (and

that's even without the extra credit I gave her for using the Writing Lab), and I know she appreciates all the time you put into helping her through this assignment. She's always had difficulties presenting a coherent argument, as she tends to stray from her thesis or to have only a vague one, but with this paper, I think she now sees how to maintain a clear focus and sense of purpose

You had asked about the comparison/contrast essays for 1301 by Charisse Vigil and Jamie Moreno, as you've spent a lot of time with them as well, during their prewriting as well as their actual drafts. Charisse's essay is her best by far too, as she's managed to clean up the careless errors that marred her past efforts. More importantly, she's finally made a point of using specific, concrete examples to illustrate and substantiate her generalizations. Like Dominique, she's had some difficulty maintaining a focus, but here she writes clearly and coherently throughout, and so has cleared up the structural problems of the previous papers. At times she can get a little redundant (perhaps past problems with pronoun/noun agreement have led her to avoid pronouns altogether) and imprecise in phrasing her contrasts (comparing an action with a thing, a verb with a noun, rather than actions with actions, things with things), but as a whole she's improved considerably. Her opening paragraph is still a bit vague, so I've commented on her paper that she could define or characterize the type of "lifestyles"/"activities" she means, but once she gets through that first paragraph, the essay improves significantly. It might be that it's not until she's finished the draft that she fully and clearly realizes her specific thesis; if so, she might consider going back to her beginning and revising. It's natural for a student to assume that, since the opening paragraph comes first, it must be written first, but that's not necessarily the case, and even if it is, that doesn't mean the first paragraph can't be rewritten last, when one knows where one is going and how one will get there: sometimes introductions are easier to write after one has already concluded.

As regards Jamie, he still capitalizes erratically for no apparent reason, but not nearly as much as before, and he's reduced significantly the number of run-on sentences. More importantly, he now has a thesis and uses it to unify his essay. He still has problems being specific at times, for though he generalizes as to the type of activities he means, aside from the Friday night football games, he really doesn't have concrete examples of the distracting social activities about which he generalizes. Similarly, when he characterizes college assignments as demanding and time-consuming, he neglects to mention any project in particular, or even any particular class or subject. As a whole though, he's edited and structured this essay much better than he has before, and I've noted on his paper that he's progressing well.

Thank you for working with them.

Curtis Fukuchi
Associate Professor of English
Tarrant County College Northwest Campus | Office: WTLO 4312A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7740 | Fax 817-515-7157
curtis.fukuchi@tccd.edu<https://legacy.tccd.edu/owa/UrlBlockedError.aspx> |
www.tccd.edu<https://legacy.tccd.edu/owa/UrlBlockedError.aspx>

Fall office hours: 8:30 a.m. to 11:30 a.m., 1:30 p.m. to 2:30 p.m., Monday, Wednesday |
8:00 a.m. to 9:00 a.m., Tuesday, Thursday

Subject:   FW: Writing Lab Kudos

From:      WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To:        christyaddress@yahoo.com;

Date:      Thursday, December 13, 2012 10:40 PM

---

From: HERRERA, CONRAD
Sent: Monday, October 29, 2012 10:37 AM
To: LEVY, MARGARET; SUBLETTE, CECILIA
Cc: WILLIAMS, CHRISTY
Subject: RE: Writing Lab Kudos

Keep up the great work, Margaret and Christy!  Thank you for copying me to this, Cecilia.

Conrad Herrera
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office:  WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu<mailto:conrad.herrera@tccd.edu> | www.tccd.edu<http://www.tccd.edu/>

Office hours:  9:00 a.m. to 11:00 a.m., Monday - Friday

From: LEVY, MARGARET
Sent: Monday, October 29, 2012 10:07 AM
To: SUBLETTE, CECILIA
Cc: HERRERA, CONRAD; WILLIAMS, CHRISTY
Subject: RE: Writing Lab Kudos

Cecilia,

Thanks for the kind words.  I appreciate the extra time you have spent sending the short form with
what you would like us to work on with the students.  It saves us time and speculation as to what the
most important areas of concern are in the eyes of the instructor.

We'll look forward to seeing more of your students as the semester winds down.

Thanks,

Margaret Levy
Instructional Associate | Northwest Writing Lab
Tarrant County College Northwest Campus | Office:  WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX  76179
817-515-7147

margaret.levy@tccd.edu<mailto:margaret.levy@tccd.edu> | www.tccd.edu<http://www.tccd.edu/>

Fall & Spring Office hours:  8:00 a.m. to 5:00 p.m., Monday - Friday

From: SUBLETTE, CECILIA
Sent: Monday, October 29, 2012 9:57 AM
To: LEVY, MARGARET; WILLIAMS, CHRISTY
Cc: HERRERA, CONRAD
Subject: Writing Lab Kudos

Hello Margaret and Christy.

I wanted to take a moment to thank you for all the hard work you have been doing with the English 1301 students, this semester - my students, in particular. These past few weeks,  have heard such positive feedback from the students I have sent to the Writing Lab for help with their short arguments or essays. And, the improvement sure shows in their final drafts. These students are really learning to become better writers; I could not be more pleased. If there is anything I can do to help you in your service, please let me know. I so appreciate what you are doing with our students.

Sincerely,
Cecilia

Cecilia J. Solis-Sublette
Assistant Professor of English
Tarrant County College Northwest Campus | Office:  WTLO 4317
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7715 | Fax 817-515-7715
cecilia.sublette@tccd.edu<mailto:cecilia.sublette@tccd.edu> | www.tccd.edu<http://www.tccd.edu>

Office Hours for Fall 2012: MW 8:30 - 10:30am; 2:00 - 2:45pm. TUTH 8:30 - 9:30am; 2:00 - 2:45pm. F 11:00am - 12:00 noon.

Subject:  FW: A little something for you.

From:     WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To:       christyaddress@yahoo.com;

Date:     Thursday, December 13, 2012 4:45 PM

From: Curtis Fukuchi [curtis.fukuchi@my.tccd.edu]
Sent: Thursday, November 29, 2012 6:10 AM
To: WILLIAMS, CHRISTY
Subject: Fwd: A little something for you.

Hi Christy,

Alisha sent this, and I thought you might appreciate it. By the way, her last essay was very good, and
she did it on her own. She'd asked for an extension, but I refused (my policy on last papers for
courses, since I have my deadline for turning in grades, and TCC won't give me an extension), and
she never did send me her draft or use the Writing Lab, since she had no time. She analyzed the ad
extremely well, so both she and Dominique wrote well on their own for their most recent papers, and
you can be proud of your work with them.

---------- Forwarded message ----------
From: Curtis Fukuchi <curtis.fukuchi@my.tccd.edu<mailto:curtis.fukuchi@my.tccd.edu>>
Date: Thu, Nov 29, 2012 at 5:46 AM
Subject: Re: A little something for you.
To: Alisha Villanueva <alisha.villanueva@my.tccd.edu<mailto:alisha.villanueva@my.tccd.edu>>

Hi Alisha,

Thank you for the story and kind words. I had a good laugh and, as they say, it made my day.

Thanks,

Curtis Fukuchi

On Wed, Nov 28, 2012 at 10:32 PM, Alisha Villanueva
<alisha.villanueva@my.tccd.edu<mailto:alisha.villanueva@my.tccd.edu>> wrote:

Dr. Fukuchi,

I have been wanting to make this cliché thank you letter/story for you. I decided I would do this when
you commented about not using clichés in my papers. I hope you have a good laugh. In all seriousness
though, I truly appreciate you!

Beating the Dead Horse.

It was a dark and stormy night and I was at the end of my rope. As luck would have it my child-care fell through and I was going to quit my classes at the drop of a hat. However, the thought of quitting had me chewing nails and spitting tacks. Thinking of failing made it near impossible for me to catch some ZZZ's. So before quitting, I called someone near and dear to my heart.

I was on pins and needles while I bent the ear of my trustee tutor. As I gave her the run down, my emotions were an open book. In a round about way, she told me not to throw in the towel, there was still hope and she wouldn't let me fall through the cracks. It seemed she would give her right arm to keep me in the game. She passed me over to my favorite professor who at the moment, handled me with kid gloves. More or less he told me to hang in there and to keep on trucking. Implying that where there's a will, there's a way and that he had it covered.

The end of the semester was just around the bend and thank goodness my professor allowed me to use the World Wide Web to finish the job. I was one of the lucky ones'. Instead of letting me fall off the edge, my professor and tutor picked me up by the boot straps and helped me to keep on keeping on when I was down in the dumps. So, here's a big shout out to Dr. Fukuchi and Christy Williams, all paled in comparison to your kindness this semester. Thanks a million!!! You have made me one happy camper!

Sincerely,

Alisha Villanueva

P.S. Hope this wasn't too much of a cliché :)

--
Curtis Fukuchi
Associate Professor of English
Tarrant County College Northwest Campus | Office: WTLO 4312A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7740<tel:817-515-7740> | Fax 817-515-7157<tel:817-515-7157>
curtis.fukuchi@my.tccd.edu<mailto:curtis.fukuchi@my.tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>

Fall office hours:  8:30 a.m. to 11:30 a.m., 1:30 p.m. to 2:30 p.m.,
Monday, Wednesday |
8:00 a.m. to 9:00 a.m., Tuesday, Thursday

| | |
|---|---|
| **From:** | HERRERA, CONRAD |
| **Sent:** | Monday, November 19, 2012 1:47 PM |
| **To:** | WILLIAMS, CHRISTY; christyaddress@yahoo.com |
| **Subject:** | FW: TutorTrac Comments |
| **Attachments:** | Christy.xlsx |

Christy,

Here are TutorTrac student comments from fall 2011, spring 2012, and fall 2012.  Let me know if you have any questions.

**Conrad Herrera**
STSC Instructor and Coordinator | Writing Lab Manager | Academic Foundations Department
Tarrant County College Northwest Campus | Office:  WCTS 1206A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7697 | Fax 817-515-7157
conrad.herrera@tccd.edu | www.tccd.edu

Office hours:  9:00 a.m. to 11:00 a.m., Monday - Friday

Williams Declaration
Ex. 9

1

TCCD 00670

Fall 2011 TutorTrac Student Remarks
Tutor: Christy Williams

:)

Amazing could not have asked for better help. THank You

Appreciate your time and sharing your knowledge and skills.

assistance with class exercise 5 things I carry.

awesome

Awesome! Very helpful

awesomest tutor ever

Bestest tudor in the whole wide world!!! :)

big help. thanks

Christy has been a great help. Thank you!

Christy is a very patient person and helper

Christy is always wonderful. I am totally satisfied.

Christy is GREAT! VERY HELPFUL!

christy is very kind a wonderful helper

CHRISTY WAS EXTREMLY HELPFUL!! I FEEL SO MUCH BETTER ABOUT SENTENCE STRUCTURE.
SHE WAS VERY PATIENT WITH TEACHING ME.

Christy was very helpful and vrey nice

excellent tutorial

finishing upo paper with Christy's help

good

good

good helper

good helper

good helpers christy and margaret very good

Great help

Great help! very informative :)

great. very helpful

have to make apointment will be back.

help with essay

Helped emphasize the basics that needed to be addressed

helped from Christy

Helped me a lot with my essay

Helped with minor editing, and citing.

I actually understand what I was helped with. I was wqorried about not being taught, or just
having thee answer handed to me with out some one explaing it. I also love the cheat sheets
they have printed for us. I can be able to found more answer on my.

I am getting on the right track. I will get there.

i arived at 8:45 but forgot to log in

i forgot to loggin had tutioring for 20mins.

I had a question about how to put the literary terms in my own words and on how to construct
part of the short response and Mrs. Williams helped me out and I really appreciate it because
now I understand what I need to do.

i highly appriciate all her help, she helped me so much place all my thoughts together, i
couldnot do my papers with out her.

i like miss williams.she is nice

i love this place :) yall are the best!@

I really appreciate the amount of time that Christy spent reviewing my paper and her constructive critisim. I was able to learn so much from her in the first few minutes. I do not have access to a writing lab on the South Campus. I was told that it was under construction/still forming.

I really like Mrs. Williams help

i will be back at 3pm

Ill see you Monday Christy, Thank you

I'm glad I came Thanks

I'm good, thanks.

It was my first visit. Christy was very helpful.

It was, as usual, a highly productive and delightful experience tohave worked with Christy. Very insightful.

log out

Lots of help !

Lots of help thank you!

love Christy and Margaret they are both so very helpful !

Ms Williams was beond helpfull. Not only did she say what I did wrong and could work on, but gave reasons and explaination. On top of that she had me criticaly think about certain aspects of the paper. I will definitely come back for my next paper.

ms. Williams hep me a lot with my homework she is kind and wood helper

Ms. Williams was so helpful! it was a very productive and delightful experience.

nice tutor helped me to find the write essay to work on :)

no help at all

satisfied

see you tommorow at 12

she help me with my essay review

She is so helpful does not just sit in her desk and ignores people. Very approachable. She is the best out of the three.

She is super amazing. I got all the help i needed.

She is very awesome. She helped me understand many things about my essay. she is great to work with and i am looking forth to working with her on my next essay :)

She was a great tutor.

She was awesome and very helpul!

She was AWESOME!!! VERY helpful!

She was helpful as uasually.

sone.

Thank you for the help.

Thank You She was very Helpful!!!!

Thank you so much Christyfor your willingness to help me and sit down and go over the essay writing process with me it's much appreciated I WILL BE BACK!!!

Thank you so much! :)

Thank you sooo much! Happy Thanksgiving!

Thank You!

Thank you!

Thank you!

thank you!

Fall 2011 TutorTrac Student Remarks
Tutor: Christy Williams

Thank you!

Thank you! I learn something new everytime I come to visit.

thanks

Thanks for all the help. Everything thing you suggested was very inforative and useful.

thanks for your help..

Thanks so much for all your help and advice

the wonderful and patience lady

they both are very helpful each time i have visited.

This was my first visit and it was very helpful!

thnaks to Ms. Williams for all help and patient

Truly a great help. Thank you so much!

very friendly staff...

Very good visit with Christy. She explained my rough draft very well. and i feel i got a lot out of

the meeting... thank you

very helpefully

very helpful

very helpful

very helpful! :)

Very helpful! Thank you.

Very Helpful, Thank you

Very helpful. Answered all of my questions in an easy to understand way. Thank you!

very helpfull

very patient

very satisfied

What's the Acting 1 heading?

wonderful helpers

Wonderful tutor

wonderful!

working on artifact journal #6

yes and it was a good experience.

Spring 2012 TutorTrac Student Remarks
Tutor: Christy Williams

awesome lasdy great help

Awesome!

Both Christy and Margaret helped a lot

Christy and Crystal really helped alot, thank you!

Christy Williams

chrisy is the only worker in here with a friendly disposition

excellent

Excellent Help!

excellent helpo

Excellent job

good

great

great

great help

Great help very friendly

GREAT HELP! She took time (more then I thought I needed) to assist. I feel very comfortable now to turn in my assignment. :)

great help!!!

great thank you

great work

great:)

He wanted to know the name of a play he could write about for his English Comp. II class. I suggested he look in his textbook, which includes several plays, and he said he would. He also said that he didn't realize his textbook had any plays in it.

helpful

I am grateful for Ms. Williams's assistance. She was very professional and thorough. Thank you so much.

