IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

TABLE OF CONTENTS

I.    Summary of the Argument                                                          1

II.   Relevant Facts                                                                    2

III.  Argument                                                                        11

      A.    Because the Limitations Period is 3 Years for Willful Violations,        11
            Plaintiff's Claim is Not Barred by Limitations

      B.    Disabilities Discrimination Under the ADA and Texas Labor Code           12

      C.    Legal Standards Applicable to the Analysis of Plaintiff's                13
            Termination Claim

      D.    The Evidence in the Record Proves the Prima Facie Case                   14

            1.    There is no one-size-fits-all iteration of the prima facie case.   14

            2.    Proof of a disability on or prior to November 13, 2013            15
                  is not the issue.

            3.    The evidence proves Plaintiff had an actual disability.           15

            4.    Plaintiff also meets the "regarded as" definition of disability   19

            5.    Plaintiff was qualified for, and able to perform,                 19
                  the essential functions of her position.

            6.    Whether Plaintiff proposed accommodation that                     24
                  would/would not have been helpful is irrelevant.

            7.    Williams was replaced by a person who did not have a disability,  25
                  and she was treated less favorably than her coworkers.

      E.    TCCD Has Not Adequately Articulated Non-Discriminatory Reasons          26
            for Its Actions

      F.    There is Ample Evidence of Pretext                                       28

      G.    Plaintiff's Failure-to-Accommodate Claim Survives Defendant's Motion    33

      H.    Plaintiff's ADA Retaliation Claim Likewise Survives Defendant's Motion  36

TABLE OF AUTHORITIES

<u>Cases</u>

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015)                 27

*Byrd v. Roadway Express, Inc.*, 687 F.2d 85 (5th Cir. 1982)                 14

*City of Austin Police Dept. v. Brown*, 96 S.W.3d 588                 14
    (Tex. App. –Austin 2002, pet. dism'd)

*Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108 (5th Cir. 2005)                 34

*EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606 (5th Cir. 2009)                 15, 32-33, 34

*EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724 (5th Cir. 2007)                 21

*EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014)                 15, 21, 31-2

*Ellerbrook v. City of Lubbock*, 465 Fed. Appx. 324 (5th Cir. Tex. 2012)                 28

*Grace v. Potter*, No. H-04-1182, 2006 U.S. Dist. LEXIS 28391                 14
    (S.D. Tex. May 3, 2006)

*Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6th Cir. 2010)                 33

*Kapche v. City of San Antonio*, 176 F.3d 840 (5th Cir. 1999)                 21

*Laxton v. Gap, Inc.*, 333 F.3d 572 (5th Cir. 2003)                 28

*Leffel v. Valley Financial Services*, 113 F.3d 787 (7th Cir. 1997),                 14, 26
    *cert. denied*, 522 U.S. 968 (1997)

*Martin v. J.A.M. Distrib. Co.*, 674 F. Supp. 2d 822 (E.D. Tex. 2009)                 26

*Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933 (3d Cir. 1997)                 14

*McCollum v. Puckett Mach. Co.*, 628 Fed. Appx. 225 (5th Cir. 2015)                 15

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007)                 31

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)                 15

*McInnis v. Alamo Community College Dist.*, 207 F.3d 276 (5th Cir. 2000)                 14

*Mzyk v. N. E. Indep. Sch. Dist.*, 397 F. Appx 13 (5th Cir. 2010)                 13

*Nelson v. Hitchcock Indep. Sch. Dist.*, No. 3:11-CV-00311,
    2012 U.S. Dist. LEXIS 180859 (S.D. Tex. Dec. 21, 2012)       34

*Nero v. Industrial Molding Corp.*, 167 F.3d 921 (5th Cir. 1999)       11

*Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004)       26

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)       28

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (U.S. 2000)       27

*Rushing v. Kansas City Southern Ry.*, 185 F.3d 496 (5th Cir. 1999)       11

*Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999)       13

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)       14

*Taylor v. Principal Fin. Grp.*, 93 F.3d 155 (5th Cir. 1996)       33

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)       27

*Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100 (1st Cir. 2005)       33

*Troutman v. Williamson County.*, No. 1:14-CV-986-DAE,
    2016 U.S. Dist. LEXIS 41986 (W.D. Tex. Mar. 30, 2016)       21

*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983)       14

<u>Statutes</u>

29 C.F.R. § 1630.2(i)       16

29 C.F.R. § 1630.2(j)(1)(iii)       16

29 C.F.R. § 1630.2(j)(1)(viii)       16

29 C.F.R. § 1630.2(j)(1)(vi)       16

29 C.F.R. 1630.2(j)       17

29 C.F.R. 1630.2(j)(3)       17

29 U.S.C § 12102(2)(A)       17

29 U.S.C. § 2614(a)(1)       11

29 U.S.C. § 2615                                                    11

29 U.S.C. § 2617                                                    11

42 U.S.C. § 12101 *et seq.*                                         12

42 U.S.C. § 12101(a)(1)                                             16

42 U.S.C. § 12102(3)(A)                                             16

42 U.S.C. § 12102(4)(A)                                             16

42 U.S.C. § 12102(4)(B)                                             16

42 U.S.C. § 12112                                                   12

42 U.S.C. § 12112(a)                                                12

42 U.S.C. § 12112(b)(5)                                             12

Texas Labor Code § 21.051                                          12

Texas Labor Code § 21.128                                          12

<u>Other</u>

http://www.merriam-webster.com/dictionary/pretext                  28

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

Plaintiff Christy L. Williams submits the following in response to Defendant's Motion for Summary Judgment.

## I.  Summary of the Argument

The FMLA requires an employer to restore an employee to her position (or an equivalent position) after a period of FMLA leave.  It is undisputed that TCCD did not do this.

Under the ADA, when an employee requests accommodations, the ADA requires the employer to engage in an interactive process to determine if there are reasonable accommodations that will allow the employee to perform the essential functions of her position. It is undisputed that TCCD did not do this.

Also under the ADA, an employer may not stymie the interactive process by hastily terminating the employee before accommodations are requested or considered, and it is undisputed that TCCD did exactly this.  Just five days after Williams sought to return to work and asked for reasonable accommodations, TCCD fired her, allegedly for poor prior performance, without any efforts whatsoever to assess Plaintiff's condition or consider accommodations.  In so doing, TCCD violated the FMLA, the ADA, and the Texas Labor Code, and its motion for summary judgment should be denied.

1

## II.  Relevant Facts

TCCD hired Williams as an Instructional Assistant in February, 2009.  She worked in the Writing Lab located on the school's Northwest campus.  Her job was to tutor students to make them better writers.  App. 3 (Williams Declaration).

Williams was good at her job, and she regularly received positive comments from the students she tutored, and complimentary emails from professors whose students worked with Williams in the Writing Lab.  App. 9-10 (Williams Declaration).  Before the start of the Fall 2012 semester, Williams received a promotion to the position of Instructional Associate (up from Assistant), and a pay raise of $151.42 per month.  App. 9 (Williams Declaration ¶ 21).

The job could be stressful and demanding at times.  Williams worked mostly with students in their late teens and twenties, and sometimes when the Lab was busy and a student could not be helped right away, the student's dissatisfaction was manifest, especially if he or she was up against a deadline for their writing assignment.  App. 4 (Williams Declaration ¶ 6).

TCCD claims that Williams repeatedly failed to handle such situations well, but its evidence is mostly hearsay and remote in time to the events in question.  All but two of the incidents cited by TCCD took place after Williams was promoted in September 2012, which calls into question why these prior events would later be dredged up as the basis for termination, and also calls into question Defendant's contention that Williams was not able to perform the essential functions of her position.

Furthermore, TCCD's example of poor behavior or performance are contradicted by other evidence.  Curtis Fukuchi is a professor in the English Department, and he was familiar with Williams performance (1) because she tutored his students, and (2) he spent several hours each week in the writing lab, where he personally observed her demeanor.  App. 123

(Declaration of Curtis Fukuchi).  Fukuchi reviewed the memo Hubbard wrote recommending

Plaintiff's termination, and point-by-point he directly contradicts most of what Hubbard said,

including:

| Hubbard | Fukuchi |
|---|---|
| *She becomes extremely agitated…* | No, she would stop what she was doing and help. |
| *She is unwilling to assist walk-in students* | No, she did help them.  In fact, it was the other two writing tutors, Brown and Levy, who consistently refused to help walk-ins. |
| *She has ongoing conflicts with her co-workers* | None that I ever witnessed – she got along well with her co-workers. |
| *She was insubordinate to Herrera.* | "I never witnessed any insubordination or any conflicts between Williams and Herrera." |
| *She has ongoing conflicts with faculty members.* | "I never observed this."  Plus, faculty members praised her work, and she did a good job. |
| *She was stressed …* | Not that I ever saw.  "[S]he was able to multitask and step away from a tutoring session to assist another student on one of the computers or with a quick writing question." |
| *She has had several loud outbursts …* | I was in the writing lab frequently, and I never saw it. |
| *She has had complaints …* | Only one that I know of, and in that case the student was wrong. |
| *"On November 13, 2012 …"* | I was in the writing lab from 2-4 that day, and I didn't hear anything. |

App. 124-6.

Regarding the complaints Helen Yakub made, a student Williams was tutoring at that moment has provided a declaration explaining how Williams handled the situation calmly and professionally.  App. 134-5 (Declaration of Dominique Campos).[1]

Keri Wilcox is another student who went to Williams for tutoring.  She went to the writing lab in tears, without an appointment, seeking help with a paper due the next day.  Williams greeted her and calmed her down, and helped with the paper even though she did not have an appointment.  Wilcox went back to Williams several times that semester, and Wilcox states: "Williams taught me more about writing than the professors did, working with me on things like how to structure sentences, and making better word choices.  I thought she should have been a teacher – she seemed to have a passion for helping the students, and she was an excellent writing instructor."  App. 132-3.

Starting in the Fall 2011, students who came for tutoring used a system called TutorTrac when they came into the writing lab, and if they chose to do so they could leave comments about their experience.  App. 23 (Williams Declaration).  Most of the comments are overwhelmingly favorable, such as: "Amazing could not have asked for better help," "chrisy [sic] is the only worker in here with a friendly disposition," and "I received great help and tips to help me write my essay."  App. 47-53.  During the three semesters for which comments about Williams are available, there as only one negative comment from a student.  App. 48.

Williams regularly received complimentary emails and comments from the teachers whose students went to Williams for help, and they would comment on how Williams had helped improve the students' writing.  App. 10 (Williams Declaration ¶ 22); App. 38-45 (the emails from faculty).  Biber and Herrera likewise complimented Williams on her demeanor and her

---

[1] Campos did not know who Yakub was, so her declaration does not give a name.  But Williams can connect the dots – in paragraph 15 of her declaration, she confirms that she was tutoring Campos when Yakub came in, and that what Campos describes in her declaration is the Yakub incident.

skills as a writing instructor.  App. 28, 88.  In short, by all accounts (except those of TTCD that came after they had decided to fire her), Williams was a patient, professional, and effective teacher.

Throughout her employment, Williams was coping with several major disabilities.  In the appendix being filed along with this brief, Plaintiff has written a lengthy and detailed affidavit describing her conditions and how they affect her.  *See* Plaintiff's Appendix ("App.") pages 3-20.  Her declaration includes a great deal of background information, but she is also careful to describe how her various impairments were affecting her as of January 7, 2013, which was the date of her termination, including a description of her conditions when she is not on medication to alleviate the deleterious effects of her conditions.  App. 18-22 (Williams Declaration ¶¶ 57-61)

Plaintiff believes the declaration provides more-than sufficient detail to prove she suffered from several physical and mental impairments which were substantially limiting with respect to many of her major life activities, but her testimony is summarized in the following paragraphs.

Attention deficit hyperactivity disorder (ADHD).  Plaintiff was diagnosed hyperactive at age five and she took Ritalin through eighth grade.  As an adult her symptoms returned and she was diagnosed as ADHD in about 1997.

Depression/major depressive disorder/dysthemia.  In 1995 Plaintiff volunteered for a depression study at St. Paul Medical Center, and she was diagnosed with major depressive disorder.  Ever since then she has taken medication to manage the depression.  In 1999-2000, because the depression had abated and then come back so many times, she was diagnosed with dysthymia (long-term depression).

Hypothyroidism.  This was also diagnosed in 1995 when Plaintiff was undergoing testing at St. Paul.  As part of the study they wanted to rule out patient whose depression might be linked to some other physical cause, and blood testing revealed Plaintiff has a thyroid disorder where she produces an inadequate quantity of thyroid-stimulating hormone, or TSH.  Depression was frequently caused by or associated with hypothyroidism, so Williams was disqualified from the study and told to see a doctor about her thyroid.  Her doctor prescribed medication to stimulate TSH production, and after a few weeks the depression improved.

Post-traumatic stress disorder (PTSD).  Plaintiff was sexually abused as a child for many years, and in her adult years she was diagnosed with PTSD.  In February 2012 she was sexually abused by her date, and she sustained physical injuries such as bruising, but worse, it triggered recurrence of not only her PTSD symptoms, but also symptoms of the depression and ADHD. Plaintiff describes the assault and her subsequent decline in well-being in paragraphs 39-42 of her declaration.

Anxiety. Historically Plaintiff's struggle with anxiety and feelings of edginess (as if too much adrenaline were rushing through her body) seems to have been concurrent with her ADHD and PTSD. During the last few years before her termination from TCCD, Plaintiff was in counseling and also seeing a psychiatrist, Dr. Raju Indukuri, to treat her anxiety.  Indukuri prescribed Valium which helped reduce the symptoms of anxiety, but it was never a cure.

In paragraph 42 of her declaration Plaintiff summarizes how her conditions were affecting her during the months following the February 2012 assault.  She had trouble forming thoughts and communicating, so she chose not to put herself in situations where she would have to do these basic things. When forced to run errands or go to the grocery store, she planned a strategy in advance so she would not be out any longer than absolutely necessary, and even then

she would have to psych herself up just to get in the car and get started, all of which was emotionally taxing and exhausting.  App. 16 (Williams Declaration).

On November 13, 2013 during her on-campus meeting with Biber and Herrera, something happened and she could not hold herself together any longer.  She began to cry uncontrollably and ramble, talking openly about a lot of things that had been bothering her. It was at least a couple of hours before she could regain enough composure to walk out to her car and drive home. App. 16 (Williams Declaration ¶ 43).

After this, Plaintiff knew she needed to get some medical help; she was approved for FMLA leave and she took some time off. She saw her general practitioner, Dr. Steven Childers, who determined through blood testing that her TSH levels were too low, which could have contributed to her extreme emotional swing on November 13, 2012.  App. 17-18, (Williams Declaration ¶ 48).  Plaintiff's psychiatrist completed forms for FMLA leave and short-term disability benefits, which were sent to TCCD.  These documents are included in plaintiff's appendix – *see* App. 57-9, 61-64.  TCCD therefore had sufficient information during this time to know that they were dealing with an ADA/need for accommodations issue.

Additionally, Williams shared the following information with her immediate chain-of-command.  On December 13, 2012, after getting back the results of the blood tests which revealed the low TSH levels, App. 60 (blood test results) Plaintiff sent an email to Herrera (her immediate supervisor), Biber (Herrera's immediate supervisor), and Hubbard (Biber's immediate supervisor) telling them:

> After many medical tests, doctors have discovered a relevant biological imbalance in my body.  This imbalance is being treated with medication.  [].  I feel much better and for that I am VERY thankful.  I will meet with one of my doctors in the morning of January 2, 2013, at which time he will hopefully approve my return to work.  And if he approves my return, I should be at work by noon on January 2, 2013.

