IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

**RESPONSE TO DEFENDANT'S OBJECTIONS
TO PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE**

Plaintiff Christy Williams submits the following in response to ECF Dkt. 36, Defendant's

Objections to Plaintiff's Summary Judgment Evidence.

**I. Introduction**

Plaintiff's motion for summary judgment has now been fully briefed, and the question to

be determined is whether the summary judgment evidence, taken as a whole, raises any questions

of fact to be decided by a jury. *See Brady v. Blue Cross & Blue Shield, Inc.*, 767 F. Supp. 131,

135 (N.D. Tex. 1991); *Khanna v. Park Place Motor Cars*, No. 3:99-CV-0135-D, 2000 U.S. Dist.

LEXIS 18375, *2 n. 2 (N.D. Tex. Dec. 6, 2000)(noting the "relaxed standards that apply to

evidence adduced by a party who opposes summary judgment.").[1]

Plaintiff's motion, and Plaintiff's reply, do not dispute the fact that Plaintiff suffers from

several physical and mental impairments.  The question of fact is therefore whether the

impairments were substantially limiting, and Plaintiff's own declaration provides more than

enough evidence to show that they were.  Plaintiff has thus shown at least a question of fact

whether she has a disability.  Defendant's boilerplate objections to Plaintiff's testimony fail

---

[1] A copy of this LEXIS case is attached, in accordance with the requirements of the Scheduling Order.

because Plaintiff has personal knowledge of her condition, and her testimony by way of a sworn

declaration is not considered hearsay.

## II.  Response to Defendant's Objections

To the extent possible, Plaintiff will address the objections by category to avoid

repetition.

A.      Objection to the Length of Plaintiff's Response[2]

Plaintiff's brief complies with the local rules.  *See* Northern District Local Rule 56.5(b)

(allowing 50 pages for the brief in support of the motion and for the response brief).  This

objection is meritless and should be overruled.

B.      Objections Related to the Writing Lab Brochure[3]

Defendant has expended a great deal of energy to exclude this document because it

undermines TCCD's contentions regarding the essential functions of Plaintiff's position.  First,

Defendant attempted to conceal the document by failing to produce it in discovery.  Next,

Defendant objected to the document and sought to exclude it from the summary judgment

record.  After that, Defendant filed a motion seeking sanctions and the disqualification of

Plaintiff's counsel.  None of Defendant's contentions in this regard have any support in either the

facts or applicable law.

Ignoring the fact that this is a document that TCCD created, Defendant argues the

document should be excluded because *Plaintiff* failed to produce it prior to the discovery

deadline.  Setting aside the absurdity of this contention, Defendant's argument fails because it is

not true.  Plaintiff did produce the document to counsel for Defendant by email on May 17, 2016,

more than one month before the discovery deadline.  *See* Appendix ("App.") at 2-6.  Defendant's

---

[2] *See* Objection I on page 1.
[3] *See* TCCD's Objections II.A.1 (pages 1-2 of TCCD's objections), and II.C.40 and 41 (page 11).

objection to the length of Plaintiff's response might have simply been oversight as to the applicable local rule, but this false representation to the Court, that the document was not produced before the discovery deadline, cannot so easily be excused.  At a minimum, this objection should be overruled.

Regarding the assertion that the complete document was not produced, all Plaintiff can say is that she has produced everything her counsel obtained from Fukuchi.  *See* App. 2 (Uloth Declaration ¶ 4).  If there is more to the document, and TCCD evidently contends there is, it is TCCD which should be called upon to produce it.  TCCD cannot hide a document in discovery, and then claim Plaintiff cannot use that document because she has not produced the complete version of the document being concealed by the Defendant.  This objection should therefore be overruled.

C.      Contact with Fukuchi[4]

Defendant has no basis for complaining about the fact that Plaintiff's counsel contacted one of its employees.  Unless an employee falls into one of the categories of persons deemed to be represented by counsel for the employer, there is no ban against contact by an opposing counsel.  *See* Texas Disciplinary Rules of Professional Conduct, Rule 4.02, comment 4; ABA Model Rules of Professional Conduct, Rule 4.2, comment 7 (2002).[5]

Defendant does not claim Fukuchi falls under any category of persons deemed to be represented, nor does Defendant claim that its trial counsel is personally representing Fukuchi in this case (a claim which has been made as to several employees and former employees, and

---

[4] See TCCD's Objections II.C.40, and 42-50 (pages 11-14).
[5] Plaintiff has more fully briefed this issue in her Response to Defendant's Motion for Sanctions and to Disqualify Counsel (ECF Dkt. 46).

which may not be true).[6]  Defendant's objection is completely without merit, and should be overruled.

D.    Objections Based on Lack of Personal Knowledge

Defendant claims Williams and Fukuchi lack personal knowledge concerning facts alleged in paragraph 19 of the Williams Declaration, and paragraphs 4, 5, 11, and 12 of the Fukuchi declarations.  *See* objections 8, 42, 43, 47, and 48.  However, each declaration clearly states that the declarant has personal knowledge of the matters contained in the declaration, and shows how the declarant is familiar with the matters addressed in the declaration.  The testimony is therefore admissible, and Defendant's objections should be overruled.

Regarding objections 51 and 53, neither Wilcox or Campos claim to have any knowledge concerning the reasons for Plaintiff's termination.  That, however, does not render their testimony irrelevant or inadmissible.  Each of these witnesses used the Writing Lab and have personal knowledge of its policies from their own direct experiences, and their testimony concerning interactions with Williams is directly relevant given the Defendant's alleged reasons for terminating Williams. Objections 51 and 53 should therefore be overruled.

E.    Other Objections Concerning Fukuchi's Declaration

Objection 43 misconstrues Fukuchi's testimony.  In the paragraphs objected to here, Fukuchi is not testifying about any conflicts or complaints TCCD may claim were a basis for Plaintiff's termination.  Rather, he is testifying from personal knowledge about what he saw based on the many hours he spent working in the Writing Lab.  Because Fukuchi's testimony is based on personal knowledge without the need for speculation, this objection should be overruled.

---

[6] Plaintiff has asked for an order from the Court clarifying which employees her attorney is prohibited from contacting on an *ex parte* basis.

Regarding objection 44, Fukuchi may not have overheard Sublette's comments to the student, but he does have personal knowledge of what transpired between the student and Williams.  These facts – what was said, and what was done on this occasion – are directly relevant in this case because of TCCD's contentions.  TCCD claims it fired Williams in part because of problems that arose when she interacted with coworkers, faculty, and students.  It is therefore relevant and admissible for an eyewitness such as Fukuchi to describe what he saw and what he heard when Plaintiff interacted with others on campus at TCCD.  The statements by the student, including what he had been told by Sublette, are not considered hearsay because they are part of the operative facts of the case.

For example, in *NLRB v. Tex-Tan, Inc.*, 318 F.2d 472 (5th Cir. 1963), the Court considered a union negotiation on which one party claimed the other had not negotiated in good faith.  The Court found that the words spoken, and even the nonverbal conduct, were all part of the operative facts which were relevant on the issue of how the negotiations went.  "Such verbal or operative facts are in no sense hearsay."  *Id.* at 484.

Similarly, in the present case the Court must consider the evidence related to Plaintiff's interactions with others.  Defendant has placed these matters in issue by alleging that Plaintiff had conflicts with others and was insubordinate.  The statements and nonverbal conduct are the only evidence available from which Plaintiff's conduct can be judged – they are part of the operative facts, and as such are not considered hearsay.

TCCD's objection 45 is immaterial, and Plaintiff has no objection should the Court wish to disregard this one sentence in paragraph 5(h) of Fukuchi's declaration.  Even without this sentence, Fukuchi's point (that he did not hear anything loud or disruptive) is clear.  The sentence merely clarifies something about that day that helps Fukuchi to remember the date, and

arguably it is not being offered for the truth of the matter asserted, but to show why Fukuchi remembers the date.  Either way, there are more important issues warranting the Court's time and attention.

Objection 46 is equally immaterial.  Plaintiff does not concede that the sentence challenged here is speculative, because Fukuchi is describing his own thought rather than speculating about someone else's thoughts or motives, but a ruling either way on this objection will not affect the outcome of the underlying motion for summary judgment.

Objection 49 should be overruled because, as discussed above, Plaintiff's interaction with students is relevant because of Defendant's claim that such interactions were a basis for the termination.  The statements and conduct of Williams and the students with whom she interacted are the operative facts, so they are not hearsay.  Defendant's characterization of Fukuchi's testimony as speculative is misplaced because Fukuchi has personal knowledge of these events and statements, and there is no reason to believe he is speculating about things he does not know from his own experience.

Objection 50 is immaterial and a ruling either way will not affect the outcome of the pending motion, so Plaintiff will not waste the Court's time debating this objection.

F.    The Remaining Objections Concerning the Wilcox and Campos Declarations

Objection 51 seeks to strike the Wilcox declaration because the events she describes took place more than one year before Plaintiff's termination are not relevant.  However, TCCD also claims that its decision to terminate Plaintiff was based in part on events which took place more than one year before the termination.  Plaintiff agrees that what happened in the Fall 2011 semester is irrelevant – whatever issues there may have been during that time frame make no difference because Plaintiff was never disciplined or warned in any way, and then she was

promoted as of September 1, 2012.  *See, e.g., Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 234 (5th Cir. Tex. 2015) (employer's alleged reasons for the termination were clearly not the basis of the decision as evidence by the passage of time and the fact the employer had seen and documented subsequent improvement by the employee).

The fact that TCCD cites alleged performance issues more than one-year old, and many months before Plaintiff was promoted, as a basis for termination shows that its stated reasons for the termination are not true – that they are a pretext, which permits an inference of discrimination.  However, if the Court concludes that performance issues from the Fall 2011 semester are relevant, then Wilcox's experiences are also relevant, and the objection should be overruled.

TCCD's objection 52 merely states the obvious – that one pleasant student interaction does not negate the possible occurrence of other less pleasant interactions.  However, given Defendant's contentions in this case, the Campos declaration provides relevant evidence concerning Plaintiff's abilities as a writing tutor and her ability to interact with faculty and students without conflicts or complaints.  The testimony is relevant and admissible, and TCCD's objection should be overruled.

G.     Documents Attached to the Uloth and Williams Declarations

Objection 39 argues that six of the pages attached to the Uloth declaration contain hearsay, but TCCD does not identify the alleged hearsay within these pages.  It is therefore impossible to accurately respond to the evidentiary objections, just as it is impossible to respond to Defendant's claims that Plaintiff was insubordinate and had multiple loud outbursts when Defendant has failed to specify the facts on which these contentions are based.  The allegation is too vague to permit a specific response.

Page 107 of the appendix is a fax cover sheet, and it is difficult to see how a ruling either way on this objection might affect the outcome of the pending motion for summary judgment.