I have had t4he best time and have learned a lot

I was an absolute pleasure to have been helped ny Christy. I would reccomend to anyone to come to the Writing lab to be helped witth their essay. thank you guys.

I'm very thankful for all her great help

It was very helpful. I appreciate it. Thanks

made appt.

Ms. Williams is great help love her tutoring.

thank you

Thank you for all the help.

Thank you very much. You were amazing.

thanks

thanks

Thanks!

The help was great

This tutor writing class is super helpfull.

Very helpful

Very helpful as always! Dr. Fukuchi also was very helpful!

Very helpful, thank you

Very helpful.

Very helpful. Thanks!

Spring 2012 TutorTrac Student Remarks
Tutor: Christy Williams

Will alway come for help.

great help
Made apt for Wed 7:00pm
Christy is GREAT!
Christy is still GREAT!
Christy is AWESOME!
The experience here is always great. This is a great tool and everyone should utilize it.
Cristie is awesome!
AWESOME!
Good day today!
AWESOME!
AWESOME!!!
great help. thanks!
Mrs. Williams was very helpful, and explained how to use comas and semicolons!
thanks, christy for your advice.
I think this will be very beneficial for my paper. This is my first visit to the writing center.
thanks for the help!
always great help given
Always very helpful and enjoyable to work with. I have learned alot by coming here. Thanks! so
much, God Bless
thank you Ms. Williams i will be back, your great!
your awesome Mrs. Williams
your awesome mras. williams thanks
she was very helpful and i learned alot in my session with her
Thank you
Great help.
A tremendous help. It would have been more difficult without her.
Great Help. I will be back.
Very helpful
She is always helpful when I attend the writing lab
great service
I have gotten all the help I needed.
I recieved great help and tips to help me write my essay :)
Painstaking hours spent here will be remembered in my future.
sooooo happy!
Finally done :)
good stuff
thanks!!!
Thank you for your help once again
Thank you for your help
The staff was very helpful,in showing me computer variables.
Thank you very much for your help with my short argument assignment.
Thank you very much.
Thank you so mutch ma'am i really needed it!
pleased with the assistance on my writing
great help!
very helpful
thanks

Fall 2012 TutorTrac Student Remarks
Tutor: Christy Williams

great help

wow, what a writing lab

Ms Williams rocks!!

Very helpful :)

very helpful!!! thank you

I learned so much an mrs williams was such a big help an very thoughtful to give such great advice an I will be back to learn more.

Iam learning,, thank you.

my paper looks good thx for all the help.

Iam learning.

doing short ideas

i will bew back

I love coming in here everyone is sooo helpful and friendly

I love working with Christy. She is so frienly and helpful.

ms.Christy is always such a great help. I love having her and know that she will help always

When enter the writing center i notice a lady being mean and rude to Ms. Chisty Williams

Ms.Williams was being nice to the lady. If any question please let me know. Sharon Walker

Christy was extremely helpful in providing excellent comments to my writing. She is amazing! I look forward to working with her again.

I really appreciate Christy's help. She is very personable and resourceful. Please keep up the good work.

very satisfied and feel very confident about my paper

loving it

wonderful help

thanks for your help.

| | |
|---|---|
| **From:** | WILLIAMS, CHRISTY |
| **Sent:** | Thursday, October 25, 2012 8:47 PM |
| **To:** | BIBER, ANITA; HUBBARD, CHRISTINE |
| **Subject:** | Continuing Concerns |

Christine and Anita,

In the interest of continuing communication, I'm writing this email to you. Also, Christine once told me that unless she hears otherwise, she will assume everything is being handled.

As you know, the Writing Lab has been short-staffed for a very long time, and Anita has been working diligently to resolve this issue. However, in the interim, I'm still here alone at night and frequently overwhelmed by needy students. Recently, some students, who I wasn't able to assist quickly enough, resorted to asking other students for help. Part of me is pleased that the Writing Lab offers a collaborative atmosphere. But a bigger part of me is troubled that we don't have enough staff to properly assist students. Thus, not only are the circumstances in the evening taking a toll on me—physically, mentally, and emotionally—but I don't feel we're adequately serving our clients/students.

I mentioned my continued and increasing concerns at the Academic Foundations meeting on 10-11-12, and at that time, Conrad said he would adjust his hours so that he could help in the Writing Lab beginning at 5 p.m. daily. However, Conrad has not yet fulfilled that commitment. As a matter of fact, of all the occasions where Conrad has said he will help in the Lab, he's only followed through twice, and one of those times, he left halfway through the time he said he would be in the Lab. In contrast, the Math Lab (across the hall) has been short-staffed, and its supervisor has stayed late to make up for the shortage, even though he has a wife, children, and is going to law school.

I don't see how I can be expected to work under these long-term, difficult circumstances. I'm often unable to take my break or to go to the bathroom in a timely fashion. When the Lab has many students, it's challenging to get away to go to the bathroom, but it's even more challenging to take a break because it is impolite and perhaps inappropriate to leave students in the Lab with no staff present.

More than one student has recently told me, "I don't know how you do it" to refer to the amount of students I'm jumping between (which involves rapid shifting between assignments, instructors, and different student needs/weaknesses). And as you know, students who visit the Writing Lab typically need a significant amount of assistance. I'm beginning to wonder if these unpleasant circumstances are designed to drive me out of my job. I certainly hope not because I enjoy the kind of work I do, and I know I'm helping students improve their writing.

One possible interim solution is to have a different person from Academic Foundations work one night a week with me. That way, 4 people would each work one night a week (until sufficiently staffed) for 3.5 hours. However, at this point, I would be happy with any amount of assistance. I should mention that David Pearse was able to visit the Lab for about 15 minutes last night (in response to my call for assistance), but his time was limited because he was doing evaluations.

Another possible solution is to close the Lab at 5 p.m. until sufficient staffing is available for the evening.

I have some other concerns, but the issues here are the most urgent.

**Christy Williams**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179

1

Williams Declaration
App. 054   10

TCCD 00792

1 of 2

11-19-12

Dr. Indukuri,

Following is some information that I thought could be relevant to you.

The increased workload and related short staffing at my job has been most prevalent and problematic for me since Fall 2011. For the past 3 months, when I have been overwhelmed at work by student demands and without any available support staff, I have had heavy sweating, shaking hands, pounding heart, headaches, and aching body pains (particularly in my neck, shoulders, and back), nausea, and dizziness.

For the past week, since breaking down in tears at work, I have had the following symptoms: loss of appetite, difficulty sleeping, intense body aches, extreme difficulty thinking clearly, confusion, forgetfulness, fear, and difficulty functioning, and extreme fatigue. For example, I had 3 appointments scheduled for today, but I'm already worn out after 1 appointment. I will go to the 2nd appointment, but I need

Williams Declaration
Ex. 11
App. 055

TCCD 00257

to reschedule the 3rd appointment.

Also, my symptom list is likely not
inclusive of all my symptoms
since I'm having trouble thinking
clearly and remembering...

You might want to know that after
I was assaulted in February, 2012, I
was examined by Dr. Coulter-Smith,
and she documented my injuries.

You may need a list of my current
medications, so they are:
Cymbalta  60 mg x 2/day
Nadolol  20 mg x 2/day
Nortriptyline  20 mg/day
Strattera  40 mg/day
Indocin SR  75 mg/day
Synthroid  .125 mg/day
Prevacid  30 mg/day
Baclofen  15 mg/day
Valtrex  500 mg/day
Oracea  40 mg/day
Valium  5 mg (as needed)

TCCD 00258

11/21/2012  12:35   8172229909          P RAJU INDUKURI,M.D.                    PAGE  89

**Dearborn ★ National**

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

Toll Free: (855) 377-5433
Fax #    (972) 996-9361

**Employee's Preliminary Statement of Disability**  *Please print or type*

Full Name Christy Leigh Williams Social Security #_____  Group # 38000

Address 7808 Arnold Terrace City N. Richland Hills State TX Zip 76180

Home Phone ( 817 ) 707-1223 Date of birth 7-27-65 Height 5'6" Weight 149 lbs Sex ☐ M ☒ F

Marital Status: ☐ Single  ☐ Married ☒ Divorced ☐ Widowed

Spouse's date of birth ___N/A___ Is spouse employed? ☐ Y ☐ N Number of children (under the age of 18) _____

Name and date of birth of each unmarried child under age 18 _____

Describe the symptoms of your disability depression, anxiety, PTSD, and difficulty
coping with stress

Is your disability related to a work injury? ☐ Y ☒ N If yes, please give details_____

Date you first noticed symptoms of illness or date of accident 1993 Date first treated for these symptoms 1994

Treated by Doctor: Dr. Indukuri Address 2707 Airport Frwy. Ste. 206  Ft. Worth, TX 76111 Phone 817-222-9907

Hospital _____ Address _____ City _____

I have been unable to work because of this illness or injury since 11-13-2012

If disability is due to an accident, please provide details and attach accident report _____

I returned to work part-time on _____ I returned to work full-time on _____ I am self employed ☐ Y ☒ N

Name of Health Care Insurance United Healthcare Health Select Group Plan/Policy # 38000 744260

ID # 009346180                Coverage is through ☒ My Employer ☐ Spouse's Employer

Are you now eligible for, have you applied for, or are you now receiving income benefits from:
If eligible for any of the following income benefits, please provide a copy of the reward letter.
Social Security: ☐Disability  Retirement  Amount awarded $_____  Date of award _____
☐Workers' Compensation   Amount awarded $_____ Date of award _____ Carrier _____
(If Workers' Compensation please submit a copy of denial letter with this form)
☐Disability Retirement  Amount awarded $_____ Date of award _____ Source _____
☐Any other disability (Federal, State, VA, etc.)  Amount awarded $_____ Date of award _____
Have you ever had the same or similar condition? ☐ Y ☒ N
If so, when? _____ Treated by _____

List all Practitioners you have seen for the past 2 years:
• Name Dr. Childers Address 8th Ave. Ft. Worth, TX Telephone 817-336-7191
  From 11-22-11 To present Diagnosis/Condition Treated general health
• Name Dr. Coulter-Smith Address 1625 Lancaster Dr. Telephone 817-916-2207
  From 2007 To present Diagnosis/Condition Treated gynecological
• Name Dr. Molenich Address 8th Ave. Ft. Worth, TX Telephone 817-930-0900
  From 2011 to present Diagnosis/Condition Treated migraines

Continued on attached

Are you employed elsewhere? ☐ Y ☒ N   ☐ Full time ☐ Part time
If yes to above question please give:  Name of 2nd Employer _____
Address _____ City _____ St _____ Zip _____
Name of person completing this form if other than the employee _____

The above statements are true and complete to the best of my knowledge and belief.

Employee's signature  (required to process the claim)    11-19-12
                                                          Date

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company®
(Downers Grove, IL) in all states (excluding New York), the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 2 of 4                                R11.01/11   X8129ERS

281

**dearborn ✦ national®**

Toll Free: (855) 377-5433
Fax #    (972) 996-9361

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

## Attending Practitioner's Statement   *Please print or type*

*All information must be legibly completed in full to avoid a delay or possible denial of your patient's claim.*

Patient's name _Christy Williams_   Patient's Date of Birth _7.27.85_
Date first seen _2.22.0_   Date last seen _11.19.12_   frequency of visits ☑ PRN ☐ weekly ☐ monthly ☐ less often
Patient impaired from tasks of his/her usual occupation from _____ to _____
Diagnosis _Major depression disorder_    ICD9CM code _298.23_
Co-morbid conditions _____
If diagnosis is pregnancy: LMP _____ Estimated delivery date _____ Is patient confined to bedrest? ☐ Y ☐ N
If delivered, date _____   Type of delivery: ☐ Normal ☐ C-section
Subjective symptoms _social depression, anxiety, sadness, disordered concentration_

Objective medical findings, include results of all diagnostic testing _described mood and affect suicidal ideation_

Objective evidence of impairment _not able to eat and sleep well, concentration not well_

Please list restrictions _all whl_

Please describe how the patient's impairment prevents him/her from performing their regular employment _not able to years of work, depressed mood_
Is disability at patient's request? ☐ Y ☐ N   Is condition work related? ☐ Y ☐ N
Plan of Treatment _medication management, counseling_
Medications _Cymbalta 60 mg π qd, Valium 1 mg qhs_
Does the patient's condition permit the safe operation of a vehicle? ☑ Y ☐ N   ☐ Patient has been instructed not to drive
Is the patient Ambulatory? ☑ Y ☐ N   ☐ Only with assistance   Confined to? ☐ Bed ☐ House ☐ Hospital
List names and phone number of other treating or consulting Practitioners _N/A_

List the date and facility of any hospital admission in the past 12 months including dates, type of surgery, condition, etc. _N/A_

How does the patient's impairment prevent alternative/other employment _yes_

Was the patient unable to work when he/she ceased work? ☑ Y ☐ N
Disability applies to: Only the patient's own job ☐ Y ☑ N;  all other types of work, including sedentary work? ☑ Y ☐ N
Date patient is expected to be able to return to his/her usual work _1.19.12_  Other work _____

I attest the above statements are true and complete to the best of my knowledge
_RAJU INDUKURI, M.D._  _MD Psychiatry_  _(817) 222 9907_
Name (Attending Practitioner)      Degree & Specialty              Telephone
_2707 AIRPORT FRWY 206_
_FT. WORTH, TX 76111_
Street Address                      City or Town           State       ZIP

_Raju Indukuri MD_                                          _11.19.12_
Attending Practitioner's Signature                           Date

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company®
(Downers Grove, IL) in all states (excluding New York), the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 3 of 4                                                              R11.01/11  I  X8126ERS

dearborn ⭐ National'

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

Toll Free: (855) 377-5433
Fax #    (972) 996-9361

## Fort Dearborn Life Insurance Company®
## Claimant Authorization

I, the undersigned claimant, have read and agree that the above statements and answers are furnished in support of my claim for benefits and are complete, true, and correctly recorded to the best of my knowledge and belief. I understand that incorrect or untrue answers on this form may result in denial of this claim and may be cause for expulsion from the Texas Employees Group Benefits Program.

I understand and agree that:

- This authorization is voluntary but that my signature is required in order for Fort Dearborn Life Insurance Company (the "Company") to evaluate my claim for benefits;
- If I refuse to sign this authorization, the Company has the right to deny my claim, or that of my dependents, if applicable;
- I may revoke this authorization at any time in writing but that such a revocation will have no effect on any actions taken by the Company prior to receipt of the revocation;
- Information disclosed pursuant to this authorization may be redisclosed by the recipient and may no longer be subject to the protections of the HIPAA Privacy Rule;
- I should retain a duplicate copy of this authorization for my own records;
- A photocopy or facsimile of this authorization shall be as valid as the original;
- This authorization shall expire the later of 24 months from the date signed or at the end of any appeal process concerning my claim.