7

App. 65.  Based on this email, Plaintiff's chain of command knew they were dealing with an employee who qualified for accommodations, but instead of working with her to see what could be done, they were orchestrating Plaintiff's termination.

Biber admits that she had decided, based on what she had seen on November 13, 2012, Plaintiff should be terminated.  App. 88.  In Hubbard's deposition, she explained how she carefully avoided having to deal with anyone's personal medical information, and as she saw things, unless there was an official request made to HR for accommodations, she was not going to do anything about it.  App. 81-84.

Williams saw her doctor on January 2, 2013 as planned, and he signed a Certification for Fitness of Duty clearing Williams to go back to work.  *See* App. 69-70 (the certification form). Section 2(b) of the form includes a check-the-box menu of physical restrictions, and above that in section 2(a) there are boxes to check to indicate if the employee is being placed on any restrictions.  As TCCD has emphasized in its brief, Indukuri checked the box indicating no restrictions.  He also checked none of the physical restrictions in section 2(b).  He did, however, include a handwritten note in box 3 stating: "Please make reasonable accommodations."  App. 70.

Plaintiff carried this form with her by hand to TCCD, where she was scheduled to meet the Head of HR, Dr. Ricardo Coronado. Williams gave the form to a lady at the desk outside his office, and then waited to go in.  When she entered for the meeting, she saw the certification form on Coronado's desk.  Coronado asked her about the accommodations being requested and there was some discussion on this topic.  App. 19-20.  It happened.

But not according to Coronado.  Even though TCCD clearly does not dispute that it received this document, Coronado swears he never saw it, App. 92, and he is evidently the

person who should have handled the official response to Plaintiff's request for accommodation. It is undisputed that he did not do so.  Instead, Coronado told Plaintiff to consider herself still on leave until further notice.  Plaintiff therefore went home, instead of the work in the writing lab as planned, and she expected to hear something from TCCD so they could discuss accommodations.  TCCD never contacted her.  App. 18.

Instead, on January 7, 2013, Sharion Marshall called and told Williams she had been terminated.  A letter from Coronado dated January 7, 2013 came soon thereafter stating Williams had been terminated for "past performance."  App. 18 (Williams Declaration ¶ 56); App. 71 (termination letter).

As of January 7, 2013, Plaintiff was dealing with multiple conditions.  Her thyroid disease required regular blood tests and regular medication. Without medication, her thyroid gland would not produce a sufficient amount of the TSH needed for her body to function properly. This is a permanent condition, and before it was diagnosed and she began taking medication for it, the condition caused Williams to suffer from major depression, and the depression would return whenever the TSH levels were out of the normal range.  Williams had been taking medication for the condition continuously since 1995, and without the medication she would have been unable to think well, concentrate, take care of herself, sleep normally, or live a normal life. App. 20 (Williams Declaration ¶ 57).

Williams was also still coping with depression as of January 7, 2013. Without taking medication to manage depression, she was unable to think clearly, and felt intensely sad and hopeless. Functioning in daily life was nearly impossible; she was incredibly fatigued and all she wanted to do was sleep. She would also be unable to form cogent thoughts and communicate

normally with others, so she would limit social contacts, and lose interest in activities she had enjoyed before. App. 18-19 (Williams Declaration ¶ 58)

Another issue for Plaintiff as of January 7, 2013 was ADHD.  Williams was taking medication for it, but without the medication she battled racing thoughts and feelings of physical edginess, among many other symptoms such as difficulty concentrating, being easily distracted, and talking too much. App. 19 (Williams Declaration ¶ 59).

Also at that time she was being treated by Dr. Indukuri for anxiety disorder. It could be part of her ADHD or PTSD, but regardless, it was overpowering at times. At those times, Williams would break out in heavy sweating, particularly on her chest, under her arms, and behind her neck. Her hands shook, and her heart pounded. She would feel unable to breathe, as if unseen hands were enclosing her neck, and then she would feel overly warm, nauseous, and dizzy. This would give way to headaches and aching body pains (particularly in her neck, shoulders, and back). Dr. Indukuri prescribed Valium for her anxiety, which helped to reduce the anxiety, but it didn't cure it. App. 21-22 (Williams Declaration ¶ 60).

PTSD or PTSD Complex was also haunting Williams in early January 2013.  She avoided talking or thinking about the Spring 2012 assault, but then flashbacks of the attack would rush into her thoughts without warning and create a sense of fear and panic. She would feel unjustifiably ashamed of what had happened to her during the attack, and also feel an increased distrust in everyone around her She also felt a deep, immediate threat, and nearly immobilizing fear if someone became angry or hostile towards her. She stopped dating because she was afraid, since that was the environment in which she had been attacked. App. 22 (Williams Declaration ¶ 61).

## III.  Argument

**A.     Because the Limitations Period is 3 Years for Willful Violations,
Plaintiff's Claim is Not Barred by Limitations**

The Family and Medical Leave Act ("FMLA") contains two distinct provisions.  The first

provision creates a set of entitlements, or substantive rights, including an employee's right to be

restored to her position, or a substantially equivalent position, after a period of FMLA leave.  *See*

29 U.S.C. § 2614(a)(1); *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).

A second key section of the FMLA prohibits an employer from taking certain actions,

such as retaliating against or discriminating against an employee because she has taken FMLA

leave, or otherwise exercised rights under the FMLA. *See* 29 U.S.C. § 2615; *Nero*, 167 F.3d at

927.  Plaintiff's complaint alleges both types of claims: failure to restore her to her position after

a period of FMLA leave, and retaliation.

Regarding the retaliation claim, Defendant's motion for summary judgment relies solely

on an affirmative defense.  TCCD contends the retaliation claim is barred because it was not

filed within two years, citing 29 U.S.C. § 2617(c).  Remarkably, however, TCCD fails to

mention that the very next sentence in section 2617(c) is a three year limitations period that

applies to claims for willful violations of the FMLA.  *See* 29 U.S.C. § 2617(c)(2).

When a party moves for summary judgment based on an affirmative defense, that party

must prove each element of the affirmative defense as a matter of law to prevail on its motion

and obtain summary judgment.  *Rushing v. Kansas City Southern Ry.*, 185 F.3d 496, 505 (5th

Cir. 1999).  TCCD has failed to prove that limitations conclusively bars the FMLA claims in this

case.  Its motion on this issue should therefore be denied.

Furthermore, TCCD's brief does not address the interference claim based on TCCD's

failure to restore Plaintiff to her position – it only addresses the retaliation claim.  Therefore,

even of the Court were to grant Defendant's motion on the FMLA issue, it would only be a partial summary judgment because the failure-to-restore claim would remain.

## B.      Disabilities Discrimination Under the ADA and Texas Labor Code

The Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and Chapter 21 of the Texas Labor Code (the "Code") protect the rights of persons who have disabilities.  In the employment context, these statutes prohibit an employer from discriminating against an employee because of his or her disability.  42 U.S.C. § 12112; Code § 21.051.

This ban on discrimination has two key components.  First, an employer may not take certain adverse actions against an employee because of her disability.  42 U.S.C. § 12112(a)(general rule); Code § 21.051.  Second, an employer illegally discriminates if it fails to reasonably accommodate an employee's known disabilities, unless the employer proves it would be an undue hardship to provide the accommodations.  42 U.S.C. § 12112(b)(5); Code § 21.128. Additionally, both the ADA and the Texas Labor Code prohibit retaliation against an employee because she exercised her rights under these statutes.

Plaintiff's complaint alleges that TCCD discriminated against her on the basis of disability by terminating her employment, and TCCD addresses this claim in pages 10 – 19 of its brief.  However, nowhere in its brief does TCCD address Plaintiff's other two disabilities claims, which are: (1) a failure-to-accommodate claim, alleging that TCCD terminated her rather than fulfilling its statutory duty to provide reasonable accommodations; and (2) a retaliation claim, alleging her termination was in retaliation for her exercise of rights.

To prove a failure-to-accommodate claim, a plaintiff must prove: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable

accommodations' for such known limitations.  *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013).  Proof of an adverse employment action is not required for this claim.  *See, e.g.*, *Mzyk v. N. E. Indep. Sch. Dist.,* 397 F. Appx 13, 16 (5th Cir. 2010)(comparing the elements of a failure-to-accommodate claim to those of a claim based on a disparate treatment theory).  Also, the burden-shifting analysis of *McDonnell Douglas* does not apply to this claim.[2]

Proof of the retaliation claim consists of: "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action."  *Id.* at 54, citing *Seaman v. CSPH, Inc*., 179 F.3d 297, 301 (5th Cir. 1999).

Because a summary judgment motion must specify the grounds supporting the motion, and prove the moving party's right to judgment as a matter of law, TCCD's motion misses the mark entirely with respect to retaliation and failure to accommodate, and the motion should therefore be denied as to these claims.

**C.**     **Legal Standards Applicable to the Analysis of Plaintiff's Termination Claim**

In the absence of direct evidence (and Plaintiff does not contend there is direct evidence in this case), the claim that an employee was terminated because of disability is traditionally analyzed using the burden-shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, the plaintiff must first establish a prima facie case by presenting some evidence – at least enough to raise a question of fact – on each element of the prima facie case.  Once satisfied that such evidence has been presented, the Court next considers whether the employer has articulated a nondiscriminatory reason for the employment decision or decisions in question.  If this requirement is sufficiently met, the Court must decide if there is a question of fact on the

---

[2] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

ultimate issue, whether Plaintiff was terminated because of a disability. *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000).

**D.      The Evidence in the Record Proves the Prima Facie Case**

      **1.      There is no one-size-fits-all iteration of the prima facie case.**

There are no hard-and-fast requirements for establishing a prima facie case, and the "prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic." *City of Austin Police Dept. v. Brown*, 96 S.W.3d 588, 596 (Tex. App. –Austin 2002, pet. dism'd), *citing United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Instead, because the facts of each case vary, the same elements will not apply in every case. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (Title VII), *quoting McDonnell Douglas*, 411 U.S. at 802 n.13. *See also Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir. 1982) (§ 1981) ("[N]o single formulation of the prima facie evidence test may fairly be expected to capture the many guises in which discrimination may appear"); *Leffel v. Valley Financial Services*, 113 F.3d 787, 793 (7th Cir. 1997), *cert. denied*, 522 U.S. 968 (1997) (ADA) ("the nature of the proof giving rise to the requisite inference of discrimination cannot be reduced to a formula that will serve any and all discrimination cases"); *Grace v. Potter*, No. H-04-1182, 2006 U.S. Dist. LEXIS 28391, at *11 n.13 (S.D. Tex. May 3, 2006) (Title VII) ("The components of a *McDonnell Douglas*-type prima facie case are variable, and do not apply to all discrimination cases across the board."). Nor does the fact that case law repeats a particular formulation mean that it is always required. *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 939-940 (3d Cir. 1997); *Leffel*, *supra*, 113 F.3d at 793 ("the elements of the prima facie case as we had described them might change as the case law applying the ADA evolved.").

In the context of disabilities discrimination where there is an allegedly adverse action taken because of disability, the Fifth Circuit has applied at least two different versions of the prima facie case.  In *EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014), the Court stated that a prima facie case of disability discrimination requires a plaintiff to prove "(1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability."  *Id.* at 697.  But in a later per curiam opinion, the Court described a prima facie case of discrimination as: "(1) He is disabled, (2) he is qualified for his job, (3) he was subject to an adverse employment action on account of his disability and (4) he was replaced by or treated less favorably than non-disabled employees." *McCollum v. Puckett Mach. Co.*, 628 Fed. Appx. 225, 229-230 (5th Cir. 2015) (per curiam).[3] TCCD's motion recites the latter version of these elements, so Plaintiff will respond accordingly.

### 2.      Proof of a disability on or prior to November 13, 2013 is not the issue.

On page ten of its motion, TCCD argues there is no evidence Plaintiff suffered from a disability before November 13, 2012.  However, in an ADA case, the relevant question is whether a disability existed at the time of the adverse action in question.  *EEOC v. Chevron Phillips*, 570 F.3d 606, 618 (5th Cir. 2009).  This argument is therefore irrelevant.  It is also contrary to the well-documented summary judgment evidence, which includes proof of disabilities dating back to Plaintiff's childhood.  App. 11 (Williams Declaration ¶ 27).

### 3.      The evidence proves Plaintiff had an actual disability.

The existence of a disability can be proved in any one of three ways: by proof of an actual disability, a record of a disability, or by showing the employee is regarded by the employer as a person with a disability.  Proving the existence of a disability often involves

---

[3] With one exception, Plaintiff does not dispute TCCD's contention that with respect to this claim, the ADA and its Texas law equivalent are identical.  The exception is with respect to the causation standard required, but the distinction is not relevant for present purposes.

multiple defined terms and the application of complex legal standards, but TCCD's motion keeps things simple.  TCCD does not question whether Plaintiff had the impairments she claims, or whether those impairments were in fact substantially limiting.  Instead, TCCD only questions whether the evidence is sufficient to raise a question of fact with respect to the major life activities of socializing, dating, and/or working.[4]  This does not affect the "regarded as" test for determining the existence of a disability because in a regarded-as case, a plaintiff does not need to prove her employer perceives her impairment as limiting a major life activity. § 12102(3)(A).  If an employer takes an adverse action because it believes the employee has an impairment, that is a violation of the ADA.  *Id.*

Following the 2008 amendments to the ADA, courts should construe the definition of an actual disability in favor of broad coverage, to the maximum extent permitted under the ADA provisions applicable to employment claims.  42 U.S.C. § 12102(4)(A).  The term "substantially limits" should be applied in a manner consistent with the purpose of the Amendments Act, 42 U.S.C. § 12102(4)(B), which was to "provide broad coverage."  42 U.S.C. § 12101(a)(1).  "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."[5]  42 U.S.C. § 12102(4)(B).  Determining if an impairment substantially limits a major life activity should be based on the impairment as it exists without the benefit of mitigating measures, such as prescription medications.  29 C.F.R. § 1630.2(j)(1)(vi).  This is critical in the analysis of the present case, because many of Plaintiff's impairments are managed with medication, but they would be debilitating without it.

---

[4] Defendant's choice to limit its discussion in this way is puzzling for two reasons: (1) Plaintiff's allegations and the discovery in this case have shown that there are several other major life activities affected by her impairments, but these are evidently not being challenged, and (2) Plaintiff has also alleged she meets the definition of disability because her employer came to regard her as disabled, and this too is not being challenged.  That said, Plaintiff will address the points Defendant has raised.

[5] *See also* 29 C.F.R. § 1630.2(j)(1)(iii); 29 C.F.R. § 1630.2(j)(1)(viii), and, 29 C.F.R. § 1630.2(i) *Major life activities*— (2), "major life activity" is not determined by reference to whether it is of "central importance to daily life."

A court should not apply an overly-demanding standard when assessing whether a disability "substantially limits," and determining whether an impairment substantially limits a major life activity should not require extensive analysis. 29 C.F.R. 1630.2(j).  In fact, the regulations identify several impairments which, as a practical matter, should virtually always be found to be actual impairments – these include major depressive disorder and post-traumatic stress disorder, because these impairments substantially limit brain function.  *Id.* at 1630.2(j)(3).

Turning now to the limited issues placed in issue by TCCD's motion, its brief is misleading because it sets up a straw-man argument, as if it were the argument actually being made by Plaintiff.  Citing two pages from Plaintiff's deposition, TCCD asserts that only two major life activities are relevant to the analysis in this case.  Def's Brief, p. 10 ("Plaintiff alleges that before November 13, 2012, her medical conditions only impacted her ability to date and socialize.").  While true that these are the only activities mentioned *in these two pages of the deposition*, it is misleading to pretend that these are the only major life activities in play.