App. 115 is a form which TCCD sent to Plaintiff and asked her to have her health care provider complete and return so Defendant could process her request for disability benefits. *See* Williams Declaration ¶ 47 (ECF Dkt. 30-1 at App. 17). App. 118-121 is another form TCCD sent to Plaintiff so her doctor could provide information needed to process her request for FMLA leave. These and other documents sent to TCCD during Plaintiff's leave informed Defendant about Plaintiff's condition, and they are relevant and admissible to show what TCCD knew at the time.

The same is true with respect to the Williams Declaration, Exhibits 12, 14, and 16. These documents show that Plaintiff provided TCCD with enough information to trigger its duty under the ADA to commence an interactive process so Defendant could assess Plaintiff's condition and determine if there was a way she could return to work, with or without accommodations. Defendant's objection to these page should therefore be overruled.

Furthermore, with respect to Exhibit 16, Defendant included this same document as an exhibit in the appendix Defendant filed as support for its motion for summary judgment. *See* ECF Dkt. At App. 19-20. The document is properly before the Court as part of the evidence to be considered in connection with the pending motion, and again the objection to this document should be overruled.

H.      Objections to the Williams Declaration

1.      Hearsay and FRCP 56

Witnesses are permitted to testify by affidavits and declarations in the context of summary judgment motions. *See* Fed. R. Civ. P. 56(c)(4). Rule 56 is a federal statute expressly

authorizing the admissibility of hearsay, thus falling within an exception in Rule 802 of the Federal Rules of Evidence.  *See* Fed. R. Evid. 802, and Advisory Committee Notes (listing Rule 56 as an example of a Supreme Court Rule or Act of Congress authorizing hearsay).  Hearsay is therefore not a valid objection to Plaintiff's own positive assertions of fact in her declaration.

For example, in paragraphs 22-23 of her declaration, Plaintiff states that she received positive comments from students and faculty.  Plaintiff's assertion is admissible testimony, and Defendant's objections 9 and 11 should be overruled.

The same is true of the paragraphs in which Plaintiff describes her impairments and the effects those impairments had on her.  Plaintiff's declaration testimony about these matters is admissible, and the hearsay objections to paragraphs 27-38, and 40[7] should be overruled.

2.      Positive student comments and faculty emails

The emails from faculty members (Exhibit 8 to the Williams Declaration) are not hearsay because they are admissions of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(C) and (D).  These are statements made by employees of the Defendant concerning matters within the course and scope of their employment – teaching students how to write – and communicating with a fellow employee on that very topic.

Both the emails and the student comments are admissible as present sense impressions under Rule 803(1).  In each instance, the document shows the author is merely expressing to Williams (in the case of the emails) or to the TutorTrac system (in the case of the student comments) what they were thinking at the time.

Additionally, both the emails and student comments are part of the operative facts of the case.  Defendant claims Plaintiff's interactions with others went poorly.  The emails and student comments show how Plaintiff interacted with faculty members in a positive manner.  These

---

[7] Objections 13-24, and 26.

documents also serve the purpose of optional completeness.  Defendant cannot cherry pick documents reflecting student complaints and negative faculty interactions, and then object to documents showing otherwise.

Both documents are also relevant to show information known to TCCD when it made the decision to terminate Plaintiff.  Herrera sent Plaintiff the TutorTrac comments by email, so he was aware of their contents.  *See* ECF Dkt. 30-1 at App. 46.  Herrera and Biber were copied on all but one of the emails.  *See* ECF Dkt. 30-1 at App. 38-43.

The TutorTrac documents are admissible as a business record of the Defendant. Plaintiff's declaration describes the fact that TCCD began using the TutorTrac software in the Fall of 2011, and students could type in their comments about the tutoring sessions.  Plaintiff has authenticated the document as a list of comments created in this manner, and it was sent by her supervisor to inform her how she was doing, in the eyes of her students.

Finally, if for no other reason, the documents meet the criteria necessary to fall under the residual hearsay exception in Rule 807.  These are documents that were produced by TCCD, so Defendant cannot complain that they are not trustworthy.  They are being offered in relation to a material fact, namely Plaintiff's abilities as a tutor, and as evidence of her interactions with students and faculty.  These written words come directly from the students and faculty members themselves, and their contemporaneous comments are more probative than if Plaintiff had gone and deposed each one of them, which would not have been reasonable. Admitting these documents into evidence will best serve the purposes of both the Federal Rules of Evidence and the interests of justice.  Defendant's objections 9-12, including the objections to Exhibits 8 and 9 of the Williams Declaration, should therefore be overruled.

3.      Element K courses

In objections 2, 3, and 4, Defendant essentially makes an estoppel argument, disguised as a relevance objection.  Defendant claims Plaintiff did not complain when she was assigned these courses, so she cannot do so now because it has somehow become irrelevant.

The argument makes no sense, especially in light of Plaintiff's testimony about these courses.  Plaintiff says these courses were routinely assigned as part of the Professional Development she was required to complete each year, and she was never told the assignment was a punishment or a corrective measure.  *See* Williams Declaration ¶ 19 (ECF Dkt. 30-1 at App. 9).  There was therefore no reason for her to complain when the courses were assigned.  However, even if she had reason to complain when the courses were assigned, a failure to do so would not logically render her testimony concerning interactions with students inadmissible.  The relevance objections to these paragraphs should be overruled.

4.      Hearsay and Relevance Objections

TCCD evidently believes that it should be entitled to present evidence concerning Plaintiff's performance, but Plaintiff should not.  Defendant is incorrect.  Given the nature of the allegations in this case – that Plaintiff was terminated due in part to the way she interacted with others – testimony by eyewitnesses (including Plaintiff) concerning these interactions are not hearsay, and they are relevant.  For these reasons, the Court should overrule the hearsay and relevance objections in paragraphs 2-7.

5.      Allegations of Nondisclosure

In several of its objections, defendant claims Plaintiff had not previously disclosed her impairments.  This is directly contradicted by paragraph 26 of Plaintiff's declaration, in which

she states she disclosed her depression, anxiety, PTSD, ADHD, and thyroid condition to Herrera, Biber, and/or Hubbard. Defendant's attempt to exclude relevant and admissible evidence on this basis should therefore be rejected.

## I.    Plaintiff's Testimony Regarding Her Impairments

Defendant has asserted numerous objections to Plaintiff's testimony about her own ailments and how they affected her both physically and mentally. No one is better qualified or more familiar with these issues than Plaintiff, and Defendant's objections should be overruled.

There is no rule requiring medical evidence to establish a plaintiff has a disability. *See, e.g.*, *Pallatto v. Westmorland County Children's Bureau*, No. 2:11cv1206, 2014 U.S. Dist. LEXIS 27008, *30 (W.D. Pa. Mar. 4, 2014).[8] To the contrary, the ADA regulations concerning the meaning of the term "substantially limits" clarify that the term "is not meant to be a demanding standard," 29 C.F.R. 1630.2(j)(1)(i), and "usually will not require scientific, medical, or statistical analysis." 29 C.F.R. 1630.2(j)(1)(v).

For example, in *Pallato*, the plaintiff had lupus, which the defendant argued was a "technical medical disease that is not amenable to the understanding of a lay jury." *Id.* at *31. The Court, however, emphasized the importance of the symptoms of the disease, and the plaintiff's own evidence concerning the symptoms proved a substantial impairment without the need for medical evidence. *Id.*

The same logic applies here, in this case. Plaintiff does not claim to be a medical expert, but she knows her diagnoses and she can testify about her symptoms. Plaintiff is not testifying as an expert witness, so Defendant's objections that she was not so designated is irrelevant.

---

[8] A copy of this LEXIS case is attached, in accordance with the requirements of the Scheduling Order.

Defendant's objection that her testimony is speculative[9] could not be further from the truth because Plaintiff is describing her own conditions and the symptoms of her impairments. Contrary to the assertion in objection 38, Plaintiff *can* use her own testimony without expert medical evidence to establish that her impairments are disabilities.

Doing so was not Plaintiff's preferred option, but she was unable to pay her treating physicians for their time and efforts as expert witnesses. Plaintiff therefore included as much detail and background about her condition as she could in order to show these are genuine conditions that she has dealt with for long periods of time, and they are substantially limiting. Defendant has objected to anything more than a few years prior to the termination as irrelevant, but Plaintiff disagrees and contends that he medical history is relevant to show when she was diagnosed and how her impairments have affected her over time.

### III.  Conclusion

Ironically, Defendant's objections merely highlight the disputed questions of fact which defeat its motion for summary judgment. Defendant's efforts to exclude the Writing Lab brochure only emphasize the fact that Plaintiff's essential job functions did not include a requirement of helping students "on a walk-in basis," as claimed by Dr. Hubbard in the memo she wrote seeking to have Plaintiff terminated. Defendant's objections to the documentation Plaintiff submitted during her medical leave only serve to highlight the volume of information Defendant had concerning Plaintiff's disabilities, which should have triggered an interactive process that Defendant completely disregarded. Defendant's objection to Plaintiff's testimony about her own impairments only serves to show just how relevant and admissible that testimony

---

[9] The objections claiming that Plaintiff's testimony about her own impairments are speculative are: objections no. 13, 15-17, 20, 21, 23-28, and 30. These objections should be overruled.

is, because it is not hearsay, it is not speculative, and Plaintiff does not need to be a doctor to provide admissible evidence concerning the way her impairments affected her.

After sorting all of this out, it will be clear that there is more than enough evidence concerning Defendant's FMLA and ADA (Labor Code) violations to defeat Defendant's motion for summary judgment and proceed to trial.

WHEREFORE, Plaintiff requests an order denying Defendant's objections except as noted above, and granting any other relief which the Court may deem appropriate.

Respectfully submitted,


/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

I certify that on October 5, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel for Defendant.

/s/  Donald E. Uloth
Donald E. Uloth

14

⚠️ Caution

As of: October 5, 2016 8:22 PM EDT

## *Khanna v. Park Place Motorcars of Houston, Ltd.*

United States District Court for the Northern District of Texas, Dallas Division

December 6, 2000, Decided ; December 6, 2000, Filed; December 7, 2000, Entered on Docket

Civil Action No. 3:99-CV-0135-D

**Reporter**

2000 U.S. Dist. LEXIS 18375; 2000 WL 1801850

DEEPAK K. KHANNA, Plaintiff, VS. PARK PLACE MOTORCARS OF HOUSTON, LTD., et al, Defendants.