I, as well as any person authorized to act on my behalf or my personal representative, acknowledge the right, upon request, to obtain a true copy of this authorization from the Company.

I authorize my employer, the Employees Retirement System of Texas ("ERS"), and any medical professional, hospital, medical facility, medical provider, pharmacy, government agency, insurance carrier, HMO, MCO, or any Covered Entity or Health Plan as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) to disclose to the Company's claims department or its authorized representative(s) any information relating to me concerning advice, care, or treatment, including any claims processed by Blue Cross Blue Shield of Texas, for any health condition, including but not limited to drug or alcohol use or abuse, mental illness, HIV (AIDS Virus), or other sexually transmitted diseases.

I authorize my employer, ERS, any government agency, or insurance carrier to disclose any information related to my employment or retirement and all other information necessary to process my claim.

Employee/Insured's Name  _Christy Williams_
(Print or Type)

Signature  _[signature]_     Date  _11-19-12_

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company® (Downers Grove, IL) in all states (excluding New York, the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 4 of 4                                                      R11.01/11  |  X6120

# MCNT
## Medical Clinic of North Texas

Elizabeth L Price PA
909 9th Avenue, Fort Worth, TX 761043903
817-336-7191   Fax: 817-332-3172

Christy  Williams  (07/27/1965)
7808 Arnold Terrace
North Richland Hills, TX 76180

EMR Acct #: 1144843
Sex: Female
Phone: (817) 707-1223

Ordered: 11/19/2012  Specimen: 11/19/2012
Order #: NGP2293507
Lab: MCNT Lab

*Note: Minor variations in lab results may cause the test to be "Out of Range", yet not be clinically significant.

| | Normal | Out of Range | Units | Reference Range |
|---|---|---|---|---|
| **CBC w/ Auto Diff** | | | | |
| White Blood Cells | 10.34 | | K/uL | 3.90-11.30 |
| NE% | 62.4 | | % | 38.0-80.0 |
| LY% | 27.2 | | % | 15.0-49.0 |
| MO% | 7.3 | | % | 0.0-13.0 |
| EO% | 2.4 | | % | 0.0-8.0 |
| BA% | 0.4 | | % | 0.0-2.0 |
| Red Blood Cells | 4.45 | | M/uL | 3.90-5.10 |
| Hemoglobin | 13.4 | | g/dL | 11.5-15.5 |
| Hematocrit | 38.7 | | % | 34.0-46.5 |
| MCV | 87.0 | | fL | 80.0-102.0 |
| MCH | 30.1 | | pg | 27.0-34.0 |
| MCHC | 34.6 | | g/dL | 32.0-36.0 |
| RDW | 13.3 | | % | 10.0-15.0 |
| Platelets | 316 | | K/uL | 150-450 |
| MPV | 10.1 | | fL | 7.5-11.5 |
| **Comprehensive Metabolic** | | | | |
| Glucose | 83 | | mg/dl | 65-99 |
| BUN | 11 | | mg/dl | 7-25 |
| Creatinine | 0.6 | | mg/dL | 0.6-1.5 |
| Glom Filt Rate, Est | >59 | | mL/min/1.73 m | 60-128 |
| If African-American | >59 | | mL/min/1.73 m | 60-128 |
| Sodium | 140 | | mmol/L | 135-152 |
| Potassium | 4.1 | | mmol/L | 3.5-5.5 |
| Chloride | 106 | | mmol/L | 95-109 |
| Carbon Dioxide | 26 | | mmol/L | 20-32 |
| Calcium | 9.6 | | mg/dl | 8.3-10.7 |
| Total Protein | 6.4 | | g/dl | 6.0-8.5 |
| Albumin | 3.9 | | g/dl | 3.5-5.5 |
| Total Bilirubin | 0.3 | | mg/dl | 0.0-1.5 |
| Alkaline Phosphatase, S | 62 | | U/L | 10-130 |
| AST/SGOT | 14 | | U/L | 5-34 |
| ALT/SGPT | 11 | | U/L | 5-41 |
| **Free T4** | | | | |
| Free T4 | 1.50 | | ng/dL | 0.85-1.72 |
| **TSH** | | | | |
| TSH | | 0.34 (L) | uIU/mL | 0.35-5.50 |

App. 060

Williams Declaration
Ex. 13

AH

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

**U.S. Department of Labor**
Wage and Hour Division



U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

## SECTION I: For Completion by the EMPLOYER

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: Tarrant County College District, Human Resources, 1500 Houston St, Fort Worth, TX

Employee's job title: Instructional ~~Associate~~ *Assistant*   Regular work schedule: Monday- Thursday 11:30 a.m.-8:30 p.m. Friday 8:00 a.m.-5:00 p.m.

Employee's essential job functions: _____

Check if job description is attached: ___✓___

## SECTION II: For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: *Christy      Leigh      Williams*
First               Middle                Last

## SECTION III: For Completion by the HEALTH CARE PROVIDER

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: _____   RAJU INDUKURI, M.D.
                                                          2707  AIRPORT FRWY
Type of practice / Medical specialty: _*Psychiatry*____   SUITE 206
                                                          FT. WORTH, TX 76111
Telephone: (*817*) *222 9907*   Fax:( *817*)  *222 9909*

Williams Declaration
App. 061                    Ex. 14

477

PART A: MEDICAL FACTS

1. Approximate date condition commenced: _____ 2.10.12

    Probable duration of condition: _____ not known at this time

    **Mark below as applicable:**
    Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
    ✓ No ___ Yes. If so, dates of admission:

    _____ as needed from 2.10.12 _____ last appt

    Date(s) you treated the patient for condition: _____ 11.19.12

    Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

    Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

    Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
    ✓ No ___ Yes. If so, state the nature of such treatments and expected duration of treatment:

    _____

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

    Is the employee unable to perform any of his/her job functions due to the condition: ____ No ✓ Yes.

    If so, identify the job functions the employee is unable to perform:

    _____ all Job functions

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

    Severe depression and anxiety
    decreased concentration
    difficulty eating, sleeping

App. 062

478

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?  ___No  _✓_Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 11.19.12 to 12.18.12

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition?  ___No  _✓_Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___No  _✓_Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   _Weekly appt will differ_

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ____No ____Yes.      N/A

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ____ No ____Yes.  If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency          : _____ times per _____ week(s) _____ month(s)

          Duration: _____ hours or ____ day(s) per episode

ADDITIONAL INFORMATION:  IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER:

_Pt is in treatment with_
_medication and counseling for_
_major depressive disorder_

App. 063

479

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| Signature of Health Care Provider | Date  11, 21, 12 |

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

Form WH-380-E  Revised  January 2009

App. 064

480

| From: | WILLIAMS, CHRISTY |
|---|---|
| To: | HERRERA, CONRAD; BIBER, ANITA; HUBBARD, CHRISTINE |
| Subject: | Update on my condition |
| Date: | Thursday, December 13, 2012 11:34:37 AM |

Hello, Conrad, Anita, and Christine.

After many medical tests, doctors have discovered a relevant biological imbalance in my body. This imbalance is being treated with medication. I will need more tests to determine if the medicine has resolved the imbalance. However, I feel much better, and for that I am VERY thankful. I will meet with one of my doctors in the morning of January 2, 2013, at which time he will hopefully approve my return to work. And if he approves my return, I should be at work by noon on January 2, 2013.

I appreciate your support and concern during this time.

Happy Holidays to you all!

**Christy Williams**
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu | www.tccd.edu

Williams Declaration
Ex. 15

App. 065

289

Subject:  FW: Meeting

From:     WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To:       christyaddress@yahoo.com;

Date:     Friday, December 14, 2012 6:30 PM

From: WILLIAMS, CHRISTY
Sent: Friday, December 14, 2012 4:29 PM
To: MARSHALL, SHARION
Subject: RE: Meeting

Thank you. And in regard to my other question, who will be in attendance?

Christy Williams
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu<mailto:christy.williams@tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>

From: MARSHALL, SHARION
Sent: Friday, December 14, 2012 4:07 PM
To: WILLIAMS, CHRISTY
Subject: RE: Meeting

1500 Houston, Fort Worth,76012, May Owens Building, HR, 2nd floor.  You may park in the fenced
parking lot on Throckmorton at 14th Street.

Sharion Marshall, MBA
EEO Employee Relations Representative
Office of Human Resources
Tarrant County College District| Office: MOC 2107B
1500 Houston | Fort Worth, TX 76102
817-515-5275| Fax 817-515-5350
sharion.marshall@tccd.edu<mailto:sharion.marshall@tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>

From: WILLIAMS, CHRISTY
Sent: Friday, December 14, 2012 3:41 PM
To: MARSHALL, SHARION
Subject: RE: Meeting

**Williams Declaration**
**Ex. 15-A**

Yes, I will be available at 3 p.m. on 1-2-13. Please tell me where the meeting will take place. Also, who will be in attendance?

Christy Williams
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147
christy.williams@tccd.edu<mailto:christy.williams@tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>

_____

From: MARSHALL, SHARION
Sent: Friday, December 14, 2012 2:15 PM
To: WILLIAMS, CHRISTY
Subject: RE: Meeting
Hello Ms. Williams,
Please confirm if you will be available on January 2, 2013, 3:00 p.m.

Sharion Marshall, MBA
EEO Employee Relations Representative
Office of Human Resources
Tarrant County College District| Office: MOC 2107B
1500 Houston | Fort Worth, TX 76102
817-515-5275| Fax 817-515-5350
sharion.marshall@tccd.edu<mailto:sharion.marshall@tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>

From: WILLIAMS, CHRISTY
Sent: Friday, December 14, 2012 12:09 PM
To: MARSHALL, SHARION
Subject: Meeting

Hello, Ms. Marshall. I would like to schedule the meeting with you and Dr. Coronado. My doctor will probably be approving me to return to work on January 2, 2013. Therefore, we could meet that afternoon (since my doctor appointment is at 10:30 a.m. that morning). Please let me know what time would work.

Thank you.

Christy Williams
Instructional Assistant | Writing Lab
Tarrant County College Northwest Campus | Office: WCTS 1151
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7147

christy.williams@tccd.edu<mailto:christy.williams@tccd.edu> |
www.tccd.edu<http://www.tccd.edu/>



**Tarrant County College**

**Certification of Fitness for Duty**

OFFICE OF HUMAN RESOURCES    1500 Houston Street ▪ Fort Worth, Texas ▪ 76102-6524 ▪ (817) 515-5100

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

| EMPLOYEE INFORMATION: For completion by the Employer | |
|---|---|
| Employee: Christy Williams | Colleage ID: 155094 |
| Employee's job title: Instructional Asst. | Department: Humanities NW Campus |

NOTE: This employee has been referred to you for an evaluation and confirmation of fitness for duty. The employee will not be permitted to return to work until this completed evaluation form is received by Tarrant County College District.

| PROVIDER INFORMATION: For completion by the Healthcare Provider | |
|---|---|
| Provider name: RAJU INDUKURI, M.D. | |
| Degree: 2707 AIRPORT FRWY SUITE 206 | Practice/medical specialty: psychiatry |
| Date Licensed: FT. WORTH, TX 76111 | State of Licensure: Texas |
| Address: | Phone: 817.222.0907 |

1.    Date condition began: 11.13.12

2(a)    Please indicate the following:
- ☑ I have reviewed this employee's job duties (see attached)
- ☑ The employee is able to work a full, regularly scheduled day with no restrictions beginning 1.3.13 (date)
- ☐ The employee is unable to return for any work until _____ (date)
- ☐ The employee is able to return to work on a reduced schedule for _____ hours per day from _____ (date) through _____ (date)
- ☐ The employee is able to return to work with restrictions from _____ (date) through _____ (date). Please complete next section (b)

Certification of Fitness For Duty                                    Page 1 of 2

Williams Declaration
Ex. 16
App. 069

TCCD 00205

| 2 (b) | Please indicate restrictions: |
|---|---|
| ☐ | no lifting or carrying objects: _____ max. lbs.  Repetitions |
| ☐ | no pushing/pulling objects: _____ max. lbs.  Repetitions |
| ☐ | no bending/stooping/squatting/twisting:  Repetitions |
| ☐ | no kneeling for more than _____ hours each day |
| ☐ | no crawling for more than _____ hours each day |
| ☐ | no sitting for more than _____ hours each day |
| ☐ | no standing for more than _____ hours each day |
| ☐ | no walking for more than _____ hours each day |
| ☐ | no climbing stairs |
| ☐ | no working/climbing on elevated equipment (ladders, stools, etc.) for more than _____ hours each day |
| ☐ | no reaching above the head or shoulders |
| ☐ | no reaching away from the body greater than with right left arm |
| ☐ | no grasping objects with ☐ right ☐ left hand |
| ☐ | no fine manipulation with ☐ right ☐ left hand |
| ☐ | no assaultive, physical control, and/or arrest situations |
| ☐ | no driving a vehicle |
| ☐ | no operating machinery or equipment |
| ☐ | no working alone |
| ☐ | no use of firearms |
| ☐ | no typing, keyboarding, or entering data for more than _____ hours each day |
| ☐ | no use of a CRT or computer monitor for more than _____ hours each day |
| ☐ | no use, including repetitive, of _____ (extremity/joint) |
| ☐ | no weight bearing on _____ (extremity) |
| ☐ | Other restrictions (specify): _____ |

3.    Other instructions:   *Please make reasonable accomodations.*

I certify that this accurately reflects my informed professional opinion regarding this individual's ability to return to work and perform job tasks as indicated at this time.

| Provider Signature: | Date: |
|---|---|
| *[signature]* | 1-2-13 |

Please return the completed form to Tarrant County College District Human Resources.

Certification of Fitness For Duty

Page 2 of 2

TCCD 00206



**Tarrant County College District**

MAY OWEN CENTER
OFFICE OF HUMAN RESOURCES

1500 Houston Street • Fort Worth, Texas 76102-6524 • 817-515-5234 • Fax 817-515-5350

January 7, 2013

Ms. Christy L. Williams
7808 Arnold Terrace
North Richland Hills, TX 76180

Dear Ms. Williams

Thank you for meeting with Sharion Marshall and me, on January 2, 2013. This letter will notify you that upon recommendation of your supervisors and respective administrators, Tarrant County College is terminating your employment effective January 7, 2013. The termination is based on your past performance. You may contact Dr. Christine Hubbard, Dean, to arrange to pick up your personal belongings, at 817-515-7782. If you should have any additional questions please feel free to call me or Ms. Marshall, at 817-515-5275.

Sincerely

Ricardo Coronado, Ph.D., SPHR
Associate Vice Chancellor for Human Resources

cc  Christine Hubbard

**Williams Declaration
Ex. 17**

An Achieving the Dream™ Institution
Community Colleges Count

TCCD 00203

## DECLARATION OF DONALD E. ULOTH

1.      My name is Donald E. Uloth.  I am over twenty-one (21) years of age and I am

competent to make this Declaration.  I have personal knowledge of the facts set forth herein, and

they are all true and correct.