For example, in response to interrogatories from TCCD, Plaintiff disclosed that she suffered from anxiety, depression, PTSD, and ADHD, and she described some of the ways they affected her.  As noted above, the EEOC regulations provide that depression and PTSD limit brain function, which is one of the defined major life activities.  29 U.S.C § 12102(2)(A). TCCD is therefore aware that brain function is one of the major life activities relevant to Plaintiff's claims.

Documents produced during the lawsuit include FMLA and short-term disability forms that were completed by Plaintiff's doctor.  One of these documents reflects Plaintiff had been diagnosed as having "major depressive disorder."  App. 57.  Another shows at various times Plaintiff was "unable to perform all job functions," and suffered from "severe depression and

anxiety, decreased concentration, difficulty eating, sleeping.".  App. 61-64.  These comments clearly implicate, or explicitly list, the major life activities of working, concentrating, thinking, eating, and sleeping."  Documents were produced showing that Plaintiff had a thyroid condition in which her body produced insufficient amounts of thyroid-stimulating hormone (TSH), App. 60, which directly implicates the function of the endocrine system – one of the "major bodily functions" listed in the ADA.  29 U.S.C § 12102(2)(B).

Given this information, it is unreasonable for TCCD to artificially try to limit the scope of the inquiry so narrowly.  Plaintiff's deposition testimony is not the equivalent of a contention interrogatory – if TCCD had asked Plaintiff in an interrogatory to identify all major life activities that were affected, then it might be reasonable for TCCD to later seek to limit the scope of the inquiry to this that were listed in her answer.  TCCD did not ask such an interrogatory.

The Court should also note two things that transpired in the deposition when TCCD's counsel asked Plaintiff these questions about major life activities.  First, Plaintiff's counsel objected to the form of the question.  Def's App. 50.  Counsel had agreed to reserve all objections in the deposition to objections to the form of the question and responsiveness of the question, so this was sufficient to preserve the more detailed objection, which is that the question uses a legal term that has a defined meaning, and without providing the definition to the witness the question was misleading and could be misconstrued.[6]  The Court should therefore sustain the objection and disregard the answers.  Second, the Plaintiff herself asked TCCD's counsel to remind her what "major life activities" were, and counsel declined to do so.  Def's App. 51.

Here, the Court should find that there is at least a fact question whether Plaintiff was substantially impaired with respect to one or more major life activities, and thus Plaintiff suffers

---

[6] Earlier in the deposition, counsel for TCCD asked the witness what disability she had as of a certain date, and Plaintiff's counsel objected to the form of the question. TCCD's counsel asked for the basis of the objection, and Plaintiff's counsel explained that the term "disability" was a legal term of art, and it could be misconstrued.

from an actual disability as defined by the ADA.  Plaintiff has proffered substantial evidence –

far more than a mere scintilla – showing that her impairments substantially limited her

performance of several major life activities.

With respect to working, because there is evidence of limitations in other areas, analysis

of this as a major life activity is not necessary.  A plaintiff alleging an actual disability need only

show he or she is substantially limited with respect to one major life activity to show a disability.

42 U.S.C. § 12102(4)(C).

**4.      Plaintiff also meets the "regarded as" definition of disability**

Plaintiff's motion does not mention this prong of the definition of "disability," even

though it was expressly stated in the Complaint.  As a result, even of the Court accepts

everything in Defendant's motion concerning the ADA, this regarded-as claim survives and

proceeds to trial on the merits.

**5.      Plaintiff was qualified for, and able to perform,**
**the essential functions of her position.**

In support of this motion, Plaintiff has submitted substantial evidence proving her ability

to perform the essential functions of her job.  Before addressing this evidence, however, it should

be noted that there is a significant factual dispute concerning what the essential functions of her

job were, and Defendant's position on this issue is also powerful evidence that is relevant to the

pretext analysis coming up in stage three of the *McDonnell Douglas* analysis.

As evidence of the essential functions, Defendant relies on two documents with vastly

differing descriptions of the job.  One of the documents, created prior to Williams' need for leave

and request for accommodations, is the written job description, which shows it was last revised

on 9/17/12.  Def's App. 1-2.  The other document is the memo Hubbard wrote to justify

Plaintiff's termination.  I Def's App. 3-4.  It is dated January 2, 2013, the day Plaintiff's leave

19

was supposed to end and she was planning to go back to work in the writing lab.  One of these things is most likely more reliable than the other.

The differences are striking, and Hubbard's memo lists several things that are not part of the written job description for Plaintiff's position.  For example, Hubbard's memo says it was an essential job function to provide feedback on writing to students *on a walk-in basis*.  The job description does not say this was required.  Furthermore, Plaintiff has submitted convincing evidence showing that it was the writing lab's policy to require students to make an appointment and drop off their typed paper at least 24 hours before the appointment, so the tutor could review it and prepare to give feedback on the assignment.  App. 123-4 (Fukuchi Declaration ¶ 4); App. 132 (Wilcox Declaration ¶ 2); App. 134 (Campos Declaration ¶ 3).  This policy was mentioned in a brochure used to promote the services of the writing lab, called "Making the Most of the Writing Lab."  App. 129-31 (the writing lab brochure in effect during Fall 2012).  TCCD has not identified anything showing that Williams was ever informed that she was required to see students on a walk-in basis, or that this was really even a requirement, as opposed to something Hubbard made up after the fact to justify termination.

Hubbard's memo also says the essential functions include "being able to thrive in a fast-paced, flexible work environment where the Instructional Associate may be the only one in the lab and must be able to simultaneously greet students and get them set up on computers, tutor students with scheduled appointments, and address the needs of students requesting walk-in assistance."  Def's App. 3.  Again, there is no evidence that these essential functions were communicated to Plaintiff.  The job description says no such thing, but is does say: "The noise level in the lab was usually quiet."  Def's App. 2.

This presents a fact question, which is not be appropriate for resolution by summary judgment.  However, to the extent this Court wishes to weigh the evidence, there are some guidelines on how to proceed, starting with: the Court should give deference to *the written job description*.  *EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014).  The Fifth Circuit has instructed:

> [A] court may hear a variety of evidence, including "(1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, and (4) the work experience of both past and current employees in the job."

*EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007) (quoting *Kapche v. City of San Antonio*, 176 F.3d 840, 843 (5th Cir. 1999)).  TCCD presented no evidence on any of these other factors *except* the written job description, which further fuels one's suspicion whether the functions described in Hubbard's memo were things the writing lab tutors ever spent time doing.  Hubbard's memo is, to say the least, suspect, and one could even go so far as to surmise it was specifically tailored to emphasis functions corresponding to the alleged performance issues she later addresses in her memo.  Of course, in the context of a summary judgment motion, all reasonable inferences from the evidence should be made in favor of the non-movant.

Turning now to TCCD's claim that Plaintiff was not able to perform the essential functions, one relevant factor to consider is the employee's performance history.  For example, in *Troutman v. Williamson County.*, 1:14-CV-986-DAE, 2016 U.S. Dist. LEXIS 41986 (W.D. Tex. Mar. 30, 2016) the Court easily found proof that the plaintiff was able to perform from the fact that he had been doing that very job for years.  *Id.* at *15.  Likewise, Plaintiff worked as a writing tutor for over 4.5 years without a bad performance review or any disciplinary action.

Plaintiff has also submitted evidence from persons familiar with her work, some of which was described above in the recitation of relevant facts – but there is even more in the record.

Plaintiff regularly received complimentary emails from the professors, whose students she tutored.  Pages 38-45 of Plaintiff's Appendix include some of these emails from the Fall 2012 semester.  One professor thanked Plaintiff for seeing one of her "drop-ins" (presumably a student without an appointment) and for the help Williams gave the student.  App. 38. Another teacher thanked Williams for the feedback she gave a student which helped her to write an "excellent" paper with good content, writing, and source citations.  App. 39.  Yet another professor took the time to thank Williams for the work she had done with several of his students.  App. 40-41.

Williams even received favorable comments from those who had a say with respect to her termination.  Plaintiff's immediate supervisor, Conrad Herrera, sent Williams an email on September 20, 2012 stating: "I also wanted to say that during the few hours I spent in the Lab last week, I was really impressed with your pleasant greetings to students as they walked in looking for help."  App. 27.  In the written comments from Biber, which Hubbard used as a basis for Plaintiff's termination, Biber wrote the following as her own personal observations:

- Ms. Williams has a very strong skill set and her attention to detail supports her ability to work extremely well with written text in the writing center.

- She [Williams] has been complimented for the noticeable improvement made by students who attend sessions.

Def's App. 12.

In Biber's deposition in this case, she had the following to say about Plaintiff's abilities as a writing tutor:

Q:      During that Fall 2012, your first semester as the head of that Academic
        Foundations Department, did you become familiar with Christy's abilities
        as a writing tutor?

A:      Yes.

Q:      How would you characterize her abilities as a writing tutor?

A:      Well her, she has a strong academic background, so she certainly can do
        that. And I would observe that when she worked with students one-on-
        one, she would do a nice job. I mean you could walk in, she'd give
        feedback, she would forward feedback to us when she would have her
        one-on-one tutoring sessions.  I never had any reason to doubt her skill set.

App. 88.

Performance reviews are sometimes helpful to get a look at the contemporaneous

documentation.  However, TCCD produced only two performance reviews.  The first was a

review that Herrera did shortly after he became the writing lab manager.  He admits he had no

knowledge concerning the performance of any of the tutors, so he gave them all a score of "2"

(on a scale of 1-3) because he said a score of 2 did not require him to provide any supporting

documentation to support the score.  App. 100-102.  The only other performance review covers

the period from September 1, 2010 through August 31, 2011, so it has little probative value with

respect to Plaintiff's performance during the final months of her employment.  It is, however,

worth noting that she received an above-average score of 2.33, including several positive

comments on her skills as a writing instructor.  Thus, to the extent the performance reviews are

relevant, they tend to negate TCCD's assertion that Williams was not able to perform the

essential functions of her position.

Given the conflict as to what the essential functions were, there is certainly a question of

fact whether Plaintiff was performing the functions emphasized by TCCD as essential.  Add to

that the many favorable comments from students, compliments from teachers, and the personal

observations of Fukuchi and Wilcox, and there is no question – at a minimum we have a question of fact for a jury to decide.

### 6.     Whether Plaintiff proposed accommodation that would/would not have been helpful is irrelevant.

On pages 15-16, TCCD suggests it had no obligation to provide accommodations, or at least those mentioned by Plaintiff, because they would not have enhanced her ability to do the job.  Even assuming the things Plaintiff suggested would not have helped, this argument has no bearing on the outcome of this motion or relevance to the Court's analysis.  The Fifth Circuit has held that a reasonable accommodation does not necessarily have to be one that augments the employee's ability to do the job.

In *Feist v. Louisiana*, 730 F.3d 450 (5th Cir. 2013), an employee with a bad knee asked the employer to provide her with a parking space.  The employer declined, and she lost her case in the district court, but she won before the Fifth Circuit, which wrote: "The text thus gives no indication that an accommodation must facilitate the essential functions of one's position."  *Id.* at 453.  The parking space may not have made the employee a better worker, but it was reasonable and the employer should have granted it.  Likewise, even if additional staffing or closing the lab earlier would not have helped Williams' performance, if the requests were reasonable they should have been granted.

TCCD's failure to agree to such requests provides further reason to suspect its motives, especially in light of the undisputed evidence that (a) the writing lab was in fact short-staffed, (b) Hubbard wanted to have at least two people on duty at all times, and (c) TCCD was already planning on hiring additional staff for the Spring 2013 semester.  Under these circumstances, why not grant the request for additional staffing instead of terminating Williams in January

2013?  Why argue that her request would not have been helpful, when all that is required is that

it be reasonable?  One possible answer is: that TCCD acted with a discriminatory motive.

### 7.    Williams was replaced by a person who did not have a disability, <u>and</u> she was treated less favorably than her coworkers.

Turning to the fourth element of the prima facie case as articulated by TCCD, this is

easily satisfied twice over.  First, after Williams was terminated, TCCD posted he job as an open

position.  Lynnelle Brown applied, and got the job.  Lynnelle Brown did not have a disability

like Williams did.  These facts are undisputed.  App. 85-86.

Second, regarded the need to show the plaintiff was treated less favorably than non-

disabled employees, the evidence here is likewise undisputed.  Williams, who had a disability,

was fired.  The other two writing tutors, Brown and Levy, who did not have disabilities, were

not.

Furthermore, being replaced by a non-disabled person or was treated less favorably than

non-disabled employees are not the only ways to create an inference of discrimination for

purposes of the prima facie case.  As discussed above, the Fifth Circuit as endorsed a variant of

the prima facie case which does not include the replaced by, or treated less favorably than,

requirement.  That variation of the prima facie case simply requires evidence suggesting the

existence of a causal connection between the disability and the adverse action.  The evidence

discussed up to this point in Plaintiff's brief includes evidence that would permit an inference of

discrimination, such as the refusal to grant the accommodation of extra staffing when TCCD was

already planning on doing just that, and the conflicting "essential elements" of the job as

described by Hubbard versus the actual job description.

All that is necessary to give rise to an inference of discrimination is evidence reasonably

suggesting that the employer would not have taken adverse action against the plaintiff had she

not been disabled and everything else had remained the same.  *See, e.g., Leffel*, 113 F.3d at 794. In the present case, the evidence overwhelmingly suggests that without her leave and requests for accommodation, Plaintiff would not have been terminated.  No matter what variation of the prima facie case this Court chooses to apply, Plaintiff has met her burden of proof on every element challenged by TCCD.

**E.      TCCD Has Not Adequately Articulated Non-Discriminatory Reasons for Its Actions**

In the second phase of the *McDonnell Douglas* analysis, the Court considers whether the employer has articulated a nondiscriminatory reason or reasons for the employment decision(s) in question.  In many cases, this portion of the analysis receives no more than lip service – courts simply reiterate an employer's reason and move on to stage three of the analysis, but in some cases that is a mistake – because the employer's reason has to meet certain minimum standards.

The nondiscriminatory reason laid out by the employer "must be both clear and reasonably specific."  *Martin v. J.A.M. Distrib. Co.*, 674 F.Supp. 2d 822, 837 (E.D. Tex. 2009). Just like a plaintiff's pleadings in a lawsuit, the employer's reason defines the scope of the inquiry.  The reason cannot be too vague or too subjective to be weighed and tested by the evidence – for example, an employer's claim that a candidate would not have been a good fit for the position is insufficient for purposes of the *McDonnell-Douglas* analysis.  *See Patrick v. Ridge*, 394 F.3d 311, 316-17 (5th Cir. 2004) ("We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement, such as that a candidate is not "sufficiently suited" for the position, is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas*. It is, at bottom, a non-reason.").

Requiring some level of specificity is important because it affords the plaintiff an opportunity to test the articulated reason against the weight of the evidence – it "frame[s] the

factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). *See also Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015)(requiring a reason clear enough to permit an opportunity to weigh the evidence and determine if the reason is pretextual).

If the employer states a sufficient reason, then the Court weighs all of the evidence, including the evidence considered as part of the prima facie case, to determine if there is a question of fact for a jury.[7]  On page 18 of its brief, TCCD lists seven reasons for terminating Plaintiff's employment. Each one is somewhat vague, and the Court should assess each to determine if it meets the minimum requirements.

TCCD's second bullet-point describes two things.  The first, "ongoing conflicts with her co-workers in the lab," is too vague and conclusory to try and rebut with evidence.  Plaintiff assumes this is a reference to the other two writing tutors, Levy and Brown, but she can only guess what instances TCCD considers to be the "ongoing conflicts" which they claim supported her termination.  Defendants' motion provides no examples of conflicts with her co-workers, so this articulated reason is insufficient to meet TCCD's burden here at stage two of the analysis.[8]

The third bullet-point (conflicts with faculty members) suffers from the same defects as discussed in the prior paragraph.  Without knowing the who, what, and when, it is impossible to present facts on point to contest this alleged reason.