**Disposition:** [*1] Park Place's July 5, 2000 motion for summary judgment denied.

## Core Terms

probation, terminated, prima facie case, summary judgment, sales, national origin, salespersons, replaced, retaliation, fail to meet, reasonable jury, nondiscriminatory, pretextual, alleges, denies, burden of production, requirements, dealership, argues

## Case Summary

**Procedural Posture**

Plaintiff sued defendant for race and national origin discrimination and retaliation, under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, *42 U.S.C.S. § 1981*, and the Texas Commission on Human Rights Act, *Tex. Lab. Code Ann. §§ 21.001-21*.405 (West 1996 & Supp. 2000), in connection with terminating his employment and tortious interference with subsequent employment. Defendant moved for summary judgment.

**Overview**

Plaintiff sued defendant for race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, *42 U.S.C.S. § 1981*; and the Texas Commission on Human Rights Act (TCHRA), *Tex. Lab. Code Ann. §§ 21.001-21*.405 (West 1996 & Supp. 2000); and national origin discrimination, in violation of Title VII and the TCHRA, after he was fired from his car salesman job for failing to meet his sales quota. After being put on probation for not meeting quota, he made his quota the first month but failed the second month and was terminated. He went to another dealership. Allegedly

defendant called that employer and told him plaintiff had filed suit and was a troublemaker, causing his termination. Plaintiff then added a tortious interference claim. Defendant moved for summary judgment. The court denied the motion, finding a rational jury could find defendant's proffered reason for termination, deficient sales performance, was pretextual, as evidence showed it was applied inconsistently and no one else of plaintiff's race had been hired.

**Outcome**

Summary judgment was denied. Defendant had not hired anyone of plaintiff's race since plaintiff's discharge. Evidence showed inconsistent application of defendant's sales requirements and probation policy, so reasonable jury could find defendant's explanation for terminating plaintiff was pretextual. Defendant failed to demonstrate entitlement to summary judgment on tortious interference.

## LexisNexis® Headnotes

Civil Rights Law > Protection of Rights > Public Versus Private Discrimination

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Racial Discrimination > Scope & Definitions

Labor & Employment Law > ... > Evidence > Burdens of Proof > General Overview

***HN1*** Claims of racial discrimination brought under *42 U.S.C.S. § 1981* are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

Civil Rights Law > General Overview

Evidence > Burdens of Proof > Burdens of Production

***HN2*** A plaintiff first must establish a prima facie case of discrimination. Once he meets this burden, the defendant is

obligated to produce a legitimate, nondiscriminatory reason for the employment decision at issue. This is a burden of production, not persuasion, and involves no credibility assessment. Once defendant meets this production burden, the presumption of discrimination disappears. The plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered are not the true reasons but are a pretext for discrimination.

Civil Rights Law > General Overview

**HN3** A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

Civil Rights Law > General Overview

**HN4** It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Rights Law > General Overview

**HN5** Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

**HN6** To defeat a motion for summary judgment, a plaintiff first must establish a prima facie case of discrimination. He must demonstrate that he: (1) was a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class.

Civil Rights Law > General Overview

Labor & Employment Law > ... > National Origin Discrimination > Evidence > Burdens of Proof

**HN7** The failure to meet the replacement requirement of the prima facie discrimination case is not necessarily fatal to a plaintiff's Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* claim.

Labor & Employment Law > Discrimination > Retaliation > General Overview

**HN8** To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) he was engaged in a protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision.

Education Law > ... > Discipline & Dismissal > Defenses > Retaliation

Business & Corporate Compliance > ... > Unfair Labor Practices > Employer Violations > Interference With Protected Activities

Labor & Employment Law > Discrimination > Retaliation > General Overview

**HN9** A plaintiff's initial burden in alleging a prima facie case of retaliatory termination is minimal. The initial requirement that a plaintiff show a "causal link" is less stringent than "but for" causation that a jury must find. Moreover, close timing between an employee's protected activity and an adverse action against him may provide the causal connection required to make out a prima facie case of retaliation.

**Counsel:** For DEEPAK K KHANNA, plaintiff: Hal K Gillespie, Attorney at Law, Gillespie Rozen & Watsky, Dallas, TX USA.

For PARK PLACE MOTORCARS OF HOUSTON, Ltd, PARK PLACE MOTORCARS, PARK PLACE PORSCHE AUDI, defendants: Carolyn Jo McFatridge, Celeste R Yeager, Attorneys at Law, Gardere Wynne Sewell, Dallas, TX USA.

**Judges:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIDNEY A. FITZWATER

# Opinion

MEMORANDUM OPINION AND ORDER

Plaintiff Deepak K. Khanna ("Khanna") sues defendant Park Place Motorcars of Houston, Ltd., Park Place Motorcars, and Park Place Porsche Audi (collectively, "Park Place") alleging that Park Place terminated his employment based on his national origin and race, retaliated against him, and tortiously interfered with his employment with a subsequent employer. Park Place moves for summary judgment. [1] The court denies

---

[1] Khanna and Park Place move to strike parts of the other side's

the motion for the reasons that follow.

**[\*2]** I

From January 1997 until February 1998 Khanna worked in the pre-owned Porsche Audi Sales Department at Park Place. According to Khanna, Tripp Steele ("Steele"), Khanna's Manager, made derogatory comments about the race and national origin of several Park Place customers and employees. [2] *See* P. App. 2. Khanna alleges that in August or September 1997, he complained about Steele's behavior to Neill Grossman ("Grossman"), Park Place's General Manager. *See id.* at 3. Grossman did not take any action regarding Khanna's complaint. *See id.* Several months later, in December 1997, Khanna complained to Ken Schnitzer, Park Place's President. *See id.*

**[\*3]** On December 6, 1997 Steele placed Khanna on probation for failing to meet his sales quota. Park Place policy required that if a salesperson failed to sell an average of seven cars per month over a 90-day period, he would be placed on probation. *See* Ds App. 34. During the 60-day probationary period, the salesperson was required to sell seven cars each month. If he failed to meet this standard, he would be terminated. Park Place put Khanna on probation after he maintained only a 5.33 sales average during September, October, and November 1997. In December 1997 Khanna sold only five cars. *See id.* at 72.

Under Park Place's policy, Khanna's December sales performance would have been grounds for termination. *See id.* at 34. Park Place nevertheless extended Khanna's probationary period an additional 30 days in light of Khanna's December complaint about Steele's conduct. *See id.* at 25. In

January 1998 Khanna met his quota by selling seven cars, but in February he made only three sales. *See id.* at 72. Park Place terminated Khanna's employment on February 28, 1998. *See* P. App. 6.

Khanna sues Park Place for race discrimination, in violation of Title VII of the Civil Rights **[\*4]** Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*, *42 U.S.C. § 1981*, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. §§ 21.001-21.405 (West 1996 & Supp. 2000); national origin discrimination, in violation of Title VII and the TCHRA; and retaliation, in violation of Title VII, *§ 1981*, and the TCHRA.

Following his termination from Park Place, after working at another dealership from May 5, 1998 until September 12, 1998, Khanna accepted an offer of employment at Auto Showcase. Ds. App. 11, 69. He alleges that in May 1999, Steele called the General Manager of Auto Showcase and informed him that Khanna had filed suit against Park Place and that Khanna was a troublemaker. *See* P. 1st Am. Compl. P 15. On May 22, 1999 the Auto Showcase General Manager terminated Khanna. *See id.* Khanna then obtained leave of court to amend his original complaint to include claims for tortious interference with contract and/or business relations. *See* P. Br. at 33.

II

The court considers first whether Park Place is entitled to summary judgment dismissing Khanna's claims for race and national origin discrimination **[\*5]** under Title VII, *§ 1981*, and the TCHRA.

A

The familiar burden shifting framework applicable to Title VII claims for race and national origin discrimination also applies to Khanna's *§ 1981* racial discrimination claim and his TCHRA claim. [3] *See LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 n.2 (5th Cir. 1996)* ("**HN1** Claims of racial discrimination brought under *§ 1981* are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."); *see also Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 n.2 (5th Cir. 1999)* (noting that law governing TCHRA

---

summary judgment evidence Except where otherwise noted, the court has not addressed these objections, either because it has not relied on the objectionable evidence or because it has concluded that the evidence, even if admissible, is insufficient to support entry of summary judgment.

[2] Park Place argues that Khanna's affidavit should be stricken from the record because it lacks an official notary seal. *See* Ds. Br. Supp Mot. to Strike at 3-5. Because the affidavit is admissible under the relaxed standards that apply to evidence adduced by a party who opposes summary judgment, *see Brady v. Blue Cross and Blue Shield of Tex., 767 F. Supp. 131, 135 (N.D. Tex. 1991)* (Fitzwater, J.), the court denies the motion to strike.

Park Place also objects to parts of Khanna's affidavit as conclusory allegations or reflecting mere subjective beliefs that are unsubstantiated by personal knowledge. *See* Ds. Br. Supp. Mot. to Strike at 5-8. Because the statements and opinions are rationally based on Khanna's personal knowledge and are not impermissibly conclusory, the court denies this ground of the motion to strike.

---

[3] The court's analysis of Khanna's Title VII cause of action also applies to his *§ 1981* and JCHRA claims. "Because these three statutory bases are functionally identical for the purposes of [plaintiff's] claims, it would be redundant to refer to all of them." *Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 (5th Cir. 1999).*

and Title VII is identical). Under this burden shifting framework, as defined in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. *HN2* Khanna first must establish a prima facie case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)*. Once he meets this burden, Park Place is obligated to produce a legitimate, nondiscriminatory reason for the employment decision at issue. *See id.* This is a burden [*6] of production, not persuasion, and involves no credibility assessment. *See id.* Once Park Place meets this production burden, the presumption of discrimination disappears. *Id.* Khanna must prove by a preponderance of the evidence that the legitimate reasons offered are not the true reasons but are a pretext for discrimination. *Id.* "The plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981))*. *HN3* "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *120 S. Ct. at 2109.* "*HN4* It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id. at 2108.* "*HN5* Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, [*7] and it may be quite persuasive." *Id.* At the summary judgment stage, Khanna need only raise a genuine issue of material fact. *See Tutton v. Garland Indep. Sch. Dist., 733 F. Supp. 1113, 1116 (N.D. Tex.1990)* (Fitzwater, J.).

B

1

*HN6* To defeat Park Place's motion for summary judgment, Khanna first must establish a prima facie case of discrimination. Khanna must demonstrate that he (1) was a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class. *Shackelford, 190 F.3d at 403*. Park Place argues that Khanna has failed [*8] to meet the fourth element of the prima facie case because he has not shown that he was replaced by someone who is not Indian. *See* Ds. Br. at 6. Steele admitted in his deposition that he was certain that Park Place replaced Khanna after he was discharged. *See* P App. 71. In Park Place's interrogatory answers, it concedes that it has not hired anyone of Khanna's race since Khanna was discharged. *See id.* at 95-100. In light of this evidence, Khanna has met the

prima facie case requirement for his race discrimination claim.