2.      Due to financial constraints in this case, Plaintiff was unable to afford a court

reporter to transcribe the depositions in this case.  I therefore followed the procedures outlined in

Rule 30 of the Federal Rules of Civil Procedure for noticing and recording depositions by non-

stenographic means.

3.      Every deposition noticed and taken by Plaintiff in this case was taken pursuant to

a written deposition notice.  By way of example, attached to my declaration as Exhibit 1 is a true

and correct copy of the First Amended Notice of Intent to Take the Oral Deposition of Tarrant

County College District.  This notice states: "Method of recording: The undersigned counsel will

record the testimony using a digital video recorder and a digital audio recorder."  Every

deposition notice served by Plaintiff in this case contained this identical language.

4.      Each of the depositions was taken at the offices of Dowell Pham Harrison, LLP,

Tindall Square No. 2, 505 Pecan St., Suite 101, Fort Worth, Texas 76102.  Lu Pham, counsel for

Defendant, appeared and was present at each of the depositions, and he was present for all of the

questions and testimony that are contained in the attached deposition transcripts.

5.      The deposition officer who was present for each of the depositions taken by

Plaintiff in this case was Daniel Caldwell, who is a notary public commissioned in the State of

Texas.  Caldwell administered the oath to each witness and remained present throughout the

entirety of each deposition.  All of the requirements and formalities required by Rule 30 were

observed.

1

6.      I recorded each of the depositions using a digital video recorder, which also recorded the audio.  I have provided digital copies of all depositions to Lu Pham, free of charge. At no time up to and including today has counsel for TCCD expressed any question or concern regarding the quality of the audio or video.

7.      Again, due to financial constraints, I personally watched each deposition and carefully transcribed portions of the depositions.  Attached to this declaration as Exhibit 2 are true and correct, full and complete transcriptions of the proceedings identified within each transcript, including questions asked, answers, objections, and discussions (except as expressly noted on the transcript).  Each transcript clearly identifies the digital file from which the proceedings were transcribed, and also identifies the start time and stop time for each portion of the deposition so that Defendant can easily go to that precise point in the digital file and play that portion in order to verify the accuracy of the transcription.

8.      The attached transcription of the questions asked and the answers given is a full, true, complete and correct transcription of the portions of the deposition identified in the attached transcripts.

9.      Attached hereto as Exhibit 3 are nineteen (19) pages of documents produced by Defendant in this case.  These are true and correct copies of the documents prodyced by Defendant.

10.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August _19_, 2016.

_____Donald S._____
Donald E. Uloth

2

App. 073

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION No. 4:15-cv-00241 |
| | § | |
| TARRANT COUNTY COLLEGE | § | |
| DISTRICT | § | |
|     Defendant | § | |

FIRST AMENDED NOTICE OF INTENT TO TAKE THE ORAL
DEPOSITION OF TARRANT COUNTY COLLEGE DISTRICT

TO:   Defendant Tarrant County College District, through its attorney, Lu Pham, Dowell Pham Harrison, LLP, Tindall Square No. 2, 505 Pecan St., Suite 101, Fort Worth, Texas 76102.

Pursuant to the Federal Rules of Civil Procedure, Plaintiff Christy L. Williams ("Plaintiff" or "Williams") notifies you that she intends to take the oral deposition of Tarrant County College District ("TCCD").

Time and place:  March 29, 2016 starting at 9:30 a.m., at the office of Dowell Pham Harrison, LLP, Tindall Square No. 2, 505 Pecan St., Suite 101, Fort Worth, Texas 76102.

Method of recording: The undersigned counsel will record the testimony using a digital video recorder and a digital audio recorder.

Matters for examination: TCCD is requested to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, on the matters listed below.  Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, an organization such as TCCD has a duty to make this designation. The persons designated must testify about information known or reasonably available to the organization.

Uloth Declaration
Ex. 1

1.     The late 2012 review of Plaintiff's ability to perform the essential functions of her position.

2.     Plaintiff's termination, including the facts supporting TCCD's decision, and who was involved in making the decision.

3.     Complaints regarding Plaintiff.

4.     Staffing demands and needs for TCCD's writing labs from 1/1/11 through 6/30/13.

5.     Hiring decisions pertaining to TCCD's writing labs from 1/1/11 through 6/30/13.

6.     For the period covering 1/1/12 to 1/7/13, the performance of the writing lab instructional assistants, associates, and peer tutors and any discipline, training, hiring, and firing decisions made regarding them.

7.     The performance improvement plan (Exhibit 6 to Plaintiff's deposition, Bates numbered TCCD 00191 – 00193), included the events described therein, when the document was created, and why it was not disclosed to Plaintiff.

8.     For the period covering 1/1/12 to 1/7/13, TCCD's policies and usual procedures for doing performance reviews, performance improvement plans, and making termination decisions.

9.     For the last two years of Plaintiff's employment and one year thereafter:

     a.   the names of any employees who were supervised by Conrad Herrera, Anita Biber, or Christine Hubbard;

     b.   their performance;

     c.   disciplinary action and/or terminations of such employees; and

d. any requests for accommodations or for FMLA leave made by these employees and how these requests were handled.

10. The person or persons hired to replace Plaintiff and whether they have any impairments or disabilities (as those terms are defined in the ADA).

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 725-0260
Fax: (866) 462-6179
Email: don.uloth@uloth.pro
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served via email to Lu Pham (lpham@dphllp.com) on February 15, 2016.

/s/ Donald E. Uloth
Donald E. Uloth

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRISTY L. WILLIAMS,           §
       Plaintiff,           §
                  §
v.           §   Civil Action No. 4:15-cv-00241-O
                  §
TARRANT COUNTY COLLEGE DISTRICT,  §
       Defendant           §

ORAL DEPOSITION OF CHRISTINE HUBBARD
February 29, 2016

Examination by Donald E. Uloth:

Tape 2

4:19

      Q:     Can you give me two or three names of faculty members who you know did, at one time or another, spend some time doing tutoring in the writing lab?

      A:     I know Curtis Fukuchi volunteered in the writing lab, because I had conversations with him, directly, on a regular basis because he was two doors down on the hall. So I know he was volunteering there regularly.  And he was there in the lab on several occasions when I visited the lab for various reasons. So he is one I can absolutely say was a regular tutor.
4:53

Tape 5

44:39

      Q:     Going back to a March 2012 meeting that you described, and we talked about a little bit more, do you remember in that time frame Ms. Williams telling you that she had been the victim of a violent crime?

      A:     When we had that first meeting of two, I think one week apart, so, I don't know if it was…I'm sorry, I'm mixing up November meetings and March meetings.  Let me look at the exhibits.

Excerpts of Deposition Transcripts – page 1

Q:     Okay. And I can ask a more general question.

A:     Okay.

Q:     Whether you ever remember Ms. Williams telling you that she had been the victim of a violent crime?

A:     I remember her referring to it.

Q:     And, do you …what else do you remember her saying to you about that?

A:     That she had some medical appointments that she would have to attend based on it.
45:40

47:14
Q:     Did you inform any other Tarrant County College employee about what Williams had told you?

A:     No, because she indicated it hadn't happened on campus, which is the first question, did it happen on here.  If it didn't happen on campus it doesn't, it's outside my scope. And it's not mine to report.

Q:     And again, another broad question, do you remember at some point Christy Williams ever telling you, if she did, that because of the staffing issue and being alone in the evenings, that she was beginning to have any kind of anxiety or troubles.

A:     Nothing related to that specific attack you referenced, no. However, you see from the exhibit, that we knew she didn't like being in the lab by herself at night.
48:16

50:08
Q:     During that period of time when she was out, do you know if the Tarrant County College did any kind of assessment of her ability to perform the functions of her job?

A:     We were…

MR. PHAM:   Objection, form.

[discussion about the objection omitted]

Excerpts of Deposition Transcripts – page 2

A:      We were asked, we being I, I was asked by Dr. Coronado, who is the Vice Chancellor for Human Resources, to prepare a recommendation to accompany a meeting that he was going to have with Christy Williams at the beginning of the Spring term. At the, on the first day when someone could theoretically come back to work. So in order to do that I had to gather that recommendation from her supervisors and present it to him.

Q:      Tell me about that process.  What did you go about doing to gather that information?

A:      I asked them to give me their recommendation, and to provide any supporting documentation so that I could send it to Dr. Coronado.

Q:      A recommendation on what, can you be more specific?

A:      A recommendation on whether or not she should be terminated from her position, because that's what I was requested to do.

Q:      When did you get that request from Dr. Coronado?

A:      I don't know the date.

Q:      Were you ever asked to help with an assessment of the ability of Ms. Williams to perform, or not perform, the essential functions of her job?

A:      That's what the recommendation was about, for the recommendation for termination would be based on whether or not someone is performing their duties.

Q:      Okay, and I guess my question is a little bit different, not focusing on simply, based on events to date is this employee performing – my question is, was there a broader assessment of whether there was a way to make it possible for her to perform as a writing lab tutor?

A:      We, was our assessment specifically in that? It was encompassed in the recommendation.

Q:      Well, okay, tell me about the way you said it was encompassed.

A:      Okay, so the recommendation is, is only a recommendation, and is based on, and can only be based on, previous experiences with that employee's behavior and performance.

Excerpts of Deposition Transcripts – page 3

And based on that employee's previous behavior and performance, we have to make a recommendation about whether or not, based on that behavior and performance, we consider they can continue to do that job.  You asked whether or not it included … I'm sorry, specify the second part?

Q:      Whether, if her employment, or her job duties, were modified a little bit, there might be a way for her to continue to work as a writing lab tutor?

A:      That was not part of the request.

Q:      Did you see any of the medical documentation identifying specific conditions that were affecting Ms. Williams?

A:      No, that's not something that would have come to me.

Q:      Were you made aware at any point that she had been diagnosed as having severe depressive disorder?

A:      No.

Q:      Were you aware at any point that she had been diagnosed as having post-traumatic stress disorder.

A:      No.

Q:      Or another related condition, PTSD complex?

A:      No.

Q:      Were you ever aware that she had been diagnosed as having an anxiety disorder?

A:      No.

Q:      Were you ever made aware of any medications that Ms. Williams took?

A:      No.

Q:      To your knowledge, was there some other person who performed an assessment of whether the job might be modified in such a way to allow her to continue to perform as a writing lab tutor?

Excerpts of Deposition Transcripts – page 4

A:      Yes.

Q:      Okay, what do you know about that?

A:      Any assessment of fitness for duty, when someone's been on any kind of leave, or just in general, is done by the office of human resources.  How that happens inside that office, I don't know the specifics.

55:19

55:50

Q:      Between November 13, 2012 and January 1st, 2013…

A:      Okay.

Q:      … you did an assessment of her ability to perform her job functions. Is that correct?

A:      Yes.

Q:      But your assessment did not take into account any medical issues or disabilities that she may have had?

A:      Because that was out of the scope for me. That's not something we would ever be aware of, or have been made aware of, so …

Q:      So, yes?

A:      Sure, yes.

56:25

Excerpts of Deposition Transcripts – page 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

ORAL DEPOSITION OF CHRISTINE HUBBARD
As the designated (30)(b)(6) representative of Tarrant County College District
June 22, 2016

Examination by Donald E. Uloth:

Tape 1

6:30

    Q:    At some point after November 13th, or maybe it was on November 13th, did Dr. Coronado ask you to assess whether Ms. Williams was able to continue to perform her job?

    A:    Yes.
6:44

7:19

    Q:    It's my understanding that your assessment did not include consideration of any medical or psychological conditions that Ms. Williams might have been experiencing, is that correct?

    A:    That, that's correct

    Q:    Why is that the case? Why did you not consider those things?

    A:    They were irrelevant. I had not received any information regarding any kind of condition for which the employee required accommodation.
7:53

Excerpts of Deposition Transcripts – page 6

8:25

Q:      But if she had told you that she has a certain psychological condition or physical issue that might have been affecting her, affecting her performance, would you have taken that into account when doing your assessment?

A:      Only to the extent that I received official notification from human resources that there was a disability for which documentation of accommodation was provided.  In that case, I would work with human resources to determine what accommodations could be made and whether or not the employee could complete the essential job functions.

Q:      And in this case, it's my understanding that you received no such official notification from HR, correct?

A:      Correct.

Q:      So in your assessment of whether Ms. Williams was able to perform the essential job functions, you did not include any consideration of, perhaps, a hormonal imbalance that she might have been experiencing?

A:      No.

Q:      Or depression?

A:      No.

Q:      You did not consider whether she had an anxiety disorder that might have been affecting her behavior?

A:      No.

Q:      I'm going to mark this as Exhibit 1 to this deposition.  Do you recognize this document?

A:      Yes.

Q:      Is this an email that you received from Christy Williams on or about December 13, 2012?

A:      Yes.

Excerpts of Deposition Transcripts – page 7

Q:      And isn't it true that in this email, she informed you that she had a biological imbalance in her body?

A:      Employees will, in this case the employee sent an email indicating this information. However, an employee's email indicating information is not the same as an official notification of a disability for which an accommodation is required.

Q:      But that wasn't my question.

A:      Okay.

Q:      Isn't it true that on December 13, 2012, Christy Williams informed you, Dr. Hubbard, that she had a biological imbalance?

A:      Yes.

Q:      But you did not consider in assessing whether she could perform the essential functions of her job whether that played any part in the behaviors that resulted in her termination?

A:      That's correct.

Q:      And the reason for that is because HR had not asked you to look medical or psychological issue, is that correct?

A:      Unless there is an official notification of a disability for which accommodation needs to be made, an employee's performance and ability to perform the essential duties of their position is based on that employee's actions, their conduct in the workplace, and nothing else. 11:30.

20:22
Q:      At some point after November 13, 2012, did Tarrant County College and Christy Williams explore other options that might be a better fit for her.

A:      Not that I'm aware of.
20:36

Excerpts of Deposition Transcripts – page 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

ORAL DEPOSITION OF ANITA BIBER

As the designated (30)(b)(6) representative of Tarrant County College District

April 20, 2016

Examination by Donald E. Uloth:

Tape 1

15:26

Q:      It's my understanding that Ms. Williams was terminated as of January 7, 2013. Did that trigger any additional hiring or staffing needs for the writing lab?

A:      It triggered having to, um, her position, to cover her position.

Q:      Having to replace and fill that position?

A:      Yes.

Q:      Did that require an HR review and approval process, or a job posting?

A:      Yes.

Q:      Okay, explain that, what had to happen after that?

A:      When you want to put a job position, of course you have to have HR, well again, provide the position ID, you put in for the position ID. Once it's approved and they create the job

Excerpts of Deposition Transcripts – page 9

post, it goes onto the web site, you have to wait probably, you know, some, so many weeks before you can begin interviewing and then you go through looking for qualified applicants.

Q:      Alright. Do you know how many people put in or applied for that opening?

A:      I don't recall.

Q:      Do you recall who was hired to fill that job posting?