The fifth bullet point is likewise too vague to respond to – "several loud outbursts" is an accusation that could be made regarding any employee, whether true or not.  TCCD's motion

---

[7] Evidence that is relevant with respect to the prima facie case, and any inferences that may properly be drawn from that evidence, are also relevant to the ultimate issue.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).
[8] Through discovery Plaintiff was able to identify one instance of alleged insubordination, so Plaintiff will not challenge the sufficiency of that allegation.

and supporting evidence includes no evidence of any loud outburst in the lab or outside hallway.

TCCD may be referring to the events of November 13, 2012 when Plaintiff met with Biber and

Herrera in a break room near the lab, and Plaintiff will address that.  Apart from this, however,

the Court should not find this a sufficiently detailed reason for the termination of an employee.

In short, the Court should not hold a plaintiff to an impossible standard, and require the

plaintiff to prove that a reason too vague to be disproved was not true.  Nailing Jello to a wall is

easier.  The Court should therefore assess only those reasons which it finds to be sufficiently

specific as possible bases for TCCD's actions, and require that Plaintiff address only those

reasons in stage three of the *McDonnell Douglas* analysis.

**F.      There is Ample Evidence of Pretext**

The simple dictionary definition of pretext is: "a reason that you give to hide your real

reason for doing something."  *Pretext, Merriam-Webster Dictionary* (2016).[9]  Pretext may be

established in several ways.  For example, it may be shown with proof of disparate treatment (as

already shown above in the discussion of prima facie case part 4), or it may be shown with proof

that calls into question whether the stated reason was the real reason (as discussed above in

connection with the job description and whether additional staffing was a reasonable

accommodation).  *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Evidence of

pretext "may take a variety of forms."  *Patterson v. McLean Credit Union*, 491 U.S. 164, 187

(1989); *accord Ellerbrook v. City of Lubbock*, 465 Fed. Appx. 324, 333 (5th Cir. 2012) (per

curiam)(unpublished)(emphasizing the variety of ways in which an employee may show pretext).

Because this is a summary judgment motion, the quantum of evidence required to defeat

the motion is not great.  If a reasonable juror could conclude from the evidence, and any

---

[9] Available online at http://www.merriam-webster.com/dictionary/pretext.

inferences to be drawn therefrom, that the employer's reason is false – simply a cover up to avoid admitting the truth – the motion must be denied.

This does not necessarily mean a plaintiff must prove that what the employer said was factually untrue. For example, a terminated employee may have been late to work a few times, and after the termination the employer explains the employee was terminated because he was late. It is true that the employee was late, but this does not automatically mean that employer wins. A juror may be influenced by evidence that the employee had never been disciplined for being late, and then he was terminated shortly after asking for accommodations. That juror might well conclude that the real reason for the termination was so the employer could avoid having to provide accommodations. Analogizing this hypothetical to the present case, assume it was true that Plaintiff had loud outbursts. There is no record of it before TCCD commenced the process of documenting reasons for Plaintiff's termination, so a jury could easily conclude that the reason is true in the sense that it did happen, but it was not a true reason for the decision. Comparing TCCD's reasons to the facts as proved by the summary judgment evidence, there are several other examples of conflicts between reason and reality that suggest the decision was possibly based on discrimination instead of some other nondiscriminatory reason.

Plaintiff was promoted at the start of the 2012 semester – but when she had to take leave, and shortly after she explicitly asked for reasonable accommodations, she was terminated based, for the most part, on events that took place before her promotion. This suffices to prove pretext.

TCCD says there were several loud outbursts, but they have not presented proof of any. Curtis Fukuchi, who was frequently in the writing lab, never saw one. If TCCD is referring to the November 13, 2012 meeting with Williams, where they say she was loud and it was

disruptive in the writing lab, Curtis Fukuchi was in the writing lab at the time, and he didn't hear anything.

TCCD alleges that Williams was insubordinate, but it gives no specifics, and Plaintiff can extract none from the summary judgment record except for one possible instance.  In the Performance Improvement Plan that TCCD claims it wrote, but never showed Williams, TCCD claims Williams was insubordinate because she did not start conducting tutoring sessions in the library.  However, Herrera, who wrote the PIP, admits he never told Williams that she was required to do this as of or by a certain date, and he admits there was no reason she would not have done it if she had been told.  App. 103.  The fact that Herrera would cite this as an example of insubordination when there was never a refusal by the employee to comply with a requests suggests this reason may not ring true as a basis for TCCD's employment actions, which permits the inference that discrimination was the real reason for the termination.

In the chart above, showing discrepancies between things described in Hubbard's memo and things as Fukuchi observed them, there are several more instances where the stated reasons for the termination are called into question, *i.e.* proof sufficient to permit a finding of pretext, but perhaps the most compelling evidence is that concerning who actually made the decision to terminate Plaintiff's employment.

The most senior human resources official for TCCD was (and still is) Dr. Ricardo Coronado, and when he was deposed on April 20, 2016, he testified to the following as the normal procedure for the termination of someone like Williams:

> The process is, there should be a recommendation from the supervisor.  It should go through administrative channels, to the Human Resources office. It is reviewed, and then it moves forward to the Vice Chancellor for the legal review, and then it would go to the Chancellor for final approval.

App. 90 (Coronado Deposition)

Coronado then confirmed that in the procedure he described, he would have been the person who did the HR review.  He could not remember the name of the person who was Vice Chancellor at the time, but he said that the Chancellor at that time was Erma Johnson Hadley.  According to Coronado, he did not make the final decision to terminate Williams.  He said that decision was made by Erma Johnson Hadley.  App. 90-91 (Coronado Deposition).

But two months later in an answer to an interrogatory, TCCD did not even mentioned Hadley as someone who was involved in the decision.  The interrogatory asked TCCD to identify each person involved in the decision to terminate Plaintiff's employment, and to describe each person's role in the decision-making process.  The interrogatory answer identified three people: Biber, Hubbard, and Coronado.  App. 136-144 (Answer to Interrogatory No. 6).

When the employer's witnesses cannot agree on an answer, no one person's word is sufficient to justify judgment as a matter of law.  *See, e.g., Coburn v Rockwell Automation, Inc.*, 238 Fed. Appx. 112 (6th Cir. 2007) (reversing summary judgment where employer's witnesses were unable to agree on who put the plaintiff's name on the RIF list: "If Rockwell cannot even give a straight answer about who recommended Coburn for the RIF list, it is trying to hide something").

Temporal proximity between a protected activity and an adverse action is often evidence sufficient to show pretext.  *McCoy v. City of Shreveport*, 492 F.3d 551, 632 (5th Cir. 2007).  The timing is usually required to be close if not very close, but in the present case it was just five days between the request for reasonable accommodations and Plaintiff's termination.  By any judicial measure, this is sufficiently close.

In *LHC Group*, there was evidence that plaintiff's performance was criticized only after she suffered from a seizure – plus she produced evidence suggesting that criticisms of her

performance were "exaggerated, unfounded, or fabricated." *Id.* at 700.  This evidence was sufficient to show at least a question of fact and allow the case to move forward so a jury could decide the contested issues of fact.  *Id.*  The present case includes analogous facts.  It was only after the episode on November 13, 2012 that TCCD began to create documents criticizing her performance, and the events which form the basis of the criticisms are either too vague to contradict with evidence, or they are in fact contradicted.

Proof of the decision maker's animus, or the animus of the person or persons who provided input used to make the decision, is often evidence of pretext, and in the present case there is such evidence.  For example, Hubbard initially approved paid leave for the Plaintiff, but Coronado later had TTCD stopped the paid leave because he believed Williams was not adequately communicating with HR.  Def's App. 17 ("Dr. C [Coronado] suspended leave pay until she is ready to talk to HR.").  A juror could conclude that he was hostile to something about her condition, or the fact she was taking leave, and so rather than respect her time off Coronado decided to punish her.

Dr. Hubbard, who was not present for the November 13, 2012 meeting with Williams, somehow formed the impression that Williams was volatile and should not be allowed back on campus without a police escort.  App. 122 ("Because of Christy Williams' volatility, we are requesting that she be accompanied by an officer to come on campus to remove her belongings from her desk. []. We will also shut down the lab to reduce disruption.").

Biber readily admits that her mind was made up based on what she witnessed on November 13, 2012 when Williams could no longer hold it in.  App. 88.

In *Chevron Phillips*, the plaintiff suggested pretext with evidence that her employer's immediate reaction to her request for disability accommodations was to determine whether she

could be terminated.  *Id.*, 570 F.3d at 612.  Hubbard did much the same thing.  As soon as Plaintiff had gone out on leave, she began collecting the input from Herrera and Biber needed to support the termination, and she steadfastly refused to even think about providing accommodations.

So, to wrap up on this point, there is ample evidence from which to conclude TCCD's stated reasons were not the real reasons, and that unlawful discrimination could have been the real motive behind TCCD's decisions.

**G.     Plaintiff's Failure-to-Accommodate Claim Survives Defendant's Motion**

Although likely unnecessary to do so given the narrow scope of Defendant's motion for summary judgment, Plaintiff wishes to reiterate the other claims she has asserted and comment briefly on their merit.

Under the ADA, an employee who feels she needs accommodation has an initial burden, to speak up and inform the employer.[10]  *Chevron Phillips,* 570 F.3d at 621 (5th Cir. 2009) (citing *Taylor v. Principal Fin. Grp.,* 93 F.3d 155, 165 (5th Cir. 1996)).  After that, the employer has an affirmative statutory duty – the employer must have a meaningful dialogue with the employee to determine how to best accommodate the employee's disabilities. *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005)). An employer satisfies the requirement if it engages in the process in good faith, *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010), even if the employee rejects the reasonable accommodations that are offered.

"When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering

---

[10] In some case, the employer has an obligation to initiate the process, but because Williams clearly informed TCCD by submitting medical documentation while she was out on leave, it is irrelevant whether TCCD should have taken the initiative and acted sooner.

the requested accommodations." *Id.* (citing *Cutrera v. Bd. of Supervisors of La. St. Univ.,* 429 F.3d 108, 113 (5th Cir. 2005)).

An employer cannot dodge this obligation by hastily terminating an employee.  "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Cutrera,* 429 F.3d at 113.

Furthermore, it is no defense for the employer to claim that the employee's request was not specific enough, or would not have been viable, if the employer does not participate in the process in the first place.  For example, in *Nelson v. Hitchcock Indep. Sch. Dist.*, No. 3:11-CV-00311, 2012 U.S. Dist. LEXIS 180859 (S.D. Tex. Dec. 21, 2012), a school teacher proposed being allowed to take pain medication during her work day.  The District Court questioned whether this would have been wise, but it quickly passed over that question because it was not relevant.  Because the defendant in that case had avoided the interactive process entirely, it could not be heard to complain whether the plaintiff had suggested viable accommodations.  *Id.* at *14. *See also Chevron Phillips*, 570 F.3d at 621 (the employee was not required to suggest the perfect solution – "Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what reasonable accommodations might be available.").

The evidence in this case shows that TCCD was on notice and should have been seeking to commence an interactive process no later than November 19, 2012 when Plaintiff provided documentation about her conditions from Dr. Indukuri, and perhaps even earlier.  Several times before November 13, 2012, Williams told her supervisor, and the next two supervisors above him (Biber and Hubbard) enough about her impairments to put them on notice as to the existence

34

of a possible disability.  Plaintiff is not claiming there was any failure to accommodate based on

these prior discussions, but mentions this only for context and to show that the key TCCD

employees had a little background regarding the disabilities even before her crying spell on

November 13, 2012.

After Plaintiff's crying spell on November 13, 2012, Williams spoke to Biber that night

by phone and told her: "I need to get to the doctor and figure out what's going on with me."

App. 17 (Williams Declaration 45).

Williams later sent several forms completed by her doctor to TCCD.  After that, TCCD

was on clear notice that Williams was dealing with issues implicating the ADA, and by law they

were obliged to engage in an interactive process to identify reasonable accommodations, but it is

undisputed that they never did so.

Hubbard makes two claims.  She testified that she was never aware of anything that

would have required a discussion concerning ADA accommodations.  She also claims that any

responsibility for discussing Williams' medical issues rested with HR, and she diligently avoided

even discussing Williams' medical issues with anyone.  App. 79-84.

The head of Human Resources for TCCD claims they never worked towards finding

accommodations because Williams never asked – but this is demonstrably false.  Emails and

faxes produced by TCCD prove they received medical documentation while Williams was out on

leave, and TCCD's own motion for summary judgment admits that Williams gave them the

Certification for Fitness of Duty on January 2, 2013, which expressly asks for reasonable

accommodations.  For TCCD to suggest that something more was required to trigger a duty to

interact and accommodate is not plausible on this record.

TCCD does not even pretend that it engaged in the interactive process required by law, and it has not asked the Court to grant summary judgment on this claim.  But even if it had, \here is far too much evidence to support a summary judgment dismissing this claims.

**H.      Plaintiff's ADA Retaliation Claim Likewise Survives Defendant's Motion**

Unless the Court finds that as a matter of law, Plaintiff cannot show she is a qualified person with a disability, then there is no way to grant summary judgment to TCCD on the retaliation claim.

Wherefore, Plaintiff requests an order denying Defendant's motion for summary judgment.

Respectfully submitted,


/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

I certify that on August 22, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel for Defendant.

/s/  Donald E. Uloth
Donald E. Uloth

36

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

**EXHIBITS**
**-- LEXIS cases cited in Plaintiff's Brief  --**


1.    *Grace v. Potter*, No. H-04-1182, 2006 U.S. Dist. LEXIS 28391 (S.D. Tex. May 3, 2006)


2.    *Nelson v. Hitchcock Indep. Sch. Dist.*, No. 3:11-CV-00311, 2012 U.S. Dist. LEXIS 180859 (S.D. Tex. Dec. 21, 2012)


3.    *Troutman v. Williamson County.*, No. 1:14-CV-986-DAE, 2016 U.S. Dist. LEXIS 41986 (W.D. Tex. Mar. 30, 2016)

**A** Neutral
As of: August 22, 2016 1:19 PM EDT

## *Grace v. Potter*

United States District Court for the Southern District of Texas, Houston Division

May 3, 2006, Decided ; May 3, 2006, Filed

CIVIL ACTION H-04-1182

**Reporter**
2006 U.S. Dist. LEXIS 28391; 2006 WL 1207735

LITA Y. GRACE, Plaintiff, vs. JOHN E. POTTER, Postmaster General, United States Postal Service Defendant.

**Prior History:** *Grace v. Potter, 2006 U.S. Dist. LEXIS 29901 (S.D. Tex., Apr. 24, 2006)*

## Core Terms

retaliation, transferred, station, Postal, sex, summary judgment, hostile work environment, employees, assault, female, adverse employment action, non-supervisory, reassigned, causal, craft, material fact, individuals, supervision, complaints, downgrade, interval, hostile, clean

**Counsel:** [*1] For Lita Y Grace, Plaintiff: Edmond Nwamdi O'Suji, Law Office Of Edmond O'Suji, Houston, TX.

For John E Potter, Postmaster General U.S. Postal Service: Defendant: Elizabeth F Karpati, Assistant U S Attorney, Houston, TX.

**Judges:** Stephen Wm Smith, United States Magistrate Judge.

**Opinion by:** Stephen Wm Smith

## Opinion

### OPINION ON SUMMARY JUDGMENT

In this federal employment Title VII suit, plaintiff Lita Y. Grace contends her former employer, the United States Postal Service ("USPS"), subjected her to a hostile work environment based on race, sex, and retaliation for prior EEO activity. The USPS seeks summary judgment on all claims. As explained below, this motion is granted.