Concerning Khanna's claim of national origin discrimination, Park Place contends that because its interrogatory answer addresses only the racial identity of its employees, Khanna cannot point to evidence demonstrating that he was replaced by someone who is not from India. *See* Ds. Rep. at 2-3. Under a rigid application of the prima facie standard, Khanna's national origin discrimination claim would not be able to survive summary judgment on this issue because there is no explicit evidence that he was replaced by a non-Indian. In *Nieto v. L&H Packing Co., 108 F.3d 621 (5th Cir. 1997)*, however, the Fifth Circuit reaffirmed that *HN7* the failure [*9] to meet the replacement requirement of the prima facie case is not necessarily fatal to a plaintiff's Title VII claim. *See id. at 624 n.7* (citing *Hornsby v. Conoco, Inc., 777 F.2d 243, 246-47 (5th Cir. 1985))*. [4] Considering this standard, and absent any evidence or allegation that Park Place did replace Khanna with an employee from India, the court declines to hold at the summary judgment stage that Khanna has failed to establish a prima facie case of national origin discrimination.

[*10] 2

Park Place is now obligated to produce evidence of a legitimate, nondiscriminatory reason for terminating Khanna's employment. *See Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 992-93 (5th Cir. 1996)*. To satisfy this burden of production, Park Place offers evidence of its probation policy and Khanna's deficient sales performance. Specifically, Park Place maintained a policy under which salespersons were required to sell an average of seven cars per month over any 90-day period. *See* Ds. App. 8-9. After Khanna averaged 5 33 sales per month from September through November 1997, Park Place placed him on probation. *See id.* at 9. To satisfy the requirements of the Park Place probation policy, Khanna would have to have sold seven cars in December 1997 and again in January 1998. Although Park Place extended Khanna's probation period after he complained to management. Khanna's performance eventually fell below probation requirements, resulting in his termination. *See id.* at

---

[4] The panel criticized recent cases within the circuit that relied on a rigid interpretation of the replacement requirement to dismiss a plaintiff's case, stating that they had ignored precedent. *See id.* (citing *Singh v. Shoney's Inc., 64 F.3d 217, 219 (5th Cir. 1995))*. Where two Fifth Circuit decisions conflict, "the earlier opinion controls and constitutes the binding precedent in the circuit." *Boyd v. Puckett, 905 F.2d 895, 897 (5th Cir. 1990)*. The earlier precedent on this issue holds that the replacement requirement should not be applied strictly. *See Hornsby, 777 F.2d at 246-47*.

72. Based on this evidence, the court concludes that Park Place has met its burden by producing evidence that it terminated Khanna's employment for a legitimate, nondiscriminatory reason.

**[\*11]** 3

Because Park Place satisfied its burden of production, Khanna is now obligated to produce sufficient evidence to permit a reasonable jury to find that Park Place's nondiscriminatory explanation for its decision is pretextual. Khanna argues that even if Park Place maintained a probation policy and sales requirements, it applied the policy in a discriminatory manner. The court concludes that a reasonable jury could find that Park Place's explanation is pretextual.

First, Park Place's requirement that salespersons maintain a seven car average over 90 days is arguably inconsistent with other aspects of its sales guidelines. For example, Park Place paid a bonus of $ 300 to salespersons who sold seven cars in any given month. *See* P. App. 73-74. Khanna posits that it is inconsistent for Park Place to claim that salespersons were required to sell an average of seven cars per month to retain their employment while simultaneously paying bonuses to those employees who met the minimum standard. *See* P. Br. at 15. Similarly, Khanna has adduced evidence that Park Place had established a monthly performance goal of 30 to 35 sales per department. *See* P. App. 45-46. During Khanna's **[\*12]** employment, his department included six people. *See id.* at 46. If each employee had sold the minimum number of cars to retain employment, department sales would have totaled 42 cars. These apparent incongruities, together with Park Place's lack of an explanation for them, would permit a reasonable jury to find that Park Place's putative rationale for terminating Khanna is pretextual.

Second, Khanna has produced evidence that suggests that Park Place did not apply the sales requirements and probation policy to all employees. Park Place records demonstrate that several employees--including five salespersons who, like Khanna, reported to Steele--repeatedly fell below the required 90-day average. *See* P. App. 120-23. As Khanna notes, Park Place put under performing salespersons on probation only 22% of the time. *See id. 118-123*. Furthermore, three Caucasian salespersons who reported to Steele were never placed on probation despite several periods during which they failed to meet the required 90-day average. *See id.*

Based on this evidence of Park Place's inconsistent application of the sales requirements and probation policy, the court concludes that a reasonable jury could **[\*13]** find that Park Place's explanation for Khanna's termination is pretextual and that its true motivation was discriminatory intent. Accordingly, the court denies Park Place's motion for

summary judgment on Khanna's Title VII, *§ 1981*, and TCHRA race discrimination claim and his Title VII and TCHRA and national origin discrimination claim.

III

The court next considers Khanna's retaliation claim. *HN8* To establish a prima facie case of retaliation, Khanna must demonstrate that (1) he was engaged in a protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision. *Shackelford, 190 F.3d at 407-08*. This prima facie case gives rise to an inference of retaliation, and the burden of production then shifts to Park Place, who must articulate a legitimate nondiscriminatory reason for the challenged employment action. *See id. at 408*. To survive summary judgment, Khanna must then make a showing sufficient to allow a reasonable factfinder to conclude that Park Place's rationale is pretextual. *See McDonnell Douglas, 411 U.S. at 801-03*. **[\*14]**

Park Place maintains that Khanna cannot satisfy the elements of a prima facie case and cannot prove that Park Place unlawfully retaliated against him. The court disagrees. Khanna meets the first two elements of the prima facie case. He complained to management and was later fired. Khanna also meets the third element. Khanna has adduced evidence that after he complained in early December 1997. Park Place placed him on probation. *See* P. App. 4. Park Place disputes Khanna's version of the sequence of these events, stating that it placed Khanna on probation approximately one week *before* he complained *See* Ds Br at 8; Ds. App. 25. This disputed fact issue is material to Khanna's prima facie case because Park Place maintains that it terminated Khanna for failing to meet the terms of his probation. If Park Place put Khanna on probation immediately after he complained to management about Steele's allegedly-racist comments, Khanna would be able to demonstrate a causal connection between his protected activity and his termination. *HN9* A plaintiff's initial burden in alleging a prima facie case of retaliatory termination is minimal. The initial requirement that a plaintiff show a "causal **[\*15]** link" is less stringent than "but for" causation that a jury must find. *See Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996)*. Moreover, "close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. General Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)* (citing *Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993))*. A reasonable jury could find that Khanna has met his prima facie burden.

The court holds that Khanna has also presented evidence that

creates a genuine issue of material fact on the issue of "but for" causation. Park Place asserts that it had a legitimate nondiscriminatory reason--Khanna's failure to meet the terms of his probation--for terminating Khanna. The court has already considered this explanation under its discussion of Khanna's discrimination claims, *see supra* § II(B)(2)-(3), and holds that although Park Place has met its burden of production, a reasonable jury could find that the explanation is pretextual. Therefore, the court denies Park Place's motion **[*16]** for summary judgment on Khanna's retaliation claim.

IV

Park Place moves for summary judgment dismissing Khanna's tortious interference claim

After Park Place discharged Khanna, he eventually obtained employment at Auto Showcase. *See* Ds. App. 11, 69. In the "Factual Background" section of his first amended complaint, Khanna alleges that Steele called the General Manager of Auto Showcase, told him of Khanna's lawsuit, and described Khanna as a "troublemaker." *See* P. 1st Am. Compl. P 15. Khanna incorporates these facts by reference and alleges that they "constitute tortious interference with the business relations and/or contract between Khanna and his subsequent employer" *Id.* P 33. Arguing that Khanna's "subsequent employer" was the first dealership at which he worked, not Auto Showcase, Park Place argues that Khanna has no evidence that it interfered with Khanna's employment at the first dealership. Khanna concedes this point and argues instead that his tortious interference claim clearly refers to his employment with Auto Showcase, not the first dealership. The court agrees. Although Khanna's reference to his "subsequent" employer is not in all respects clear, he does **[*17]** incorporate by reference his factual allegations, which do not even mention the first dealership. Because Park Place has not demonstrated that it is entitled to summary judgment on Khanna's claim that it tortiously interfered with his Auto Showcase employment, the court denies the motion.

* * *

Park Place's July 5, 2000 motion for summary judgment is denied.

**SO ORDERED.**

December 6, 2000.

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE


Neutral

As of: October 5, 2016 5:48 PM EDT

## *Pallatto v. Westmorland County Children's Bureau*

United States District Court for the Western District of Pennsylvania

March 3, 2014, Decided; March 4, 2014, Filed

2:11cv1206

**Reporter**

2014 U.S. Dist. LEXIS 27008

SANDRA L. PALLATTO, Plaintiff, v. WESTMORLAND COUNTY CHILDREN'S BUREAU a local agency of Westmoreland County, Defendant.

**Subsequent History:** Motion denied by *Pallatto v. Westmorland County Children's Bureau, 2014 U.S. Dist. LEXIS 122382 (W.D. Pa., Sept. 3, 2014)*
Motion granted by, in part, Motion denied by, in part *Pallatto v. Westmorland County Children's Bureau, 2014 U.S. Dist. LEXIS 122379 (W.D. Pa., Sept. 3, 2014)*
Motion denied by, Without prejudice *Pallatto v. Westmorland County Children's Bureau, 2014 U.S. Dist. LEXIS 122378 (W.D. Pa., Sept. 3, 2014)*

## Core Terms

accommodation, disability, harassment, impairment, reasonable jury, caseworkers, essential function, reasonable accommodation, prima facie case, summary judgment, materially, disciplined, retaliatory, proffered, remedial, visits, major life activity, sufficient evidence, circumstances, conditions, inferences, dictation, reasons, hostile work environment, unannounced visit, defense motion, schedules, altered, illness, sleep

**Counsel: [*1]** For SANDRA L. PALLATTO, Plaintiff: Adam R. Gorzelsky, Susan N. Williams, Williams Law Offices, Greensburg, PA.

For WESTMORELAND COUNTY CHILDREN'S BUREAU, a local agency of Westmoreland County, Defendant: Thomas P. Pellis, LEAD ATTORNEY, Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., Greensburg, PA; Bernard P. Matthews, Jr., Meyer, Darragh, Buckler, Bebenek & Eck, Greensburg, PA.

**Judges:** David Stewart Cercone, United States District Judge.

**Opinion by:** David Stewart Cercone

## Opinion

### Electronic Filing

Sandra Pallatto ("Plaintiff") commenced this action against her former employer, Westmoreland County Children's Bureau ("Defendant") seeking redress for discrimination based on a disability and retaliation. Plaintiff advances federal and state law claims for disparate treatment and hostile work environment and a federal claim for retaliation. On September 30, 2013, the court issued an order denying defendant's motion for summary judgment. This opinion is issued in support of that ruling.