A:      Yes

Q:      Who was hired?

A:      Lynnelle Brown.

16:48

24:14

Q:      On topic number ten, you've told me that Lynnelle Brown was ultimately the replacement for Christy Williams' …

A:      Correct.

Q:      …position.  Do you know if Ms. Brown has any impairment or disability?

A:      No.

24:30

Excerpts of Deposition Transcripts – page 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

ORAL DEPOSITION OF ANITA BIBER
June 22, 2016

Examination by Donald E. Uloth:

Tape 1
2:45

> Q:    Let me ask you to walk me through the October 31st, 2012 meeting.

> A:    Okay.

> Q:    What was the purpose of this meeting?

> A:    Christy had … I had become recently, department chair.  And she just had some concerns about the way things were going in the writing lab. So we offered an opportunity to have all of us sit and just allow an opportunity to share her thoughts.

3:14

4:47

> Q:    Okay, I guess another point you mentioned was that Ms. Williams talked about staffing.

> A:    Right.

> Q:    What did she say about staffing?

> A:    All along she had felt like it was, they were understaffed, and that the environment in the evenings, she was alone a lot.

Excerpts of Deposition Transcripts – page 11

Q:     Did anyone respond to that point when she raised it?

A:     I was in the process of trying to hire on calls.

Q:     Were the on calls going to be used to assist during those evening hours?

A:     Yes.

5:26

14:45

Q:     During that Fall 2012, your first semester as the head of that Academic Foundations Department, did you become familiar with Christy's abilities as a writing tutor?

A:     Yes.

Q:     How would you characterize her abilities as a writing tutor?

A:     Well her, she has a strong academic background, so she certainly can do that. And I would observe that when she worked with students one-on-one, she would do a nice job. I mean you could walk in, she'd give feedback, she would forward feedback to us when she would have her one-on-one tutoring sessions.  I never had any reason to doubt her skill set.

15:26

Tape 3

13:00

Q:     After what had happened on November 13, 2012, did you begin to think that maybe Christy Williams should no longer be employed there as a writing tutor?

A:     As of November 13th, yes.

13:15.

16:02

Q:     You said you had made changes in the environment. What changes had you made?

A:     We were in the process of bringing in new employees, and we were in the process of writing guides.

Excerpts of Deposition Transcripts – page 12

Q:      But none of those things had happened yet, correct?

A:      Right, correct.

Q:      So, you had not made changes in the environment yet, as of November 13th, 2012, correct?

A:      Um,. Correct.

16:28

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

ORAL DEPOSITION OF RICARDO CORONADO
As the designated (30)(b)(6) representative of Tarrant County College District
April 20, 2016

Examination by Donald E. Uloth:

Tape 1

21:15

Q:      What about termination?  Did the college have guidelines and policies in place that would have applied to Christy Williams in the latter part of 2012, first month of 2013?

A:      Yes

Q:      What policies applied to the termination process?

A:      The termination policies

Q:      Okay, and what are the normal policies for doing a termination at Tarrant County College District for that time period?

A:      The normal policy would be, are you asking about the process of termination, or what the policy says, or both?

Q:      Why don't we start with the process?

A:      The process is, there should be a recommendation from the supervisor.  It should go through administrative channels, to the Human Resources office. It is reviewed, and then it

Excerpts of Deposition Transcripts – page 14

moves forward to the vice chancellor for the legal review, and then it would go to the Chancellor for final approval.

21:38

27:09

    Q:     In your description of the process a few moments ago you said HR reviewed, and I assume in this case, you would have been the HR review.

    A:     Correct.

    Q:     And that the next step was to the vice chancellor for legal review.

    A:     Yes, the vice chancellor for administration.

27:32

28:17

    Q:     Do you know who made the decision to terminate Christy Williams?

    A:     Yes.

    Q:     Who decided?

    A:     The Chancellor.

    Q:     And who was the Chancellor?

    A:     Mrs. Erma Johnson Hadley.

28:34

30:49

    Q:     How, what actions did the college take to follow that policy?

    A:     Which policy are you talking about, the termination policy?

    Q:     No, the policies regarding accommodation that we just discussed.

    A:     So yes they were followed

    Q:     Describe the actions taken that allow you to say that?

Excerpts of Deposition Transcripts – page 15

A:      Had there been a request for accommodations that would have been followed. Had there been a request for anything related to that it would have been followed.  So there were none that were not followed.

Q:      Don't you recall getting a note from a doctor asking for Ms. Williams to be provided with accommodation?

A:      No.

Q:      You never saw that?

A:      No.

Q:      But if you had seen a note like that, it would have implicated some policies and procedures that the college has in place?

A:      Yes.

Q:      Did you meet with Christy Williams on January 2d, 2013?

A:      I don't know.

32:29

Excerpts of Deposition Transcripts – page 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRISTY L. WILLIAMS,                          §
              Plaintiff,              §
                                             §
v.                                            §   Civil Action No. 4:15-cv-00241-O
                                             §
TARRANT COUNTY COLLEGE DISTRICT,  §
              Defendant              §

ORAL DEPOSITION OF RICARDO CORONADO
June 22, 2016

Examination by Donald E. Uloth:

Tape 1

5:18

      Q:     Did you have to be involved to approve some time off for Christy Williams?

      A:     I was involved, yes.

      Q:     And do you know if y'all decided to classify the time off as Family and Medical Leave Act leave?

      A:     Not at that moment, no.

      Q:     Was it later classified as FMLA leave?

      A:     Yes, later it was.

5:45.

13:18

      Q:     In her memorandum, she addresses the essential functions of an instructional associate in the Northwest Campus writing lab.  Were you already familiar with the essential job functions of that position?

      A:     I can't say that I was.

Excerpts of Deposition Transcripts – page 17

Q:      When you received this memorandum, do you remember, did you look at the job description for instructional associate?

A:      I may have, but I don't recall that I did.

Q:      Do you know if you did anything else? Or something that you did do to confirm what the essential functions of that position were?

A:      If I remember correctly, it would have been on the job description, and, it's on everybody's job description.

Q:      What's on everybody's job description?

A:      Essential functions.

Q:      Did you discuss any of the events described in this memorandum with Anita Biber?

A:      I don't recall that I did.

Q:      Did you discuss any of these events that are on the memorandum with Conrad Herrera?

A:      I don't recall that I talked to him.  I could have, but I don't remember.
14:49

20:52
Q:      And, I'd like to show you what I've marked as deposition exhibit 4. Take a moment to look at that, and tell me if you're familiar with this document.

A:      No.

Q:      Do you believe this is the first time you've seen this document?

A:      Uh, this is the first time I've seen it?  No.

Q:      Okay, when did you see it before today?

A:      Probably last week.

Excerpts of Deposition Transcripts – page 18

Q:      Was it in connection with discussions with counsel?

A:      Yes.

Q:      So, before the last week or two, you, you don't believe you had ever seen deposition exhibit 4, right?

A:      Correct.

Q:      When you met with Christy Williams on January 2d 2013, were there discussions about making reasonable accommodations to allow her to return to work?

A:      No.

Q:      So, if she said that you did discuss accommodations, you would probably disagree with that, correct?

A:      Correct.

Q:      Do you know … who else was in the meeting with you?

A:      According to these notes that I saw, Sharion … uh, was in there, and I can't recall her last name.

Q:      Sharion Marshall?

A:      Yes.

Q:      Between the time of the on-campus incident we discussed from November 2012, and the time of the termination, the letter being dated January 7, 2013, did you attempt to educate yourself about Ms. Williams' medical and psychiatric conditions?

A:      Between what time period?

Q:      Between the time of the on-campus incident with Ms. Williams in November 2013 [sic] and the time of your letter recommending or implementing the termination, did you educate yourself about any health-related conditions or psychological conditions that Ms. Williams was experiencing?

Excerpts of Deposition Transcripts – page 19

A:      I don't recall.

23:33

24:42

Q:      On deposition exhibit 4, would you take a look at the second page of the exhibit?

A:      Okay.

Q:      In the box, number 3, with "Other instructions," I will represent to you that that handwriting says something to the effect of "please make reasonable accommodations."  Do you believe that's accurate?

A:      That's what it looks like.

Q:      Do you know if anyone else at Tarrant County College had received this document, or any other document from Ms. Williams asking for reasonable accommodations up to or prior to the time she was terminated?

A:      No.

Q:      Where did you leave things with Ms. Williams at the January 2d, 2013 meeting, when it concluded?

A:      The best I can recall is that we asked her to continue her leave.

Q:      And did you do anything after that to gain information or talk to people so that you could decide how to handle her return to work, or her termination, if that was going to be the direction it went.

A:      Yes.

Q:      What did you do?

A:      I don't remember the exact thing I did, but I know what would have happened, and that would have been that, uh, we would have followed our procedure to move forward with the recommendation, and send it for review.

Q:      Okay. To who?

A:      At that time I would have sent it to my boss.

Excerpts of Deposition Transcripts – page 20

Q:      And, I know at the last deposition, I don't think you were able to recall the name of the boss at that time.  Can you remember it today?

A:      I think I can.

Q:      Who was your boos at the time?

A:      I believe it was Ms. Angela Robinson.

Q:      What was her position?

A:      Her position would have been the Vice Chancellor for Administration, and General Counsel.

Q:      Okay. And the answer, that you would have done that in the normal course of procedure, do you have an independent recollection of whether that's actually what you did back in 2013?

A:      I would say, with a high degree of accuracy, yes.

Q:      But you are filling in your memory and speculating a bit based on normal procedures, correct?

A:      Correct.

27:39


29:41

Q:      Okay, and I believe the question was, do you remember having a conversation with Angela Robinson about the recommendation for termination of Christy williams?

A:      No.

Q:      Might there have been a conversation that you have forgotten?

A:      Uh, yes, more than likely.

Q:      And, it's my recollection from your previous deposition, not today but in the prior deposition, that you're not certain but believe the procedure would have next dictated Ms.

Excerpts of Deposition Transcripts – page 21

Robinson passing along the recommendation to the Chancellor of Tarrant County College, correct?

A:      That's correct.

Q:      And I believe you said that was Erma Johnson Hadley?

A:      That is correct.

Q:      And, do you believe that was the final step in the decision to terminate Ms. Williams employment?

A:      That is correct.

Q:      What was the purpose of the Vice Chancellor review from Angela Robinson?

A:      The purpose of it is, one, it's a procedure that we follow.  And the purpose is also to review it.

Q:      So, if there was any one person here who had the final say on the termination decision, who would that have been?

A:      The Chancellor.

Q:      Ms. Erma Johnson Hadley?

A:      Correct.

Q:      To your knowledge, did anyone at Tarrant County College consider making any accommodations for Ms. Williams, uh, depression?

A:      I don't think there was ever a…

Mr. Pham:     Objection to the form of that question, but you may answer.

A:      To the best of my knowledge, there was never a request for an accommodation for any, uh, request that came to our office.
31:52

Excerpts of Deposition Transcripts – page 22

34:23

Q:      In the human resources world, do you sometimes have to respond to employees who make you aware of a disability?

A:      We do respond yes if they make us aware of a disability.

Q:      And do you consider making accommodations for a person's disability?

A:      Yes.

Q:      And my question is simply asking you for the name of a person who responded to Christy Williams for her medical and psychiatric conditions.

Mr. Pham:      Objection, form.

Q:      If you are aware of someone who did that.

Mr. Pham:      Objection, form.

A:      I'm not aware of that, nor am I aware that there were any medical conditions to give an accommodation.
35:05.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

ORAL DEPOSITION OF CONRAD HERRERA
As the designated (30)(b)(6) representative of Tarrant County College District
April 20, 2016

Examination by Donald E. Uloth:

<u>Tape 1</u>

6:18
Exhibit 3 marked

Q:      Mark this as Herrera deposition exhibit 3. Do you recognize this?

A:      Yes, it's from the employee performance appraisal system on Web Advisor.

Q:      Is this a performance appraisal for Christy Williams?

A:      Yes, that's right.

Q:      And is it one that you primarily prepared?

A:      Yes, that's true.

6:45

7:49

Q:      Does the review period track, I guess, the fiscal year, or academic year?

A:      Fiscal year.

Excerpts of Deposition Transcripts – page 24

Q:      So it would be from September 1 through the following August 31st?

A:      Yes, that's right. And this was the first one I ever did.

Q:      For Ms. Williams, or ever?

A:      Ever, because, what stands out to me is that everything's a 2.  So whenever we're receiving, the department chairs receiving training on this, the way we learned it, definitely the way I learned it, is that a 2 means we don't have to provide any documentation. So, it doesn't mean good or bad, it means they were doing their jobs.
8:43

9:34
Q:      The numbers that are assigned, which you said, as you pointed out were all 2s on the first one, deposition exhibit 3, what's the scale?

A:      1 to 3.  And we could do 1.5, 2.5 if you wanted to.

Q:      Okay, so what's a 1?

A:      1 is someone who, it's a scenario where the employee needs improvement.

Q:      And a 2 is what?

A:      Satisfactory.

Q:      What's a 3?

A:      It's excellent.  That's whenever the employee really excels.

Q:      When did you become the writing lab manager?

A:      In the Fall 2010.

Q:      So for the review that we marked as deposition exhibit 3, you were assessing Christy Williams for work done before you became her immediate supervisor?

A:      That's right.

Q:      Correct?

Excerpts of Deposition Transcripts – page 25

A:     So it was, yeah, I assessed her, appraised her for ... I gave her a 2, it was like giving...I gave everybody a 2.  Well, I didn't have to appraise Lynnelle, she was a part-timer.  But it was a 2 because it really was after the fact, and I wouldn't have, like I said, give them, gave them the benefit of the doubt because I wasn't really there to observe everything.  11:23.

Tape 3

5:27

Q:     Can you tell me what deposition exhibit 5 from Dr. Hubbard's deposition, what that document is?

A:     Yes. It's the performance improvement plan, the PIP, that I wrote on March 28, 2012.

Q:     Okay.  I see on the last page, there's lines for Division Dean signature and employee's signature, which are blank, right?

A:     Correct.

Q:     Division Dean, would that have been Dr. Hubbard?

A:     Correct.

Q:     Did she ever sign this document?

A:     No, she didn't.

Q:     And to your knowledge, did Christy Williams ever even see this document while she was employed?

A:     I don't think she did, because I never presented it to her.

Q:     Do you know why this was never presented to her?

A:     It was never approved by the Dean.

Q:     At any point during Ms. Williams' employment, to your knowledge, was she placed on a performance improvement plan?

Excerpts of Deposition Transcripts – page 26

A:      No, she wasn't.

6:35

10:09

Q:      Was Christy Williams ever given a date by which she needed to start doing her tutoring in the library?

A:      No.

10:22

20:00

Q:      Looking at the second page of Hubbard deposition exhibit five, under "Concern#2", after that fairly sizeable first paragraph, it says: "the employee has violated the following TCCD policy." Do you see where I am?

A:      Yes, I see it.