### Background

Lita Grace is a black female who began working for USPS in 1986, eventually becoming a supervisor. Her tenure with the USPS was not always harmonious, and ended in 2001 with a disability retirement. In 1993 and 1995, Grace filed EEO complaints against her supervisors, Willy Johnson and Albert Brewer. [1] The complaint against Johnson was for sexual harassment; the exact date and nature of the other is unclear. [2] Grace contends that, beginning in 1997, the USPS retaliated against her by subjecting [*2] her to a hostile work environment. In response, Grace filed two more EEO complaints in 2000, one in July and one in November, this time for a hostile work environment based on race, sex, and retaliation. Grace cites the following in support of her hostile work environment claim:

. She was transferred nine times between 1997-1998 [3] after she filed the EEO complaints, which prevented her from proving herself at any one assignment;

. In September 1999, she was required to use sick and annual leave time by her manager after she was falsely accused of assault by an employee under her supervision;

. In February 2000, she was slandered by union officials who complained about her aggressive and combative style of supervision and her poor relations with customers, but was then denied the opportunity to defend herself by a district manager;

. On March 17, 2000, a postal carrier and subordinate (Devaughn) assaulted her in violation of the USPS zero tolerance policy, but the incident was not investigated nor was Devaughn immediately disciplined;

. On April 1, 2000, her supervisory authority was undermined when the acting Station Manager at the Ashford West Station resolved [*3] all grievances

---

[1] Dkt. 36, Ex. 2, p. 5.

[2] During her deposition, Grace stated that, in reference to Brewer, "I don't remember exactly what I filed on him." Dkt. 36, Ex. 10, p. 43.

[3] Conflicting dates are given in the record for exactly when these transfers occurred. It appears they started in 1997 and occurred throughout 1998. *See* Dkt. 36, Ex. 10, pp. 47-81.

Exhibit 1

without an investigation; and,

. In August 2000, she was denied reassignment to a non-supervisory position even though one was available.

In December 2002, an Administrative Judge issued a finding rejecting these claims. [4] In January 2003 the agency adopted the AJ's decision as its final action. Potter appealed the decision to the EEOC's Office of Federal Operations, which affirmed the agency's final order on the merits.

### [*4] Analysis

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001).* In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on its pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).* In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

### 1. Hostile Work Environment Based on Race and Sex

Title VII of the Civil Rights [*5] Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a).*

To establish a claim of hostile work environment based on race or sex, a plaintiff must show that she: (1) belongs to a protected class; (2) was subjected to unwelcome harassment; (3) that is based on race or sex; (4) that affects a term, condition, or privilege of employment; and (5) which the employer knows or should know of and fails to promptly remedy. *See Septimus v. Univ. of Houston, 399 F.3d 601, 611 (5th Cir. 2005); Frank v. Xerox Corp., 347 F.3d 130, 138 (5th*

*Cir. 2003).*

Even accepting Grace's version of events at face value, there is nothing to suggest these incidents were based on race or sex. Unlike racial slurs or sexual innuendo, these incidents carry no overtly racist or sexist overtones. Grace has merely rehearsed a litany of indignities and unfair treatment which are untethered to any form of discriminatory bias. Multiple transfers, required use of [*6] sick and annual leave time, slander by union officials without recourse, assault by a black co-worker, undermining of her supervisory authority, and denial of transfer to a lesser position at no cut in pay-none of these things inherently suggest a work environment infected by invidious discrimination. [5] In her deposition testimony, Grace was specifically asked to identify the connection to race or sex with respect to several of these matters, but was unable to do so other than to vaguely suggest that cumulatively they amounted to racial and sexual harassment. [6]

Even if these various incidents [*7] are considered abusive or hostile in some loose sense, the USPS's conduct must have been in violation of some protection afforded by Title VII to be actionable. The law offers little recourse for an employee who merely finds her work experience unpleasant or disagreeable. *Cf. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297 (3d Cir. 1997)* ("not every insult, slight, or unpleasantness gives rise to a valid Title VII claim").

Grace attempts to draw an inference of discrimination by pointing to more favorable treatment allegedly accorded other employees similarly situated with respect to assaults by co-workers and transfers to non-supervisory positions: [7]

. Merla Hanks, a black female, was reassigned from a supervisory position without having to take a corresponding reduction in pay or "downgrade";

. Jack Devaughn, a black male, was not disciplined for hitting her;

. Ruby Holcombe, a white female; when a person under her supervision assaulted her, that person was suspended

---

[4] The EEOC's further dispositions affirming the Administrative Judge's decision may be reviewed at *2003 EEOPUB LEXIS 5538, 2003 WL 22288478 (Sept. 30, 2003, E.E.O.C. Doc. 01A32003)* and *2004 EEOPUB LEXIS 209, 2004 WL 189646 (Jan. 13, 2004, E.E.O.C. Doc. 05A40143).*

[5] Although some of these incidents might well be analyzed as separate, stand-alone employment decisions rather than subsumed into a hostile work environment claim, the court will address the theory advanced by the plaintiff and her counsel in the pleadings and at oral argument. As will be seen, the ultimate outcome is not affected by how her claim is packaged.

[6] *See, e.g.,* Dkt. 36, Ex. 10, pp. 37-41

[7] *See* Dkt. 2, pp. 39-41; Dkt. 37, Ex. 7.

immediately;

. Isidor Mesa, a Hispanic male; when he was assaulted, the assailant was immediately suspended;

. Sylvia Balboa, a Hispanic female, was transferred to a [*8] non-supervisory position with no downgrade;

. Sonia Hernandez, a Hispanic female, was transferred to another position with no downgrade;

. Glynn Craft, a white male, was transferred from a supervisory position with no downgrade.

One glance at this list destroys any inference of race-or sex-based disparate treatment. Four of the favored individuals are female, and two are black (including one black female). Even accepting for the moment Grace's unsupported assertion that these individuals received the favorable treatment she claims, this list effectively rebuts any inference of discrimination based on her race or sex. [8]

[*9] Moreover, USPS has provided a nondiscriminatory explanation for these employment actions. Grace is simply mistaken when she asserts that the alleged assault by Jack Devaughn was neither investigated or that Devaughn was not disciplined. In fact, the local police were called, Postal Service investigators were brought in, and Devaughn, Grace, and Ahn Nguyen, another USPS employee, were questioned about the matter. [9] Devaughn was not terminated, however, because the investigation was inconclusive. [10] The USPS determined that there were no witnesses who directly observed the incident and thus, no definitive conclusion could be drawn as to what, if anything, happened, or which of the parties were at fault if there was an altercation. [11]

USPS also explains that Grace was not transferred to a non-supervisory position because she would not accept a corresponding reduction in pay. Phillip Pelch, a manager [*10] of human resources with the USPS, clarified that

---

[8] In order to establish disparate treatment, a plaintiff must show that individuals **outside** of her protected class were treated differently under circumstances nearly identical to hers. *See Abarca v. Metropolitan Transit. Auth., 404 F.3d 938, 941 (5th Cir. 2005)* (per curiam); *Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995); Little v. Republic Refining Co., Ltd., 924 F.2d 93, 97 (5th Cir. 1991).*

[9] *See* Dkt. 36, Exs. 13, 14.

[10] See Dkt. 36, Exs., 13, 14.

[11] Dkt. 36, Ex. 13, 14.

Ms. Grace wanted a non-supervisory position, but she did not want a decrease in her salary. I could not accommodate Ms. Grace's request to transfer to an enabling job because the Postal Service had placed a hold on all such positions in Houston in preparation of downsizing. . . . I gave Ms. Grace the opportunity to be reassigned or downgraded to a non-supervisory position, but Ms. Grace refused because she did not want to take a pay cut. [12]

Grace has not cast doubt on these explanations or produced any summary judgment evidence which would allow a reasonable trier of fact to conclude that the USPS's articulated reasons were pretext for racial or sexual discrimination. Her subjective belief that the USPS should have adopted her characterization of the incident and terminated Devaughn is not material. *Cf. Guarino v. Potter, 2003 U.S. Dist. LEXIS 19157, at 46, 2003 WL 22439799, at *16 (E.D. La. 2003)* ("it is irrelevant whether the Postal Service's [*11] decision may have been based on incorrect facts, so long as its decision was not motivated by discriminatory or retaliatory animus").

Because there is no genuine issue of material fact, summary judgment must be granted in favor of the USPS on the race and sex-based hostile work environment claims.

## 2. Hostile Work Environment Based on Retaliation

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under this subchapter." *42 U.S.C. § 2000e-3(a).* A retaliation claim under Title VII has three elements: [13] (1) the employee

---

[12] Dkt. 36, Ex. 17.

[13]

These elements are sometimes referred to as a "prima facie case", but that terminology invites confusion. The components of a *McDonnell Douglas*-type prima facie case are variable, and do not apply to all discrimination cases across the board. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). None of the four prima facie elements listed by Justice Powell in *McDonnell Douglas* are indispensable to a finding of Title VII liability, even in a hiring case. *See* S.W. Smith, *Title VII's National Anthem, 12 LAB. LAW. 371, 376 (1997)* (citing cases). By contrast, the three listed elements of a retaliation claim are indispensable to a finding of retaliation, because these elements embody requirements rooted in the text of *§ 704(a)*: standing, injury, causation. *Id.* at 395-98. A retaliation plaintiff unable to establish (or

engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between the protected activity and the adverse employment action. *Walker v. Thompson, 214 F.3d 615, 628-29 (5th Cir. 2000)*. The standard for proving causal nexus in retaliation cases is "causation-in-fact" or "but-for" causation. "Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity **[*12]** she would not have been subjected to the action of which she claims." *Jack v. Texaco Research Center, 743 F.2d 1129, 1131 (5th Cir. 1984); see also Ray v. Tandem Computers, Inc., 63 F.3d 429, 436 (5th Cir. 1995)*.

**[*13]** It is undisputed that filing a formal EEO complaint is activity protected by *§ 704 of Title VII, and* so Grace has satisfied the first element. *See, e.g., Evans v. City of Houston, 246 F.3d 344, 352-53 (5th Cir. 2001); Suttles v. United States Postal Serv., 927 F. Supp. 990, 1009 (S.D. Tex. 1996)* (postal employee's filing of EEO complaint was protected activity). The Fifth Circuit holds that the "adverse employment action" must be an "ultimate employment decision," such as hiring, granting leave, discharging, promoting, or compensating; not merely an "interlocutory or mediate" decision. *Mattern v. Eastman Kodak Co., 104 F.3d 702, 707-08 (5th Cir. 1997)*. This formulation suggests that a hostile work environment theory of retaliation might not be viable in this circuit, although no case has expressly so held. The Supreme Court recently heard oral argument in a case to decide what types of conduct can constitute actionable retaliation under *Title VII § 704. Burlington Northern Santa Fe Railway Co. v. White, 126 S. Ct. 1671, 164 L. Ed. 2d 395 (April 17, 2006)*. In light of that pending decision, it will be assumed for purposes of this motion that Grace has **[*14]** at least created a fact issue as to the adverse employment action element of her claim.

However, Grace has utterly failed to produce any evidence of causal nexus. Although not determinative, the timing of the putative retaliation is an important factor in determining the presence of a causal link. *See, e.g., Swanson v. General Services Admin., 110 F.3d 1180, 1188 (5th Cir. 1997); Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 268 (5th Cir. 1994)*. By itself, temporal proximity between an employer's knowledge of protected activity and an adverse employment action may be sufficient evidence to create a jury issue on retaliation, provided that the time interval is "very close." *Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* (per curiam). *Breeden* held that a gap of 20 months "suggests, by itself, no causality at all" and cited with approval circuit court decisions

holding that intervals of 3 months and 4 months, respectively, were insufficient. *Id.; Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997)* (3 months); *Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992)* **[*15]** (4 months).

The 2-year time interval between Grace's 1995 EEO complaint [14] and the initial onset of adverse employment actions is far too long to warrant an inference of causal nexus under *Breeden*. No reported Fifth Circuit decision has ever upheld judgment in favor of a Title VII retaliation plaintiff over such an interval of time. *See, e.g., Foster v. Solvay Pharms., Inc., 160 Fed. Appx. 385, 389 (5th Cir. 2005)* (unpublished). To the contrary, absent countervailing evidence, such a time gap actually negates an inference of retaliatory motivation.

Nor has Grace offered any such countervailing evidence. There is no indication that Grace's supervisors reacted in a hostile or negative **[*16]** manner to her EEO complaints. *Cf. Shirley v. Chrysler First, Inc., 970 F.2d 39, 43 (5th Cir. 1992)* (plaintiff's supervisor made disparaging references to her EEOC charge at least twice a week during 14 month interval). Nor is there any evidence that the individuals responsible for the treatment complained of in the earlier charges were in any way involved in the allegedly retaliatory conduct beginning in 1997. The record is also devoid of evidence that USPS gave preferential treatment to similarly situated employees who had not filed EEO complaints.

Finally, Grace has not offered any evidence to contradict USPS legitimate, non-retaliatory explanation for the multiple transfers which are the principal focus of her retaliation claim. According to the USPS, Grace was transferred to various postal stations in the Houston area for two reasons: (1) to meet legitimate staffing needs, and (2) to attempt to find an environment where Grace could get along with her co-workers.

Bernadette Triche, the Area Manager of the USPS in the Houston District, explained:

> I initiated Ms. Grace's transfers because I was trying to help her. Her poor interpersonal skills consistently **[*17]** caused conflict with the craft employees she supervised and caused problems with other supervisors. But I didn't

---

14

Measured from her initial EEO complaint in 1993, the time gap doubles to four years. This lengthy period of tolerance for Grace's earlier claims of discrimination further undermines any inference of retaliatory motive. *See Ray v. Tandem Computers, Inc., 63 F.3d 429, 436 (5th Cir. 1995)*.

---

at least create a fact issue on) all three of these elements cannot prevail.

want to fire Ms. Grace because, to me, she seemed to have the potential for being a good supervisor if she could improve her interpersonal and communication skills. I also sent Ms. Grace to training to help her improve her interpersonal skills.

In making my decisions to transfer Ms. Grace, I gave no consideration to whether she had filed any type of EEO complaint in the past. When a supervisor has on-going conflict with her craft employees, it is customary to move the supervisor to a different station. It is also more cost-effective to resolve supervisor-employee conflicts by reassigning one supervisor than it is to reassign several craft workers.

I also want to note that Ms. Grace had expressed a desire to get experience working at other stations and branches. By transferring her to various stations I was trying to help Ms. Grace reach those goals. [15]

Phillip Pelch, manager of human resources, offered this similar reason for the transfers:

In my opinion, Ms. Grace did not perform well as a supervisor because she had frequent run-ins with employees. Her [*18] aggressive, confrontational style of communicating caused repeated conflicts with the craft employees she supervised. Ms. Grace often displayed a poor attitude and disagreeable behavior.