*Federal Rule of Civil Procedure 56(c)* provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that **[*2]** there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. *National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).* Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed.R.Civ.P. 56 (a)*, *(e)*) (emphasis in Matsushita). An issue is genuine only **[*3]** if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586*. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)*. Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." *Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992)*. Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. *Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990)*. If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. *Anderson, 477 U.S. at 249-50*; *see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992)*, cert. denied, *507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993)* [*4] (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. In 1995 plaintiff was hired by defendant as a substitute caseworker and became full time later that year. As a caseworker plaintiff investigated allegations of child abuse and neglect, and took appropriate action to protect the safety and welfare of children. Her duties included conducting home visits and parent and child interviews, determining the need for protective services, maintaining contact with service providers, preparing court petitions and motions, testifying at hearings and maintaining case records.

From 1997 until her retirement in May of 2010, plaintiff repeatedly was disciplined. From 1997 until 2005, most of the disciplinary measures related to plaintiff's failure to 1) maintain case files and keep up with her dictation, 2) meet or maintain contact with children and 3) follow agency procedures and conform to agency standards. Plaintiff also was reprimanded for her accountability in the field and for making unannounced [*5] visits to children's homes when the family was absent.

In May of 2005, defendant changed its policy concerning unannounced visits. Defendant required all caseworkers to schedule client visits and obtain approval from a supervisor. Nevertheless, caseworkers continued to make unannounced visits without the permission of a supervisor especially when the schools were not in session.

From September of 2006 until May of 2008, plaintiff was disciplined on a number of occasions for use of sick leave. Although plaintiff was not seeing a doctor and did not have a formal diagnosis, she informed her supervisors that she was suffering from migraines and sleep problems. She claimed that she only was taking time off when her condition left her too fatigued to work. Plaintiff's supervisors did not believe plaintiff and continued to reprimand her. In October of 2006, plaintiff grieved certain disciplinary actions concerning her use of sick time. In July of 2007, an arbiter found for defendant and determined that plaintiff had been abusing her sick leave.

In May of 2008, plaintiff applied for leave under the Family Medical Leave Act ("FMLA"). She again informed her supervisors of her headaches and difficulty [*6] sleeping and the effect they had on her ability to perform her job. Prior to her application, defendant had not 1) made plaintiff aware of the FMLA, 2) given her information about it or 3) posted FMLA information anywhere in the workplace. The day plaintiff applied for FMLA leave, (Can't Find Title) Charles Dominick ("Dominick") told her that it was very "convenient" that she was bringing her paper work in and that the issue "was not over."

Before she applied for FMLA leave, plaintiff was disciplined for two significant events. On February 12, 2008, plaintiff was suspended for three days for failure to see a child in a shelter and failure to obtain treatment for the child's wisdom teeth. Plaintiff grieved this suspension, but the arbiter found that it was just. Plaintiff did not appeal. On February 15, 2008, plaintiff was disciplined for failure to notify her supervisor in a timely manner. A youth in plaintiff's care gave birth and plaintiff did not immediately notify her supervisor. However, there was nothing in the applicable regulations or defendant's policies that stated immediate notification was required.

In 2008, plaintiff also was disciplined for 1) failing to see or make contact [*7] with children, 2) conducting unannounced visits without approval, 3) filing a petition in an untimely manner and 4) taking time off in violation of defendant's attendance policy. She also was disciplined for failure to have a father participate in developing a family service plan.

In January of 2009 plaintiff was diagnosed with lupus. She informed her immediate supervisor Michele Bianco ("Bianco") and Dominick and handed a doctor's note to department administrator Charles McCallen ("McCallen"). Plaintiff also requested help from other caseworkers in completing her work and conducting visits, which was

common practice within the office. Bianco refused the request without explanation.

Around this time the harassment directed at plaintiff increased. Bianco changed plaintiff's schedule and the way rules were being applied to plaintiff. Paperwork was returned to plaintiff the day it was due, requiring her to correct it and turn it in late. Client visits were rescheduled for times when plaintiff was unavailable. Plaintiff's dictation was required to be caught up within the day while other caseworkers were given a month. Sometimes plaintiff was permitted to use her discretion in conducting **[*8]** unannounced visits and other times she was required to obtain approval.

Plaintiff's supervisors also questioned the legitimacy of her illness. Bianco constantly told plaintiff that she was not sick and that she should find a job that she was able to perform. Dominick harassed plaintiff about her use of sick time despite the fact that she provided him with doctor's notes, MRIs and pill bottles. On one occasion plaintiff overheard Bianco and McCallen trying to figure out how to write her up.

In August of 2009, plaintiff was hit from behind by another motorist. She suffered a cervical strain and her symptoms related to her lupus seemed to worsen. In September of 2009, she was diagnosed with jamais-vu.[1]

On September 29, 2009, plaintiff received a letter from Bianco directing her to work past 4:00 pm in order to see her clients.[2] Plaintiff again asked for help from other caseworkers. She also asked to see children earlier instead of flexing her time past 4:00 p.m. Both requests were denied.

On February 5, 2010, plaintiff received another letter indicating a change in scheduling. It stated that plaintiff's schedule would be changed from 8:30 a.m. — 4:00 p.m. to 10:30 a.m. — 6:00 p.m. if she did not see all of her clients within the first two weeks of the month. Plaintiff informed her superiors that she could not work past 4:00 p.m. due to her condition. She had tried to work 4:00 p.m. for a year but her illness left her sore, tired and falling asleep at the wheel. She also told her supervisors that working past 4:00 p.m. prevented her from taking her medication.

On February 16, 2010, plaintiff provided a doctor's that stated she could not work more than 37.5 hours per week. Plaintiff's

doctor thought that plaintiff's schedule was 8:30 am — 4:00 pm and did not know that caseworkers could be required to flex their time during the week. Thus, he thought the note was sufficient to prevent plaintiff from working past 4:00 p.m.

Plaintiff was never informed that the note was insufficient to excuse her from working past 4:00 p.m. She offered to start her **[*10]** day earlier and meet children before school. She was told that this was unacceptable and that the morning was not the best time to meet children. However, other caseworkers were permitted to make morning visits.

Plaintiff was able to see all but one of her clients in the first two weeks in March of 2010. Plaintiff scheduled a visit for that client later in the month. On March 12, 2010, plaintiff, Bianco, McCallen, Dominick and Saveikis met to discuss plaintiff working past 4:00 pm. During this conference plaintiff's longtime schedule of 8:30 am — 4:00 pm was changed to 10:30 am — 6:00 pm. Towards the end of the conference, Dominick slammed his hands on the table, got in plaintiff's face and screamed at her. After the conference plaintiff had a nervous breakdown.

On March 16, 2010, plaintiff contacted Dr. Berger and was given a doctor's note indicating she was unable to return to work for ten days. Thereafter, she was referred to a therapist for a psychiatric evaluation. Plaintiff was diagnosed with major depression and given a doctor's note by Dr. Hauber that stated she could not return to work until further notice. Plaintiff was told that if she returned to work she would be committed **[*11]** due to her nervous breakdown and building anxiety/depression.

Between the March 12, 2010 conference and plaintiff's diagnosis of major depression, a client complaint was filed against plaintiff charging her with being unprofessional, failing to communicate with the family and refusing to meet children when they were off from school. Bianco was the supervisor who received and processed the complaint. Bianco previously had said that the client was impossible to please and made other comments about the difficulty of working with the client.

On April 6, 2010, plaintiff filed for indefinite leave under the FMLA. Her FMLA leave was approved from March 25, 2010 until June 7, 2010 and then from June 8, 2010 until July 23, 2010. On May 5, 2010, plaintiff applied for Social Security Disability. In June of 2010, plaintiff was hospitalized with Legionnaires disease, pneumonia and sepsis. On July 7, 2010, plaintiff applied for indefinite medical leave commencing on July 26, 2010. On July 26, 2010, plaintiff retired from her employment based on a disability.

**McDonnell-Douglas Standard**

---

[1] Jamais-vu is a medical condition where a person forgets what they are doing or where they are without losing consciousness. Plaintiff experienced this while driving and watching television.

[2] Prior to 2009 **[*9]** and until the change of plaintiff's schedule in March of 2010, plaintiff's work schedule was consistently 8:30 am — 4:00 pm.

Page 4 of 13

Case 4:15-cv-00241-O   Document 64   Filed 10/05/16   Page 24 of 33   PageID 799
2014 U.S. Dist. LEXIS 27008, *11

Plaintiff seeks to prove her claims under the FMLA, ADA and the PHRA through use of indirect evidence. It is well-settled [*12] that claims of discrimination based on circumstantial evidence are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *St. Mary Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*; *Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995)* (citing *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)*); see also *Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996)* ("It is axiomatic that the familiar analytical framework first pronounced in *McDonnell Douglas*,...also guides an analysis of claims brought under the ADA."). Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence [*13] that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facie case of discrimination. *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)*. The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. *Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999)* (citing *Burdine, 450 U.S. at 253-54* ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting *Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)*).

There is no talismanic formula for presenting a prima facie

[*14] case. *Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999)* ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. *Waldron, 56 F.3d at 494*. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; *see also Furnco, 438 U.S. at 577*.

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. *Keller, 130 F.3d at 1108*. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case. *St. Mary's Honor Center, 509 U.S. at 511*; [*15] *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*.

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. *Jones, 198 F.3d at 410*. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine, 450 U.S. at 253*. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." *St. Mary's Honor Center, 509 U.S. at 515*. This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones, 198 F.3d at 410* (quoting *Burdine, 450 U.S. at 252-53 (1981))*.

"To [*16] discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes, 32 F.3d at 765*. Instead, the plaintiff must come forward with evidence that demonstrates "such

Page 5 of 13

Case 4:15-cv-00241-O   Document 64   Filed 10/05/16   Page 25 of 33   PageID 800
2014 U.S. Dist. LEXIS 27008, *16

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (citations omitted). In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence. Id. at 764. For example, "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the [*17] plaintiff may not need to discredit the remainder." Id. at 764 n. 7. "That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Id.

## FMLA Retaliation Claim

Plaintiff has produced sufficient evidence to survive defendant's motion for summary judgment. First, plaintiff has set forth a prima facie retaliation claim for retaliation. To assert a prima facie retaliation claim under the FMLA, a plaintiff must demonstrate that: (1) he or she is protected under the FMLA, (2) he or she suffered a materially adverse employment action, and (3) the materially adverse action was causally related to the plaintiff's exercise of his or her FMLA rights. _Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004)_; _Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir. 2007)_.[3] Plaintiff's retaliation claim is controlled by the three-step burden shifting McDonnell Douglas analysis, as outlined above. See _Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006)_ [*18] ("If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies.").