Q:      And the next paragraph ends with "refusal to carry out job duties or reasonable directives of the employee's supervisor."

A:      I see that.

Q:      What directive or duties had she failed to carry out?

A:      Oh, specifically refusing to carry out tutoring services in the library.  So the directive came from the Dean, the Dean told me, then I asked Christy to do, we had to tutor in the library.

Q:      Okay.  But, a little while ago I thought you said you never gave her a date by which she had to start going to the library to do the tutoring sessions.

A:      That's right, yeah.

Q:      Do you have any reason to think that if you had given her a specific date – as of Thursday – you must do it in the library, that she would have refused?

A:      I don't know.  I don't remember giving her a date.

21:31

Excerpts of Deposition Transcripts – page 27

| | |
|---|---|
| **From:** | ELLIS, LEANN |
| **Sent:** | Monday, September 24, 2012 10:22 AM |
| **To:** | LEBLANC, ELVA; RODE, JOE |
| **Subject:** | RE: 2012-2013 budget |
| **Attachments:** | NW 2012-13 Non-Faculty Personnel Requests 5-14-12.xlsx |

Dr. LeBlanc:
Attached is the Non-Faculty Personnel Request spreadsheet that I believe Nancy is referring to.  According to our new budget book, promotions were *approved* for the following:

Writing Center:
Christy Williams, from FT Instructional Assistant to FT Instructional Associate  (priority ranking #29)

Computer Science Lab:
June Relyea, from FT Instructional Assistant to FT Instructional Associate (priority ranking #31)
Jonathan Justice, from PT Instructional Assistant to PT Instructional Associate (priority ranking #32)
TBN, from PT Instructional Assistant to PT Instructional Associate (priority ranking #33)  This position has now been filled by Lucas Lima.

The other promotion *requested* was for the following:
Writing Center:
Lynelle Brown, from PT Instructional Assistant to PT Instructional Associate (priority ranking #30).

It just doesn't make sense to me that **all the other promotion requests were approved and this one was not.**

Thanks,
Leann


**Leann Ellis**
Vice President for Academic Affairs
Tarrant County College Northwest Campus | Office: WADM 1216
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7702 | Fax 817-515-7107
leann.ellis@tccd.edu | www.tccd.edu

Office hours:  8:00 a.m. to 5 p.m., Monday – Friday

**From:** LEBLANC, ELVA
**Sent:** Saturday, September 22, 2012 6:07 AM
**To:** RODE, JOE; ELLIS, LEANN
**Subject:** FW: 2012-2013 budget

Greetings please see Nancy's response to me. Leann I do not have my budget book with me. Perhaps we can check her comment about the promotion on Monday. Thank you
**Elva LeBlanc, Ph.D.**
President of Northwest Campus
Tarrant County College | WADM 1209B

1

TCCD 00914

App. 104

4801 Marine Creek Parkway
Fort Worth, Texas  76179-3599
Phone 817-515-7750 | Fax 817-515-7107
elva.leblanc@tccd.edu | www.tccd.edu

**From:** "CHANG, NANCY" <NANCY.CHANG@tccd.edu>
**Date:** Fri, 21 Sep 2012 15:06:02 -0500
**To:** Elva LeBlanc <elva.leblanc@tccd.edu>
**Cc:** "MILLS, VALERIE" <VALERIE.MILLS@tccd.edu>, "WELLS, DAVID" <DAVID.WELLS@tccd.edu>
**Subject:** RE: 2012-2013 budget

Elva, see below, I hope that I answer your question.   Have a good week end

**Nancy Chang**

**From:** LEBLANC, ELVA
**Sent:** Friday, September 21, 2012 12:12 PM
**To:** WELLS, DAVID; CHANG, NANCY
**Cc:** MILLS, VALERIE; LEBLANC, ELVA
**Subject:** 2012-2013 budget

Greetings Dr. Wells and Ms. Chang,

I hope that you are doing well. This is a follow-up to our telephone conversation earlier this week regarding the 2012-2013 budget. Following are items missing that were approved by CELT and Board:

1 Full-time nurse for NW campus

301WSDES-AD004  we created the position, but missed in the budget, it will add on your P157

Writing center NW campus: the part-time instructional assistant was to be converted to part-time instructional associate (This impacts employee Lynnelle Brown.

Look your NON Faculty Personnel Request, 301WHUM-SS021 that is Williams, Christy so the promotion went to her
I thank you

**Elva LeBlanc, Ph.D.**
President of Northwest Campus
Tarrant County College | WADM 1209B
4801 Marine Creek Parkway
Fort Worth, Texas  76179-3599
Phone 817-515-7750 | Fax 817-515-7107
elva.leblanc@tccd.edu | www.tccd.edu

TCCD 00915

| | |
|---|---|
| **From:** | HUBBARD, CHRISTINE |
| **To:** | BIBER, ANITA |
| **Cc:** | HERRERA, CONRAD |
| **Subject:** | Re: Follow up Conversation with C Williams 11.14.12 |
| **Date:** | Wednesday, November 14, 2012 8:52:51 PM |

Hello,

Thank you for communicating with Christy and setting events in motion to help her move forward. I am happy she is open to exploring what might be the best fit for her. Please enjoy your time with your family. You have done everything you can to prepare the department to function while you are out.

Best regards,

Christine Hubbard, Ph.D.
Dean, Humanities Division
Tarrant County College Northwest Campus
Office: WTLO 4306A
817-515-7782 Fax 817-515-7007
4801 Marine Creek Parkway
Fort Worth, TX 76179
Christine.hubbard@tccd.edu

Office hours: 8:00a.m.to 5:00 p.m. Monday-Friday

On Nov 14, 2012, at 8:44 PM, "BIBER, ANITA" <ANITA.BIBER@tccd.edu> wrote:

> Hello-
>
> I just spoke with Christy. I told her that you had worked with Dr. Coronado to give her paid leave, and she was very thankful. She wanted me to tell you she had no words to express her gratitude. She is touched by our concern.
>
> She did share that she had not taken Valium before the meeting (she took 2 1/2 mg before the last two meetings) because she didn't expect to get upset. She said Conrad was being very nice and was "extending the olive branch". She had let her defenses down, so learning about Helen's comment was unexpected. Betrayal is a sensitive issue with her and it hit a raw nerve. She said she might like to visit with Helen to find out what happened but acknowledged it was best not to make decisions at this time.
>
> Christy said she had already talked to HR today about short term disability, and she was worried about finances when it was explained she'd have to use sick & vacation time + 30 days without pay.
>
> I advised her to call Sharion before she puts anything in motion so that the two paths don't work against each other. She knows to call Sharion in the morning to get more specific information about the leave. She is also anticipating a meeting with HR next Tuesday or Wednesday when she is at her best.
>
> She said is worried about job security because the writing center needs somebody who doesn't feel overwhelmed and gets upset so easily. She said she sincerely cares about students. She was very clear in her thinking. I did feel better that she was making these comments because I do hope she is the one who decides that the lab setting is not the ideal place for her talents to shine. I would much rather she reach this conclusion on her own because I worry that continuing in this setting is not the best place for her well-being.
>
> She said she'd stay in touch and keep me posted.
>
> As a reminder, I will be out of my office tomorrow through next Wed. I will have my phone/email and will continue to check in. We are flying tomorrow afternoon, so there will be pockets when I am not available. I will stay in contact.
>
> Anita Biber
> Department Chair and Instructor of Reading| Academic Foundations Dept. | Humanities Division

183

_11/21/2012  12:35   8172229909              P RAJU INDUKURI.M.D.              PAGE  01

**P. Raju Indukuri, M.D., P.A**
2707 Airport Freeway, Suite # 206
Ft. Worth, TX 76111
(817) 222-9907
Fax: (817) 222-9909

| To: TCC | Date: 11/21/12 |
|---|---|
| From: Karna | Fax Number: 817-515-0589 |
| Attn: Krestin White | Pages: 16 |
| Re: Christy Williams | |

**CONFIDENTIALITY NOTICE:** The documents' accompanying this transmission contains
confidential health information that is legally privileged. This information is intended only
for the use of the individual or entity named above. The authorized recipient of this
information is prohibited from disclosing this information to any other party unless
required to do so by law or regulations and is required to destroy the information after its
stated need has been fulfilled.

If you are not the stated recipient, you are hereby notified that nay disclosure, copying,
distribution, or action taken in reliance on the contents of these documents is strictly
prohibited.  If you have received this information in error, please notify the sender
immediately and arrange for the return or destruction of these documents

In no way is this information intended to be constructed as legal advice nor will
implementation of the policies or forms guarantee compliance with federal and state
privacy rules.

TCCD 00255

- If you have short-term disability coverage, you will be eligible once you have met the 30-day elimination period and have exhausted your paid leave. If you haven't already done so, please return your completed disability claim form to me in Human Resources for processing (this may be returned prior to the 30-days). For more information on your short-term disability plan, please visit the following website: http://www.ers.state.tx.us/Employees/Insurance/Short-term_Disability/

- If the circumstances of your leave change and you are unable to return to work earlier than the date indicated, you will be required to notify us at least one week prior to the date you intend to report for work.

Once we obtain sufficient certification as specified above, we will inform you, within five (5) business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please do not hesitate to call me at 8175155247 or email me at krestin.white@tccd.edu.

Sincerely,

Krestin White

*Fax 817-515-0589*
*& send original*

encl:   Certification Form

cc:    Conrad Herrera
       Payroll

TCCD 00256

11/21/2012  12:35   8172229989            P RAJU INDUKURI, M.D.            PAGE  04



Tarrant
County
College
District

## Instructional Associate

**FLSA Status:**         Nonexempt
**Class Code:**          51
**Job Classification:**  Instructional Support

### Job Summary
Performs instructional tasks in a laboratory setting. Assists students through tutoring and teaching.

### Essential Duties and Responsibilities
- Discusses assigned teaching area with classroom teacher to coordinate instructional efforts
- Maintains and checks out to students, equipment used for field production
- Plans, prepares, and develops various teaching aids and materials
- Maintains software on lab computers and liason with Academic Computing for lab workstations
- Provides secretarial duties for program bids and purchase orders, program recordkeeping for files and advisory committee minutes
- Assists students, individually or in groups, with lesson assignments to present or reinforce learning concepts
- Researches equipment for purchases
- Delegates work duties to work-study student assistants
- Previews, orders and maintains inventories of equipment, instructional materials and supplies
- Plans, prepares, develops and maintains various teaching aids or materials
- Attends the workplace regularly, reports to work punctually and follows a work schedule to keep up with the demands of the worksite
- Completes all required training and professional development sessions sponsored through the Tarrant County College (TCC) Institute
- Supports the values of the College: diversity, teaching excellence, student success, innovation and creativity and service to the College

### Minimum Requirements
- Bachelor's degree from a regionally accredited college or university
- * Courses in the specialized field or equivalent knowledge and experience
- Two (2) years of work experience
- Proficiency with word processing, spreadsheet and presentation software
- Excellent customer service skills
- Excellent oral and written communication skills
- Experience working with computerized systems

Job Description                    Page 1 of 2                    Revised 8/7/12

TCCD 00260

11/21/2012  12:35   8172229989           P RAJU INDUKURI,M.D.                    PAGE  05



**Instructional Associate**

Tarrant
County
College
District

### Preferred Qualifications

### Physical Demands
The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. While performing the duties of this job, the employee is regularly required to talk or hear. The employee frequently is required to use hands to finger, handle, or feel objects, tools, or controls and reach with hands and arms. The employee is occasionally required to stand; walk; sit; climb or balance; stoop, kneel, crouch, or crawl; and taste or smell. The employee must occasionally lift and/or move up to 40 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus. Requires color, depth, and texture perception.

### Work Environment
The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. While performing the duties of this job, the employee occasionally works near moving mechanical parts; in high, precarious places; and with explosives and is occasionally exposed to wet and/or humid conditions, fumes or airborne particles, toxic or caustic chemicals, risk of electrical shock, risk of radiation, and vibration. The noise level in the work environment is usually quiet.

The duties listed are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position. The job description does not constitute an employment agreement between the employer and employee and is subject to change by the employer as the needs of the employer and requirements of the job change.

Reasonable accommodations may be made to enable individuals with disabilities to perform the essential duties and responsibilities.

Job Description                        Page 2 of 2                        Revised 9/7/12

TCCD 00261

1 of 2

11-19-12

Dr. Indukuri,

Following is some information that I thought could be relevant to you.

The increased workload and related short staffing at my job has been most prevalent and problematic for me. since Fall 2011. For the past 3 months, when I have been overwhelmed at work by student demands and without any available support staff, I have had heavy sweating, shaking hands, pounding heart, headaches, and aching body pains (particularly in my neck, shoulders, and back), nausea, and dizziness.

For the past week, since breaking down in tears at work, I have had the following symptoms: loss of appetite, difficulty sleeping, intense body aches, extreme difficulty thinking clearly, confusion, forgetfulness, fear, and difficulty functioning, and extreme fatigue. For example, I had 3 appointments scheduled for today, but I'm already worn out after 1 appointment. I will go to the 2nd appointment, but I need

TCCD 00257

to reschedule the 3rd appointment.

Also, my symptom list is likely not inclusive of all my symptoms since I'm having trouble thinking clearly and remembering.

You might want to know that after I was assaulted in February 2012, I was examined by Dr. Coulter-Smith, and she documented my injuries.

You may need a list of my current medications, so they are:
Cymbalta  60 mg x 2/day
Nadolol  20 mg x 2/day
Noctriptyline  20 mg/day
Strattera  40 mg/day
Indocin SR  75 mg/day
Synthroid  .125 mg/day
Prevacid  30 mg/day
Baclofen  15 mg/day
Valtrex  500 mg/day
Oracea  40 mg/day
Valium  5 mg (as needed)

TCCD 00258

11/21/2012  12:35   8172229989          P RAJU INDUKURI, M.D.           PAGE  08

 Dearborn ★ National®

Toll Free: (855) 377-5433
Fax #    (972) 996-9361

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75285-5403

## Employee

- Complete identifying information in the Employee's Preliminary Statement of Disability (page 2 of this claim form) and send the form to your Benefits Coordinator for completion of the Employer's section.
- Your employer will return the claim form to you for further handling.
- When your Benefits Coordinator returns the claim form to you, complete, sign, and date page 2 and 4 of the form. The signed Claimant Authorization on page 4 will allow FDL or its representative to obtain additional information which may be required to complete the processing of your claim.
- Take the entire claim form (pages 1, 2, 3 and 4) to your treating physician, who must be an Approved Practitioner.
- Your physician must fully and legibly complete the Attending Practitioner's Statement on page 3 of this claim.
- Send completed claim form and all additional information to FDL at the address shown above. FDL must receive the form within 12 months of the date your Total Disability began.

### Attending Practitioner

- In order to avoid a delay or possible denial of your patient's claim, all information must be legibly completed in full.

- To qualify for Total Disability your patient must have a documented "medically determinable" impairment.