As for Ms. Grace's series of reassignments in 1997 and 1998, it is not unusual to move a supervisor when repeated employee-supervisor conflicts arise. It is not uncommon to move supervisors from one unit to another, not only for personality disputes, but also due to other business conditions. It is easier to resolve employee-supervisor problems by moving one supervisor than by moving several craft workers. [16]

In response, Grace offers only a conclusory assertion that the USPS has issued "inconsistent explanations" for the transfers. [17] No elaboration is given and no specific examples of inconsistencies are identified. Moreover, in her deposition testimony Grace was questioned about each individual transfer. For the most part, Grace acknowledged that she was transferred [*19] to various postal stations either because a supervisor was needed at that station, or because they were behind in deliveries at the station and additional help was

required. [18] Grace did not cite retaliation, race, or gender as motivating any particular transfer. Instead, Grace stated:

I consider it to be abusive in a sense because I was used as going to clean up places and it made me look like the bad supervisor because I was doing my job, and they abused me because they were not disciplining other supervisors for not doing their job, so I had to go and clean up other supervisors -- the jobs that they didn't do I had to go and clean them up and I had to go get them in order and those other supervisors were moved to other easy positions. If I was moved from one station to the next station they moved that supervisor back in that clean position, in that clean area, and I thought it was very abusive to me because it made me look like the hardnose supervisor. [19]

[*20] Accordingly, there is no substantial record evidence on which a reasonable fact-finder could render a retaliation verdict in Grace's favor. USPS is therefore entitled to judgment as a matter of law on this claim as well.

## Conclusion

For these reasons, the USPS's motion for summary judgment is granted.

Signed on May 3, 2006, at Houston, Texas.

**Stephen Wm Smith**

**United States Magistrate Judge**

## FINAL JUDGMENT

Plaintiff Lita Y. Grace's claims against the defendant are dismissed, and judgment is entered for the defendant.

Signed on May 3, 2006, at Houston, Texas.

**Stephen Wm Smith**

**United States Magistrate Judge**

---

[15] Dkt. 36, Ex. 19.

[16] Dkt. 36, Ex. 17.

[17] Dkt. 37.

[18] *See* Dkt. 36, Ex. 10, pp. 49-81.

[19] Dkt. 36, Ex. 10, pp. 79-80.

**End of Document**

A Neutral
As of: August 22, 2016 1:14 PM EDT

# *Nelson v. Hitchcock Indep. Sch. Dist.*

United States District Court for the Southern District of Texas, Galveston Division

December 21, 2012, Decided; December 21, 2012, Filed

CIVIL ACTION NO. 3:11-CV-00311

**Reporter**
2012 U.S. Dist. LEXIS 180859; 27 Am. Disabilities Cas. (BNA) 437; 15 Accom. Disabilities Dec. (CCH) P15-138; 2012 WL 6681917

IRIS NELSON, Plaintiff, VS. HITCHCOCK INDEPENDENT SCHOOL DISTRICT, Defendant.

**Prior History:** *Hitchcock Indep. Sch. Dist. v. Walker, 2010 Tex. App. LEXIS 9941 (Tex. App. Houston 1st Dist., Dec. 16, 2010)*

## Core Terms

Walker, accommodation, surgery, pain, race discrimination, disability, terminated, interactive process, summary judgment, pills, reasonable accommodation, medication, lawsuit, knee, retaliation claim, whistleblower, classroom, cane

**Counsel:** [*1] For Iris Nelson, Plaintiff: Allecia Lindsey Pottinger, Law Office of Allecia Lindsey Pottinger, Houston, TX.

For Hitchcock Independent School District, Defendant: Christopher B Gilbert, LEAD ATTORNEY, DeAndrea C. Washington, Thompson & Horton LLP, Houston, TX.

**Judges:** Gregg Costa, United States District Judge.

**Opinion by:** Gregg Costa

## Opinion

### MEMORANDUM AND ORDER

When Head Start students arrived for the start of the 2009-2010 school year in Hitchcock, Texas, Ms. Nelson was missing. Ms. Nelson was missing because she had requested leave to undergo her second knee replacement surgery that calendar year. But Defendant Hitchcock Independent School District denied the leave request, noting that Ms. Nelson had already exhausted her allotted family medical leave for the first surgery, and terminated her.

In June 2011, Ms. Nelson filed this lawsuit challenging her termination under the Americans with Disabilities Act, alleging that Hitchcock ISD failed to accommodate her disability by refusing to provide her with extended leave, or, in the alternative, by prohibiting her from using crutches, a walker, or pain medication. She also alleged that Hitchcock violated Title VII by firing her in retaliation for "opposing a discriminatory [*2] practice" against the former Head Start director. Hitchcock ISD now seeks summary judgment. Having reviewed the parties' briefing, the evidence, and the applicable case law, the Court **DENIES** Hitchcock ISD's motion with respect to the ADA claims because genuine issues of material fact exist, including whether Hitchcock ISD engaged in the "interactive process" required to determine whether a reasonable accommodation existed for Ms. Nelson's disability. The Court **GRANTS** the motion with respect to the Title VII claims, however, because Ms. Nelson has failed to present evidence that she engaged in activity protected by Title VII.

### I. BACKGROUND

#### A. Facts Relating to the ADA Claim

Ms. Nelson began working for the Head Start program as a teacher's aide in 1996. In February 2009, she was diagnosed with severe bilateral knee arthritis, which required knee replacement surgery for both legs. Ms. Nelson took medical leave for right knee surgery from February 24, 2009 until May 26, 2009, for a total of 59 days—one day short of the twelve-week leave period guaranteed under the Family Medical Leave Act. Docket Entry No. 19-1, Exs. A ¶ 2, A-2. Under Hitchcock ISD's Board Policy DEC (Local), the FMLA year [*3] for an employee starts on the day that the employee's first covered leave begins. Docket Entry No. 19-1, Ex. A-3 at 3. Thus, Ms. Nelson's FMLA year ran from February 24, 2009 to February 23, 2010.

On August 11, 2009, before the new school year started, Ms. Nelson met with Theresa Fails, the Payroll and Benefits Supervisor for Hitchcock ISD, to request roughly two-and-a-half months off for surgery on her left knee. Fails informed Ms. Nelson that she had no remaining family medical leave

Exhibit 2

and would not be eligible for more until the following year.

The parties dispute what else was said at the meeting. According to Ms. Nelson, she responded that instead of undergoing surgery at that time, she "would just have to work using [a] cane or walker," but Fails said she could not use them. Docket Entry Nos. 22-14 ¶ 9; 22-4 at 24:13-19. Ms. Nelson attests that she then said she would "just take pain pills," but Fails refused again and noted that the school would test her for drugs. Docket Entry Nos. 22-14 ¶ 10; 22-4 at 24:20-25:7. Hitchcock ISD, on the other hand, presents affidavit testimony from Fails that she did not prohibit Ms. Nelson from using a walker or pain pills, but merely expressed [*4] her safety concerns about using those aids while supervising small children. *See* Docket Entry No. 19-1, Ex. A ¶ 5. Fails also suggests in her affidavit that Ms. Nelson planned to undergo surgery regardless, and that the discussion regarding a walker and pain pills only pertained to Ms. Nelson's desire to work from August 17, 2009, the day when teachers were to report for classroom preparation, until her surgery the next week. *Id.* Indeed, at the time of their meeting, Ms. Nelson had already booked her surgery and been told by her doctor that surgery could not wait. Docket Entry Nos. 19-3, Ex. C at 16:4-7; 24-2 at 15:6-20. However, a statement from Fails to the Equal Employment Opportunity Commission is more consistent with Ms. Nelson's depiction of events: "I informed Ms. Nelson that if she could wait until February 2010 her FMLA would renew one year after the first surgery. Ms. Nelson replied she could maybe work taking pain killers and using a walker or crutches." *See* Docket Entry No. 22-3.

After the meeting, Fails sent an e-mail to Betty Martins, the interim Head Start director, and copied Dr. Mike Bergman, the school superintendent. *See* Docket Entry No. 22-10. Fails described the [*5] conversation and concluded: "Until a Doctor's note can be obtained and a decision made...I recommend she not be allowed to return or be on the campus grounds." *Id.* Ms. Nelson denies that she was asked to provide a doctor's note in order to obtain leave. Docket Entry No. 24-2 at 22:22-23:7.

Without hearing anything further from Hitchcock ISD, Ms. Nelson returned to work on August 17, 2009, the week before students arrived. That same day, she filed a "Request for Leave" form, seeking "[a]bout 2½ months" of leave starting August 20, 2009. Docket Entry No. 19-2, Exs. B ¶ 3, B-1. The proper Hitchcock ISD administrator apparently did not receive the form until August 24, 2009. Docket Entry No. 19-2, Ex. B-1. Ms. Nelson worked that week without a walking aid—purportedly because she thought she was not allowed to use one—although no children were present and her responsibilities were limited to preparing the classroom.

Docket Entry No. 22-14 ¶¶ 11-14. Without having received a response from any Hitchcock ISD official about the status of her leave request, Ms. Nelson unilaterally took leave and underwent surgery on August 23, 2009.

On August 25, 2009, Hitchcock ISD's superintendent wrote a letter [*6] to Ms. Nelson denying her leave request, noting that she had exhausted her FMLA entitlement. Docket Entry No. 19-2, Ex. B-2. On August 31, 2009, he sent her a notice of termination, informing Ms. Nelson that her "employment with Hitchcock ISD has been terminated for being unable to perform the essential functions of your job." Docket Entry No. 19-2, Ex. B-3.

**B. Facts Relating to the Retaliation Claim**

Ms. Nelson's retaliation claim arises out of assistance she provided Doreatha Walker, the former director of the Head Start program. While Ms. Nelson was on leave for the first knee surgery, Walker asked her to write a letter to the superintendent explaining that Walker had not written her up for an incident involving a child running away. Docket Entry Nos. 19-3 at 37:6-39:18. Ms. Nelson wrote the letter on April 29, 2009. Docket Entry No. 22-8.[1] Walker intended to use the letter to refute allegations that she had mistreated employees. *See* Docket Entry No. 22-16 ¶¶ 5-6.

After being placed on a leave of absence, Walker filed numerous lawsuits against Hitchcock ISD, including a whistleblower suit—in which Ms. Nelson testified—and a race discrimination and retaliation suit, which involved a separate whistleblower claim. Hitchcock ISD contends that Ms. Nelson's letter and testimony were restricted to the first whistleblower suit, but Walker and Ms. Nelson maintain that the suits were intertwined and the "assistance" extended to the race discrimination claim. Ms. Nelson admits that when she wrote the letter, Walker had not told her of any race discrimination allegations and she had no understanding of Walker's dispute with Hitchcock ISD. Docket Entry No. 19-3 at 36:15-37:5. She also admits that she never spoke to the EEOC on Walker's behalf. Docket Entry No. 22-4 at 41:8-11.

When asked at her deposition why she thought writing the letter caused her termination, Ms. Nelson responded that: (1) her problems with Hitchcock ISD only started after she wrote the letter; (2) she heard second-hand that other employees were told not to write a letter if they valued their jobs; and (3)

---

[1] The body of the letter states in full: "When Mrs. Walker and I had that conversation about a child running away, there was no one around. I talked to her for myself cause I figured I would have gotten written up, by someone [*7] for him running from me." Docket Entry No. 22-8.

another employee who wrote the [*8] letter—and was not fired—"has been catching hell ever since." *Id.* at 41:18-43:6. But Ms. Nelson concedes that nobody at Hitchcock ISD ever talked to her about the letter or about her involvement with Walker and Walker's disputes. *Id.* at 43:7-13.

## II. STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001)* (citation omitted).

## III. DISCUSSION

### A. The ADA Claim

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability . . . ." *42 U.S.C. § 12112(a)*. The Act defines such discrimination to include "not making reasonable accommodations to the known physical [*9] or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id. § 12112(b)(5)(A)*. The Act further defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id. § 12111(8)*.

The parties agree that Hitchcock ISD is a covered entity and that Ms. Nelson had a disability; the only question is whether Hitchcock ISD failed to make reasonable accommodations that would have allowed Ms. Nelson to perform the essential functions of a Head Start classroom aide.[2] "An employee who

needs an accommodation because of a disability has the responsibility of informing her employer." *EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 621 (5th Cir. 2009)* (citing *Taylor v. Principal Fin. Grp., 93 F.3d 155, 165 (5th Cir. 1996))*. Once that happens, the employer must engage in an "interactive process"—*i.e.,* "a meaningful dialogue with the employee to find the best means of accommodating [*10] [the] disability." *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005))*. "When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations." *Id.* (citing *Cutrera v. Bd. of Supervisors of La. St. Univ., 429 F.3d 108, 113 (5th Cir. 2005))*. "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Cutrera, 429 F.3d at 113*.

The Court finds that a fact [*11] issue exists concerning whether Hitchcock ISD engaged in this ADA-required interactive process. It is undisputed that Ms. Nelson informed her employer of her disability and need for an accommodation when she met with Fails on August 11, 2009. Regardless of Fails's lack of "authority to make any decisions on this issue," Docket Entry No. 19 at 11, Hitchcock ISD's relevant decisionmakers were also aware of Ms. Nelson's situation, as Fails sent an e-mail to the program's director and the superintendent on the day of her meeting with Ms. Nelson. *See* Docket Entry No. 22-10; *see also Chevron Phillips, 570 F.3d at 609-10, 621-22* (finding fact issue where employee requested an accommodation from "a customer service manager who supervised her work," who then e-mailed the information to a human resources employee). The director even saw Ms. Nelson at work on the week of August 17, 2009, but failed to address Ms. Nelson's situation. *See* Docket Entry No. 19-3, Ex. C at 26:12-27:7. Hitchcock ISD never engaged in the "communication and good-faith exploration" of accommodation requests that the ADA requires. *Chevron Phillips, 570 F.3d at 621* (quoting *Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007))*.

Hitchcock [*12] ISD argues that (1) the request for a walking aid or pain pills only pertained to "a few days" in August 2009 because Ms. Nelson had already scheduled surgery for August 23, 2009; and (2) the request for an extra two-and-a-half months of leave for surgery was unreasonable.[3] Docket

---

[2] In addition to the accommodation claim, Ms. Nelson asserts a separate discrimination claim based on "Fails' act of declaring Nelson 'unsafe.'" Docket Entry No. 22 ¶ 18. The Court rejects this claim to the extent it is different from the accommodation claim; the mere act of perceiving an employee as unsafe does not constitute the type of "adverse employment action" required for liability under the ADA. *See McInnis v. Alamo Cmty. Coll. Dist., 207 F.3d 276, 279-80*

*(5th Cir. 2000)* (listing the factors of an ADA claim).

[3] For the argument that a lengthy extended leave is unreasonable, Hitchcock ISD cites *Roberts v. Unitrin Specialty Lines Ins. Co., 405*

Case 4:15-cv-00241-O   Document 33   Filed 08/23/16   Page 52 of 60   PageID 483

Page 4 of 6
2012 U.S. Dist. LEXIS 180839, *12

Entry No. 19 at 3. But Ms. Nelson presents sufficient evidence that she would have postponed surgery had she been afforded an accommodation. First, Fails's letter to the EEOC, quoted above, explicitly states that Ms. Nelson presented the idea of working with pain pills and a walker or crutches until she was eligible for more FMLA leave. Docket Entry No. 22-3. Second, Ms. Nelson's affidavit states that she offered to use a cane or walker when told she had no remaining leave and offered to use pain pills when told she could not use a cane or walker. Docket Entry No. 22-14 ¶¶ 9-10. Finally, Fails's expressed concern about the requested pain-killer accommodation—that a medicated classroom aide may pose a safety risk to the young children—makes little sense if the accommodation discussion was limited to the period before Ms. Nelson's surgery because students would not be present during those few days of teacher [*13] preparation. Thus, given that a jury could conclude from the evidence that Ms. Nelson would have waited for surgery until she had sufficient FMLA leave if she had received other accommodations, the Court need not determine the reasonableness of an extended leave.