In Burlington Northern, the Supreme Court clarified that anti-retaliation provisions are not coterminous with anti-discrimination provisions and thus, are not limited to "workplace-related or employment-related retaliatory acts and

harm." _Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)_. Furthermore, anti-retaliation provisions are not to be construed as "forbidding the same conduct prohibited by . . . antidiscrimination provision[s]." Id. "Consistent with this view, the Court held that a plaintiff claiming retaliation . . . must show that a reasonable employee would have found the alleged retaliatory actions materially adverse." _Moore, 461 F.3d at 341_ (quotations omitted).

Retaliatory actions are [*19] "materially adverse" if they would have the effect of "dissuad[ing] a reasonable worker" from exercising his or her rights. _Burlington, 548 U.S. at 68_ (what is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"); _Moore, 461 F.3d at 341_. As materially adverse actions can take the form of retaliatory harassment, it is necessary to look at the overall scenario and imperative that individual incidents are not isolated. _Hare, 220 Fed. Appx. at 132_; _Jensen v. Potter, 435 F.3d 444, 450 (3d. Cir. 2006)_.

Materially adverse actions also must be linked to a retaliatory animus directed at the plaintiff's engagement in a protected activity. Thus, the record must contain sufficient evidence from which the finder of fact can link the materially adverse action to a retaliatory animus. _Moore, 461 F.3d at 342_. Two central factors are brought into play: (1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period. _Jensen, 435 F.3d at 450_ [*20] (quoting _Abramson v. William Paterson Coll. Of New Jersey, 260 F.3d 265 288 (3d Cir. 2001)_ (quoting _Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)_)). "Timing alone raises the requisite inference when it is unusually suggestive of retaliatory motive." Id. (internal quotations omitted). "But even if temporal proximity is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." Id. (quoting _Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)_) (internal alterations omitted). However, "these are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id. (quoting _Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)_ and citing in support _Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997)_ ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context specific.").

Neither party disputes that plaintiff is protected under the FMLA. Rather, the parties dispute whether plaintiff suffered a

---

[3] A number of courts within the Third Circuit have agreed that the legal framework established in Title VII retaliation claims applies to the analysis of FMLA retaliation claims. _Mascioli v. Arby's Restaurant Group, Inc., 610 F. Supp.2d 419, 433 (W.D. Pa 2009)_; _Curcio v. Collingswood Bd. Of Educ., No. Civa 04-5100, 2006 U.S. Dist. LEXIS 46648, 2006 WL 1806544 at *11 (D.N.J. 2006)_.

materially adverse **[*21]** action and whether that action can be linked to retaliatory animus.

Defendant's assertion that plaintiff did not suffer a materially adverse action is unconvincing. A reasonable jury could find that the numerous employment actions levied against plaintiff after she applied for FMLA leave were sufficient to create an overall scenario that would dissuade a reasonable worker from exercising her rights. Plaintiff's schedule was altered, requiring her to meet with clients at times when she was unavailable. She was expected to keep her case files updated by the day while other caseworkers were given a month. Plaintiff was prohibited from having co-workers assist her in completing her work even though this was a common practice within the workplace. Plaintiff's immediate supervisors (mainly Bianco and Dominick) harassed her about missing work and told her to quit and find a job she could perform. Finally, her longtime schedule was changed, requiring her to work until 6:00 p.m. Taking all of these events in their totality, a reasonable jury could find that plaintiff was subject to materially adverse employment.

Similarly, defendant's argument that the materially adverse action(s) cannot be linked **[*22]** to retaliatory animus is unpersuasive. In her deposition plaintiff alleged that Dominick remarked about the convenience of plaintiff's FMLA application. At that time he also assured plaintiff that the issue concerning her use of sick time was not closed. Because this incident directly related to plaintiff's use of FMLA leave, it raises an obvious inference of retaliatory animus.

Furthermore, plaintiff was never made aware of the FMLA and before her utilization of its protection she frequently was disciplined for taking sick leave despite the fact that she informed her supervisors about her condition. When Dominick's comments are taken in conjunction with the special treatment plaintiff received after her application for FMLA leave and the fact that her utilization of the FMLA disposed of a mode of discipline previously used against her, a jury could find that plaintiff was treated more adversely than she otherwise would have been because she exercised her rights under the FMLA. Thus, plaintiff has produced sufficient evidence to establish a prima facie case.

In turn, defendant has produced sufficient evidence to satisfy the second prong of the *McDonnell Douglas* test. Defendant claims **[*23]** that plaintiff was missing visits, making unannounced home visits when no one was present at the client's home and falling behind with her dictation. Thus, it was necessary to monitor plaintiff closely and change her schedule in order to ensure that she was seeing all of her clients and completing all of her work. As the defendant's

burden is only one of production and not persuasion, defendant has satisfied the second prong.

Finally, plaintiff has fulfilled her burden of production under the third prong of the *McDonnell-Douglas* paradigm. Plaintiff has proffered evidence of pretext. First, she has shown that the disciplinary and remedial measures aimed at her were not applied to others within the office. For example, other caseworkers were permitted to conduct unannounced visits when schools were not in session, but when plaintiff conducted such visits she was disciplined. Plaintiff was singled out with regard to her dictation and quality of paperwork. Plaintiff testified that all persons within the office had trouble keeping up with their dictation and enjoyed latitude as to the types of grammatical errors that were accepted within documents. After invocation of her rights under the **[*24]** FMLA plaintiff was the only employee required to keep her dictation up to date on a daily basis and was sometimes returned paperwork on the day it was due, requiring her to turn the corrected copies in late.

Second, plaintiff has made a showing that the changes in her schedule could be found to be inconsistent with logic. It was well documented that plaintiff was having trouble seeing clients. If plaintiff already was having trouble scheduling visits and improperly was relying on unannounced visits, it can be assumed that a reasonable supervisor would encourage her to schedule the visits. Instead, Bianco made it more difficult for plaintiff to do just that by altering plaintiff's schedule. Thus, Bianco's rescheduling of plaintiff's visits to times when she was unavailable could be found to be non-sensical.

Furthermore, plaintiff's longtime schedule adversely was changed to require her to work until 6:00 p.m. Defendant argues that this change was necessary because plaintiff was still failing to see her children. However, plaintiff testified that within the first two weeks of March she had seen all of her children but one and thus had remedied the very shortcoming the scheduling change **[*25]** purportedly was designed to resolve.

The above evidence sufficiently demonstrates weaknesses and inconsistencies in defendant's proffered reasons for its actions. Although all employees had trouble maintaining their case files, plaintiff was singled out and closely monitored. She also was singled out for special treatment in that she was forced to obtain approval from supervisors to conduct unannounced home visits when other caseworkers were not under similar circumstances. Finally, the change in plaintiff's schedule could be found to be unneeded or at least extreme as she evidently had remedied her shortcomings in failing to see her clients.

Page 7 of 13

Case 4:15-cv-00241-O   Document 64   Filed 10/05/16   Page 27 of 33   PageID 802
2014 U.S. Dist. LEXIS 27008, *25

Defendant has failed to produce any evidence that undercuts plaintiff's testimony as a matter of law. Defendant has produced no evidence that shows other similarly situated caseworkers were treated in a comparable way. Nor has it produced evidence that shows that 1) other caseworkers were required to obtain permission to conduct unannounced visits and were disciplined when they did not, 2) other caseworkers who were behind in their dictation were closely monitored and required to keep their dictation up to date on a daily or even weekly basis, 3) [*26] other caseworkers schedules were changed so as to pull them from previously scheduled visits or 4) other caseworkers who failed to see children had their schedules closely monitor and changed so as to remedy the failure.

Furthermore, defendant has not justified its refusal to allow plaintiff the help of others in completing her work even though this was the generally accepted practice within the office. Defendant also has failed to displace the probative effect of the comments from Bianco and Dominick following her application for FMLA leave. Defendant merely engages in a "he said, she said" with plaintiff, claiming that these events never occurred. At this juncture, plaintiff's testimony must be taken as true. Accordingly, defendant's motion for summary judgment must be denied on this count.

### ADA and PHRA Discrimination

Plaintiff has adduced sufficient evidence to create a genuine issue of material fact with respect to her claim for discrimination under the ADA and PHRA.[4] The ADA proscribes "discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, [*27] employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. A "qualified individual" means a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. §12111(8)*; *Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002)*. A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual, (B) a record of such impairment; or (C) being regarded as having such an impairment." Id. at *§ 12102(1)*.

In order for a plaintiff to establish a prima facie case of

discrimination under the ADA, the plaintiff must show that he or she: (1) a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) has suffered an otherwise adverse employment decision [*28] as a result of discrimination. *See Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999)*; *Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998)*. The refusal to make reasonable accommodations for a plaintiff's disabilities constitutes as an adverse employment decision. *Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004)*. Constructive discharge can also constitute as an adverse employment decision. *Suders v. Easton, 325 F.3d 432, 447 (3d Cir. 2003)*.

Defendant contends that none of the above elements are met and plaintiff's attempt to show a prima facie case of discrimination is an utter failure. Thus, an examination of each element is warranted.

Plaintiff has proffered sufficient evidence from which a reasonable jury could find she falls under the protection of the ADA. To invoke the protection of the ADA, a plaintiff must show that she suffers from 1) an impairment, 2) that the impairment limits a major life activity and 3) the limitation is substantial. *42 U.S.C. §12102 (1)(A)*; *Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 194-95, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)*. "A major life activity is one of central importance such as caring for oneself, [*29] performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working, as well as sitting [and] standing." *Kania v. Potter, 358 Fed. Appx. 338, 342 (3d Cir. 2009)* (internal quotations and citations omitted). "Substantially limit[ed]" has been defined as the inability "to perform a major life activity that the average person in the general population can perform or significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity." *Toyota, 534 U.S. at 195-96 (2002)* (quoting *29 C.F.R. §1630.2(j) (2001)* (internal quotations and alterations omitted). Although an impairment must substantially limit a major life activity, it need not "limit other major life activities in order to be considered a disability." *42 U.S.C. 12102 (4)(C)*. Furthermore, an impairment that is episodic or in remission need not have a permanent or long term impact to be considered a disability if it "substantially limit[s] a major life activity when it is active." Id. at *12102(4)(D)*; accord *Britting v. Secretary, Dept. of Veterans Affairs, 409 Fed. Appx. 566, 568 (3d Cir. 2011)*.

A plaintiff that seeks [*30] to prove a disability must set forth evidence that shows that her impairment, in terms of her own

---

[4] PHRA claims are analyzed under the same framework as ADA claims. See *Taylor v. Phoenixville School Dist., 184 F.3d 296 (3d Cir. 1999)*. Thus, only plaintiff's ADA claims will be discussed.

experience, is substantial. _Toyota, 534 U.S. at 198_. Thus, the determination of whether a plaintiff has a disability is to be determined on a case-by-case basis and "an individualized assessment . . . is particularly necessary when the impairment is one whose symptoms vary widely from person to person." _Id. at 198-99_.