- The Attending Practitioner's Statement must contain objective clinical findings which document the impairment causing "Disability" and any co-morbid conditions. In cases involving mental impairments the clinical information must include your patient's capacity for understanding and memory, social interaction and adaptation medications and frequency of therapy.

- Totally Disabled from "Own Occupation" means the inability of the insured, because of an injury or sickness established by medical evidence based on objective clinical findings using current AMA guidelines and certified by an approved practitioner, to perform the usual tasks of his or her occupation in such a way as to procure and retain employment. Totally Disabled from "Any Occupation" means the inability of the insured to perform the usual tasks of any compensated occupation for which he or she is reasonably suited by training, education or experience, in such a way as to procure employment. This definition will govern the determination of benefits.

### Employer

- Complete the Employer's Section below and attach (1) Job description (detailed duties) (2) Time records from last day worked to present. Return claim form and attachments to the employee.

### Employer's Section

Employee ID# _____   Social Security # _____   Policy No. 38000 _____
Employee Name _____
Date of hire _____ Short-term Disability Eff. Date _____ Long-term Disability Eff. Date_____
Last day at work _____ Occupation _____
Date returned to work F/T_____ P/T_____
Return to Work Occupation_____
Eligible for sick leave or extended sick leave? ☐ Y ☐ N   Duration _____
Eligible for salary continuation? ☐ Y ☐ N   Amount $_____ Duration _____
Eligible for Short-term Disability benefits from another carrier? ☐ Y ☐ N  Name of Carrier _____
Is employee eligible for pension disability? ☐ Y ☐ N   Is this employee eligible for workers' compensation? ☐ Y ☐ N
Employer Name  Tarrant County College District _____
Employer Address  1500 Houston Street, Fort Worth, TX 76102 _____ Signature _____
Title _____ Telephone Number _____ Date _____

Did the employer pay any portion of the employee's Short-term Disability premium? ☐ Y ☐ N  If yes, what _____%
Did the employer pay any portion of the employee's Long-term Disability premium? ☐ Y ☐ N  If yes, what _____%

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company® (Downers Grove, IL) in all states (excluding New York), the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 1 of 4                                                    R11.01FM  |  X812RER3

TCCD 00259

11/21/2012  12:35   8172229909          P RAJU INDUKURI,M.D.          PAGE  09

**Dearborn ★ National®**

Toll Free: (855) 377-5433
Fax #   (972) 996-9361

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

**Employee's Preliminary Statement of Disability**  *Please print or type*

Full Name Christy Leigh Williams  Social Security # 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 Group # 35000

Address 7808 Arnold Terrace  City N. Richland Hills  State TX  Zip 76180

Home Phone (817) 707-1223  Date of birth 1-27-65  Height 5'6"  Weight 149 lbs  Sex ☐ M ☒ F
Marital Status: ☐ Single  ☐ Married ☒ Divorced ☐ Widowed

Spouse's date of birth N/A  Is spouse employed? ☐ Y ☐ N  Number of children (under the age of 18) _____

Name and date of birth of each unmarried child under age 18 _____

Describe the symptoms of your disability depression, anxiety, PTSD, and difficulty coping with stress
Is your disability related to a work injury? ☐ Y ☒ N If yes, please give details _____

Date you first noticed symptoms of illness or date of accident 1993  Date first treated for these symptoms 1994
Treated by Doctor: Dr. Indukuri  Address 2707 Airport Frwy. Ste. 201 Ft. Worth, TX 76111  Phone 817-222-9907

Hospital _____  Address _____  City _____

I have been unable to work because of this illness or injury since 11-13-2012

If disability is due to an accident, please provide details and attach accident report _____

I returned to work part-time on _____  I returned to work full-time on _____  I am self employed ☐ Y ☒ N

Name of Health Care Insurance United Healthcare Health Select  Group Plan/Policy # 35000 744260

ID # 009346180  Coverage is through ☒ My Employer ☐ Spouse's Employer
Are you now eligible for, have you applied for, or are you now receiving income benefits from:
If eligible for any of the following income benefits, please provide a copy of the reward letter.
Social Security: ☐Disability Retirement  Amount awarded $ _____  Date of award _____
☐Workers' Compensation  Amount awarded $ _____  Date of award _____  Carrier _____
(If Workers' Compensation is denied submit a copy of denial letter with this form)
☐Disability Retirement  Amount awarded $ _____  Date of award _____  Source _____
☐Any other disability (Federal, State, VA, etc.)  Amount awarded $ _____  Date of award _____
Have you ever had the same or similar condition? ☐ Y ☐ N
If so, when? _____  Treated by _____
List all Practitioners you have seen for the past 2 years:
- Name Dr. Childers  Address 8th Ave. Ft. Worth, TX  Telephone 817-336-7191  Diagnosis/Condition Treated general health
  From 11-28-11  To present
- Name Dr. Coulter-Smith  Address 1625 Lancaster Dr.  Telephone 817-416-2299  Diagnosis/Condition Treated gynecological
  From 2007  To present
- Name Dr. Molenich  Address 8th Ave. Ft. Worth, TX  Telephone 817-980-0900  Diagnosis/Condition Treated migraines
  From 2011  To present
Continued on attached
Are you employed elsewhere? ☐ Y ☒ N  ☐ Full time  ☐ Part time
If yes to above question please give: Name of 2nd Employer _____  St _____  Zip _____
Address _____  City _____
Name of person completing this form if other than the employee _____

The above statements are true and complete to the best of my knowledge and belief.

Employee's signature (required to process the claim)   Date 11-19-12

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company® (Downers Grove, IL) in all states (excluding New York), the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 2 of 4
R11.01/11  I  X6120/ERS

TCCD 00246

11/21/2012  12:35   8172229909          P RAJU INDUKURI,M.D.              PAGE  10

**Dearborn ★ National®**

Toll Free: (855) 377-5433
Fax #     (972) 996-9361

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

## Attending Practitioner's Statement  *Please print or type*
*All information must be legibly completed in full to avoid a delay or possible denial of your patient's claim.*

Patient's name  Christy Wilhcaus      Patient's Date of Birth  7.27.45
Date first seen  2.28  Date last seen  11.19.12  frequency of visits  ☑ PRN  ☐ weekly  ☐ monthly  ☐ less often
Patient impaired from tasks of his/her usual occupation from _____ to _____
Diagnosis  Major depression disorder      ICD9CM code  298.23
Co-morbid conditions _____
If diagnosis is pregnancy: LMP _____  Estimated delivery date _____  Is patient confined to bedrest? ☐ Y ☐ N
If delivered, date _____  Type of delivery:  ☐ Normal  ☐ C-section
Subjective symptoms  severe depression anxiety
Objective medical findings, include results of all diagnostic testing
Objective evidence of impairment  not able to eat and sleep well concentration at work
Please list restrictions  all work

Please describe how the patient's impairment prevents him/her from performing their regular employment
Is disability at patient's request? ☐ Y ☑ N  Is condition work related? ☐ Y ☐ N
Plan of Treatment  medication management
Medications  counseling

Does the patient's condition permit the safe operation of a vehicle? ☑ Y ☐ N  ☐ Patient has been instructed not to drive
Is the patient Ambulatory? ☑ Y ☐ N  ☐ Only with assistance  Confined to? ☐ Bed  ☐ House  ☐ Hospital
List names and phone number of other treating or consulting Practitioners  N/A.

List the date and facility of any hospital admission in the past 12 months including dates, type of surgery, condition, etc.
N/A

How does the patient's impairment prevent alternative/other employment  yes

Was the patient unable to work when he/she ceased work? ☑ Y ☐ N
Disability applies to:  Only the patient's own job ☐ Y ☑ N;  all other types of work, including sedentary work? ☑ Y ☐ N
Date patient is expected to be able to return to his/her usual work  7 . 19 . 12  Other work _____

I attest the above statements are true and complete to the best of my knowledge
RAJU INDUKURI, M.D.        MD Psychiatry      (817)  222  9909
Name (Attending Practitioner)      Degree & Specialty      Telephone
2707  AIRPORT FRWY  206
FT. WORTH, TX 76111
Street Address      City or Town      State    ZIP

                                                    11.19.12
Attending Practitioner's Signature                  Date

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company®
(Downers Grove, IL) in all states (excluding New York), the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 3 of 4                                          R11.01/11  |  XH126ER3

TCCD 00247

**Dearborn ☆ National**

Toll Free: (855) 377-5433
Fax #    (972) 996-8361

**Disability Claim Form**
Return to Dearborn National at:
Administrative Office:
P.O. Box 655403
Dallas, Texas 75265-5403

### Fort Dearborn Life Insurance Company®
### Claimant Authorization

I, the undersigned claimant, have read and agree that the above statements and answers are furnished in support of my claim for benefits and are complete, true, and correctly recorded to the best of my knowledge and belief. I understand that incorrect or untrue answers on this form may result in denial of this claim and may be cause for expulsion from the Texas Employees Group Benefits Program.

I understand and agree that:

- This authorization is voluntary but that my signature is required in order for Fort Dearborn Life Insurance Company (the "Company") to evaluate my claim for benefits;
- If I refuse to sign this authorization, the Company has the right to deny my claim, or that of my dependents, if applicable;
- I may revoke this authorization at any time in writing but that such a revocation will have no effect on any actions taken by the Company prior to receipt of the revocation;
- Information disclosed pursuant to this authorization may be redisclosed by the recipient and may no longer be subject to the protections of the HIPAA Privacy Rule;
- I should retain a duplicate copy of this authorization for my own records;
- A photocopy or facsimile of this authorization shall be as valid as the original;
- This authorization shall expire the later of 24 months from the date signed or at the end of any appeal process concerning my claim.

I, as well as any person authorized to act on my behalf or my personal representative, acknowledge the right, upon request, to obtain a true copy of this authorization from the Company.

I authorize my employer, the Employees Retirement System of Texas ("ERS"), and any medical professional, hospital, medical facility, medical provider, pharmacy, government agency, insurance carrier, HMO, MCO, or any Covered Entity or Health Plan as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) to disclose to the Company's claims department or its authorized representative(s) any information relating to me concerning advice, care, or treatment, including any claims processed by Blue Cross Blue Shield of Texas, for any health condition, including but not limited to drug or alcohol use or abuse, mental illness, HIV (AIDS Virus), or other sexually transmitted diseases.

I authorize my employer, ERS, any government agency, or insurance carrier to disclose any information related to my employment or retirement and all other information necessary to process my claim.

Employee/Insured's Name  *Christy Williams*
                                (Print or Type)

Signature  _[signature]_                    Date  11-19-12

Products and services marketed under the Dearborn National® brand and the star logo are underwritten and/or provided by Fort Dearborn Life Insurance Company® (Downers Grove, IL) in all states (excluding New York, the District of Columbia, the United States Virgin Islands, the British Virgin Islands, Guam and Puerto Rico.
Page 4 of 4                                                                    R11.01/11  I  X6126

TCCD 00248

11/21/2012  12:35   8172229909                P RAJU INDUKURI, M.D.                PAGE  12

*Please have doctor fill out certification form.*

Certification for Leave
Family and Medical Leave Act (FMLA)

NOTE: Failure to fully complete the enclosed form co... 
leave or delay in approval of an FMLA leave for the e...
foreseeable, such as for an expected birth, an employ...
advance notice of the need for leave to the supervis...
possible. This information includes anticipated timi...

Pursuant to the Genetic Information Nondiscrimination Act (GINA)'s "safe harbor  provisio...
29 CFR § 1635.8(b)(1)(i), the GINA disclosure language must be included with any request for
employment-related medical information or examinations (e.g., FMLA for employee, ADA,
Fitness-for-Duty exams, Workers' Compensation exams, post-offer/pre-employment exam,
etc.) for the individual's own condition.

Notice to Health Care Provider:
The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other
entities covered by GINA Title II from requesting or requiring genetic information of an
individual or family member of the individual, except as specifically allowed by this law. To
comply with this law, we are asking that you not provide any genetic information when
responding to this request for medical information. "Genetic information," as defined by
GINA, includes an individual's family medical history, the results of an individual's or family
member's genetic tests, the fact that an individual or an individual's family member sought or
received genetic services, and genetic information of a fetus carried by an individual or an
individual's family member or an embryo lawfully held by an individual or family member
receiving assistive reproductive services.

TCCD 00249

11/21/2012  12:35   8172229909          P RAJU INDUKURI,M.D.          PAGE  13

**Certification of Health Care Provider for**
**Employee's Serious Health Condition**
**(Family and Medical Leave Act)**

**U.S. Department of Labor**
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 2/28/2015

INSTRUCTIONS to the EMPLOYER: The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact: Tarrant County College District, Human Resources, 1500 Houston St, Fort Worth, TX

Employee's job title: Instructional Associate *Assistant*  Regular work schedule: _____

Employee's essential job functions: _____

Check if job description is attached: ___✓___

INSTRUCTIONS to the EMPLOYEE: Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name:  *Christy*   *Leigh*   *Williams*
            First        Middle       Last

INSTRUCTIONS to the HEALTH CARE PROVIDER: Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: *Psychiatry*

Type of practice / Medical specialty: _____

Telephone: ( *817* ) *222 9907*   Fax:( *817* ) *222 9909*

RAJU INDUKURI, M.D.
2707  AIRPORT FRWY
       SUITE 208
FT. WORTH, TX 76111

Page 1                    CONTINUED ON NEXT PAGE          Form WH-380-E  Revised January 2009

TCCD 00250

11/21/2012  12:35   8172229989          P RAJU INDUKURI,M.D.          PAGE  14

1. Approximate date condition commenced: _____ 2.10.12 _____

   Probable duration of condition: _____ not known at this time _____

   **Mark below as applicable:**
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   ✓ No ___ Yes. If so, dates of admission:

   _____ as needed from 2.10.12 _____ last appt _____
                                      11.19.12

   Date(s) you treated the patient for condition: _____

   _____

   Will the patient need to have treatment visits at least twice per year due to the condition? ___ No ✓ Yes.

   Was medication, other than over-the-counter medication, prescribed? ___ No ✓ Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   ✓ No ___ Yes. If so, state the nature of such treatments and expected duration of treatment:

   _____

2. Is the medical condition pregnancy? ✓ No ___ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to the condition: ___ No ✓ Yes.

   If so, identify the job functions the employee is unable to perform:
   _____ as all job functions _____

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

   _____ Severe depression and anxiety _____
   _____ decreased concentration _____
   _____ difficulty eating, sleeping _____

   _____

   _____

Page 2                        CONTINUED ON NEXT PAGE                Form WH-380-E Revised January 2009

TCCD 00251

App. 119

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No ✓Yes.

   If so, estimate the beginning and ending dates for the period of incapacity: 11.19.12 to 12.18.12

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ✓Yes.

   If so, are the treatments or the reduced number of hours of work medically necessary?
   ___No ✓Yes.