Similarly, the Court need not determine whether the use of a walking aid or pain pills would have been a reasonable accommodation. While the Court agrees that Hitchcock ISD raises serious doubts about the wisdom of supervising a classroom of children under the influence of certain pain medication, the ADA-mandated interactive process that was ignored in this case is designed to gather the information that allows for such an assessment to be made. Had the [*14] district engaged in the interactive process, it could have clarified whether Ms. Nelson needed a walker, pain medication, or both.[4] *See* Docket Entry No. 22-4 at 49:21-50:9 ("[I]f I could have worked using my cane, I mean, people work with canes and walkers every day. It don't mean I couldn't do my job."). If it turned out that Ms. Nelson required pain medication as part of any accommodation, the interactive process would have enabled the district to discover whether over-the-counter medication would suffice. If prescription pain relievers were required, the district could have explored the required dosages and the associated side effects. The

answers to these questions may well have provided Hitchcock ISD with the information that would allow it to reasonably conclude that Ms. Nelson's requested accommodations would "impose an undue hardship on the operation" of Head Start. *42 U.S.C. § 12112(b)(5)(A)*. But Hitchcock ISD's silence following Ms. Nelson's meeting with Fails is sufficient for a jury to conclude that Hitchcock ISD refused Ms. Nelson's requested accommodations without giving them the consideration that the ADA requires. *See Chevron Phillips, 570 F.3d at 622* (ruling that employee's [*15] testimony that employer "remained silent and made no comment on the requested accommodations" was sufficient to survive summary judgment).

## B. The Retaliation Claim

To establish a prima facie retaliation claim, Ms. Nelson must prove that: (1) she engaged in an activity that Title VII protects; (2) Hitchcock ISD carried out an adverse employment action; and (3) a causal nexus exists between her protected activity and Hitchcock ISD's adverse action. *Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 439 (5th Cir. 2005)*. An employee has engaged in activity protected by Title VII if she has either "opposed any practice made an unlawful employment practice by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *42 U.S.C.A. § 2000e-3(a)*. Additionally, retaliation includes instances when an employer takes adverse action against an employee to punish another employee who engaged [*16] in protected activity. *Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 131 S. Ct. 863, 870, 178 L. Ed. 2d 694* (holding that an employee who was allegedly terminated in retaliation for his fiancée filing a discrimination charge with the EEOC fell within the zone of interests protected by Title VII).[5]

Ms. Nelson has failed to present evidence that would allow a jury to reasonably conclude that she engaged in activity that Title VII protects. Ms. Nelson's argument that she opposed an unlawful employment practice by writing a letter for Doreatha Walker on April 29, 2009 is not enough to withstand summary judgment.[6] First, there is no connection between the four corners of the letter and a Title VII dispute. The letter

---

*F. App'x 874 (5th Cir. 2010)*; *Harville v. Tex. A&M Univ., 833 F. Supp. 2d 645, 661 (S.D. Tex. 2011)*; *Wood v. Green, 323 F.3d 1309 (11th Cir. 2003)*; *Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 461-62 (E.D. Pa. 2005)*; and *Reifer v. Colonial Intermediate Unit 20, 462 F. Supp. 2d 621, 635-36 (M.D. Pa. 2006)*. *See* Docket Entry No. 19 at 12.

[4] Fails contends that she inquired further by asking for a doctor's note, but Ms. Nelson directly rebuts this, and the Court must construe facts in favor of the nonmovant for purposes of summary judgment. *See Evans, 246 F.3d at 348*.

---

[5] Ms. Nelson does not raise a *Thompson*-type claim, but instead relies on the letter she wrote and testimony she provided regarding Walker. *See Thompson, 131 S. Ct. at 870*.

[6] The parties also note that Ms. Nelson testified in a whistleblower lawsuit brought by Walker, but that testimony occurred in July 2011—nearly two years after Ms. Nelson's termination—and, therefore, could not have been the basis of any adverse employment action against Ms. Nelson. *See* Docket Entry No. 19-2, Ex. B-5.

Case 4:15-cv-00241-O   Document 33   Filed 08/23/16   Page 53 of 60   PageID 484

Page 5 of 6
2012 U.S. Dist. LEXIS 180859, *16

pertains to Walker's and Ms. Nelson's handling of an incident where a child ran away; it does not mention discrimination. *See* Docket Entry No. 22-8. Though a letter like Ms. Nelson's could potentially be considered protected activity if it were drafted to combat a discriminatory pretext, such is not the case here. Ms. Nelson admitted that **[*17]** when she drafted the letter, Walker had not told her of any race discrimination allegations and she had no understanding of Walker's dispute with Hitchcock ISD. Docket Entry No. 19-3 at 36:15-37:5; *see also Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)* ("The opposition clause of *§ 2000e-3(a)* requires the employee to demonstrate that she had at least a 'reasonable belief' that the practices she opposed were unlawful." (citing *Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. 1981)))*. Ms. Nelson cites no cases, and the Court is aware of none, in which a federal court has construed Title VII to protect activity that neither facially pertains to discrimination nor was made with awareness of the activity's connection to an employment practice prohibited by Title VII.

Second, Ms. Nelson fails to present sufficient evidence showing how her **[*18]** letter was used in Walker's race discrimination charge or lawsuit against Hitchcock ISD. Walker offers affidavit testimony that she used the letter in her race discrimination charge to rebut Hitchcock ISD's claim that she was insubordinate and mistreated employees. Docket Entry No. 22-16 ¶ 12. But a review of the record shows that Walker did not use the letter for her race discrimination grievance or suit, but instead for her first whistleblower suit. Indeed, Ms. Nelson testified in Walker's first lawsuit, which did not include a race discrimination claim, but did not testify in Walker's second lawsuit, which did include a race discrimination claim. *Compare* Docket Entry No. 19-2, Exs. B-4, B-5, *with* Docket Entry Nos. 22-11; 22-12. And Ms. Nelson provides no evidence showing when the letter was produced in the race discrimination matter or how and when the Hitchcock ISD officials who terminated her would have learned about it. When taken as a whole, these defects in the first element of Ms. Nelson's retaliation claim establish, as a matter of law, that she did not engage in Title VII protected activity.

## IV. CONCLUSION

For the reasons above, Hitchcock Independent School District's motion **[*19]** for summary judgment (Docket Entry No. 19) is **DENIED IN PART** and **GRANTED IN PART.** The Court **DENIES** Hitchcock ISD's motion with respect to Ms. Nelson's ADA claim and **GRANTS** the motion with

respect to the Title VII claim.[7]

SIGNED this 21st day of December, 2012.

/s/ Gregg Costa

Gregg Costa

United States District Judge

---

[7] The Court also **DENIES** the Motion to Strike Hitchcock ISD's Summary-Judgment Evidence contained in Ms. Nelson's summary judgment response (Docket Entry No. 22). The Court does not find the disputed testimony to be inconsistent, and, in any event, the Court did not rely on that testimony in reaching its holding.

**End of Document**



Neutral

As of: August 22, 2016 1:15 PM EDT

# *Troutman v. Williamson Cnty.*

United States District Court for the Western District of Texas, Austin Division

March 30, 2016, Decided; March 30, 2016, Filed

No. 1:14-CV-986-DAE

**Reporter**

2016 U.S. Dist. LEXIS 41986

WALTER CHAD TROUTMAN, Plaintiff, vs. WILLIAMSON COUNTY AND ITS SHERIFF'S DEPARTMENT, Defendant.

**Prior History:** *Troutman v. Williamson Cnty., 2016 U.S. Dist. LEXIS 13892 (W.D. Tex., Feb. 4, 2016)*

## Core Terms

sleep apnea, disability, accommodation, termination, summary judgment, sleep, prima facie case, disciplined, retaliation, discrimination claim, Recommendation, disability discrimination, protected activity, genuine, fired, adverse employment action, major life activity, essential function, prima facie, discriminatory, conclusions, memorandum, arriving, prong, spoke

**Counsel:** [*1] For Walter Chad Troutman, Plaintiff: Thomas Newton Cammack, III, LEAD ATTORNEY, Poncio Law Offices, San Antonio, TX; Adam Poncio, Poncio Law Offices PC, San Antonio, TX.

For Williamson County and its Sheriff's Department, Defendant: Benjamin Eliot New, Larry J. Simmons, LEAD ATTORNEYS, Germer PLLC, Beaumont, TX; Chris A. Blackerby, LEAD ATTORNEY, Germer Gertz Beaman & Brown, Austin, TX.

**Judges:** David Alan Ezra, Senior United States District Judge.

**Opinion by:** David Alan Ezra

## Opinion

### ORDER ADOPTING THE MAGISTRATE'S REPORT AND RECOMMENDATION

Before the Court are Plaintiff Walter Chad Troutman's Objections (Dkt. # 41) to Magistrate Judge Andrew W.

Austin's Report and Recommendations (Dkt. # 40) regarding Defendant Williamson County's Motion for Summary Judgment (Dkt. # 21). Defendant filed a response to the Objections on February 25, 2015 (Dkt. # 42). Pursuant to *Local Rule 7(h)*, the Court finds this matter suitable for disposition without a hearing. After reviewing the Objections and the supporting and opposing memoranda, the Court **ADOPTS** the conclusions of the Report and Recommendation, for the reasons stated below. (Dkt. # 40.)

### BACKGROUND

#### I. Factual Background

This case arises from Walter Chad Troutman's September 11, 2013, termination [*2] by a unanimous vote of the Disciplinary Review Board of the Williamson County Sheriff's Office. (Dkt. # 1 ¶ 20.) Troutman had been an employee of the Williamson County Sheriff's Office since 1997. (Id. ¶ 9.)

He states that he has suffered from sleep apnea, a respiratory disorder which causes him to stop breathing at certain points in his sleep cycle, since the mid-to-late 1990s. ("Troutman Dep.," Dkt. # 35, Ex. A at 15:12-26.) He was formally diagnosed some time in 2003 or 2004. (Id. at 13:16-14:2.) According to Troutman, his sleep apnea makes it difficult to sleep deeply, and he frequently feels fatigued during the day. (Id. at 16:2-17:9.) In 2005, Troutman states that upon the advice of his doctor, he requested permission from Sergeant Carmona, his supervisor at the time, to take the stimulant Ritalin to combat his fatigue. (Id. at 76:19-77:22.) After checking with the chain of command, Sergeant Carmona denied permission to take the medication. (Id. at 77:1-6.)

Plaintiff had multiple supervisors during the time he has suffered from sleep apnea. Prior to approximately 2005, Sergeant James David was Troutman's supervisor. (Troutman Dep. 78:20-79:11.) Around 2005, Sergeant Carmona became [*3] Troutman's supervisor. (Id. 76:13-17.) At some point after that, Sergeant David Denson supervised Troutman (id.); Sergeant Kelly Bomer, who was Troutman's supervisor

Exhibit 3

when he was terminated from employment, assumed the position in October 2012. (Id. 83:4-7.)

Troutman did not have a perfect record during his employ with Williamson County. During his deposition, he testified that in 2005 he was disciplined for falling asleep behind the wheel of a moving vehicle. ("Troutman Dep. 2," Dkt. # 21, Ex. A, at 98:13-99:21.) The same year, he was disciplined for taking his wife's prescription medication. (Id. at 99:22-100:6; 11:13-23.) In 2006, Troutman was disciplined for making frequent stops at his residence while on duty. (Id. at 100:7-12.) In 2011, Troutman was disciplined for running a fleet vehicle into a gate, damaging the vehicle. (Id. at 100:25-101:15.)

In early 2012, Kevin Jones filed suit against Defendant after being dismissed from employment. (Dkt. # 1 ¶ 12.) Plaintiff states in his complaint that Williamson County's Internal Affairs interviewed him regarding Jones' complaint. (Id.) However, Plaintiff states that he spoke only to Mr. Jones about his lawsuit, and never spoke with Jones' [*4] attorney, nor did he testify or agree to testify or otherwise participate in Jones' suit. (Troutman Dep. at 80:16-85:10.)

In October, 2012 when Sergeant Bomer began supervising Troutman's department, she sent a memorandum to all her officers outlining her expectations. (Dkt. # 21, Ex. D.) Sergeant Bomer's memorandum states that she expects officers to arrive to work at 0545, call in sick via phone, wear a wrinkle-free uniform with shined boots, and be proactive in filing their reports and conducting investigations. (Id.) Sergeant Bomer disciplined Troutman five times in the spring of 2013 for failure to meet these expectations. Specifically, she disciplined Troutman for (1) failure to timely report a felony offense[1] (Dkt. # 21, Ex. E); (2) failure to properly document a "hold" placed on a vehicle after impoundment[2] (Dkt. # 21, Ex. F); (3) mishandling evidence on two occasions[3] (Dkt. # 21, Ex. G at 1); (4) failure to submit a time

---

sheet, and informing Sergeant Bomer that he submitted the sheet when he in fact did not (id. at 2); (5) arriving to work in a wrinkled uniform shirt on one occasion and oversleeping and arriving late to work (id. at 3).[4]

On May 6, 2013, Lieutenant Tony Carter, Sergeant Bomer's supervisor, sent a memorandum to Captain Mike Gleason listing specific reasons, including those for which he had recently been written up, why Troutman's performance was unsatisfactory. (Dkt. # 21 at 9.) On May 10, 2013, Troutman met with his supervisors and agreed to certain disciplinary measures, including three days without pay, a prohibition on Off Duty Employment or Elective Overtime for six months, and a six month Personal Improvement Program conducted by Sergeant Bomer. (Dkt. # 21, Ex. I, at 1.) Sergeant Bomer wrote a detailed evaluation of Troutman's progress on his personal improvement plan on June 18, 2013 and noted that his performance had improved to an acceptable level in many areas, but still required consistent improvement. (Dkt. # 21, Ex. J.) However, on July 5, 2013 Sergeant Bomer filed an official complaint against Troutman because he called in a last-minute absence to work, stating he needed to attend [*7] a medical appointment with his mother, and later admitted that he was not being truthful, and that he took the day off because he was tired and concerned about money. (Dkt. # 21, Ex. K at 2, 4-5.) Sergeant Bomer expressed concern that Troutman's untruth violated the Williamson County General Orders Rules of Conduct, section 200-001 # 37. (Id. at 1.) On September 11, 2013, the Disciplinary Review Board reviewed the complaint, and unanimously voted to terminate Troutman. (Dkt. # 21, Ex. B.)

Plaintiff brought suit against Williamson County, alleging that his termination was a discriminatory discharge in violation of the Americans with Disabilities Act, and further alleging that his discharge was motivated by a retaliatory purpose based upon his purported support of former Deputy Jones, in violation of Chapter 21 of the Texas Labor Code. (Dkt. # 1 ¶¶ 12, 22-25.)

## LEGAL STANDARD

---

[1] According to the report, Troutman responded to a report of [*5] prior assault on February 25, 2013, but did not complete the report until the next day, in violation of policy. (Dkt. # 21, Ex. E.) Troutman states that he did not submit the report late, and believes the late delivery of the report was due to a computer error. (Troutman Dep. 2 at 106:4-107:18.)

[2] Troutman does not believe this failure was discipline-worthy, as he alleges at least some other officers follow the procedure Troutman used without being disciplined. (Troutman Dep. 2 at 108:12-109:9.)

[3] In one instance, Troutman received evidence in connection with a reported crime on April 8, 2013, but did not submit the evidence until May 1, 2013. (Dkt. # 21, Ex. G, ¶ 1.) In the other instance, Troutman handled the evidence from an April 13, 2013 incident

---

without gloves, and did not submit the evidence until May 1, 2013. (Id.) At that point, Troutman submitted the evidence to the detective on the case rather than submitting it using the proper protocol. (Id.) Troutman's failure to follow protocol prevented the evidence from being processed.

[4] Troutman's write-up states: "While I understand that upon occasion oversleeping can occur, this has happened at least 3 times in the past several months and [*6] it is not acceptable." (Dkt. # 21, Ex. G ¶ 1.) Troutman contends that this was not a proper subject for discipline, but never says that the contents of the report are untrue. (Troutman Dep. 2 at 115:8-116:14.)