Medical testimony is not necessarily required to establish a disability. _Marinelli v. City of Erie, 216 F.3d 354, 360 (3d Cir. 2000)_ (citing _Katz v. City of Metal Co., 87 F.3d 26, 32 (1st Cir. 1996))_. If an impairment is one that is "amenable to comprehension by a lay jury," failure to present medical evidence in support of it is not dispositive. _Marinelli, 216 F.3d at 360_.

Defendant's argument that plaintiff does not qualify as disabled under the ADA is wide of the mark. Plaintiff has established her existing impairment through her 2008 FMLA application, her diagnosis of lupus in 2009 and her deposition testimony. Plaintiff's 2008 FMLA application stated she was unable to perform her job when she was suffering from the effects of her migraine headaches and sleep apnea. Thus, [*31] plaintiff's FMLA application indicates that plaintiff's impairment substantially affected major life activities such as sleeping and concentrating as her condition affected her sleep and left her fatigued and unable to work.

Plaintiff testified that her migraines and sleep problems were diagnosed as symptoms of lupus. When these symptoms were present she had difficulty sleeping, concentrating, thinking and driving. Defendant alludes to the proposition that lupus is a technical medical disease that is not amenable to the understanding of a lay jury. Nevertheless, the symptoms of the disease are things many people struggle with from time to time. Thus, the production of medical evidence beyond what is already in the record is not required. In short, plaintiff has produced medical evidence that shows she was suffering from a substantial impairment in 2008 and in 2009 these symptoms were officially diagnosed as the manifestations of lupus. Because a reasonable jury could find that plaintiff suffered from a substantial impairment there is a genuine issue of material fact as to whether she was disabled under the ADA.

Similarly, defendant's argument that plaintiff is not a qualified individual [*32] is unavailing. The determination of whether an individual with a disability is qualified is made at the time of the employment decision; not at the time of the lawsuit. _Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998)_. The Interpretive Guidance to the EEOC Regulations preface the inquiry of whether an individual is "qualified" with two threshold questions: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position; and (2) whether the individual,

with or without reasonable accommodation, can perform the essential functions of that position. _29 C.F.R. § 1630.2(m)_; see also _Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002)_.

The determination of whether an individual can, with or without reasonable accommodation, perform the essential functions of the position also involves a two-step process. _Deane v. Pocono Medical Center, 142 F.3d 138, 146 (3d Cir. 1998)_. As the court in Deane explained, "[f]irst, a court must consider whether an individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, _a fortiori_, is not entitled to accommodation). [*33] If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation. If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the prima facie case." Id.

The parties do not dispute plaintiff's general qualifications as a caseworker. Rather, they dispute whether plaintiff was able to perform the essential functions of her position. Defendant apparently argues that plaintiff could not perform the essential functions of her position and that any of plaintiff's requests/proposed accommodations would have eliminated these functions. In response, plaintiff argues that her requests/proposed accommodations would have kept the essential functions of her job intact. Thus, an examination of what the essential functions of plaintiff's job were and what constitutes as a reasonable accommodation is warranted.

First, it is well established that "[w]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" _Turner v. Hershey Chocolate USA, 440 F.3d 604, 612 (3d Cir. 2006)_ (quoting _Deane, 142 F.3d at 148_); [*34] see also _Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001)_ (same). Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. _29 C.F.R. § 1630.2(n)(1)_; _Turner, 440 F.3d at 612_ (quoting _29 C.F.R. §1630.2(n)(1)_). The term "essential function" does not include the "marginal" functions of the position. Id. at _§ 1630.2(n)(1)_. A job function may be considered essential for any of several reasons, including but not limited to:

> (i) The function may be essential because the reason the position exists is to perform that function;

> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Id. at *§ 1630.2(n)(2)*. Evidence of whether a particular function is essential can include but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The **[*35]** amount of time spent performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

Id. at *(n)(3)*.

Plaintiff was hired and her position as a caseworker was specifically created to 1) ensure the safety of her client children, 2) investigate allegations of child abuse and neglect and 3) take appropriate action to protect the safety and welfare of the children. A number of activities are listed under the "Essential Duties and Responsibilities" section of the "Position Description" form for caseworkers of Westmoreland County. These include: conducting home visits and parent and child interviews; investigating allegations of neglect, abuse and other complaints and determining whether there is the need for protective services; maintaining contact with service providers; preparing court petitions and motions; testifying at hearings and maintaining case records.

In short, although there are a number of actions that can be found to be essential functions of plaintiff's job, the primary **[*36]** essential function appears to be ensuring the safety of the client children. Under this concept lies a number of actions that are essential to the actuation of the overall goal and thus these actions also should be considered as essential to plaintiff's job. Such actions necessarily would include visiting clients and making contact with their environment to determine if they are in fact safe as well as working closely with the families of the children to ensure that they are not being neglected or abused.

Defendant argues that plaintiff was unable to see all of her clients and thus was unable to ensure that the children were receiving proper care. Thus, plaintiff was unable to perform the essential functions of her job. Plaintiff claims she would have been able to perform her duties adequately with the support of her coworkers and modifications to her schedule.

With this backdrop in mind, an analysis of what constitutes as a reasonable accommodation is necessary to determine if the above duties and responsibilities could have been accomplished through plaintiff's requests. A "reasonable accommodation" includes:

Job restructuring, part-time or modified work schedules, reassignment to a **[*37]** vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*42 U.S.C. § 12111(9)(B)*.

The regulations define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." *29 C.F.R. §1630.2(o)(1)(ii)*. "[T]he question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk, 307 F.3d at 170*; *see also Skerski v. Time Warner Cable Co., a Div. of Time Warner Entertainment Co., L.P., 257 F.3d 273, 286 (3d Cir. 2001)*; *Turner v. Hershey Chocolate USA, 440 F.3d 604, 614 (3d Cir. 2006)* ("As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question.").

The employee must make a facial showing that his or her proposed accommodation was possible. If that showing is made, the burden shifts **[*38]** to the employer to prove the affirmative defense that the requested accommodation was unreasonable or would have placed undue hardship on the employer. *Turner, 440 F.3d at 614* (citing *Gaul, 134 F.3d at 580*). The plaintiff is required only to identify an accommodation where the costs do not clearly exceed its benefits on its face. See *Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 670 (3d Cir. 1999)*. A grant of summary judgment for a defendant is appropriate only "in cases in which plaintiff's proposal is either *clearly ineffective or outlandishly* costly." *Id. at 670* (quotation omitted) (emphasis added).

Plaintiff requested that 1) her fellow coworkers be allowed to

help her complete her work and 2) she be allowed to see children in the morning so that she would not have to work past 4:00 p.m. She has testified that caseworkers regularly helped each other and defendant has produced no evidence to the contrary. Furthermore, defendant has not shown why this presumably common practice was unreasonable and how it would otherwise interfere with ensuring the safety of plaintiff's clients.

Plaintiff also testified that her client's families were open to plaintiff meeting their [*39] children in the morning. Plaintiff has produced evidence that the accommodation was viable. She had utilized the approach for a lengthy period prior to the events giving rise to this suit and in March she was able to see all but one child in the first two weeks of the month.

Defendant merely posits that plaintiff had to see children after 4:00 pm or she would not be able to perform an essential function of her job, namely ensuring that her clients were safe. However, in order to prevail on this affirmative defense defendant must do more than simply assert in a conclusive fashion that an accommodation is unreasonable or that it eliminates an essential function of the job.

Plaintiff has made a prima facie showing that her proposed accommodations were possible. Defendant has failed to meet its burden. Thus, a genuine issue of material fact exists with respect to whether plaintiff's requested accommodations were reasonable.

Moreover, since plaintiff's requested accommodations could be considered to be reasonable and a jury could find that these accommodations would enable her to perform the essential functions of her job, a reasonable jury could also find that plaintiff was a qualified individual [*40] under the ADA. Thus, a genuine issue of material fact exists as to the second element of plaintiff's claim.

Defendant also argues that the third element of plaintiff's ADA discrimination claim is deficient. According to defendant, plaintiff never asked for a reasonable accommodation and never informed it of her disability. Thus, defendant assuredly did not deny plaintiff a reasonable accommodation.

Defendant's argument is misplaced. Under the ADA, adverse employment decisions "include refusing to make reasonable accommodations for a plaintiff's disabilities." *Williams, 380 F.3d at 761*. Notice of an employee's request for an accommodation must be clear in that "the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability." *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 314 (3d Cir. 1999).*

Formalisms and the manner of request are irrelevant. *Id. at 313*. What matters is that the employee provide sufficient information so that the employer is put on notice of both the disability and the requested accommodation(s). Id. Where an employee has notified the employer of a [*41] desire for an accommodation, the employer "cannot escape his duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." *Id. at 317*. Thus, "both parties have a duty to assist in the search for the appropriate reasonable accommodation and to act in good faith." *Id. at 312*.

"An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" *Williams, 380 F.3d at 772* (quoting *Taylor, 184 F.3d at 317*).

In Taylor, the plaintiff did not formally notify the defendant of her disability. The plaintiff became psychotic at work, the school district knew she was hospitalized pursuant to this psychotic break and the hospital provided the school district [*42] with a number and was directed to call if it had questions. *Id. at 313-14*. Furthermore, the school district required the plaintiff to submit a note from her doctor but knew of plaintiff's requirement to be on medication for her illness. Id. The Third Circuit held that this was more than enough to put the school district on notice and that the plaintiff only had to request an accommodation to trigger the defendant's burden of interaction. Id.

Here, defendant's argument boils down to the fact that plaintiff never used the words "disability" or "accommodation" when she informed it of her impairment and/or asked for assistance with the difficulty she was having at work. Plaintiff provided defendant with an FMLA application that emphasized the severity of her impairment in 2008. Prior to 2008, plaintiff had informed defendant of her migraine headaches, sleep apnea and fatigue for several years. Defendant knew of plaintiff's lupus diagnosis in 2009. Given the totality of the circumstances, a reasonable jury could determine that at the latest defendant was put on notice of plaintiff's disability in or around late 2008 or early 2009. Thus, a reasonable jury could also find that if plaintiff [*43] requested an accommodation at this time defendant bore a burden of helping plaintiff determine what accommodations would be reasonable.

Case 4:15-cv-00241-O   Document 64   Filed 10/05/16   Page 31 of 33   PageID 806

Page 11 of 13
2014 U.S. Dist. LEXIS 27008, *43

There also is sufficient evidence to support the contention that plaintiff asked for an accommodation and defendant did not make a good faith effort to assist her. *Id. at 314*. It is undisputed that plaintiff asked to work earlier instead of later. Plaintiff testified that she asked to work earlier due to the severity of her impairment and the difficulties it created. For example, due to the fatigue and pain that grew worse as the day wore on, plaintiff testified that she would fall asleep at the wheel. Although defendant disputes why plaintiff asked to do her work earlier in the day, a reasonable jury could take her request as one for an accommodation.