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

   _____ weekly appt will differ _____

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ___Yes.    N/A

   Is it medically necessary for the employee to be absent from work during the flare-ups?
   ___ No ___Yes. If so, explain:

   _____

   _____

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency          : _____ times per _____ week(s) _____ month(s)

          Duration: _____ hours or ___ day(s) per episode

   Pt is in treatment with
   medication and counselling for
   major depressive disorder

Page 3                          CONTINUED ON NEXT PAGE                Form WH-380-E Revised January 2009

TCCD 00252

11/21/2012  12:35   8172229989                P RAJU INDUKURI,M.D.              PAGE  16

Signature of Health Care Provider                    Date   11.21.12

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29
C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB
control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this
collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining
the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden
estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the
Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC
20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

Page 4                                                                  Form WH-380-E Revised January 2009

TCCD 00253

## MARSHALL, SHARION

| | |
|---|---|
| From: | CORONADO, RICARDO |
| Sent: | Wednesday, January 02, 2013 6:23 PM |
| To: | MARSHALL, SHARION |
| Subject: | FW: Removal of Personal Belongings from Writing Lab |
| | |
| Importance: | High |

Ricardo Coronado, Ph.D., SPHR
Associate Vice Chancellor for Human Resources
Tarrant County College District | Office: DMOC 2107F
1500 Houston | Fort Worth, TX 76102
817-515-5234 | Fax 817-515-0993
ricardo.coronado@tccd.edu | www.tccd.edu

**From:** HUBBARD, CHRISTINE
**Sent:** Wednesday, January 02, 2013 12:24 PM
**To:** CORONADO, RICARDO; MARSHALL, SHARION; PRICE, LATONYA
**Cc:** ELLIS, LEANN; LEBLANC, ELVA
**Subject:** Removal of Personal Belongings from Writing Lab
**Importance:** High

Hello,

Because of Christy Williams' volatility, we are requesting that she be accompanied by an officer to come on campus to remove her belongings from her desk. If you would like to send her here after you meet with her this afternoon at 3pm, please let me know. We would like to schedule a time and have an officer available. We will also shut down the lab to reduce disruption.

We would also be more than happy to box up her belongings and mail them to her. This may be an even better solution. Please advise us on the best course of action.

Thank you for your assistance in this matter.

Best regards,

Christine Hubbard, Ph.D.
Dean | Humanities Division
Tarrant County College Northwest Campus | Office: WTLO 4306A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7782 | Fax 817-515-7007
christine.hubbard@tccd.edu | www.tccd.edu

Office hours: 8:00 a.m. to 5:00 p.m., Monday - Friday

1

TCCD 00204

## DECLARATION OF CURTIS FUKUCHI

1.      My name is Curtis Fukuchi. I am over twenty-one (21) years of age and I am competent to make this Declaration. I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.      At the start of the Fall 2010 semester, I became an Associate Professor in the English Department at Tarrant County College, Northwest Campus. About two years ago I became a full professor, and I still work there.

3.      Ever since I started at Tarrant County College, I have volunteered my time to work in the writing lab on the Northwest campus. I often went there instead of to my office, and I would assist students as needed, and if not needed I would grade papers or perform other tasks. For each semester from Fall 2010 through Fall 2012, I spent about two to four hours per week in the writing lab. I therefore had a firsthand look at Christy Williams' work as a writing tutor.

4.      I have read Dr. Christine Hubbard's Memorandum to Ricardo Coronado dated 2 January 2013 recommending termination of Christy Williams' employment, and based on my own observations I disagree with some of the things in the memorandum. For example, the memo says it was an essential function to provide feedback to students "on a walk-in and scheduled basis." However, at that time it was the official written policy of the writing lab to require students to make an appointment, and to turn in their writing assignment more than 24 hours before the tutoring session. In other words, seeing students on a walk-in basis was contrary to the lab's own written policy. Attached to this declaration as Exhibit A is a true and correct copy of a writing lab brochure that described the policy.

1

This brochure was issued in June 2012, and the policies were in effect for the Fall 2012 semester.

     5.     Regarding the eight bullet points that begin in the middle of page one:

a.     *"She becomes extremely agitated ..."*  I never saw Williams become agitated as described here.  Rather, if Williams was doing a tutoring session and another student had a quick question, she would usually stop for a moment and help the other student.  This was true even during times she was in the lab by herself.  If she was not already doing a session with a student, it was not unusual for her to go beyond answering a quick question and spend twenty or thirty minutes helping and tutoring the student who originally asked the question.

b.     *"She is unwilling to assist walk-in students..."*  I never observed the behavior described in this section of the Memorandum.  To the contrary, it was my experience that Williams did one of two things when a student sought help on a walk-in basis.  If she was not already engaged in a tutoring session and a student walked in, she would help the student and do a tutoring session.  If she was working one-on-one with a student and someone walked in seeking help, she would stop and talk to the student long enough to ask the student to wait, come back later, or make an appointment.  This was in contrast to the other writing tutors, Margaret Levy and Lynnelle Brown, who did not help students on a walk-in basis.  They would follow the lab's policy and tell the student to make an appointment and turn their paper in at least 24 hours ahead of time, and return another day.

c.     *"She has ongoing conflicts with her co-workers..."*  I never saw any such conflicts.  Her co-workers were Margaret Levy and Lynnelle Brown, and it seemed to me that

2

App. 124

the three writing tutors all got along well.  Regarding Herrera, I never witnessed any insubordination or any conflicts between Williams and Herrera.

d.  *"She has ongoing conflicts with the faculty members ... "*  I never observed this.  In fact, I remember several faculty members praising her work, and as a professor in the English Department, I sent my students to the lab and to Williams for tutoring, and in my experience she always did a good job.

e.  *"She is stressed ... "*  I do not have any specific knowledge about the scheduling issues, but I was in the lab on many occasions when Williams was the only tutor on duty, and I would not describe her as stressed.  As mentioned above, she was able to multitask and step away from a tutoring session to assist another student on one of the computers or with a quick writing question.

f.  *"She has had several loud outbursts ... "*  I was in the lab frequently, over at least five semesters when Williams was a tutor in the writing lab, and I never witnessed her having a loud outburst, or interpersonal conflict as described here.

g.  *"She has had complaints ... "*  There is only one complaint that I know about, and in my opinion the student who complained did so without justification.  That was a student of professor Cecilia Sublette, who had given the student comments on a paper and told him he could redo the assignment for a better grade.  The student wanted Williams to explain Sublette's written comments, but the comments were ambiguous (I read them too) and Williams merely suggested that he ask Sublette what her comments meant.  The student later complained that Williams refused to help him, but that was not the case -- she and I had both tried to help him, but we were unable to do so because neither of us fully understood professor Sublette's

3

written comments. I explained this to Dr. Hubbard shortly after he made his complaint.

h. *"On November 13, 2012 …"* I cannot speak to the specifics of what happened in the breakroom that day, but I do remember I was in the writing lab from 2 to 4 that afternoon. I remember because Margaret Levy told me a little about what was going on and that Williams was in the breakroom. I never heard anything, so at least for the two hours I was in the lab, Williams was not being loud or disruptive.

6.     In addition to my observations from spending time in the writing lab, some of my own students went to Williams for tutoring and I could see the benefits of her tutoring. Based on my own observations, Williams was very good at her job.

7.     While other tutors would only work with students once they had finished drafts, Williams commonly spent many preparatory hours over several days taking a student through the entire writing process for an assignment, from initial brainstorming, to clustering ideas, to selecting a topic, to narrowing the focus, to formulating a thesis, all in addition to a formal tutoring session focusing on revising the initial draft. Even during the formal tutoring sessions, she often went beyond the basic mechanics of writing to guide students through higher-level thinking about their overall structure and concept, making sure each paragraph had a clear topic sentence that related to the thesis. In this way, she helped students maintain a focus and a clear sense of purpose.

8.     Williams worked with a wide range of students, including some for whom English was a second language. There were other tutors who were specifically trained to help those students, but if one of those tutors was not immediately available Williams would help as much as she could.

4

9.     Williams also got along well with the students, and I never saw her be rude, impatient, or get loud with a student. To the contrary, there were times when a student came in without an appointment and became upset that he or she could not get immediate assistance, but Williams was always patient and respectful.

10.     Conrad Herrera was the writing lab manager, but he was hardly ever in the writing lab. His office was down the hall and around the corner from the lab. I never saw him in the lab tutoring a student, or observing a tutoring session being done by one of the other tutors, and I wonder how he could possibly evaluate the writing tutors since he never saw them tutoring.

11.     Crystal Bravo did not have the same job as Williams and the other writing tutors. Bravo was hired as one of the instructors to help students who were not native English speakers. She may have worked a few shifts at most, and she was not here very long.

12.     After Williams was terminated, Lynnelle Brown took over the evening hours that Williams used to work. The staffing has greatly increased: after Williams was terminated, the lab was staffed with four full-time tutors, two part-time tutors, and some peer writing tutors (students who get paid to work part time as writing tutors in the lab).

13.     Of all the tutors I've worked with throughout my nineteen years of college teaching, Williams was the most dedicated to helping in ways that went beyond just writing. One of my literature students lost her entire draft in the writing lab computer and was near tears, yet persevered and reconstructed her entire paper with Williams' guidance and encouragement. The reconstruction was probably better than the accidentally deleted original, and that student's multiple visits and long hours with Williams in the writing lab

5

led her to improve significantly with each essay.  Another full-time student was ready to drop all of her classes and quit college altogether due to child care issue at home that interfered with taking daytime classes, but Williams had her get in touch with me to plan an alternate schedule involving online submissions and frequent email communication. Williams herself worked with that student many late nights in the lab, enabling her not only to stay in school, but also to receive an A in every class.

14.     After Williams left, students who had worked with her before tried to go back to her for help, and I overheard students requesting her specifically and expressing disappointment at her unavailability.

15.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August _9_ , 2016.

Curtis Fukuchi

6

App. 128

# MAKING THE
# MOST OF THE



# WRITING
# LAB

Tarrant County College
Northwest Campus
Writing Lab
**WCTS 1151**
(817) 515-7147

Exhibit A

Welcome to Tarrant County College Northwest Campus Writing Lab!

The goal of the Writing Lab is to promote students' endeavors in grammar, style, and creativity. We can help you improve your writing by explaining the skills needed to become confident and self-sufficient writers.

Please keep in mind, however, that we cannot edit, proofread, correct, or fix your assignment because that would violate TCC's academic honesty policy. **Your goal in visiting the Writing Lab should be to become a more skilled writer, not to get a good grade or extra credit on a particular assignment. Success takes sustained effort and practice!**

Writing tutors will make a return appointment when you submit your essay. Students should plan their drafts accordingly, properly allotting time for the writing process.

We suggest that you make an appointment with a tutor after completing some form of an outline or rough draft. Writing is a multi-step process that requires several drafts, so visit a tutor early in the assignment. This is a <u>free service</u>, and is first come -first served. **Please plan your time well!**

<u>Please Note: Tutors are not available to review drafts for the first time within the 24 hours prior to the assignment's due date/time.</u>

hwest

ting by
dent

nnot
nt

iting
riter,
a

ent
d plan
for

t with
e or
at
the
come

eview
prior

# MAKING AN APPOINTMENT



Before making an appointment with a writing tutor, please follow these procedures:

1. **Run a spelling & grammar check** on your paper. **Essays must be typed for review.**
2. **Proofread your paper** and make any changes that the above checks failed to flag. **The tutors cannot proofread your paper for you.**
3. **Print your paper** to present to a tutor.
4. **To make an appointment**:
   Drop off your paper with any tutor **more than 24 hours before your paper or project is due.** The tutor will reserve an assigned time for your appointment. Come to your tutorial prepared to discuss your essay, ideas, or questions.

## DECLARATION OF KERI WILCOX

1.      My name is Keri Wilcox.  I am over twenty-one (21) years of age and I am competent to make this Declaration.  I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.      During the Fall 2011 semester, I was a student at Tarrant County College.  I was taking classes at their Trinity River campus, but my home was closer to the school's Northwest Campus.

3.       During the Fall 2011 semester, I went to the writing lab on the Northwest campus seeking emergency assistance with a writing assignment, a paper that was due the next day.  I was very stressed and I was crying, and I knew it was not normal for me to go to the writing lab for help without an appointment; the writing lab's policy required a student to make an appointment at least 24 hours in advance.  But Christy Williams, who was working in the lab that day, was very compassionate.  She greeted me when I came in and helped me to calm down, and after she finished the tutoring session she was in at the moment, she worked with me on my paper even though I did not have an appointment.

4.      Williams was extremely helpful with my paper – so much so that I returned to her several times that semester seeking help with other writing assignments.  Williams taught me more about writing than the professors did, working with me on things like how to structure sentences, and making better word choices.  I thought she should have been a teacher – she seemed to have a passion for helping the students, and she was an excellent writing instructor.

5.      I liked going to the lab on the Northwest campus to work, and I was there frequently during that Fall 2011 semester.  During these times I sometimes overheard Williams tutoring other students and doing the same excellent job with them that she had done with me.  One of her

1

strengths was that she knew what the professors were looking for, and she could teach her students how to write the way their particular professor wanted.

6.     The writing lab where Williams worked could get busy at times, with more students seeking assistance than there were writing tutors or staff, but even in such stressful situations Williams was always calm and helpful.  She was never loud and never rude to any students or coworkers during the many hours that I spent in her writing lab that semester.

7.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August __11__, 2016.

*Keri Anne Wilcox*

_____

Keri Wilcox

## DECLARATION OF DOMINIQUE CAMPOS

1.      My name is Dominique Campos.  I am over twenty-one (21) years of age and I am competent to make this Declaration.  I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.      During the Fall 2012 semester, I was a student at Tarrant County College.  I was taking classes at their Northwest campus, including an English class with professor Curtis Fukuchi. I sometimes went to the writing lab on the Northwest campus for assistance with my writing assignments, and by doing so I came to know Christy Williams, who was one of the writing tutors there in the lab.

3.      The policy for using the Writing Lab was to make an appointment, and to drop off your paper more than 24 hours before the appointment.

4.      One day during the Fall 2012 semester, I was in the writing lab doing a one-on-one tutoring session with Christy Williams. A group of people came into the writing lab, and Williams excused herself for a moment to get up and help them.  They were speaking in Spanish, and I looked over from time to time as Williams helped get them set up and working on the computers in the writing lab. I did not notice any issues or personal conflicts taking place with anyone.

5.      Williams came back and apologized to me for the interruption, saying that the people who had come in did so unexpectedly and without an appointment.  We continued the tutoring session, but Williams had to stop a couple more times to get up and assist one of the students on the computers.  I had limited time for my appointment so I was not very happy about this, but Williams remained calm and did an excellent job of switching back and forth between me and the other students to make sure we all got what we needed.

1

6.      I went to the writing lab several times that semester for help with writing assignments, and I worked one-on-one with Williams several times. She was very knowledgeable about the writing process and she taught me a lot.

7.      From my own observations during several hours spent in the writing lab, Williams had no difficulty multitasking or dealing with stressful situations like the one described above, where many people were all needing help from her at the same time. She was always professional and courteous – I never saw her be rude to anyone or be loud.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2016.

Dominique Campos

2

App. 135