## I. Review of a Magistrate Judge's Memorandum and Recommendation

Any party may contest the Magistrate Judge's findings by filing written objections within fourteen days of being served with a copy of the Memorandum and Recommendation. *28 U.S.C. § 636(b)(1)(C)*. The objections must specifically identify those findings or recommendations that the party wishes to have [**8**] the district court consider. *Thomas v. Arn, 474 U.S. 140, 151, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*. A district court need not consider "[f]rivolous, conclusive, or general objections." *Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987)* (quoting *Nettles v. Wainwright, 677 F.2d 404, 410 n. 8 (5th Cir. 1982)*, overruled on other grounds by *Douglass v. United States Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996))*.

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected. See *28 U.S.C. § 636(b)(1)(C)* ("[A] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

Here, Plaintiff objects to both major conclusions reached by the Magistrate: that he has failed to meet his summary judgment burden to prevail on a discrimination claim or a retaliation claim. (Dkt. # 41.) Specifically, Plaintiff objects to the Magistrate's conclusion that he failed to meet his burden to demonstrate that Defendant's non-discriminatory reasons for taking adverse employment actions against him were pretextual (id. ¶ 7); that he failed to establish the first and third elements of a prima facie case of retaliation (id.); and that Sergeant David Denson's statements related to Plaintiff's retaliation claim are inadmissible hearsay (id.). Defendant objects to the finding that Troutman is disabled under the ADA due to his sleep [**9**] apnea. (Dkt. # 42 at 8.)

## II. Motion for Summary Judgment

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp., 477 U.S. at 323*. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012)*. In deciding whether a fact issue exists, the Court "may not make credibility determinations or weigh the evidence." *Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014)* (quoting *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000))*. However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)*. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. In an ADA discrimination claim, "all facts and interferences" should be construed "in the light most favorable to the nonmovant, and [the Court] will not weigh evidence or evaluate [**10**] the credibility of witnesses." *E.E.O.C. v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 615 (5th Cir. 2009)* (citing *Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001))*.

## DISCUSSION

## I. ADA Discrimination Claim

Troutman's first claim against Williamson County is that his dismissal was based upon disability discrimination. The ADA prohibits employers from discriminating against a "qualified individual with a disability on the basis of that disability." *42 U.S.C. § 12112(a)*. At the summary judgment stage, a plaintiff alleging disability discrimination must first establish a prima facie discrimination claim under the ADA by proving "(1) he is disabled within the meaning of the ADA, (2) he is qualified and able to perform the essential functions of his job, and (3) his employer fired him because of his disability." *Kemp v. Holder, 610 F.3d 231, 235 (2010)*; see also *Zenor v. El Paso Healthcare Sys., Ltd., 176 F.3d 847, 853 (5th Cir. 1999)*. Where the plaintiff is able to make out a prima facie case, "an inference of intentional discrimination is raised and the burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action." *Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009)*. If the defendant is able to offer a legitimate, nondiscriminatory explanation for firing the employee, "the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext." Id. (citing *McDonnell Douglas Corp v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))*.

A. Whether Plaintiff established [**11**] prima facie case

Page 4 of 6

Case 4:15-cv-00241-O   Document 33   Filed 08/23/16   Page 58 of 60   PageID 489
2016 U.S. Dist. LEXIS 41986, *11

1. Whether Plaintiff demonstrated that he is disabled

"As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability." *Waldrip v. Gen. Elec. Co., 325 F.3d 652, 653 (5th Cir. 2003)* (quoting *Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir. 1996))*. A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual . . ." *Kemp, 610 F.3d at 235.* The Court bears a "statutory obligation to determine the existence of disabilities on a case-by-case basis." *Waldrip, 325 F.3d at 655* (quoting *Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999))*.

When determining whether plaintiff's sleep apnea constitutes a disability, it is necessary to first establish that sleeping is a "major life activity," the type of activity that is "of central importance to daily life." *Waldrip, 325 F.3d at 655* (quoting *Bragdon v. Abbott, 524 U.S. 624, 638, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998))*. With regards to sleeping, this is beyond disagreement; some individuals spend a third or more of their lives sleeping, and there are major industries devoted to helping individuals get a restful night's sleep. Accordingly, sleeping is unquestionably a major life activity. See *Chevron Phillips, 570 F.3d at 616* ("Every circuit that has addressed the issue has concluded that sleeping is a major life activity.").

However, "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA." *Chevron Phillips, 570 F.3d at 614.* Accordingly, Plaintiff bears the burden of establishing [*12] that his sleep apnea, an impairment which affects sleeping, "*substantially limits* [this] major life activity." Id. (emphasis added); see also *Waldrip, 325 F.3d at 655.* While not controlling, as a case-by-case determination is required when determining whether a plaintiff has established the presence of a disability, other courts considering plaintiffs suffering from sleep apnea have consistently found that it is not a disability. See, e.g. *Matthews v. City of Houston Fire Dep't, 609 F. Supp. 2d 631, 648 (S.D. Tex. 2009)* (finding plaintiff who presented no evidence "to suggest that her sleep apnea substantially limits 'either a class of jobs or a broad range of jobs in various classes,'" was not disabled for purposes of an ADA discrimination claim (quoting *Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995))*; *Taylor v. Blue Cross and Blue Shield of Tex., Inc., 55 F. Supp. 2d 604, 611 (N.D. Tex. 1999)*; *Grubb v. Southwest Airlines, 296 Fed. App'x 383, 388 (5th Cir. 2008)*.

Plaintiff has not satisfied his burden to show that his particular case of sleep apnea substantially burdened his ability to sleep. Troutman alleges that he has issues with arriving to work on time because of his sleep apnea, and this

Court can infer that he was also tired at work, because he once requested permission to take a stimulant on the job. (Troutman Dep. at 76:19-79:3.) However, Troutman presents no evidence that his sleep apnea substantially affects his ability to sleep, as he must, to support a finding that he suffers [*13] from a disability under the ADA.

2. Whether Plaintiff demonstrated that he was qualified for his job

The second element of a prima facie discrimination claim requires a plaintiff to show that he was qualified for his job at the time he was fired. A plaintiff can show that he was qualified for his job by demonstrating either that he (1) "could 'perform the essential functions of the job in spite of [his] disability,' or, if [he] could not, (2) that 'a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *E.E.O.C. v. LHC Group, Inc., 773 F.3d 688, 697 (5th Cir. 2014)* (quoting *Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1093 (5th Cir. 1996))*. "A function is 'essential' if it bears 'more than a marginal relationship to the employee's job.'" *LHC Group, Inc., 773 F.3d at 697* (quoting *Chandler v. City of All., 2 F.3d 1385, 1393 (5th Cir. 1993))*.

Importantly, "once the employee presents a request for an accommodation, the employer is required to engage in [an] interactive process so that *together* they can determine what reasonable accommodations might be available." *LHC Group, Inc., 773 F.3d at 700* (quoting *Chevron Phillips, 570 F.3d at 622*). However, the employee must actually request an accommodation. Id. (finding that plaintiff had met her burden to show that her employer failed to provide a reasonable accommodation because she "expressly reached out to her supervisors, indicating that she wanted temporary [*14] help").

Troutman alleges that he informed each of his supervisors that he suffered from sleep apnea. (Troutman Dep. at 76:19-78:23.) At some time before 2005, Troutman explicitly told Sergeant James David that he "had a tendency to sleep very hard and it was hard for [him] to hear the alarm clock," occasionally causing him to run late. (Id. 78:20-79:9.) Troutman only recalls specifically requesting accommodation for his sleep apnea on one occasion in 2005, when he sought and was denied permission from Sergeant Carmona to take Ritalin. (Troutman Dep. at 76:19-78:23.) Viewing the summary judgment evidence in the light most favorable to the Plaintiff, Williamson County did not provide Troutman with accommodations for his sleep apnea in 2005. However, Troutman also retained his employment despite his unaccommodated sleep apnea during 2005.

Troutman has no recollection of making any accommodation

requests for his sleep apnea since 2006. (Id. 79:12-29:15.) Further, Troutman had the "responsibility of informing [his] employer" of his need for an "adjustment in working conditions or duties" due to his medical condition. *Chevron Phillips, 570 F.3d at 621*. Without satisfying this responsibility, he cannot allege that he was not [*15] afforded reasonable accommodations for his disability that would enable him "to perform the essential functions of the job." *LHC Group, 773 F.3d at 697* (quoting Turco, 101 F.3d at1093). Based on the evidence Troutman himself presented, he never affirmatively requested an accommodation for his sleep apnea from Sergeant Boman, his supervisor at the time he was dismissed.

In spite of Troutman's failure to request accommodations after 2006, there is no genuine issue of material fact that he "could 'perform the essential functions of the job in spite of [his] disability.'" *LHC Group, Inc., 773 F.3d at 697* (quoting *Turco, 101 F.3d at 1093*). Troutman began suffering from sleep apnea as early as the mid-1990s, yet was employed by the Sheriff's department from 1997 until 2013. Accordingly, the Court finds there is no genuine issue of material fact that Troutman was qualified to perform his job in spite of his sleep apnea; Troutman has satisfied the second prong of the prima facie disability discrimination test.

3. Whether Plaintiff's sleep apnea caused an adverse employment decision

Finally, in order to establish a prima facie case for disability discrimination, a plaintiff must show that there was a causal nexus between the adverse employment decision and his disability. [*16] *LHC Group, Inc., 773 F.3d at 700* (finding that plaintiff met her burden to prove nexus because she demonstrated that: (1) her job performance was criticized only after she had a grand mal seizure; (2) she produced evidence that criticisms of her performance were "exaggerated, unfounded, or fabricated;" and (3) she submitted multiple statements by her supervisor indicating that her disability rendered her unfit for her job); see also *Chevron Phillips, 570 F.3d at 612* (finding that plaintiff, who produced written evidence that her employer's immediate reaction to her request for disability accommodations was to determine whether she could be terminated, had made a prima facie case for disability discrimination).

Troutman has not established a nexus between his dismissal and his alleged disability. The record reflects that Troutman exhibited performance issues throughout his time with Williamson County—both when his supervisors were aware of his sleep apnea, and when they were not. Prior to the July 5, 2013 incident, Troutman was written up for numerous offenses that Troutman does not connect to his sleep apnea or the side effects of sleep apnea. For example, Troutman does

not state that he mishandled evidence or submitted a late felony offense report [*17] because he was too fatigued by his sleep apnea to work. Further, there is no indication in the summary judgment record that Sergeant Bomer understood the extent of Troutman's sleep apnea, or that Troutman ever spoke to her to request accommodation for his sleep apnea. (Troutman Dep. at 76:19-78:23.)

Accordingly, even Troutman's write-up for over-sleeping and arriving to work in a wrinkled uniform cannot be connected to a disability discrimination claim, because there is no evidence that Sergeant Bomer understood Troutman's alleged disability. Finally, the behavior for which Troutman was ultimately terminated, lying to a supervisor, cannot be connected in any way to sleep apnea. Accordingly, Troutman has not demonstrated a nexus between his termination and his dismissal, and fails to satisfy the third prong of the prima facie case for disability discrimination.

At the summary judgment stage, failure to make a prima facie case for disability discrimination entitles Defendant to summary judgment on the issue. *Kemp, 610 F.3d at 235*. Summary judgment is **GRANTED** to Williamson County on Troutman's disability discrimination claim.

II. Retaliation Claim

Troutman also claims that his dismissal was retaliatory, and that [*18] he was fired for supporting Deputy Jones' discrimination case against Williamson County in violation of Chapter 21 of the Texas Labor Code. An employer violates the Texas Labor Code if he "retaliates against a person who (1) opposes a discriminatory practice . . . or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." *Tex. Lab. Code. § 21.055*. To establish a prima facie case of retaliation, a plaintiff must show "1) that he is engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action." *Pineda v. United Parcel Service, Inc., 360 F.3d 483, 487 (5th Cir. 2004)*; see also *Gorman v. Verizon Wireless Tex., LLC, 753 F.3d 165, 170 (5th Cir. 2014)*. If a plaintiff fails to make a prima facie case, summary judgment on the issue is appropriate. Each of these elements will be evaluated below.

A. Whether Troutman was engaged in protected activity

"An employee engages in a protected activity when she 'opposes a discriminatory practice,' 'makes or files a charge,' 'files a complaint,' or 'testifies, assists, or participates in any manner in an investigation proceeding, or hearing." *San Antonio Water System v. Nicholas, 461 S.W. 3d 131 (Tex. 2015)* (quoting *Tex. Lab. Code § 21.055*). Troutman has not presented any evidence that he engaged in any of the above-mentioned protected activities in connection [*19] with

Page 6 of 6

Case 4:15-cv-00241-O   Document 33   Filed 08/23/16   Page 60 of 60   PageID 491
2016 U.S. Dist. LEXIS 41986, *19

Deputy Jones' discrimination case. While Troutman testifies that he spoke with Deputy Jones specifically regarding the handling of a domestic violence call and a mental health call, he does not testify that he spoke up on Jones' behalf after witnessing discriminatory behavior. (Troutman Dep. 80:16-81:6.) Further, Troutman does not he allege that he filed a complaint on Jones' behalf or participated in any proceedings on Jones' behalf. Accordingly, Troutman has not satisfied the first prong of the prima facie test for retaliation.

B. Whether an adverse employment action occurred

Troutman was terminated from his position. This is certainly an adverse employment action. Regardless of the cause for his termination, the second prong of the prima facie test is satisfied.

C. Whether there was a causal link between the protected activity and the adverse action

A plaintiff alleging retaliation under § 21.055 must demonstrate "that 'but for' [employer's] discriminatory conduct he would not have been fired." *Pineda, 360 F.3d at 488*. Troutman entirely fails to meet that burden here. While Troutman does state that other officers were not disciplined for engaging in certain, similar offenses, such as a failure to properly document **[*20]** a hold on an impounded vehicle (Troutman Dep. 2 at 108:12-109:18, 111:13-17), he agrees that he was validly disciplined for other behaviors, including mishandling evidence (id. 114:18-115:6). Further, Troutman himself wrote a statement admitting to the behavior which ultimately lead to his unanimous termination by a five-person disciplinary review board. (Dkt. # 21, Ex. K at 4-5.)

The only evidence Troutman presents that make any connection between retaliation and his termination are two statements he made during his deposition: Troutman stated that when Sergeant Denson was his supervisor, he said

"Lieutenant Carter had warned him about talking to me . . . because Carter felt that I was speaking to Kevin and his attorneys and investigators regarding this case (Troutman Dep. at 81:15-19); he also testified that Sergeant Bomer informed him that Lieutenant Carter, her supervisor, told her to write up all of Troutman's performance issues (id. at 57:18-58:25). While Williamson County argues that Sergeant Denson's statement is inadmissible hearsay, the issue need not be addressed; even if the statement were found admissible, it would not be sufficient to show that Troutman's association with **[*21]** former Deputy Jones was the "but for" cause of his termination. Troutman could have been fired solely on the basis of Sergeant Bomer's July 5, 2013 complaint, supported by his own affidavit admitting he lied to get a day off work when he could have simply asked for the day off. Accordingly, Troutman fails to produce evidence to establish the first and third prongs of a prima facie case for retaliation, and summary judgment is proper as to Defendant on this claim.

CONCLUSION

For the reasons stated above, the Court **ADOPTS** the conclusions of the Magistrate Judge's Report and Recommendation (Dkt. # 41). The Defendant's Motion for Summary Judgment (Dkt. # 21) is **GRANTED** and the Court **ORDERS** this case **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**DATE**: Austin, Texas, March 30, 2016.

/s/ David Alan Ezra

David Alan Ezra

Senior United States District Judge

---

End of Document