At this stage defendant would have had a duty to help plaintiff identify and implement any suitable accommodations. Defendant received a note from plaintiff's physician and plaintiff believed the note was sufficient to excuse her from working past 4:00 p.m. It is reasonable to infer that defendant became aware of plaintiff's belief. If at that juncture defendant believed the note was insufficient, the **[*44]** burden was on it to seek out additional information and act in good faith in relation to plaintiff's requested accommodation. Given the evidence in the record, a reasonable jury could find that defendant failed to meet its obligation as it could have contacted plaintiff's doctor to clear up any ambiguities or asked plaintiff for documentation that would have satisfied defendant. There is no evidence that it did either of these.

Arguing in favor of this course of action, defendant claims that the new schedule was required to ensure the safety of plaintiff's client children. But defendant does not explain or give any reason as to why this was so and/or why it did not work with plaintiff to find a suitable accommodation. The record can be read to support a finding that defendant simply ignored plaintiff's request. As such, when taking all reasonable inferences in plaintiff's favor, a reasonable jury could find that defendant fell short in discharging its duty to engage in the interactive process in good faith and that plaintiff could have been accommodated but for defendant's failure to do so.

Plaintiff also testified that she asked for help from her coworkers. Once again, because a reasonable **[*45]** jury could find that defendant was put on notice of plaintiff's disability, they could also find that defendant failed to meet its burden of good faith negotiation. Defendant has produced little evidence that shows why this request was denied. Furthermore, defendant has produced no evidence to show that it participated in any process to try and accommodate plaintiff in this or any other regard. As such, plaintiff has met the third element of an ADA disparate treatment claim.

Because a reasonable jury could find that plaintiff was disabled, a qualified person under the ADA, requested an accommodation and was denied that accommodation and defendant has not identified legitimate reasons as to why plaintiff's requested accommodations had to be rejected, defendant's motion for summary judgment with respect to plaintiff's ADA and PHRA discrimination claims must be denied.

**ADA Hostile Work Environment**

By the thinnest of reeds plaintiff has produced sufficient evidence to move forward on her claim for hostile work environment. A case for a hostile work environment under the ADA has the following elements: "1) [the plaintiff] is a qualified individual with a disability under the ADA; 2) [he or **[*46]** she] was subject to unwelcome harassment; 3) that harassment was based on [a] disability or a request for an accommodation; 4) the harassment is sufficiently severe or pervasive to alter the conditions of employment and to create an abusive working environment; and 5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action." *Barclay v. Amtrak, 435 F. Supp.2d 438, 448 (E.D. Pa. 2006)* (quoting *Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999))*.

In analyzing whether a plaintiff has met its burden, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." *Id. at 276* (citing *Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997))*. This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting *Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990))*.

First, as noted above, plaintiff has set forth sufficient evidence from which a **[*47]** reasonable jury could find that she was a qualified individual under the ADA. Second, plaintiff has set forth sufficient facts to show that she received unwelcome harassment beginning in the mid-2000s which continued until her retirement in 2010.

Third, plaintiff has produced evidence to show that the harassment was linked to her disability. Prior to plaintiff's FMLA application she was heavily disciplined for her use of sick time. Upon application for FMLA leave in May of 2008, plaintiff was told by Dominick that the issue was not over. Thereafter, plaintiff's schedule was modified, requiring her to work at taxing times, plaintiff was required to obtain approval for all unannounced home visits even though other workers were not, and her paperwork was returned for correction without adequate time to meet deadlines. Bianco constantly

questioned the legitimacy of plaintiff's impairment and she with McCallen looked for opportunities to discipline plaintiff. Given these circumstances, a reasonable jury could find that plaintiff was treated disparately because of her disability.

Fourth, although subject to debate, there appears to be sufficient evidentiary basis for a jury to find that the **[*48]** harassment was so pervasive that it altered the conditions of plaintiff's employment. The harassment included constant second guessing of and badgering about the legitimacy of plaintiff's impairment. Plaintiff's schedule was changed to times she was unavailable and her paperwork was returned without sufficient time to meet deadlines. Plaintiff was not afforded help from her fellow case workers despite the fact that it was common place to receive assistance. Plaintiff repeatedly was reprimanded for failing to keep her dictation up to date even though this problem was widespread throughout her department. Finally, plaintiff's schedule was changed even after she remedied the underlying deficiency and then was verbally accosted by Dominick. When these facts are viewed in their totality, a reasonable jury could find that the harassment altered the conditions of plaintiff's employment and created an abusive work environment.

Finally, when the facts are read in the light most favorable to plaintiff, a reasonable jury could find that her employer knew of the harassment and the harassment culminated in a tangible change in the terms of employment. Plaintiff testified that she told Bianco, Saveikis **[*49]** and McCallen to stop the harassment because the increased stress worsened her illness. Plaintiff also made her supervisors aware of her illness by providing doctor's notes, MRIs and pill bottles as wells as documentation regarding medical leave. Plaintiff explained that working past 4:00 p.m. was too difficult given her impairment and its seriousness. Despite all of this, the harassment continued and plaintiff's schedule was changed. It continued to the point where plaintiff had a nervous breakdown. Given these facts and the ones outlined above, the finder of fact can conclude that the employer was on notice of the harassment and failed to take appropriate remedial action. See *Griffin v. Harrisburg Property Servs. Inc., 421 Fed. Appx. 204, 208 (3d Cir. 2011)* (Where harassment that constitutes a tangible employment action occurs at the hands of managers or supervisors, knowledge of their conduct is imputed to the employer and the fifth element is satisfied.); *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)* (A tangible employment action is one that "constitutes a significant change in employment status, such a hiring, firing, failing to promote, reassignment with significantly **[*50]** different responsibilities, or a decision causing a significant change in benefits." It likewise may be established by demonstrating a materially adverse change based upon other indices that are

unique to the particular situation.) (citing with approval *Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)); Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993* (protection under remedial statutes prohibiting discrimination come into play well before the harassing conduct leads to a nervous breakdown).

Defendant argues that the actions described above were legitimate because plaintiff was not performing the fundamental functions of her job. However, a reading of the record pursuant to the summary judgment standard precludes this assertion. If plaintiff remedied her shortcoming by timely seeing children pursuant to a schedule that did not require her to work past 4:00 pm, it is difficult to see how changing her schedule to require her to work until 6:00 pm was truly warranted. Defendant also fails to explain how returning paperwork for revisions the day it is due was a legitimate exercise of **[*51]** remedial discipline. Furthermore, reprimanding plaintiff for actions that other employees were permitted to engage in cannot be found to be a legitimate use of disciplinary authority as a matter of law.

When all reasonable inferences are drawn in plaintiff's favor, these actions taken together could be found to have altered the conditions of plaintiff's employment. Plaintiff's job was made more difficult and frustrating through the actions of her supervisors. Plaintiff was required to work a revised schedule that was known to be very difficult for her given her impairment. She also was subject to constant harassment about her illness. As plaintiff has produced sufficient evidentiary material to support her claim of a hostile work environment, defendant's motion must be denied.

**Constructive Discharge**

Plaintiff's claim for constructive discharge also survives defendant's motion for summary judgment. To sustain a constructive discharge claim, a plaintiff must present evidence from which the finder of fact can conclude that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Sunders, 542 U.S. 129, 131, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).* **[*52]** "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.7* (quoting *Pennsylvania State Police, 542 U.S. at 134*). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled

Page 13 of 13

Case 4:15-cv-00241-O   Document 64   Filed 10/05/16   Page 33 of 33   PageID 808
2014 U.S. Dist. LEXIS 27008, *52

to resign?" Id. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc., 510 U.S.17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. Of course, the analysis also focuses on the "totality of the circumstances," as no one factor is determinative. *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)*.

In this case a genuine issue of material fact exists as to whether plaintiff was subjected to a hostile work environment. Thus, a reasonable jury could find that plaintiff had to endure an abusive work environment and that the harassment became severe **[*53]** and pervasive. For plaintiff to sustain her cause of action for constructive discharge she must further show that the hostile work environment was so intolerable that it would have caused a reasonable person to resign. Plaintiff has met this standard.

Although plaintiff was never threatened with discharge, her immediate supervisor frequently told her to quit and find a job she could handle. Bianco regularly told plaintiff she was tired of plaintiff taking sick time and fed up with doing plaintiff's work. Plaintiff's job responsibilities were altered and her schedule adversely was modified. Normally, this change would be minor, but given the circumstances, it was far from inconsequential. First, the change was unnecessary as plaintiff had remedied the problem by seeing virtually all of her clients in a timely fashion. Second, given plaintiff's impairment and its severity, the change was dangerous to plaintiff as she had tried to work past 4:00 p.m. for a year and physically was unable to do so.

Not only was plaintiff harassed about her illness, Dominick verbally accosted her after her schedule was changed. This display of anger and intimidation along with the constellation of other incidents **[*54]** can be viewed as a form of constant pressure being placed on plaintiff. Viewing the events in their totality and taking all inferences in plaintiff's favor, a

reasonable jury could find that an objective person in plaintiff's position and in her subjective state of body and mind would find her working conditions so intolerable that she had no other option but to quit.

Defendant argues that plaintiff retired because of her mounting illnesses. More specifically, defendant points to plaintiff's hospitalization in July of 2010 with pneumonia, sepsis and Legionnaire's disease and the cognitive problems she was suffering secondary to her car accident. What defendant fails to recognize is that plaintiff did not return to work after her altercation with Dominick on March 12, 2010. Plaintiff testified that she had a nervous breakdown after this event due to the mounting pressure and harassment she was experiencing for numerous years which finally crushed her. Not only does plaintiff proffer this testimony, but defendant's exhibits support her contention. After the incident with Domicick plaintiff went to a therapist and was diagnosed with depression. Plaintiff also testified that her therapist **[*55]** told her that she would be committed if she returned to the workplace and thus she got medical authorization to be excused from work. Given the record and taking all inferences in plaintiff's favor, a reasonable jury could find that plaintiff quit because of the mounting harassment and that an objective person similarly situated would have done the same. Thus, defendant's motion for summary judgment fails on this count.

In conclusion, plaintiff has produced evidence from which a reasonable jury could find that she has satisfied the requirements for claims of discrimination and hostile work environment under the ADA and PHRA and retaliation under the FMLA. Thus, defendant's motion for summary judgment must be denied on all counts.

Date: March 3, 2014

/s/ David Stewart Cercone

David Stewart Cercone

United States District Judge

---