IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| | § | |
| Defendant | § | |

**PLAINTIFF'S MOTION TO COMPEL, REQUEST FOR A HEARING, AND REQUEST FOR SANCTIONS**

Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

## TABLE OF CONTENTS


I. Summary of the Argument 1

II. Applicable Law 2

A. The Duty to Disclose Contact Information of Persons with Relevant Knowledge 2

B. The Applicable Rules of Ethics 3

1. Rule 3.04(a): A Lawyer Shall Not Obstruct a Party's Access to Evidence 3

2. Rule 4.01: Truthfulness in Statements to Others 3

3. Rule 4.02: Communication with One Represented by Counsel 3

4. Representation of a Client's Individual Employees 5

II. Relevant Facts 7

A. Nature of the Case 7

B. The Conduct of Defendant and its Lawyers 7

1. Defendant failed to provide addresses and telephone numbers of witnesses and persons with knowledge of discoverable information. 7

2. Defendant obstructed access to witnesses and documents. 8

3. Defendant concealed an important document. 8

4. Defendant filed a frivolous motion as part of its efforts to obstruct Plaintiff's access to witnesses and evidence. 8

5. Counsel for Defendant Reneged on an Oral Agreement. 9

6. Defendant's attorneys may have falsely claimed certain current and former employees are their clients. 10

Prayer for Relief 11

Certificate of Conference 11

Certificate of Service 12

# TABLE OF AUTHORITIES


| Cases | Page(s) |
|---|---|
| Banks v. Office of Senate Sergeant-at-Arms, 222 F.R.D. 1 (D.D.C. 2004) | 3 |
| Dixon v. CertainTeed Corp., 164 F.R.D. 685 (D. Kansas 1996) | 2 |
| Harry A. v. Duncan, 330 F. Supp.2d 1133 (D. Mont. 2004) | 6 |
| Michaels v. Woodland, 988 F. Supp. 468 (D.N.J. 1997) | 6 |
| Rodriguez v. Christus Spohn Health Sys. Corp., No. C-09-95, 2011 U.S. Dist. LEXIS 114062 (S.D. Tex. Oct. 3, 2011) | 2 |
| Viveros v. Nationwide Janitorial Ass'n, Inc., 200 F.R.D. 681 (N.D. Ga. 2000) | 2 |
| **Rules** | |
| Fed. R. Civ. P. 26 | 2, 7 |
| Rule 83.8 of the Local Rules for the Northern District of Texas | 3 |
| ABA Model Rules of Professional Conduct | 3 |
| Rule 3.4 | 3 |
| Rule 3.4(a) | 5 |
| Rule 4.1(a) | 5 |
| Rule 4.2 | 3, 9 |
| Texas Disciplinary Rules of Professional Conduct | 3 |
| Rule 3.04 | 3 |
| Rule 4.01 | 3 |
| Rule 4.02 | 3-4, 5, 9 |
| ABA Formal Ethics Opinion 95-396 (1995) | 4 |
| Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court, Ohio Supreme Court Op. 2005-3 (2005) | 4 |
| Utah State Bar Ethics Advisory Opinion Committee, Op. 04-06 (2004) | 5 |

Wisconsin Professional Ethics Committee, Opinion E-07-01 (2007) ……………….. 4-5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00241-O |
| | § | |
| TARRANT COUNTY COLLEGE DISTRICT, | § | |
| Defendant | § | |

**PLAINTIFF'S MOTION TO COMPEL, REQUEST FOR A HEARING, AND REQUEST FOR SANCTIONS**

Plaintiff requests a hearing with the Court, an order compelling discovery from Defendant, and sanctions for the discovery abuse of Defendant and its attorneys.

## I. Summary of the Argument

From the beginning of this case, Defendant's lawyers have obstructed Plaintiff's access to evidence and fact witnesses. They have refused to provide the addresses and phone numbers of persons with knowledge of relevant facts. They concealed important documents. They moved to disqualify counsel for Plaintiff to chill his efforts to communicate with fact witnesses and obtain evidence from them. They reneged on an oral agreement between counsel. They may also have gone so far as to claim they personally represent certain fact witnesses with whom they have no attorney-client relationship, solely to obstruct Plaintiff's access to the witnesses.

To resolve these issues, Plaintiff asks the Court to issue an order setting this matter for hearing, ordering Defendant and its lawyers to show why the contact information has not been provided, and to show the basis for the claim that Defendant's counsel has an attorney-client relationship with the persons they claim to represent personally.

Plaintiff also requests such sanctions and other relief the Court deems fit under the circumstances.

## II. Applicable Law

### A. The Duty to Disclose Contact Information of Persons with Relevant Knowledge

Rule 26 of the Federal Rules of Civil Procedure requires a party to disclose the name, address, and telephone number of the persons a party might use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A). "The decisions interpreting Rule 26 make it clear that the home addresses and telephone numbers, if known, are required to be produced." *Rodriguez v. Christus Spohn Health Sys. Corp.*, No. C-09-95, 2011 U.S. Dist. LEXIS 114062, at *1 (S.D. Tex. Oct. 3, 2011) (citing cases).

Courts have rejected the argument that withholding this information is permissible to keep an opposing counsel from contacting employees who should not be contacted ex parte. *See Viveros v. Nationwide Janitorial Ass'n, Inc.*, 200 F.R.D. 681, 684 (N.D. Ga. 2000); *Dixon v. CertainTeed Corp.*, 164 F.R.D. 685, 689 (D. Kansas 1996). There are legitimate needs for, and ways to use, the contact information without violating ethical prohibitions against ex parte communications, and attorneys receiving the information are bound to follow the rules of ethics.

In the present case, Plaintiff needs the information in order to serve subpoenas for the attendance of certain witnesses at trial. Plaintiff has repeatedly asked counsel for Defendant to either provide the contact information or, for any employees they may represent individually, to accept service of subpoenas. So far Defendant's counsel has failed to commit one way or the other, at least with respect to some of the witnesses. The contact information is important, there is no legitimate reason why it was not disclosed in the first place, and the Court should order Defendant to disclose the addresses and phone numbers of all persons it had identified in disclosures, interrogatory answer, and in its witness list for trial.

**B. The Applicable Rules of Ethics**

Northern District of Texas Local Rule 83.8(e) adopts the Texas Disciplinary Rules of Professional Conduct (referred to herein as the "Texas Disciplinary Rules") as the standard for defining unethical behavior by an attorney. Because the Texas Disciplinary Rules are based on the ABA Model Rules of Professional Conduct ("ABA Model Rules"), the ABA Model Rules, and cases applying those rules, are also potentially applicable.

**1. Rule 3.4(a): A Lawyer Shall Not Obstruct a Party's Access to Evidence**

Texas Disciplinary Rule 3.04 states: "A lawyer shall not (a) unlawfully obstruct another party's access to evidence."[1] Fact witnesses are a source of evidence, and in the absence of some prohibition, a lawyer for a party should have free access to communicate with fact witnesses about the case. *See, e.g.*, *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 6 (D.D.C. 2004) ("[N]o one owns a witness, and each party to a lawsuit has an equal right to interview the witnesses who are not parties."). "[O]bstructing another party's access to a witness in any kind of case solely for the sake of obstruction is improper." *Id.*

**2. Rule 4.01: Truthfulness in Statements to Others**

Rule 4.01 of the Texas Disciplinary Rules states: "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person."

**3. Rule 4.02: Communication with One Represented by Counsel**

Texas Disciplinary Rule 4.02 generally prohibits a lawyer from communicating directly with someone about a matter when the lawyer knows the person is represented by counsel on that matter. When the client is an "organization" instead of a natural person, the prohibition applies to only two categories of persons: "(1) those persons presently having a managerial

---

[1] ABA Model Rule 3.4 contains the identical language quoted here.

responsibility with an organization or entity of government that relates to the subject of the representation, or (2) those persons presently employed by such organization or entity and whose act or omission in connection with the subject of representation may make the organization or entity of government vicariously liable for such act or omission." Texas Disciplinary Rule 4.02(c). The prohibition does not apply to all current employees, and it does not apply at all to communications with former employees. *See* Texas Disciplinary Rule 4.02(c) and comment 4.

In litigation, a lawyer representing an organization may not obstruct an opposing party from contacting fact witnesses by claiming to represent all of his client's employees. *See* ABA Formal Ethics Opinion 95-396[2] (a lawyer representing an organization "cannot insulate all employees from contacts with opposing lawyers by asserting a blanket representation of the organization."). At least three states that have issued ethics opinion on this matter concur.

> **Ohio.** The Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court has issued Ohio Supreme Court Op. 2005-3 (2005).[3] The opinion states: "Corporate counsel's assertion of blanket representation of the corporation and all its corporate employees is bluster. It is inappropriate."
>
> **Wisconsin.** The Professional Ethics Committee has issued Wisconsin Opinion E-07-01 (2007),[4] which states that there is "no basis" for an entity's lawyer to claim he represents all current and former employees of an organization. The opinion also states that a lawyer who makes this improper assertion may violate several rules of ethics, including

---

[2] A copy of this opinion is attached to this motion as Exhibit A. It is available online at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/formal_opinion_95_396.authcheckdam.pdf.

[3] A copy of this opinion is attached to this motion as Exhibit B. It is available online at https://www.ohioadvop.org/wp-content/uploads/2017/04/Op_05-003.pdf.

[4] A copy of this opinion is attached to this motion as Exhibit C. It is available online at https://www.wisbar.org/newspublications/wisconsinlawyer/pages/article.aspx?Volume=80&Issue=6&ArticleID=1238.

Wisconsin's versions of ABA Model Rule 4.1(a) (which prohibits a lawyer from making a false statement of fact or law to a third person), ABA Model Rule 3.4(a) (which prevents a lawyer from unlawfully obstructing another party's access to evidence), as well as rules prohibiting solicitation of clients and conflicts of interest. In short, the organization's lawyer may only claim to represent a current or former employee if he has the consent of the entity client, the individual, and has properly addressed conflicts.

**<u>Utah.</u>** The State Bar's ethics panel has expressed the same view as the foregoing Wisconsin opinion – that falsely claiming to represent current and former employees violates the rules of ethics:

> [I]n the absence of such a fully formed and proper attorney-client relationship, it is improper for corporate counsel to block opposing counsel's access to the other corporate constituents, by asserting an attorney-client relationship unless these individuals [are within one of the groups of persons deemed to be represented by Rule 4.2]. Similarly, it is improper to block opposing counsel's access to any former employee in the absence of a current fully formed and proper attorney-client relationship.

Utah State Bar Ethics Advisory Opinion Committee, Op. 04-06 (2004).[5]

By the same logic, a lawyer may not ethically claim to represent all employees who happen to have information relevant to the case, unless the lawyer has actually obtained the informed consent of each employee he claims to represent personally.

**4. Representation of a Client's Individual Employees**

If an organization's employee is not within one of the two categories described in Texas Disciplinary Rule 4.02(c), the employee might still be off limits to opposing counsel if the employee is truly represented by an attorney. However, as the foregoing ethics opinions and the

[5] A copy of this opinion is attached to this motion as Exhibit D. It is available online at http://www.utahbar.org/wp-content/uploads/2017/11/2004-06.pdf.

following cases illustrate, the actual informed consent of the individual employee would have to be demonstrated to show the employee is truly represented.

In *Michaels v. Woodland*, 988 F. Supp. 468 (D.N.J. 1997) a plaintiff sought to conduct informal ex parte interviews of fact witnesses employed by one of the defendants, a hospital. The defendants opposed such contact, claiming they had offered representation to each of the fact witnesses. *Id.* at 469. The district court easily concluded that a mere offer of representation was insufficient to form an attorney-client relationship and stated: "Absent any evidence that these potential witnesses have accepted the defendants' offer of representation, the court shall not blindly assume that they are actually represented." *Id.* at 474. There was no evidence supporting any actual attorney-client relationships, so the court granted plaintiff permission to contact the witnesses ex parte. *Id.* at 474-5.

In *Harry A. v. Duncan*, 330 F. Supp.2d 1133 (D. Mont. 2004), the court reached similar conclusion. A school district was being sued, and the law firm representing the district notified all of its employees that it represented the school district and each of them individually. *Id.* at 1141. One of the firm's lawyers even signed a declaration stating his firm represented the school and each of its employees with respect to the matter that was the subject of the lawsuit. *Id.* The court looked past the lawyer's declaration and rejected the notion that an attorney-client relationship could be created unilaterally by the law firm's notice to the employees.

As the foregoing cases and ethics opinions demonstrate, it is unethical for a lawyer to claim he represents an employee of his client unless the employee has formally consented to the representation. Furthermore, a Court should require evidence substantiating the claim, as opposed to assuming it to be true just because an attorney says so.

## III. Relevant Facts

### A. Nature of the Case

Plaintiff is a former employee of the Defendant, Tarrant County College District. Following her termination in 2013, Plaintiff filed this lawsuit alleging disabilities discrimination under both state a federal law.

### B. The Conduct of Defendant and its Lawyers

#### 1. Defendant failed to provide addresses and telephone numbers of witnesses and persons with knowledge of discoverable information.

In its initial disclosures, Defendant identified ten current employees as persons with knowledge of discoverable information. The disclosures did not provide their addresses and phone numbers as required by Rule 26. Instead, the disclosures said the employees "may be contacted through the undersigned counsel." App. 2.

In June 2016, Defendant answered an interrogatory which specifically asked for the "name, home address, and home or cell phone number" of persons with knowledge of relevant facts. App. 13. Defendant's answer listed the ten previously identified employees, plus four additional current or former employees. Defendant provided an address and telephone number for only two of these persons – all others were listed as "c/o Lu Pham, Dowell Pham Harrison LLP," followed by the law firm's address and telephone number. App. 13-16. Defendant did not object to proving the personal contact information for the persons, it simply did not do so.

On September 30, 2016, Defendant filed its Witness List identifying all fourteen previously-identified current or former employees, plus six additional current or former employees, as possible witnesses. Defendant did not provide contact information for any of these witnesses, but again listed them as "c/o Lu Pham." Dkt. 54 (Defendant's Witness List).

**2. Defendant obstructed access to witnesses and documents.**

Before discovery even began, Plaintiff disclosed that she would be seeking communications between the decision makers about their decision to terminate her. Defendant took the position that any text messages or other communications on their cell phones or personal devices were beyond TCCD's possession, custody, or control. Dkt. 8 (Joint Report Regarding Contents of Scheduling Order), pages 5-6 (discussion of item 10).

After receiving Defendant's Initial Disclosures, Plaintiff asked counsel for Defendant to either accept service of subpoenas to the likely decision makers, or to provide their contact information so Plaintiff could serve subpoenas. App. 7-8 (emails between counsel). Defendant refused to provide the contact information without offering any justification. Eventually, in December 2015, counsel for Defendant finally agreed to accept service of the subpoenas, *see* App. 9-10 (emails between counsel), but the unjustified refusal to disclose the contact information caused months of delay and considerable expense of time and effort.

**3. Defendant concealed an important document.**

Defendant failed to produce – and tried to hide the existence of – a brochure describing procedures for the Writing Lab where Plaintiff worked. This issue is the subject of a pending motion (Dkt. 74), so the facts will not be repeated here, but this conduct is extreme and should factor heavily into the Court's assessment of the conduct of Defendant and its counsel for purposes of this motion.

**4. Defendant filed a frivolous motion as part of its efforts to obstruct Plaintiff's access to witnesses and evidence.**

When investigating the facts of the case, counsel for Plaintiff learned of an English Professor at TCCD (Curtis Fukuchi) who was familiar with the operations of the Writing Lab.

After taking precautions to make sure that contacting Fukuchi was allowed by the rules of ethics, counsel for Plaintiff contacted him and obtained important factual information and documents.

Defendant moved to disqualify counsel for Plaintiff because he had communicated with Fukuchi. The motion was frivolous because it misrepresented the applicable ethical standards. *See* Dkt. 41 (Defendant's motion) Dkt. 46 at pages 8-9 (explaining why Defendant's argument had no merit after the 2002 revision to the rule, and would have been rejected even under the prior rule). The Court denied the motion. *See* Dkt. 71.

**5. Counsel for Defendant Reneged on an Oral Agreement.**

Comment 6 to ABA Model Rule 4.2 states: "A lawyer who is uncertain whether a communication with a represented person is permissible may seek a court order." Counsel for Plaintiff decided to seek such an order, and called opposing counsel, Lu Pham, on September 26, 2016 to confer on the motion. Pham agreed to provide the names of persons he contended to be off limits for ex parte communications,[6] and in the response to the motion to disqualify, Plaintiff requested an order identifying who could and could not be contacted. *See* Dkt. 46 at page 13 (Request for Clarification) and page 14 (Certificate of Conference confirming the discussion with Pham).

Although there was an oral agreement between counsel, Defendant never did identify who it believed to be off limits for ex parte communications. Rather, by letter dated October 28, 2016, counsel for TCCD claimed that all current and former TCCD employees should be considered off limits for ex parte contact. App. 21.

[6] *See* App. 20 (email from Don Uloth to Lu Pham regarding the oral agreement).

**6. Defendant's attorneys may have falsely claimed certain current and former employees are their clients.**

In the reply brief filed in support the motion to disqualify discussed above, Defendant stated: "Plaintiff's Counsel Has a Pattern and Practice of Contacting Employees Represented by TCCD's Counsel." TCCD then asserts that its attorneys also represent thirteen of its current and former employees, including Margaret Levy.[7]

Levy signed a declaration, which was filed along with TCCD's reply brief, but it does not say that she is represented by counsel. TCCD's brief cited Defendant's interrogatory answers as evidence of an attorney-client relationship between the employees and TCCD's lawyers, but the interrogatory answer suggests the opposite is true. The interrogatory answer expressly states that TCCD's lawyers represent two of the persons identified (Conrad Herrera and Nancy Ball), but do not make this claim regarding all of the other persons identified. App. 13-16 (Defendant's interrogatory answers). Unless there are additional facts unknown to counsel for Plaintiff, Defendant and its attorneys may have falsely claimed that TCCD's lawyers represent current and former employees.

Over the past four weeks, Plaintiff has made several attempts to get to the truth of the matter. Counsel for TCCD have reiterated the assertion that they represent several of Defendant's current and former employees, but they seem unwilling to answer when asked if they have actually obtained the informed consent of each person they claim to represent. *See* App. 22-26 (emails between counsel). Something is amiss here, and because Plaintiff and her counsel have so far been unable to ascertain the truth, Plaintiff has found it necessary to seek intervention from the Court.

---

[7] The reply brief lists the following as "Employees Represented by TCCD's Counsel:" Margaret Levy, Lynnelle Brown, Anita Biber, Dr. Ricardo Coronado, Dr. Christine Hubbard, Lily Covio-Calzada, Helen Yakub, Cecilia Sublette, Krestin White, Linda Freeman, Dr. Joe Rhode, and Nancy Ball. Dkt. 53 at p. 4.

The question concerning representation of individual employees is simple – for each employee, that employee has either consented to be represented, or has not. However, when asked if consent was obtained, opposing counsel dodges the question and simply states that his firm represents them. As in *Harry A. v. Duncan*, cited above, in which a lawyer filed a declaration claiming to represent all employees, this Court should look beyond the assertion to determine the underlying truth of the matter, and issue an order clarifying which employees and former employees of TCCD have given their informed consent to be represented by the law firm of Dowell Pham Harrison, LLP.

WHEREFORE, Plaintiff requests that this matter be set for hearing and the Court enter an appropriate order.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

**CERTIFICATE OF CONFERENCE**

I certify that on April 12, 2018, I conferred with Lu Pham regarding the relief requested herein. The motion is opposed. I have also tried to resolve these matters many times over many months by email and in other conversations, but the time has come to seek relief from the Court.

/s/ Donald E. Uloth
Donald E. Uloth

## CERTIFICATE OF SERVICE

I certify that on April 29, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel for Defendant.

/s/ Donald E. Uloth
Donald E. Uloth

**List of Attachments**

Cases

Rodriguez v. Christus Spohn Health Sys. Corp., No. C-09-95, 2011 U.S. Dist. LEXIS 114062 (S.D. Tex. Oct. 3, 2011).

Exhibits (ethics opinions)

A. ABA Formal Ethics Opinion 95-396 (1995)

B. Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court, Ohio Supreme Court Op. 2005-3 (2005)

C. Wisconsin Professional Ethics Committee, Opinion E-07-01 (2007)

D. Utah State Bar Ethics Advisory Opinion Committee, Op. 04-06 (2004)

Neutral
As of: April 30, 2018 12:34 AM Z

# Rodriguez v. Christus Spohn Health Sys. Corp.

United States District Court for the Southern District of Texas, Corpus Christi Division

October 3, 2011, Decided; October 3, 2011, Filed

CIVIL ACTION NO. C-09-95

**Reporter**
2011 U.S. Dist. LEXIS 114062 *

SUSANNA HINOJOSA RODRIGUEZ, VS. CHRISTUS SPOHN HEALTH SYSTEM CORPORATION, et al, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *Rodriguez v. Christus Spohn Health Sys. Corp., 2011 U.S. Dist. LEXIS 114078 (S.D. Tex., Oct. 3, 2011)*

**Prior History:** *Rodriguez v. Christus Spohn Health Sys. Corp., 2011 U.S. Dist. LEXIS 113426 (S.D. Tex., Sept. 30, 2011)*

## Core Terms

telephone number, employees, current employee, subject matter, home address, DISCLOSURES, lawsuit, opposing the motion, vicarious liability, subordinates, vicariously, disclose, omission, ethical, argues

**Counsel:** **[*1]** For Susanna Hinojosa Rodriguez, Plaintiff: Gay Ellen Gilson, LEAD ATTORNEY, Attorney at Law, Corpus Christi, TX; Adriaan Tieleman Jansse, Jansse and Moore PLLC, San Antonio, TX.

For Christus Spohn Health System Corporation, Christus Health, Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital Corpus Christi - Memorial, Defendants: David Reeves Iler, LEAD ATTORNEY, Warren Szutse Huang, Fulbright & Jaworski, Houston, TX; Jessica Paige Sykora, Fulbright Jaworski LLP, Houston, TX.

For John Hill, Defendant: F Edward Barker, LEAD ATTORNEY, Barker Leon et al, Corpus Christi, TX.

**Judges:** B. JANICE ELLINGTON, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** B. JANICE ELLINGTON

## Opinion

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S OPPOSED MOTION TO COMPEL SUPPLEMENTAL RULE 26 DISCLOSURES**

In this lawsuit plaintiff alleges that she was sexually assaulted by defendant John Hill, a mental health technician, while a private pay patient at defendant's hospital. Pending is plaintiff's opposed motion to compel CHRISTUS Spohn Health System Corporation d/b/a CHRISTUS Spohn Hospital Corpus Christi – Memorial (Spohn) to supplement its *Rule 26* Disclosures (D.E. 153). Spohn filed a response (D.E. **[*2]** 160). The motion is granted in part and denied in part.

*Rule 26 of the Federal Rules of Civil Procedure* requires a party to disclose, without awaiting a discovery request, "the name, and if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." *FED. R. CIV. P. 26(a)(1)(A)(i)*.

Plaintiff argues that Spohn failed to sufficiently detail the subject of the information required by the rule. Spohn responds that it gave a brief description of the subject matter about which the witness could testify by providing a list of all employees who provided care to plaintiff during her brief stay in the hospital. The court agrees with Spohn. Plaintiff failed to cite any law in support of her claim that the subject matter of the disclosure was insufficient. The motion to compel a more detailed description of the subject of the subject matter about which such witnesses could testify is DENIED.

Plaintiff also argues that she is entitled to the home addresses and telephone numbers, if known, of Spohn's **[*3]** current employees.[1] Spohn's response is that it need not provide home

[1] Spohn has already provided, or agreed to provide, plaintiff with its last known contact information for former employees.

addresses and telephone numbers because all persons presently employed by Spohn are represented by Spohn's counsel (under the theory that they are persons whose acts or omissions may create vicarious liability against Spohn), and it would be unethical for plaintiff's counsel to contact such persons.

It is certainly debatable whether all of the employees, nurses and records custodians can vicariously bind Spohn in this lawsuit,[2] but it is not presently necessary to decide this issue. The court will not speculate on whether plaintiff's counsel will violate ethical rules by contacting represented persons. It is assumed that she is ethical and she will not.

The decisions interpreting *Rule 26* make it clear that the home addresses and telephone numbers, if known, are required to be produced. *Dixon v. CertainTeed Corp., 164 F.R.D. 685, 689 (D.Kansas 1996)*; *Fausto v. Credigy Services Corp., 251 F.R.D. 427, 429 (N.D.Cal. 2008)*; *Thurby v. Encore Receivable Mgmt., 251 F.R.D. 620 (D.Colo. 2008)*; *Viveros v. Nationwide Janitorial Ass'n., Inc., 200 F.R.D. 681, 684 (N.D.Ga. 2000)*; and *Hartman v. American Red Cross, 2010 U.S. Dist. LEXIS 46126, 2010 WL 1882002 (C.D. Ill 2010)* **[*5]** (unreported). Spohn cited no law to the contrary.

Accordingly, plaintiff's request for the home addresses and telephone numbers of current Spohn employees, if known, is granted. The information shall be provided within fourteen days of the date of this order. Plaintiff shall not re-disclose this information to anyone, not even to her client, except as necessary in the context of this lawsuit.

All relief not granted by this order is DENIED.

ORDERED this 3rd day of October, 2011.

/s/ B. Janice Ellington

B. JANICE ELLINGTON

UNITED STATES MAGISTRATE JUDGE

End of Document

---

[2] It is well settled that a plaintiff in a ***Section 1983*** action cannot obtain damages or injunctive relief from a policy-maker or supervisor solely on a theory of *respondeat superior*. *Beattie v. Madison County School Dist., 254 F.3d 595, 600 n.2 (5th Cir. 1983)* (citing *Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))*. "[S]upervisory **[*4]** officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001)* (quoting *Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987))*. "***[Section] 1983*** does not give a cause of action based on the conduct of subordinates." *Thompson v. Steele, 709 F.2d 381, 382 (5th Cir.)*, cert. denied, ***464 U.S. 897, 104 S. Ct. 248, 78 L. Ed. 2d 236 (1983)*** (citations omitted). Spohn's argument that it represents all current employees because the actions of all current employees could make it vicariously liable for an act or omission is disingenuous and clearly at odds with its summary judgment position that it is not responsible for the actions of employee/defendant Hill.

# AMERICAN BAR ASSOCIATION

STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

**Formal Opinion 95-396** **July 28, 1995**

**Communications with Represented Persons**

*Rule 4.2 prohibits a lawyer from knowingly communicating with a represented person about the subject matter of the representation without the consent of that person's lawyer. This prohibition applies to the conduct of lawyers in both civil and criminal matters, and covers any person known to be represented by a lawyer with respect to the matter to be discussed.*

In the context of criminal investigations, nonetheless, it must be recognized that the Rule has been interpreted by some courts not to prohibit contacts by investigative agents acting under the general direction of a lawyer, with a person known to be represented in the matter being investigated, prior to arrest or the institution of formal charges.

The communicating lawyer is not barred from communicating with the represented person absent actual knowledge of the representation. Such knowledge may, however, be inferred from the circumstances; thus, a lawyer may not avoid the need to secure consent of counsel by closing her eyes to circumstances that make it obvious that the person to be communicated with is represented with respect to the matter in question.

The communicating lawyer is not barred from communicating with a represented person about topics that are not the subject of the representation.

When a corporation or other organization is known to be represented with respect to a particular matter, the bar applies only to communications with those employees who have managerial responsibility, those whose act or omission may be imputed to the organization, and those whose statements may constitute admissions by the organization with respect to the matter in question. Thus, a lawyer representing the organization cannot insulate all employees from contacts with opposing lawyers by asserting a blanket representation of the organization.

The fact that the represented person is the one who initiates a communication does not render inapplicable the prohibition on communicating about the subject matter of the representation.

When a person known to have been represented initiates contact with a lawyer and declares that she has terminated or intends to terminate the representation, the lawyer should obtain reasonable assurance that the representation has in fact been terminated before engaging in substantive discussion of

---

AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY, 541 N. Fairbanks Court, Chicago, Illinois 60611 Telephone (312)988-5300 CHAIR: Margaret C. Love, Washington, DC ❑ Richard L. Amster, Roseland, NJ ❑ Deborah A. Coleman, Cleveland, OH ❑ Ralph G. Elliott, Hartford, CT ❑ Lawrence J. Fox, Philadelphia, PA ❑ David B. Isbell, Washington, DC ❑ George W. Jones, Jr., Washington, DC ❑ Marvin L. Karp, Cleveland, OH ❑ Arthur W. Leibold, Jr., Washington, DC ❑ Kim Tayler-Thompson, Stanford, CA ❑ CENTER FOR PROFESSIONAL RESPONSIBILITY: George A. Kuhlman, Ethics Counsel; Joanne P. Pitulla, Assistant Ethics Counsel

© 1995 by the American Bar Association. All rights reserved.

the subject of the representation.

A lawyer may not direct an investigative agent to communicate with a represented person in circumstances where the lawyer herself would be prohibited from doing so. Whether in a civil or a criminal matter, if the investigator acts as the lawyer's "alter ego," the lawyer is ethically responsible for the investigator's conduct.

The bar against contacts with represented persons applies to all communications relating to the subject matter of the representation except those that fall within the narrow category of being "authorized by law." Communications "authorized by law" include communications that are constitutionally protected, and in addition, communications that are specifically authorized by statute, court rule, court order, statutorily authorized regulation or judicial decisional precedent.

Recent controversy concerning Rule 4.2 of the Model Rules of Professional Conduct (1983, as amended) has prompted this Committee to undertake a comprehensive consideration of the proper scope of the Rule.[1] The Rule as it now stands provides:

**Communication with Person Represented by Counsel**

In representing a client, a lawyer shall not communicate about the subject matter of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.[2]

The questions framing this examination of the Rule are these: (1) Does Rule 4.2 apply to the conduct of lawyers in criminal as well as civil matters? (2) Does a represented "party," under the Rule, mean only a person who is a formally designated party to an adjudicative proceeding, contract or negotiation, or does it apply more broadly to any person who is represented by counsel with respect to the matter that is the subject of the communication? (3) In the context of criminal investigations, does the prohibition apply differently before arrest or the filing of formal charges than it does after those events? (4) Does the prohibition apply if the communicating lawyer does not have definite knowledge that the person with whom she wishes to communicate is represented in the matter to be discussed? (5) What is the scope of the subject

1. This opinion was prompted in part by the dialogue between the American Bar Association and the United States Department of Justice in connection with the promulgation of the Department's regulations on Communications with Represented Persons, 28 C.F.R. Part 77.

2. This Committee has proposed an amendment to the Rule, to substitute "person" for "party" in the text of the Rule. That proposal will be submitted to the House of Delegates for consideration in August 1995. The change would resolve the ambiguity in the present Rule that is discussed in Part II of this Opinion. The Committee's proposal would also amend the Comment to the Rule to clarify certain matters regarding its proper scope as discussed in this Opinion in the text accompanying notes 36 and 38.

matter about which communication is prohibited? (6) May a lawyer representing a corporation or other organization bar communication with all employees of the organization by declaring a blanket representation of the organization and its employees? (7) May a lawyer communicate with a represented person absent consent of that person's lawyer if that person initiates the contact? (8) May a lawyer communicate with a person known to have been represented in the matter to be discussed who states that she has terminated or intends to terminate the representation? (9) To what extent does the prohibition on a lawyer's communicating with a represented person apply also to investigative agents acting under the direction of a lawyer? (10) What communications with represented persons fall within the "authorized by law" exception in Rule 4.2?

The Background and Purposes of the Anti-Contact Rule

While the debate about the scope and application of Rule 4.2's prohibition on contacts with represented parties has been heated, the controversy appears to be of relatively recent vintage. The ethical prohibition against such contacts has enjoyed a long history and broad acceptance. Its origin appears to be found in Hoffman's treatise, in 1836:

I will never enter into any conversation with my opponent's client, relative to his claim or defence, except with the consent, and in the presence of his counsel.[3]

Every ethical code promulgated by the American Bar Association has contained an anti-contact provision. Thus, the Canons of Professional Ethics, promulgated in 1908, included the following provision in Canon 9:

A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel.

Since that time, rules embodying this fundamental ethical precept, usually following one or another of the models offered by the ABA, have been adopted in every state.[4]

In DR 7-104(A)(1) of the ABA Model Code of Professional Responsibility, which superseded the 1908 Canons and in turn anteceded the Model Rules, the language closely resembles what is now found in Rule 4.2:

**Communicating With One of Adverse Interest.**

(A) During the course of his representation of a client a lawyer shall not:

---

3. 2 David Hoffman, A Course of Legal Study Addressed to Students and the Profession Generally 771 (2d ed. Baltimore 1836), quoted in John Leubsdorf, Communicating with Another Lawyer's Client: the Lawyer's Veto and the Client's Interests, 127 U. Pa. L. Rev. 683, 684 n.6 (1979).

4. See Roger C. Cramton & Lisa K. Udell, State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti-Contact and Subpoena Rules, 53 U. Pitt. L. Rev. 291, 292 n.3 (1992).

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in the matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

In addition, EC 7-18 of the Model Code set out the central proposition on which all of the anti-contact rules have rested:

The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel.

Implementing this fundamental premise, the anti-contact rules provide protection of the represented person against overreaching by adverse counsel, safeguard the client-lawyer relationship from interference by adverse counsel, and reduce the likelihood that clients will disclose privileged or other information that might harm their interests.[5]

## I. The Bar Against Communication With Represented Parties Applies to Criminal As Well As Civil Matters

Model Rule 4.2, like its predecessors, seeks to maintain a real barrier between the opposing lawyer and the represented person. In the context of a civil matter, the rule has been described as perhaps the sole barrier between the client and an overreaching opponent.[6] Similarly, the prohibition against communications with represented persons operates in a criminal matter to protect a represented person against harmful admissions and waivers of privilege that may result from interference with the client-lawyer relationship. Recognizing that communications in a criminal case may entail significant consequences for the represented person, the Department of Justice has noted that the reasons for an anti-contact rule apply to criminal proceedings, "perhaps with more force than in the civil context."[7]

Although there have been holdings to the contrary,[8] the Committee believes it is clear that Rule 4.2 applies to the conduct of lawyers in criminal as well as civil matters, including both federal and state prosecutors. It has been argued that, because the Rule applies to a lawyer only "[i]n representing a client," the Rule does not reach the conduct of a prosecutor since she does not represent a "client" in the ordinary sense.[9] However, the history of the

5. Cramton & Udell, supra note 4 at 325.

6. Id. See also Polycast Technology Corp. v. Uniroyal, Inc., 129 F.R.D. 621, 625 (S.D.N.Y. 1990) (stating that the anti-contact rule prevents lawyers from using superior skills and training to obtain "unwise statements" from an opposing party, protects privileged information, and aids in settlements by allowing lawyers skilled in negotiating to conduct discussions about the matter).

7. 4 Op. Off. Legal Counsel 576, 584 (1980) (concluding, however, that DR 7-104 did not prohibit federal criminal investigative activities because such activities are "authorized by law").

8. See, e.g., State v. Richmond, 560 P.2d 41, 46 (Ariz. 1976), cert. denied, 433 U.S. 915 (1977); State v. Nicholson, 463 P.2d 633, 636 (Wash. 1969).

9. See F. Dennis Saylor, IV & J. Douglas Wilson, Putting a Square Peg in a Round Hole: The Application of Model Rule 4.2 to Federal Prosecutors, 53 U. Pitt. L. Rev. 459 (1992).

Rule and its predecessors offers no support for any assertion that it was intended to exempt prosecutors. Moreover, a majority of court decisions have concluded that Rule 4.2 and its predecessor anti-contact rules apply to both federal and state prosecutors;[10] even though, as discussed in part III below, some decisions have also limited the Rule's application in the context of criminal investigations prior to arrest or indictment.

Defense counsel in criminal cases of course are also subject to the provisions of Rule 4.2. For example, suppose that co-Defendants Able and Baker are charged with a crime, and Lawyer representing Defendant Able wishes to communicate with Defendant Baker because she has reason to believe that he may be able to exculpate her client. If Lawyer knows that Defendant Baker is represented in that matter, she may not engage in any communications with Baker without the consent of Baker's lawyer.[11]

## II. The Bar Applies to Communications Not Only with Formal "Parties" but Also with Any Person Known to Be Represented with Respect to the Matter to Be Discussed

Although most frequently encountered in the context of litigation, Rule 4.2 applies (as have its predecessor anti-contact rules) in transactional circumstances as well. For example, suppose Buyer and Seller in a real estate transaction are each represented by counsel. The lawyer who represents Seller contacts Buyer, without leave of Buyer's lawyer, to suggest postponement of the closing. That communication would be prohibited under Rule 4.2 absent the consent of Buyer's lawyer. The same would of course apply to separately represented parties to negotiations leading to a closing, or to any other transaction or potential transaction.

Moreover, even in a litigation context, the application of the Rule does not depend on a proceeding having actually commenced, so that those involved in a dispute have become formal "parties." The Comment to Rule 4.2 makes

---

10. See generally, United States v. Hammad, 858 F.2d 834 (2d Cir. 1988), cert. denied, 498 U.S. 871 (1990); United States v. Thomas, 474 F.2d 110 (10th Cir.), cert. denied, 412 U.S. 932 (1973); In re Doe, 801 F. Supp. 478 (D.N.M. 1992); United States v. Lopez, 765 F. Supp. 1433 (N.D. Cal. 1991), rev'd on other grounds, 4 F.3d 1455 (9th Cir. 1993); Suarez v. State, 481 So.2d 1201 (Fla. 1985), cert. denied, 476 U.S. 1178 (1986); People v. Green, 274 N.W.2d 448 (Mich. 1979).

11. See United States v. Santiago-Lugo, Crim. No. 95-029 (D. P.R. June 6, 1995), 11 ABA Law. Man. Prof. Conduct 192 (criminal defense counsel who conducted ex parte interviews with co-defendants of their client censured for violating Rule 4.2); but cf. Grievance Comm. for the Southern District of New York v. Simels, 48 F.3d 640 (2d Cir. 1995) (holding that the lawyer for a criminal defendant was not barred from interviewing, without consent of his lawyer, a potential witness against his client in one matter, who was also a potential codefendant of his client in another matter, since in neither case was this individual a "party" in the same "matter" as the lawyer's client within the meaning of DR 7-104(A)).

plain that "the rule covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question."[12]

Much of the controversy regarding the scope of Rule 4.2 has turned on its use of the term "party." There is case law holding that in order for a person to be deemed a "party" under the Rule or its predecessors, at least in the criminal context, formal proceedings must have been initiated in which that person is named as a party.[13] A majority of the Committee believe, however, that the term "party," as used in Rule 4.2, should not be given so narrow a meaning. As pointed out above, the Comment to the Rule states that it applies to "any person, whether or not a party to a formal proceeding." And the word "party" has a broad as well as a narrow sense.[14]

The Committee recognizes that, as just indicated, the word "party" as used in the Rule is ambiguous -- an ambiguity compounded by the fact that the caption of the Rule refers to a "person" represented by counsel.[15] The key to resolving this ambiguity, the Committee believes, is consideration of the purposes intended to be served by the Rule. In this light, the broader sense of the word "party," taking it as equivalent to "person," is clearly the appropriate one.[16] The reasons for protecting uncounselled persons against overreaching

---

12. Rule 4.2 cmt. [3].

13. See United States v. Ryans, 903 F.2d 731, 739 (10th Cir.), cert. denied, 498 U.S. 855 (1990) ("We are not convinced that the language of [DR 7-104(A)(1)] calls for its application to the investigative phase of law enforcement" because "the rule appears to contemplate an adversarial relationship between litigants, whether in a criminal or a civil setting".) But see United States v. Hammad, 858 F.2d 834 (2d Cir. 1988), cert. denied, 498 U.S. 871 (1990) (DR 7-104(A)(1) applies prior to filing of formal charges).

14. Thus, the term "party" is commonly used to refer to persons beyond the technical parties involved in a matter. For example, "third party discovery" is frequently used with the same meaning as "non party discovery." Moreover, the definition of "party" appears in Black's Law Dictionary (6th ed. 1990) as "[a] person concerned or having or taking part in any affair, matter, transaction, or proceeding, considered individually."

See also Charles W. Wolfram, Modern Legal Ethics 611 (1986) (observing that "party" is a lawyerism that is intended to refer broadly to any "person" represented by a lawyer in a matter, and suggesting that while DR 7-104(A)(1) of the Model Code of Professional Responsibility "probably" prohibited contact with any represented person, Model Rule 4.2 clearly does); N.Y. State Bar Assoc. Comm. on Profl. Ethics, Op. 656 (1993) (interpreting N.Y. Disciplinary Rule 7-104(A)(1) as applying to communications between lawyer representing parent in child custody proceeding and child for whom a law guardian had been appointed even though the child is not a "party" to the proceeding); N.Y. State Bar Ass'n Comm. on Prof. Ethics Op. 463 (1977) (describing DR 7-104(A)(1) as an absolute proscription against communications with a represented person, not merely a technical party).

15. The comprehensive record of the deliberations of the Kutak Commission casts no light on the reason why the word "person" was used in the caption of the Rule while "party" was used in its text.

16. In order to eliminate the ambiguity arising from use of the term "party," described in the accompanying text, the Committee has proposed that the Rule be amended to substitute the word "person" for "party" in the body of the Rule. See note 2, supra.

by adverse counsel, protecting the client-lawyer relationship from interference by such counsel, and protecting clients from disclosing privileged information that might harm their interests, are not limited to circumstances where the represented person is a party to an adjudicative or other formal proceeding. The interests that the Rule seeks to protect are engaged when litigation is simply under consideration, even though it has not actually been instituted, and the persons who are potentially parties to the litigation have retained counsel with respect to the matter in dispute.[17]

The harms that may flow from the disparity in sophistication and skill between a lay person and a lawyer are as likely to occur prior to the initiation of formal proceedings as they are following the filing of papers. Indeed, the critical phase in the representation of a client may be precisely the period when a lawyer, using her professional skills and training, attempts to avoid the filing of a suit entirely or to shape prospective litigation. In such circumstances, a lawyer may, intentionally or otherwise, take advantage of unsophisticated persons who are represented by counsel and thereby circumvent the client-lawyer relationship. Rule 4.2 should, therefore, operate to prevent a lawyer from adversely affecting the relationship between a client and her lawyer even in the absence of a formal proceeding.[18]

If the Rule is to serve its intended purpose, it should have broad coverage, protecting not only parties to a negotiation and parties to formal adjudicative proceedings, but any person who has retained counsel in a matter and whose interests are potentially distinct from those of the client on whose behalf the communicating lawyer is acting. Such persons would include targets of criminal investigations,[19] potential parties to civil litigation,[20] and witnesses who

---

17. See, e.g., United States v. Jamil, 546 F. Supp. 646, 654 (E.D.N.Y. 1982), rev'd on other grounds, 707 F.2d 638 (2d Cir. 1983) (stating that DR 7-104(A)(1) protects a person who is a potential litigant); Florida State Bar Assoc. Comm. on Prof. Ethics, Op. 78-4 (1978) (stating that DR 7 104(A)(1) applies "whenever an attorney-client relationship has been established . . . regardless of whether or not litigation has commenced."); Mississippi State Bar, Op. 141 (1988) ("The actual filing of a lawsuit or intent to file a lawsuit is irrelevant to the question of whether the lawyer may communicate with the adverse party."); Texas State Bar Prof. Ethics Comm., Op. 492 (1994) (prohibitions of the Texas anti-contact rule, which is similar to Rule 4.2, apply "despite the fact that litigation is neither in progress nor contemplated.").

18. See Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct 730 (1993 Supp.). See, e.g., Comm. on Prof. Ethics and Conduct of the Iowa State Bar Assoc. v. Shepler, 519 N.W.2d 92 (Iowa 1994) (attorney's violation of DR 7-104(A)(1) resulted in disbarment when he obtained personal gain in a direct transaction with an elderly woman after being instructed to contact either her family or attorney regarding business matters).

19. See, e.g., United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976), cert. dismissed as improvidently granted, 436 U.S. 31 (1978). But see the discussion in Part III infra, regarding decisional authority limiting the Rule's application in criminal investigations prior to arrest or the filing of formal charges.

have hired counsel in the matter.[21] In sum, the Rule's coverage should extend to any represented person who has an interest in the matter to be discussed, who is represented with respect to that interest, and who is sought to be communicated with by a lawyer representing another party.[22]

## III. The Bar May Have More Limited Application to Criminal Investigations Prior to Arrest or the Filing of Criminal Charges

As has been noted, the reasons for the prohibition on contacts with represented persons apply at least as forcefully in the criminal as in the civil context; and in both contexts they apply before formal proceedings have been initiated as well as afterward. Nonetheless, a number of court decisions, mainly involving the conduct of undercover investigators or informants acting in concert with prosecutors, have limited the applicability of the Rule or its predecessor anti-contact rules in the criminal context, either holding the prohibition wholly inapplicable to all pre-indictment non-custodial contacts,[23] or holding it inapplicable to some such contacts by informants or undercover agents.[24] Some cases note that the Rule would apply if the communication had been made by the prosecutor himself, or at his specific direction.[25] Some courts have specifi-

---

20. See, e.g., Triple A Machine Shop, Inc. v. State, 261 Cal. Rptr. 493, 498 (Ct. App. 1989)(California anti-contact rule's prohibitions "attached once an attorney knew that an opposing party was represented by counsel even where no formal action had been filed."). See also decisions cited in note 17, supra.

21. See, e.g., United States v. Pinto, 850 F.2d 927 (2d Cir.), cert. denied, 488 U.S. 867 (1988) (holding that DR 7-104 applied where the prosecutor interviewed a represented witness who was a potential defendant); ABA Formal Op. 187 (1938) (holding that the prohibition in Canon 9 covers a party in a civil case who also is a prospective witness in the matter).

22. In the Committee's view, the decision in the Simels case, supra note 11, took an unduly narrow view of the anti-contact rule there involved, DR 7-104, in declining to hold the rule applicable to contact with a represented adverse witness and potential codefendant.

23. See United States v. Ryans, 903 F.2d 731, 740 (10th Cir.), cert. denied, 498 U.S. 855 (1990)(DR 7-104(A)(1) does not apply "during the investigation process before the initiation of criminal proceedings"); United States v. Heinz, 983 F.2d 609, 613 (5th Cir. 1993) (following Ryans).

24. See United States v. Jamil, 707 F.2d 638, 645-46 (2d Cir. 1983) (communication by undercover informant in pre-indictment non-custodial setting did not violate DR 7-104(A)(1) where informant was not acting as "alter ego" of prosecutor); United States v. Lemonakis, 485 F.2d 941, 954-56 (D.C. Cir. 1973) cert. denied, 415 U.S. 989 (1974) (DR 7-104 did not prohibit use of undercover informant in a pre-indictment, noncustodial circumstance because the informant's instructions from the prosecutor were not such as to make him the prosecutor's alter ego).

25. See United States v. Hammad, 858 F.2d 834, 838-40 (2d Cir. 1988), cert. denied, 498 U.S. 871 (1990) (DR 7-104(A)(1) applies prior to filing of formal charges, and undercover informant's use of sham subpoena, under specific direction of prosecutor, to trick suspect contributed to the informant's becoming the prosecutor's alter ego); United States v. Jamil, 546 F. Supp. 646, 654 (E.D.N.Y. 1982), rev'd on other grounds,

cally relied upon the Rule's use of the word "party"(as opposed to "person") to reach the conclusion that the Rule was not intended to apply to non-custodial pre-indictment communications with represented persons in the criminal context.[26] But at least one court has held that an anti-contact rule using the term "person" rather than "party" has no application to pre-indictment non-custodial investigations.[27] Some courts have appeared to take the view that since non-custodial pre-indictment communications with persons known to be represented would not violate the Sixth Amendment, such contacts should not be considered violative of anti-contact rules.[28] And some courts have expressed the view that applying a no-contact rule before indictment would unduly limit the government's ability to investigate suspected criminal activity.[29]

The Committee believes that to the extent those decisions suggest that the Rule has no application at all in the criminal context, or that it does not come into play until Sixth Amendment rights attach, they are not sound.[30] As one court has noted, since prosecutors have substantial control over the timing of an indictment, limiting the Rule to post-indictment communications could allow the government to "manipulate grand jury proceedings to avoid its encumbrances."[31] Moreover, applying the Rule to prohibit only post-indictment com-

---

707 F.2d 638 (2d Cir. 1983) ("Any direct communication between the Assistant United States Attorney, or a representative of his office, and the defendant occurring after the government became aware that he was represented by counsel would constitute a violation of DR 7-104(A)(1)."); People v. White, 567 N.E.2d 1368, 1386-87 (Ill. App.) appeal denied, 575 N.E.2d 922 (Ill. 1991) (holding, following Hammad, that DR 7-104 applies prior to filing of formal charges, but is only violated by use of an informer in such circumstances when the attorney/prosecutor is "intimately involved in the investigation", so as to make the informer his alter ego). See also United States v. Heinz, 983 F.2d at 615 (Parker, J., concurring in part and dissenting in part) (prosecutor's use of lawyer as undercover informant violated DR 7-104 because he was able to act as a "prosecutorial alter ego" for the government).

26. See, e.g., United States v. Ryans, 903 F.2d at 739 ("We are not convinced that the language of [DR 7-104(A)(1)] calls for its application to the investigative phase of law enforcement" because the rule's use of the word "party" "appears to contemplate an adversarial relationship between litigants, whether in a criminal or a civil setting.").

27. See In re Disciplinary Proceedings regarding John Doe, 876 F. Supp. 265 (M.D. Fla. 1993) (Florida version of Model Rule 4.2 should be interpreted consistently with that Rule in other circuits, notwithstanding the fact that it uses the word "person" rather than "party".).

28. See, e.g., United States v. Dobbs, 711 F.2d 84 (8th Cir. 1983); United States v. Kenny, 645 F.2d 1323 (9th Cir.), cert. denied, 452 U.S. 920 (1981); United States v. Heinz, 983 F.2d 609 (5th Cir. 1993).

29. See, e.g., United States v. Ryans, 903 F.2d at 739-40; United States v. Jamil, 707 F.2d at 745.

30. Accord ABA Informal Op. 1373 (1976) (finding that Canon 9 bars a prosecutor from sending a letter containing a plea offer to a represented person, even though the communication was pre-indictment).

31. United States v. Hammad, 858 F.2d at 839.

munications would render the rule of little use in the criminal context.[32]

The Committee also believes that, in criminal cases, Rule 4.2 is not simply coextensive with the Fifth and Sixth Amendments. While the Fifth and Sixth Amendments provide protections to individuals in the context of a criminal case, the Constitution establishes only the "minimal historic safeguards" that defendants must receive rather than the outer limits of those they may be afforded.[33] Ethics rules, on the other hand, seek to regulate the conduct of lawyers according to the standards of the profession quite apart from other laws or rules that may also govern a lawyer's actions. Consequently, by delineating a lawyer's duties to maintain standards of ethical conduct, ethical rules like Rule 4.2 may offer protections beyond those provided by the Constitution.[34]

The Committee recognizes that prohibitions against communications with a represented person can be an obstacle to investigation, but the search for truth is not the only value to which lawyers, including government lawyers, must respond. Indeed, the Sixth Amendment right to counsel puts limits on the government's investigatory efforts. The filing of an indictment, which triggers that constitutional right, may mean that the government can establish a prima facie case against the person charged, but more investigation is generally required ultimately to prove the person's guilt beyond a reasonable doubt. Thus, it could be argued that but for the attachment of the right to counsel, lawyers could arrange for undercover investigations

---

32. See Alafair S.R. Burke, Reconciling Professional Ethics and Prosecutorial Power: The Non-Contact Rule Debate, 46 Stan. L. Rev. 1635, 1642-45 (1994).

It should be noted that the Department of Justice's regulations on Communications with Represented Persons recognize that in limited circumstances, an anti-contact prohibition applies pre-indictment. Specifically, although the regulations take a categorical position that no one is a "party" until there is a formal proceeding in which he is named as such, 28 C.F.R. ß 77.3(a), they prohibit negotiation of a plea agreement, settlement, immunity agreement and other disposition of potential criminal charges with a represented person unless the communication was initiated by that person and the procedure referred to in the text, infra at note 51, has been followed, 28 C.F.R. ß 77.8. In addition, the accompanying amendments to the United States Attorneys' Manual forbid ex parte contacts with represented "targets" of investigations in all but exceptional circumstances. U.S.A.M. 9- 13.240 Overt Communications with Represented Targets. The manual defines a target as a person against whom the lawyer for the government "(a) has substantial evidence linking that person to the commission of a crime or to other wrongful conduct; and (b) anticipates seeking an indictment or naming as a defendant in a civil law enforcement proceeding."

33. United States v. Hammad, 858 F.2d at 839 (quoting McNabb v. United States, 318 U.S. 332, 340 (1943)).

34. Id. See also 4 Op. Off. Legal Counsel 576, 581 (1980) (stating that "DR 7-104, as generally interpreted, provides suspects and defendants with protections that the Constitution does not.").

involving contacts with the charged person. However, despite the resulting investigatory problems, the Sixth Amendment bars lawyers from "deliberately eliciting" information from a person who is represented unless her counsel is present or she expressly waives her right to counsel.[35] There are also statutory limitations on investigative techniques, which go beyond constitutional requirements.[36] And other ethical prohibitions indubitably restrict prosecutors' activities.[37] Similarly, Rule 4.2 imposes an additional burden on the opposing counsel to use investigatory means other than direct contact with a represented person.

All this said, the Committee recognizes that there is a body of decisional law that in effect concludes that the public interest in investigating crime may outweigh the interests served by the Rule in the criminal context, at least where the contacts are made with represented persons who have been neither arrested nor formally charged, and the contacts are made by undercover agents or informants and not by the government lawyers themselves (or by agents acting so closely under the lawyers' direction as to be their "alter egos"). Accordingly, the Committee believes that so long as this body of precedent remains good law, it is appropriate to treat contacts that are recognized as proper by such decisional authority as being "authorized by law" within the meaning of that exception stated in the Rule.[38]

## IV. The Bar Applies Only if the Communicating Lawyer Knows That the Person Sought To Be Communicated With Is Represented By Counsel in the Matter To Be Discussed; But Such Knowledge May Be Inferred from the Circumstances

The Rule's requirement of securing permission of counsel is limited to those circumstances where the inquiring lawyer "knows" that the person to whom he wants to speak is represented by counsel with respect to the subject of the communication.[39]

---

35. See Maine v. Moulton, 474 U.S. 159 (1985); Brewer v. Williams, 430 U.S. 387 (1977); Massiah v. United States, 377 U.S. 201 (1964).

36. E.g., 18 U.S.C.§ 2511 (prohibiting wiretapping without a warrant); 12 U.S.C.§3402 (limiting governmental access to financial records of customers of financial institutions).

37. E.g., Model Rule 3.8 (Special Responsibilities of a Prosecutor); Model Rule 4.1(a) (Truthfulness in Statements to Others); Model Rule 4.3 (Dealing with Unrepresented Persons); Model Rule 4.4 (Respect for Rights of Third Persons).

38. The Committee's proposal for amendment of Rule 4.2, discussed in note 2, supra, includes a proposed amendment to Comment [2] to the Rule, to recognize as "authorized by law" governmental investigative activities prior to the commencement of criminal proceedings and in addition civil enforcement proceedings when they have been held permissible by such judicial authority.

39. The purposes of the Rule, which is to say the reasons for requiring consent of counsel representing the person with whom communication is sought, clearly apply whether or not the inquiring lawyer is aware of the representation. Thus, the requirement that that lawyer know of the representation serves not to implement the purposes

The term "knows" is defined in the Terminology section of the Model Rules as follows:

> "Knowingly," "known," or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances.

"Know" does not mean "reasonably should know," which is also a defined term in the rules that does not appear in the text of Rule 4.2 although it does appear in Rule 4.3, "Dealing with Unrepresented Person" (which applies to the communication if the lawyer does not know that the person contacted is represented by counsel). [FN40] The Terminology provides that

"Should have known," when used in reference to a lawyer denotes that a lawyer of reasonable prudence and competence would ascertain the matter in question.

Thus, in the Committee's view, Rule 4.2 does not, like Rule 4.3, imply a duty to inquire. Nonetheless, it bears emphasis that, as stated in the definition of "knows" (set out above), actual knowledge may be inferred from the circumstances. It follows, therefore, that a lawyer may not avoid Rule 4.2's bar against communication with a represented person simply by closing her eyes to the obvious. [41]

## V. The Bar Is Limited to Communications Related to the Subject Matter of Both Representations

Rule 4.2 makes reference to the subject matter of two representations, and requires a link between them. Thus, it provides that "in representing a client," a lawyer shall not communicate "about the subject of the representation" -- referring to the lawyer's representation of her client. It goes on to refer to communications with one whom the lawyer knows to be "represented in the matter" -- requiring that the second representation be within the compass of

---

of the Rule but only to frame a rule of conduct that can as a practical matter reasonably be imposed. It would not, from such a practical point of view, be reasonable to require a lawyer in all circumstances where the lawyer wishes to speak to a third person in the course of his representation of a client first to inquire whether the person is represented by counsel: among other things, such a routine inquiry would unnecessarily complicate perfectly routine fact-finding, and might well unnecessarily obstruct such fact-finding by conveying a suggestion that there was a need for counsel in circumstances where there was none, thus discouraging witnesses from talking.

40. Rule 4.3 provides:

Dealing with Unrepresented Person

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

41. The Committee's proposed amendment to Rule 4.2 to substitute "person" for "party," discussed in note 2, supra, would also amend the Comment to deal more clearly with the requirement that the communicating lawyer know of the representation.

the inquiring lawyer's representation. This required connection between the two representations, imparted by the phrase "in the matter," significantly limits the scope of the prohibition.

If a person is represented by counsel on a particular matter, that representation does not bar communications on other, unrelated matters. For example, suppose a lawyer represents Defendant on a charge involving crime A. Under Rule 4.2, another lawyer may not, pursuant to a representation, either as prosecutor or as counsel for a co-defendant involving crime A, communicate with Defendant about that crime without leave of Defendant's lawyer. However, if the communicating lawyer represents a client with respect to a separate and distinct crime B and wishes to contact Defendant regarding that crime, the representation by counsel in crime A does not bar communications about crime B. Similarly, the fact that Defendant had been indicted on crime A would not prevent the prosecutor from communicating with Defendant, directly or through investigative agents, regarding crime B.[42]

Questions regarding the scope of representation "in the matter" have arisen in the context of investigations of ongoing criminal enterprises. Can a lawyer representing persons believed to be involved in organized crime bar communications with her clients by advising the prosecutor that she represents these clients in all matters, without specification of what the matters are? Or may an individual insulate herself from undercover investigation in a criminal matter by retaining "house counsel?" The Committee believes that in both situations, and quite apart from the latitude that, as explained in part III above, the courts have allowed for undercover investigative contacts before arrest or indictment, the prosecutor is not barred from communicating under the Rule.

By prohibiting communication about the subject matter of the representation, the Rule contemplates that the matter is defined and specific, such that the communicating lawyer can be placed on notice of the subject of representation. Thus, if the representation is focused on a given matter, such as one involving past conduct, and the communicating lawyer is aware of this representation, she may not communicate with the represented person absent consent of the representing lawyer. However, where the representation is general -- such as where the client indicates that the lawyer will represent her in all matters -- the subject matter lacks sufficient specificity to trigger the operation of Rule 4.2.

Similarly, retaining counsel for "all" matters that might arise would not be sufficiently specific to bring the rule into play. In order for the prohibition to apply, the subject matter of the representation needs to have crystallized between the client and the lawyer. Therefore, a client or her lawyer cannot

---

42. As a practical matter, in the course of contact with a person represented by counsel in another matter, the communicating lawyer would be well advised to take care not to elicit comments or attempt to communicate about crime A. However, Rule 4.2 does not preclude discussions of crime B.

simply claim blanket, inchoate representation for all future conduct whatever it may prove to be, and expect the prohibition on communications to apply. Indeed, in those circumstances, the communicating lawyer could engage in communications with the represented person without violating the rule.

In the civil context also, the "matter" with which the representation is concerned must have been concretely identified. For example, suppose that Corporation A wishes to purchase a subsidiary of Corporation B. Corporation B has an on-going relationship with outside counsel, law firm XYZ, such that the firm represents the corporation on all of its legal matters. In addition, Corporation A knows that XYZ law firm always represents Corporation B in its legal matters. However, Corporation A has not broached with Corporation B the possible purchase of Corporation B's subsidiary, and thus the general counsel for Corporation A has no reason to believe, let alone to know, that Corporation B has consulted its counsel regarding such an acquisition. In such circumstances, because the representation by outside counsel is not specifically focused on the matter, the general counsel for Corporation A is not barred by Rule 4.2 from contacting the president of Corporation B to initiate discussions without asking law firm XYZ for its consent. Correspondingly, the XYZ firm cannot preclude such a communication by announcing that it represents Corporation B for all purposes. A similar analysis applies as respects in-house general counsel, who represent the corporation for all purposes.[43]

## VI. Representation of an Organization Does Not Bar Communications with All Employees of the Organization

Questions arise as to the manner in which the Rule applies when the represented party is a collective entity, such as a corporation, rather than an individual. Specifically, the Committee has considered whether a lawyer's representation of an organization extends the Rule's prohibition, either automatically or upon the declaration of the organization's lawyer, to cover communications with all employees or members of that organization.

Some courts addressing this issue have found that the represented party is limited to corporate employees who fall within the "control group": those employees who manage and speak for the corporation.[44] The Comment to Rule 4.2, however, makes plain that the term represented party refers not only to those with managerial responsibilities but to anyone who may legally bind

---

43. As a practical matter, to be sure, a lawyer wishing to open a dialogue with a person or entity known to be generally represented by a particular firm or by in-house counsel may find it more expeditious and less likely to generate dispute to communicate through counsel.

44. See, e.g., Wright ex rel. Wright v. Group Health Hosp., 691 P.2d 564 (Wash. 1984) (applying Model Code of Professional Responsibility DR 7-104(A)).

the organization with respect to the matter in question.[45] Consequently, when the party is an organization, the bar against communication covers not only the control group but in addition anyone "whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."[46]

Expansive though the Rule's coverage is with respect to officers and employees of a represented organization, the Rule does not contemplate that a lawyer representing the entity can invoke the rule's prohibition to cover all employees of the entity, by asserting a blanket representation of all of them. So, for example, if in-house counsel for the XYZ corporation announces that no one may talk to any XYZ employee without obtaining in-house counsel's permission, the communicating lawyer is not barred from communicating with all employees. If an employee cannot by statement, act or omission bind the organization with respect to the particular matter, then that employee may ethically be contacted by opposing counsel without the consent of in-house counsel. Of course, if individual employees have their own counsel in the matter, then the bar against communication would apply absent consent of that separate counsel. But the fact that an entity is represented by counsel does not prevent communication with all current employees of the represented corporation.[47]

## VII. Initiation of the Contact by the Represented Person Does Not Remove the Bar

Another issue arising under the Rule is whether the prohibition against communications with represented persons applies if the represented person

---

45. Comment [2] provides:

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f).

46. Accord, Upjohn Co. v. United States, 449 U.S. 383 (1981); Chancellor v. Boeing Co., 678 F. Supp. 250, 253 (D. Kan. 1988); Shearson Lehman Bros., Inc. v. Wasatch Bank, 139 F.R.D. 412 (D. Utah 1991); Morrison v. Brandeis University, 125 F.R.D. 14, 16-17 (D. Mass. 1989); Niesig v. Team I, 76 N.Y.2d 363 (1990). See ABA Informal Op. 1410 (1978) (stating that DR7-104(A)(1) bars communication with an officer or employee of a corporation in a particular situation unless the communicating lawyer has the prior consent of the lawyer representing the corporation).

47. It should be noted that Rule 4.2 does not prohibit contacts with former officers or employees of a represented corporation, even if they were in one of the categories with which communication was prohibited while they were employed. This Committee so concluded in ABA Formal Op. 91-359 (1991).

initiates contact with the communicating lawyer. Rule 4.2 exempts communications if the lawyer representing the contacted person consents; but the Rule says nothing about permitting the represented person to forego the protection accorded him by the ethical responsibilities of the communicating lawyer. This Committee concluded in Formal Opinion 108 (1934) that the anti-contact rule does not contemplate such a waiver.

Since then, a number of courts have similarly found that because the ethical prohibition is designed, in part, to protect the effectiveness of the lawyer's representation, the represented person may not waive it.[48]

While the Committee recognizes that not allowing the represented person to waive the Rule's protection may be seen as paternalistic, it believes that Rule 4.2 requires that result. Reflecting the concern that the represented person may not be in a position to make an informed waiver of the presence of counsel, the Rule operates to reduce the likelihood of the represented person engaging in communications that might ultimately prove harmful to her cause by imposing a strict ethical obligation on the communicating lawyer.[49]

## VIII. When Contact Is Initiated by a Person Who Is Known to Have Been Represented by Counsel in the Matter But Who Declares That the Representation Has Been or Will Be Terminated, the Communicating Lawyer Should Not Proceed Without Reasonable Assurance that the Representation Has in Fact Been Terminated

Of course, any represented person retains the right to terminate the representation. In the event that such a termination has occurred, the communicating lawyer is free to communicate with, and to respond to communications from, the former represented person. The communicating lawyer's conduct would then be governed by Rule 4.3, Communications with Unrepresented Persons. [50]

As a practical matter, a sensible course for the communicating lawyer would generally be to confirm whether in fact the representing lawyer has been effectively discharged. For example, the lawyer might ask the person to provide evidence that the lawyer has been dismissed. The communicating

---

FN48. See, e.g., United States v. Lopez, 4 F.3d 1455, 1459 (9th Cir. 1993) ("the trust necessary for a successful attorney-client relationship is eviscerated when the client is lured into clandestine meetings with the lawyer for the opposition. As a result, uncurbed communications with represented parties could have deleterious effects well beyond the context of the individual case...."); People v. Green, 274 N.W. 2d 448, 453 (Mich. 1991) (defendant's willingness to speak does "not excuse compliance with the standard of professional conduct prescribed by DR 7-104(A)(1)"); United States v. Thomas, 474 F.2d 110, 111 (10th Cir.), cert. denied, 412 U.S. 932 (1973); United States v. Batchelor, 484 F. Supp. 812 (E.D. Pa. 1980); State v. Morgan, 646 P.2d 1064, 1068-70 (Kan. 1982); State v. Ford, 793 P.2d 397, 401 n.4 (Utah App. 1990).

49. See Lopez, 4 F.3d at 1462 (finding that "[t]he rule against communicating with represented parties is fundamentally concerned with the duties of attorneys, not with the rights of parties.").

50. See note 40, supra.

lawyer can also contact the representing lawyer directly to determine whether she has been informed of the discharge. The communicating lawyer may also choose to inform the person that she does not wish to communicate further until he gets another lawyer.

There are some circumstances where the communicating lawyer may need to go beyond determining that the person has discharged her lawyer. One is that in a criminal case where the Court has appointed a lawyer to represent the client, the lawyer is not relieved as counsel of record until the court grants her leave to withdraw. Consequently, even if the contacted person tells the communicating lawyer that she has fired her lawyer, the communicating lawyer may not proceed without reasonable assurance that the court has granted the lawyer leave to withdraw. Similarly, if retained counsel has entered an appearance in a matter, whether civil or criminal, and remains counsel of record, with corresponding responsibilities, the communicating lawyer may not communicate with the person until the lawyer has withdrawn her appearance. In addition, if a communicating lawyer knows that the represented person is incompetent, that person's statement regarding the status of her representation may not be sufficiently reliable to allow the communicating lawyer to assume that she is free to engage in communications with the person.

On the other hand, there may be situations, particularly in the criminal context, in which the represented person is reluctant to terminate her relationship with counsel, or wishes to negotiate with the prosecutor without the knowledge of her counsel, because of doubt as to whether the lawyer representing her is in fact concerned with protecting her interests as distinct from protecting the interests of others who may have arranged for her representation. Even in such circumstances, the prohibition of Rule 4.2 against communications with the represented party applies, at least until the lawyer seeking to communicate with that person has assurance that the representation that the person is seeking to disclaim has been either terminated or superseded by a new representation. A useful course of action in such circumstances may be to request a court (if there is one with jurisdiction) to hold an ex parte hearing to appoint new counsel or give approval to the communication without counsel.[51] While arranging for such a hearing, the communicating lawyer should refrain from offering advice or engaging in other substantive discussions with the person in question until the court has acted.[52]

## IX. A Lawyer Is Ethically Responsible for Contacts by Investigators Acting Under Her Instructions That Would Violate the Bar if Made by a Lawyer

The next issue the Committee has undertaken to address concerns the applicability of Rule 4.2 to the activities of investigators working with

---

51. The Department of Justice regulations on Communications with Represented Persons contemplate such a procedure. 28 C.F.R. ß 77.6(c).

52. Accord, Mich. State Bar Comm. on Prof. and Jud'l. Ethics, Op. 202 (April 5, 1965).

lawyers; and in particular, the circumstances where a lawyer may be held vicariously responsible if an investigator collaborating with her communicates with a represented person without the consent of the representing lawyer.

There is no doubt that the use of investigators in civil and criminal matters is normal and proper. Particularly in the criminal context, there are legitimate reasons not only for the use of undercover agents to conduct investigations, but for lawyers to supervise the acts of those agents.[53] And the investigators themselves are not directly subject to Rule 4.2, even if they happen to be admitted to the Bar (as many FBI agents are), because they are not, in their investigative activities, acting as lawyers: they are not "representing a client."[54] However, when the investigators are directed by lawyers, the lawyers may have ethical responsibility for the investigators' conduct.

Such responsibility will ordinarily arise under Rule 5.3, which provides in part:

> Responsibilities Regarding Nonlawyer Assistants
>
> With respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> * * *
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
>
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer is a partner in the law firm in which the person is

---

53. Lawyer supervision of the activities of investigators is likely to make their work product more useful, and to provide assurance against the commission of improprieties by the investigators.

54. Although there appears to be no decisional authority on the point, it seems clear, and widely understood, that the fact that an investigator is also a member of the bar does not render him, in his activities as an investigator, subject to those ethical rules -- the overwhelming majority of the provisions of the Model Rules -- that apply only to a lawyer "representing a client." Such an investigator would nonetheless be subject to those few provisions of the Model Rules, such as portions of Rule 8.4 (Misconduct) that apply to lawyers even when they are not acting as such. See, e.g., Rule 8.4(b): "It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

Thus, the Department of Justice regulations on Communications with Represented Persons exclude from the defined term "attorney for the government" (with whose activities the regulations are principally concerned), "any attorney employed by the Department of Justice as an investigator or other law enforcement agent who is not authorized to represent the United States in criminal or civil law enforcement litigation or to supervise such proceedings." 28 C.F.R. § 77.2(a).

> employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Under these provisions, if the lawyer has direct supervisory authority over the investigator, then in the context of contacts with represented persons, the lawyer would be ethically responsible for such contacts made by the investigator if she had not made reasonable efforts to prevent them (Rule 5.3(b)); if she instructed the investigator to make them (Rule 5.3(c)(1)); or if, specifically knowing that the investigator planned to make such contacts she failed to instruct the investigator not to do so (Rule 5.3(c)(2)).

The Committee believes, however, that if, despite instruction to the contrary, an investigator under her direct supervisory authority (or one not under such authority) made such contacts, she would not be prohibited by Rule 5.3 from making use of the result of the contact.[55] Rule 8.4(a) imposes similar, albeit narrower, ethical limits on what a lawyer can direct an investigator to do. Rule 8.4(a) provides:

> Misconduct
>
> It is professional misconduct for a lawyer to:
>
> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

Since a lawyer is barred under Rule 4.2 from communicating with a represented party about the subject matter of the representation, she may not circumvent the Rule by sending an investigator to do on her behalf that which she is herself forbidden to do.[56] Whether in a civil or a criminal matter, if the investigator acts as the lawyer's "alter-ego," the lawyer is ethically responsible for the investigator's conduct.

---

55. Although the question is a close one, the Committee does not believe that a lawyer's making use of evidence offered by an investigative agent by means that would have been forbidden to the lawyer herself but in which she was not complicitous would constitute "ratification" under Rule 5.3(c)(1).

"Ratify" is defined by Black's Law Dictionary (6th ed. 1990) as:

To approve and sanction; to make valid; to confirm; to give sanction to. To authorize or otherwise approve, retroactively, an agreement or conduct either expressly or by implication.

56. See ABA Informal Op. 663 (finding that Canon 9 prohibits employment of investigator in defense of malpractice suit to communicate with plaintiff who was represented by counsel); ABA Formal Op. 95 (1933) (finding that it is improper under Canon 9 for a municipal lawyer to permit police officers to obtain written statements from persons having personal injury claims against the municipality when the lawyer knows that the claimants are represented by counsel). See, e.g., Shantz v. Eyman, 418 F.2d 11, 13 (9th Cir. 1969); cert. denied, 397 U.S. 1021 (1970) (finding that a prosecutor acted unethically by sending a psychiatrist to speak with a represented defendant without counsel's knowledge).

## X. There Are Several Categories of Communications That Are "Authorized by Law"

The final issue the Committee has undertaken to address is the scope of the exception in Rule 4.2 permitting otherwise prohibited communications if they are "authorized by law." That exception first appeared in the black letter text of DR 7-104(A)(1), but had been found to be implied in Canon 9,[57] and is now to be found in the anti-contact rule of every jurisdiction but one.[58]

The Comment to Rule 4.2 identifies, as an example of a communication authorized by law, "the right of a party to a controversy with a government agency to speak with government officials about the matter" -- the right in question being First Amendment right of petition.[59] The "authorized by law" exception to the Rule is also satisfied by a constitutional provision, statute or court rule, having the force and effect of law, that expressly allows a particular communication to occur in the absence of counsel -- such as court rules providing for service of process on a party,[60] or a statute authorizing a government agency to inspect certain regulated premises.[61] Further, in appropriate circumstances, a court order could provide the necessary authorization.[62]

As has been explained in part III above, an additional category of circumstances that appear to be fairly treated as "authorized by law" are those where courts have held that certain criminal investigative activities prior to arrest or the filing of formal charges, such as the use of undercover agents or informers not acting as the prosecutor's "alter ego," are not prohibited by the Rule.

A more difficult issue is raised by the Department of Justice regulations on Communications with Represented Persons,[63] which are evidently intended to rest squarely on the "authorized by law" exception in Rule 4.2. That issue is what, if any, directives by a governmental department or agency purporting to permit contacts with represented parties fall within the "authorized by law" exception? The Committee believes that such directives will qualify as "law" for purposes of the Rule only when embodied in formal regulations that have been properly promulgated pursuant to statutory authority that contemplates

57. See ABA Informal Op. 985 (1967) (opining that a formal offer of judgment could, consistently with Canon 9, be served directly upon a represented opposing party, but only if this was specifically authorized by statute, and if a copy was simultaneously served on counsel).

58. The single exception is Florida. See Florida Rules of Prof. Conduct, Rule 4-4.2. See also In re Disciplinary Proceedings regarding John Doe, 876 F. Supp. 265 (M.D. Fla. 1993), discussed in note 27 supra.

59. Rule 4.2 cmt. [2]. See also Wolfram, supra note 14, at 614-15.

60. See Hazard & Hodes, supra note 18, at § 4.2.109 (1994 Supp.)

61. See ABA Informal Op. 1496 (1983) (an agency lawyer may conduct an inspection of regulated business premises without first contacting the lawyer for the business).

62. See United States v. Lopez, 989 F.2d 1032, 1099 amended, 4 F.2d 1455 (9th Cir. 1993) (noting that a court order, if it is to authorize an exception to the Rule's pro hibition, must be based upon accurate, and not misleading, information).

63. 28 C.F.R. Part 77.

regulation of the character in question. Were any other regulation or fiat by an agency head to be considered an authorization by law, any government agency could "authorize" its lawyers to engage in conduct expressly prohibited by ethical codes simply by promulgating a regulation or policy.[64]

The Committee's view finds support in Chrysler v. Brown, 441 U.S. 281, 198 (1979), where the Supreme Court rejected the view that any agency conduct that has been directed or approved by an agency head is "authorized by law," within the meaning of a statute prohibiting such conduct except where "authorized by law." Rather, the Court held that for a government agency's regulation to have the force and effect of law, it must be a substantive regulation, which has been adopted in accordance with the procedural requirements imposed by Congress, and also rooted in a Congressional grant of authority. Chrysler v. Brown teaches that when an agency promulgates regulations purporting to authorize conduct in derogation of other law, those regulations must be grounded in a statute which contemplates regulations of the kind issued. A general grant of regulatory authority to an agency is not sufficient to support the issuance of regulations that permit what other law forbids. Although in Chrysler v. Brown the federal agency regulations in issue would have overridden requirements of a federal statute, the Committee believes the same result should be reached if the other law involved were rules of professional conduct adopted by state courts -- or, for that matter, federal courts.[65]

CONCURRENCE

This is an important opinion addressing critical issues arising under Model Rule 4.2 and putting to rest a series of misguided notions that have been asserted by those who seek to undermine the sanctity of the lawyer-client relationship embodied in the provisions of Model Rule 4.2. There is nothing more central to what it means to be a client in the American system of justice than to know that, having hired a lawyer, the client need not worry about being taken advantage of by lawyers, with special skills and training, who represent others. Once the client's representation is disclosed, all lawyers are on notice that they must deal with the client's lawyer on all matters, unless the represented person's lawyer provides otherwise. Whether the matter is civil,

---

64. As has been noted above, ethical rules prohibiting communications with represented persons have been adopted in every state as a part of comprehensive ethics regulations. Lawyers representing the federal government are governed by these rules as a result of the specific requirement by Congress that federal attorneys be "duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia." Department of Justice Appropriation Authorization Act, Fiscal Year 1980, Pub. L. No. 96-132, § 3(a), 93 Stat. 1044, as carried forward in Pub. L. No. 103-317, § 102, 108 Stat. 1734 (1994).

65. Although the Committee believes, as stated, that the Chrysler v. Brown test is an appropriate one for interpreting the term "authorized by law" in Rule 4.2, we express no view as to whether the Department of Justice regulations have sufficient statutory authorization to meet that test.

criminal or transactional, whether a complaint has been filed, an indictment brought, a tax audit commenced or an agreement of sale signed, whether an adverse party, a co-defendant or plaintiff, a witness or a participant in a transaction, all clients who have hired lawyers should benefit from the protection of Rule 4.2. Nor may a lawyer avoid the rule by using non-lawyer agents to undertake what the lawyer is prohibited from doing, by maintaining studied ignorance of the representation, or by claiming the represented person initiated the contract.

This concurrence is filed to address several points on which the author believes the majority opinion and the dissents do not have it quite right. First, the Committee observes in the headnote that "the Rule has been interpreted by some courts not to prohibit contacts by investigative agents acting under the general direction of a lawyer with a person known to be represented . . . " While this statement is correct, it doesn't explain to the unsuspecting, who might only read the syllabus, that almost all of those cases rely on reasoning which this opinion rejects, reasoning which this Committee, in issuing this Opinion describing what it believes to be the correct interpretation of the Rule, hopes courts in the future will also reject.

For too long, the mere repetition of the words "legitimate needs of prosecutors" has been used by the opponents of the principles of Model Rule 4.2 to undermine the protections the Rule is intended to provide. In responding to this litany, some of these courts, quite incorrectly, have eviscerated the Rule in the very situations where it is most needed: to protect from improper contacts those represented persons who face the awesome power of the government. Once a person has retained a lawyer in a matter, as this Opinion so carefully reasons, then all contacts are to be through that lawyer, and any contacts that are made on any basis other than through the lawyer, are in violation of the Rule.

Second, the majority opinion addresses by indirection the Department of Justice regulations on Communications with Represented Persons, regulations which by their terms are premised on so-called principles that are rejected out-of-hand in this opinion. More important, those regulations are clearly not authorized by law. There is no Congressional grant of authority to the Justice Department to issue regulations undermining the fundamental rights of clients to be represented by counsel. Moreover, regulation of lawyers, including Justice Department lawyers, has been traditionally and quite properly left to the states. Indeed, in the author's view, there could never be a delegation to the Justice Department or other law enforcement agency to set its own ethics rules unilaterally. When the drafters of Model Rule 4.2 inserted the words "authorized by law" they must have had in mind law established by either the courts or the legislature.

The Department of Justice regulations demonstrate the evil of having one party to disputed matters have that power. The regulations provide for loopholes so large that in some contexts they render the protections of Model Rule

4.2 meaningless. To ever permit a litigant (particularly one as powerful and capable of threatening represented parties as the Justice Department) to decide what rules will govern its own lawyers unbalances the judicial process in a fundamental, unfortunate and inequitable way.

Third, addressing Mr. Elliot's dissent, its flawed interpretation of Model Rule 4.2 as limited to "parties," not "persons," becomes apparent if one analyzes one of his opinion's examples. In trying to explain how, on the basis of principle, he is able to decide who is a party (and therefore entitled to the protection of the rule) and who is a person (and therefore not), Mr. Elliot explains that "[i]n a real estate transaction, the buyer and seller would be 'parties,' and, if represented, could not contacted by the other's attorney absent consent of their own attorney. The buyer's mortgagee bank and the seller's bank whose mortgage the buyer would have to pay off would not be 'parties,' even if represented." This result will come as a great surprise to those in our profession who represent lenders, underwriters and other key "players" in transactions; in those situations, when it is made known that the bank or investment company will be represented by counsel, there should be every expectation, based on Model Rule 4.2, that lawyers for the buyer and seller would not be contacting the bank or investment company directly. If Mr. Elliot thinks otherwise, then that is but one more reason to conclude that Model Rule 4.2 was intended to reach these "persons" as well as the buyer and seller "parties." The buyer, the seller, the bank, the title company, the investment banker, the auditor and any other represented persons to a transaction, by the sole fact they choose to be represented by counsel, are entitled to the full protection of Model Rule 4.2, whether they meet Mr. Elliot's strained interpretation of party or not.

Finally, addressing Mr. Amster's dissent, while I share his view that the protections of Model Rule 4.2 are even more important in the criminal context, this does not mean that those protections should not be available to all clients, including organizations. The Rule recognizes, quite properly it seems, that the lawyer who represents an organization should not be able to prevent unsupervised contacts with all organization employees. By the same token, it recognizes that in order for an organization's lawyer to provide effective representation, contacts with employees having managerial responsibility, and any person whose act or omission in connection with the matter may be imputed to the organization or whose statement may constitute an omission must be prohibited. Any other rule would make it impossible for organization clients to receive the same level and quality of representation accorded to individuals. This may, as Mr. Amster notes, interfere with informal fact gathering but the need to resort to formal fact gathering is a very small price to pay for the important protections Model Rule 4.2 provides.

Lawrence J. Fox

Kim Taylor-Thompson

**DISSENTS**

I cannot go along with this opinion. It is overbroad and obstructs the legitimate search for the facts and the truth in civil litigation. In concentrating upon the applicability of Rule 4.2 in the criminal context where the constraint upon communication with represented persons is based upon the constitution and concern for the rights of criminal defendants which might be overwhelmed by the resources of law enforcement agencies, this committee has overlooked its impact upon the pursuit of the truth and facts in civil litigation. The opinion provides counsel for organizations with even broader power to isolate potential adverse witnesses than presently exists under Rule 4.2. [FN66] By erecting this wall blocking the fact-seeker from persons who may have knowledge of the matter in both criminal and civil litigation, the committee has thrown out the baby with the bath water. This opinion in the civil context protects lawyers and their clients rather than individuals who might shed light on the factual basis of civil litigation.

Some members of the majority have asserted that the above-cited comment to Rule 4.2 fixed the direction of this opinion and that this dissent should have been directed at the rule rather than the opinion. If that is so, somewhere in this opinion the committee should have suggested modifications to the rule which would have made it less onerous to a fact-seeker in civil litigation, especially one with limited resources. Not only did they not do so, but they compounded the problem by opining that even if the contact is initiated by a low-level employee of a represented organization, the rule bars any contact. This means that in the run-of-the-mill civil case, where a lawyer announces that he represents the organization in all personal injury matters, it will be more time-consuming and expensive to marshall facts from persons who in many cases will be best situated to witness the event which resulted in the litigation, i.e., low-level employees of a represented organization who may be willing to tell what they know about the incident.

During the committee's lengthy discussions, a paragraph was suggested which would exempt communication initiated by a whistle-blower for the purpose of disclosing wrongdoing on the part of a corporation. Such a provision to this writer made common sense, but a majority of the committee voted to delete the paragraph. The opinion also fails to take into account the endless variety of factual situations where a noncontrol employee far down on the food chain might provide relevant information in civil litigation and makes it almost impossible to develop the facts without the oversight of lawyers thus making the search for the truth an obstacle course.

---

66. Comment to Rule 4.2 provides that in the case of a represented organization, communications are prohibited with "persons having managerial responsibility on behalf of the organization and with any other person whose act or omission in connection with this matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."

In addition to my substantive concern about this opinion, its length and complexity requires some comment. Several members of this committee tried their hand at writing an opinion upon which a majority of the committee might agree, and it is fair to say that the opinion ultimately took on a life of its own. The end result is a protracted and global interpretation of Rule 4.2 which is so convoluted and complex that it provides little comfort for the lawyer seeking facts to support his client's case as to precisely what conduct is permissible.

I envisage that the role of this committee is to furnish all members of the legal profession with guidelines which if followed would aid the ordinary practicing lawyer to comply with those ethical standards embodied in the Model Rules. This opinion is more appropriate for a learned legal periodical and does not take into account the real world where individual lawyers are confronted with time constraints in making hard decisions in the field of ethics. It just does not show them the way; to the contrary, it will add to their confusion.

The committee might have been better off had it abandoned its efforts and not written this opinion once the problems which gave rise to our interminable discussions and revisions surfaced. Unfortunately, it did not do so, and we are now issuing this massive work product which, in this writer's opinion, creates more problems for the average practicing attorney than it solves.

In light of the foregoing, I dissent.

Richard L. Amster

* * *

The fundamental premise of much, if not most, of the Committee's opinion is the proposition that when Rule 4.2 uses the word "party", it really means "any person". The distinguished American writer, thinker and philosopher, Johnny Carson, was wont to observe: "You buy the premise, you buy the joke." I do not buy the premise. Accordingly, I dissent.

My dissent, however, is limited to the premise. I have no quarrel with the reasoning of the Committee on those points that do not require its latitudinarian interpretation of the word "party". Indeed, if I were to accede to that definitional view, I would have no quarrel with the elaboration of those points that do depend upon that premise. My dissent is simply based upon the fact that despite best efforts at textual archeology, the Committee can find no basis whatsoever in legislative history for its conclusion; the conclusion it reaches violates basic and universally-applied canons of statutory construction that govern the interpretation of these Rules; other jurisdictions have, by their actions on the Rules of Professional Conduct, recognized that "party" does not mean "any person"; and the conclusion itself is reduced in the end to a desperate exercise in wish fulfillment. The Model Rules, for better or worse, are not and never have been a wishing well.

**Legislative History**

The Committee concedes, as it must, that it hasn't a clue as to why Rule 4.2 uses the word "party" instead of "person" when describing the protected com-

municatee. It recognizes that Canon 9 of the 1908 Canons of Professional Ethics used the word "party", and did so in a context clearly disclosing that the "party" was one with whom a dispute or transaction was involved. That same word "party" was repeated in DR 7-104(A)(1) under the title "Communicating With One of Adverse Interest". The word "party" again was employed in Model Rule 4.2, this time under the title "Communicating With Person Represented by Counsel". The Committee can find no discussion in the legislative history as to the meaning of "party" in any of these iterations of the rule.

**Canons Of Constructions**

In light of the fact that throughout the Model Rules the word "person" is frequently used, but the word "party" is used in Rule 4.2, canons of statutory construction, universally applied as well in construing court rules like the Model Rules of Professional Conduct, compel the conclusion that "party" means something different from "person".

There is a presumption of purpose behind every sentence, clause or phrase of a rule, and no word in a rule is to be treated as superfluous. DeSisto College, Inc. v. Town of Howey-in-the-Hills, 706 F. Supp. 1479, 1495 (M.D. Fla. 1989), affirmed 888 F.2d 766; Fox-Knapp, Inc. v. Employees Mutual Casualty Co., 725 F. Supp. 706, 709 (S.D.N.Y. 1989), affirmed 893 F.2d 14; Peck v. Jacquemin, 196 Conn. 53, 64, 491 A.2d 1043 (1985). The use of different words in the same Rules must indicate a difference in legislative intent. BFP Resolution Trust Corp., 114 S. Ct. 1757, 1761 (1994); Lankford v. Law Enforcement Assistance Administration, 620 F.2d 35, 36 (4 Cir.; 1980); Tafoya v. U.S. Dept. of Justice, LEAA, 748 F.2d 1389, 1392 (10 Cir.; 1984). Fritz v. Madow, 179 Conn. 269, 272, 426 A.2d 268 (1979); Hinchcliffe v. American Motors Corporation, 184 Conn. 607, 613, 440 A.2d 810 (1981); Farricielli v. Personnel Appeal Board, 186 Conn. 198, 203, 440 A.2d 286 (1982).

We are not permitted to "torture words to import ambiguity where the ordinary meaning leaves no room for it." Mingachos v. CBS, Inc., 196 Conn. 91, 98, 481 A.2d 368 (1985). A rule does not become ambiguous solely because people disagree as to its meaning. As much as we may think a rule should have meant something else, its intent is to be found not in what its enactors meant to say, but in the meaning of what they did say. We are not permitted to read into the terms of a rule something which manifestly is not there in order to reach what we think would be a just result. In re Pederson, 875 F.2d 781, 784 (9 Cir. 1989). Commissioner v. Freedom of Information Commission, 204 Conn. 609, 620, 529 A.2d 692 (1987). Neither does a rule become ambiguous simply because different courts might have interpreted it differently. Jones v. Brown, 41 F.3d 634, 639 (Fed. Cir. 1994).

Fidelity to the canons of construction which govern courts in interpreting the Model Rules, and therefore ought to govern this Committee, compels the conclusion that this Committee cannot impose upon the word "party" the meaning of "any person".

As a simple matter of logic, the Committee cannot, by the ipse dixit of an

opinion, ignore the fact that for almost 90 years a different word -- "party" -- has been used in Rule 4.2 and its antecedents at the same time that the Committee's favored word -- "person" -- has been used elsewhere in the same Canons, Code and Rules by the same authors. To import synonymy where the drafters used different words is resolutely to close one's eyes to the obvious, and to flout the canons of construction that govern our deliberations.

**What Other Jurisdictions Have Done**

That "party" does not mean "any person" is demonstrated as well by the understanding of the jurisdictions -- now, some 40 -- which have adopted the Model Rules or variants of them. Simply put, when these jurisdictions wanted Rule 4.2 to protect more than just parties, they amended Rule 4.2 to say so. Thus, Alaska Rule 4.2 ("party or person"); Texas Rule 4.2 ("person, organization or entity of government"); Florida Rule 4-4.2 ("person"); and see Oregon DR 7-104(A)(1) ("person"). This Committee itself has -- in what one presumes is not an act of supererogation -- proposed to the House of Delegates in August, 1995 changing the word "party" to "person" in Model Rule 4.2.

Presumably, the 40 or so jurisdictions that have adopted the Model Rules -- indeed those still operating under the Code of Professional Responsibility -- have long understood that "party" is a subset, and not a synonym, of "person". Those who wanted a more expansive protection have amended the rule. Amendment, not wish-fulfilling interpretation, is the way to pour the new wine of "person" into the old bottle of "party".

**Unambiguous Meaning**

The Committee for some reason (probably because it wants an excuse to construe it so that it can then apply it as it does in the Opinion) and contrary to universally-applied canons of construction, supra, purports to find the word "party" ambiguous, and finds the ambiguity "compounded" by use of the word "person" in the title to the Rule. But that latter fact should not affect the meaning of "party" in the Rule. All parties are persons, but not all persons are parties. The overall title to the section comprising Model Rules 4.1 - 4.4 is "Transactions With Persons Other Than Clients."

The Committee chooses to treat "party" as meaning "person" despite the fact that the drafters knew full well how to employ the broader "person" when they meant "person" -- they used that word in Rules. 4.1, 4.3 and 4.4 -- but avoided using it in Rule 4.2. The Committee, seeking to buttress the logic of interpreting "party" to mean "person", notes that the word "party" is used as a synonym for "person" in the phrase "third party discovery". In the Model Rules, however, when "third person" is meant, "third person" is the phrase the drafters use. See, e.g., Model Rules 4.1(a) and (b) and 4.4.

Seeking support for its expansive interpretation, the Committee cites part, but not all, of the Black's Law Dictionary definition of "party". A more instructive citation would have included the entire definition:

Party, n. A person concerned or having or taking part in any affair, matter, transaction, or proceeding, considered individually. A "party" to an action is

a person whose name is designated on record as plaintiff or defendant. M & A Elec. Power Co-op v. True, Mo. App., 480 S.W.2d, 310, 314. Term, in general, means one having right to control proceedings, to make defense, to adduce and cross-examine witnesses, and to appeal from judgment. City of Chattanooga v. Swift, 223 Tenn. 46, 442 S.W.2d 257, 258.

"Party" is a technical word having a precise meaning in legal parlance; it refers to those by or against whom a legal suit is brought, whether in law or in equity, the party plaintiff or defendant, whether composed of one or more individuals and whether natural or legal persons; all others who may be affected by the suit, indirectly or consequently, are persons interest by not parties. Golatte v. Mathews, D.C. Ala. 394 F. Supp. 1203, 1207.

See also Nominal defendant; Parties; Prevailing party.

Black's Law Dictionary (5th ed.)

When we accept the lexicographers' invitation to see related words and turn to "parties" we find a definition which, quite rightly, takes the word beyond the confines of litigation:

Parties. The persons who take part in the performance of any act, or who are directly interested in any affair, contract, or conveyance, or who are actively concerned in the prosecution and defense of any legal proceeding. Green v. Bogue, 158 U.S. 478, 15 S. Ct. 975, 39 L.Ed. 1061 See also Party.

Id.

Indeed, in light of the clearly limited meaning of "party" as a common law term, the Committee's diktat that "party" means "any person" contravenes yet another canon of statutory construction: that unless those promulgating a rule make manifest an intent to the contrary, a presumption obtains that when they use a common law term, they intend to use it in its common law sense. United States v. Shabani, 115 S.Ct. 382, 385 (1994); Resolution Trust Corp. v. Diamond, 45 F.3d 665; 672 (2 Cir. 1995); Citizens Action League v. Kizer, 887 F.2d 1003, 1006 (9 Cir. 1989), cert. den. Department of Health Services of California v. Citizens Action League, 110 S. Ct. 1524; U.S. v. Patterson, 882 F.2d 595, 603 (1 Cir. 1989), cert. den. 110 S. Ct. 737; and see Gilbert v. United States, 370 U.S. 650, 655 (1962).

The Committee's discussion is also unpersuasive because the Committee appears constantly to be shifting ground in identifying the concept against which it is fighting. Too often the Committee seeks to justify its "person" choice by arguing that for policy reasons the communicatee need not be a "party to an adjudicative or other formal proceeding." But the Comment already says that. The issue, with which the Committee never comes to grips, is whether by using the word "party" the drafters intended to mean a person who had an interest in the matter -- be it a lawsuit, a contract negotiation, a real estate closing, or whatever -- which it was the purpose and foreseeable outcome of the matter significantly and directly to affect. Such persons would have an interest qualitatively different from others in the matter, a qualitative difference signified by the word "party". The Committee neither acknowledges nor addresses this natural -- and in my view, correct -- rationale for the use consis-

tently since 1908 of the word "party" instead of the word "person". Such an interpretation, however, is exactly what "parties" supra, is defined as meaning.

In this scenario, for instance, a plaintiff and defendant in a lawsuit would be "parties", because the purpose and foreseeable outcome would directly affect their interests. The fact or expert witness would not be a "party", even if for whatever reason he had retained a lawyer to advise him in his capacity as a witness. In a matrimonial case, where custody, visitation rights or support are issues, the represented children of the marriage would be parties because of the centrality of their interests to the matter, even though they are not formal parties to the litigation.

In a real estate transaction, the buyer and seller would be "parties", and, if represented, could not be contacted by the other's attorney absent consent of their own attorney. The buyer's mortgagee bank and the seller's bank whose mortgage the buyer would have to pay off would not be "parties", even if represented; so that the buyer's lawyer could contact directly the seller's mortgage officer to find out the precise amount of the pay-off figure without the intermediation of the bank's lawyer. While both banks have an interest in the transaction, the interest is qualitatively ancillary to the central interest of the buyer and the seller.

As a policy matter, of course, it might conceivably be better if the word "person" were used in Rule 4.2 instead of "party". It certainly would be easier to apply the Rule (though the consequences of such a broad applicability have only begun to be discerned in the Committee's opinion). Indeed, the Committee has proposed changing the Rule to substitute "person" for "party"; and if that change is adopted, this discussion will be moot for the Model Rule, though still relevant in the vast majority of jurisdictions which have adopted Rule 4.2 using "party".

But ease of application and logical consistency cannot effect a change in the meaning of a word used consistently since 1908 in this particular rule, especially where, as here, there is a perfectly normal, natural meaning to be accorded to the word "party" that acknowledges its more limited ambit as a subset, instead of a synonym, of "person".

**Conclusion**

If the Committee's expansive reading of "party" to mean "person" is correct, there is no need for the House of Delegates in August of 1995 to change the text of Model Rule 4.2, as proposed by the Committee. If the Committee's reading is correct, the Judges of Oregon, Alaska and Texas did not know what they were doing when they amended their rules, thinking they were expanding "party". If the Committee's reading is correct, the ABA House of Delegates stands accused of bizarre and irrational behavior for using the word "party" in Rule 4.2 to mean the same thing as that for which everywhere else it had used "person" (and so do the Houses that adopted the Model Code and the Canons).

Of course, this is not so. This Committee, in proposing the rule change, understood that it was proposing just that: a change in the rule. The Judges of

Alaska, Oregon and Texas did not engage in futile gestures of rule-making. The House of Delegates in adopting Model Rule 4.2 and deliberately using the word "party" where everywhere else it had used the word "person" clearly intended a difference in meaning.

If my colleagues want Model Rule 4.2 to protect "any person", their remedy is not to imagine ambiguity in the current term "party" and then through construction transform it into the broader term "person". Their remedy is to proselytize the members of the House to change the words as the Committee has proposed. Theirs must be the route of legislation, not interpretation.

Ralph G. Elliot

# *The Supreme Court of Ohio*

BOARD OF COMMISSIONERS ON GRIEVANCES AND DISCIPLINE

65 SOUTH FRONT STREET, 5TH FLOOR, COLUMBUS, OH 43215-3431
(614) 387-9370 (888) 664-8345 FAX: (614) 387-9379
www.sconet.state.oh.us

OFFICE OF SECRETARY

**OPINION 2005-3**
Issued February 4, 2005

***Withdrawn by Adv. Op. 2016-5 on August 6, 2016***

**SYLLABUS**: Counsel representing an interest adverse to a corporation may communicate without the consent of a corporation's lawyer with certain current employees and former employees of the corporation, even when corporate counsel asserts blanket representation of the corporation and all its current and former employees.

As to communication with current employees of a corporation, these guidelines apply. When a corporation is known to be represented with respect to a particular matter, DR 7-104(A)(1) prohibits communications without the consent of corporate counsel with an employee of the corporation who supervises, directs or regularly consults with the corporation's lawyer concerning the matter, or has authority to obligate the corporation with respect to the matter, or whose act or omission in connection with the matter may be imputed to the corporation for purposes of civil or criminal liability. This modifies Opinion 90-20.

As to communication with former employees of a corporation, these guidelines apply. While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel. Such communication would not violate DR 7-104(A)(1) when conducted within the following boundaries. An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents. An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents. An attorney must obtain the consent of the former employee to the interview. An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel. An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation. Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

**OPINION**: This opinion addresses an attorney's communication, without the consent of a corporation's lawyer, with current and former employees of a

corporation when opposing corporate counsel asserts blanket representation of the employees and the corporation.

> Is it proper for counsel who represents an interest adverse to a corporation to communicate without consent of the corporation's counsel with certain current and former employees of the corporation, when the corporate counsel asserts blanket representation of the corporation and all current and former employees?

DR 7-104 is the anti-contact rule in the Ohio Code of Professional Responsibility.

> DR 7-104
>
> (A) During the course of his [her] representation of a client a lawyer shall not:
>
> (1) Communicate or cause another to communicate on the subject of the representation with a party he [she] knows to be represented by a lawyer in that matter unless he [she] has the prior consent of the lawyer representing such other party or is authorized by law to do so.
>
> (2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his [her] client.

EC 7-18 broadly explains the reason for the anti-contact rule: "The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel." In practice, the rule protects represented clients from overreach by opposing counsel who might elicit information harmful to the client and protects unrepresented persons from receiving advice that might not be in their best interest. And, as explained in ABA, Formal Opinion 95-396 (1995), "the anti-contact rules provide protection of the represented person against overreaching by adverse counsel, safeguard the client-lawyer relationship from interference by adverse counsel, and reduce the likelihood that clients will disclose privilege or other information that might harm their interests" (citing Roger C. Cramton & Lisa K. Udell, *State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti-Contact and Subpoena Rules*, 53 U. Pitt. L. Rev. 291, 325 n. 4 (1992)).

### Blanket representation

Corporate counsel's assertion of blanket representation of the corporation and all its corporate employees is bluster. It is inappropriate. First, a unilateral declaration by a corporation's counsel that he or she represents all current and former employees does not make it so. Second, such blanket representation of a

corporation and all its current and former employees would in many instances be fraught with impermissible conflicts of interest for the corporate lawyer.

The Board's view is that a lawyer representing a corporation may not prohibit contact with all employees by asserting blanket representation of the corporation and all its current and former employees. A similar view is expressed by the ABA, Committee on Ethics and Professional Responsibility: "[A] lawyer representing the organization cannot insulate all employees from contacts with opposing lawyers by asserting a blanket representation of the organization." ABA, Formal Op. 95-396 (1995).

[For this Board's view as to blanket instructions to government employees see Opinion 92-7 advising that "[a] government department or agency or its counsel should not give blanket instructions to all its employees not to communicate with counsel representing an adverse party unless the government attorney is present.") Ohio Sup.Ct., Bd. Commrs. Grievances & Discipline, Op. 92-7 (1992).]

Yet, some current employees of a corporation are off limits—they are protected by DR 7-104(A)(1) from contact by opposing counsel without corporate counsel's consent. The Board has provided guidance in Opinions 90-20 (1990) and Opinion 96-1 (1996) as which employees are protected by the rule. This advice is reviewed below.

## Current employees

Certain current employees of a corporation are considered represented by corporate counsel and are shielded by the anti-contact rule from contact by opposing counsel without consent of corporate counsel. Defining the group of protected employees helps attorneys to comply with DR 7-104.

In Opinion 90-20 the Board advised that "when litigation against a corporation is contemplated or after a lawsuit is filed, a lawyer representing an interest adverse to the corporation must notify the corporation's counsel when seeking to interview management employees, employees who can 'speak for' or bind the corporation, employees whose opinions form the basis of management decisions and employees whose acts or omission in connection with the controversy may be imputed to, or an admission of, the corporation." Ohio Sup.Ct., Bd. Commrs. Grievances & Discipline, Op. 90-20 (1990).

In Formal Opinion 95-396, the ABA, Committee on Ethics and Professional Responsibility advised that "[w]hen a corporation or other organization is known to be represented with respect to a particular matter, the bar applies only to communications with those employees who have managerial responsibility, those whose act or omission may be imputed to the organization, and those whose statements may constitute admissions by the organization with respect to the matter in question." ABA, Formal Op. 95-396 (1995).

More recently, a 2002 amendment to the comment to ABA Model Rule 4.2 (the anti contact rule) provides further clarity as to off limits employees.

> In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

ABA, Model Rule 4.2, comment 7.

The Board finds the language of comment 7 to Model Rule 4.2 to illuminate which employees are protected by the anti-contact rule. Thus, while the past language of Opinion 90-20 has served well, the language of the Model Rule 4.2 comment 7 may provide more clarity to Ohio attorneys. Thus, the Board modifies Opinion 90-20 by now advising that when a corporation is known to be represented with respect to a particular matter DR 7-104(A)(1) prohibits communications with an employee of the corporation who supervises, directs or regularly consults with the corporation's lawyer concerning the matter, or has authority to obligate the corporation with respect to the matter, or whose act or omission in connection with the matter may be imputed to the corporation for purposes of civil or criminal liability.

### Former employees

Former employees, who have not obtained counsel in a matter, may be interviewed without consent of the corporation's counsel.

In Opinion 96-1 (1996), this Board advised:

> While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel. Such communication would not violate DR 7-104(A)(1) when conducted within the boundaries set forth. An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents. An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents. An attorney must obtain the consent of the former employee to the interview. An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel. An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation. Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

See also ABA, Formal Op. 91-359 (1991) advising that "it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer."

## Conclusion

Counsel representing an interest adverse to a corporation may communicate without the consent of a corporation's lawyer with certain current employees and former employees of the corporation, even when corporate counsel asserts blanket representation of the corporation and all its current and former employees.

As to communication with current employees of a corporation, these guidelines apply. When a corporation is known to be represented with respect to a particular matter, DR 7-104(A)(1) prohibits communications without the consent of corporate counsel with an employee of the corporation who supervises, directs or regularly consults with the corporation's lawyer concerning the matter, or has authority to obligate the corporation with respect to the matter, or whose act or omission in connection with the matter may be imputed to the corporation for purposes of civil or criminal liability. This modifies Opinion 90-20.

As to communication with former employees of a corporation, these guidelines apply. While representing a client in a matter adverse to a corporation, an attorney may communicate on the subject matter of the representation with former employees of the corporation without notification or consent of corporate counsel. Such communication would not violate DR 7-104(A)(1) when conducted within the following boundaries. An attorney may not communicate ex parte if a former employee is represented by his or her own counsel in the matter, unless that counsel consents. An attorney may not communicate ex parte if a former employee has asked the corporation's counsel to provide representation in the matter, unless that counsel consents. An attorney must obtain the consent of the former employee to the interview. An attorney must inform the former employee not to divulge any communications that the former employee may have had with corporate or other counsel. An attorney must fully explain to the former employee that he or she represents a client adverse to the corporation. Under DR 7-104(A)(2), an attorney must not give advice to the unrepresented former employee other than advice to seek counsel in the matter.

**Advisory Opinions of the Board of Commissioners on Grievances and Discipline are informal, nonbinding opinions in response to prospective or hypothetical questions regarding the application of the Supreme Court Rules for the Government of the Bar of Ohio, the Supreme Court Rules for the Government of the Judiciary, the Code of Professional Responsibility, the Code of Judicial Conduct, and the Attorney's Oath of Office.**

Wisconsin Lawyer

THE OFFICIAL PUBLICATION OF THE STATE BAR OF WISCONSIN

JUNE 2007 VOLUME 80 NUMBER 6

WISCONSIN Lawyer YOUR PRACTICE. OUR PURPOSE.

# Ethics Opinion E-07-01: Contact with Current and Former Constituents of a Represented Organization

PROFESSIONAL COMMITTEE

**Effective date:** July 1, 2007.

**Synopsis:** When an organization is represented in a matter, SCR 20:4.2 prohibits a lawyer representing a client adverse to the organization in the matter from contacting constituents who direct, supervise, or regularly consult with the organization's lawyer concerning the matter, who have the authority to obligate the organization with respect to the matter, or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. All other constituents may be contacted without consent of the organization's lawyer. Consent of the organization's lawyer is not required for contact with a former constituent of the organization, regardless of the constituent's former position. When contacting a current or former constituent of a represented organization, a lawyer must state his or her role in the matter, must avoid inquiry into privileged matters, and must not give the unrepresented constituent legal advice. The mere fact, however, that a current or former constituent may possess privileged information does not in itself prohibit a lawyer adverse to the organization from contacting the constituent. A lawyer representing an organization may not assert blanket representation of all constituents and may request, but not require, that current constituents refrain from giving information to a lawyer representing a client adverse to the organization. The mere fact that an organization has in-house counsel does not render the organization automatically represented with respect to all matters. Former Opinions E-82-10 and E-91-01 are withdrawn.

Opinions and advice of the Professional Ethics Committee, its members and assistants, are issued pursuant to State Bar Bylaws, Article IV, Section 5. Opinions and advice are limited to the facts presented, are advisory only and are not binding on the courts, the Office of Lawyer Regulation, or members of the State Bar of Wisconsin.

Members who desire an ethics opinion should address requests to: State Bar Professional Ethics Committee, P.O. Box 7158, Madison, WI 53707-7158. The identities of parties involved in requests for opinions will not be revealed in published opinions.

Ethics Hotline: Members with specific questions also can contact State Bar Ethics Counsel Timothy J. Pierce at (608) 250-6168 or (800) 444-9404, ext. 6168, Monday through Friday, 9 a.m. to 4 p.m.

**Discussion:** This opinion discusses the extent to which SCR 20:4.2 prohibits contact with current and former constituents of an organization when the organization is represented with respect to a matter.[1] The opinion also discusses the obligations under the Rules of Professional Conduct of lawyers seeking to contact constituents of represented organizations and the obligations of lawyers representing organizations.

SCR 20:4.2 *Communication with Person Represented by Counsel* reads:

"In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by a court order."[2]

As is apparent, the language of the rule itself does not provide explicit guidance with respect to constituents (for example, employees, officers, agents) of a represented organization. Paragraph [7] of the comment to the rule, however, provides as follows:

"[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4."

The comment to SCR 20:4.2 thus provides specific guidance with respect to the question at hand. Before discussing the parameters of allowable contact with current and former constituents of represented organizations, the Professional Ethics Committee believes some background information regarding the history and purpose of SCR 20:4.2 is appropriate. Understanding the intent of the drafters of ABA Model Rule 4.2, which Wisconsin has adopted as SCR 20:4.2, and the rule as interpreted by courts and ethics committees of other states will provide enhanced guidance for Wisconsin lawyers.

**I. History and Purpose of SCR 20:4.2**

Wisconsin's current SCR 20:4.2 and comment are identical to ABA Model Rule 4.2 and comment. The ABA Model Rule and its comment were amended in 2002 as part of the ABA's Ethics 2000 revision of the Model Rules of Professional Conduct. Like the current Rule 4.2, the prior Model Rule (which was almost identical to Wisconsin's prior SCR 20:4.2) itself contained no reference to constituents of a represented organization but rather addressed the issue in the comment.[3]

The 2002 amendments to the comment were significant and reflected the ABA's intention to clarify the language and provide better guidance. In particular, the ABA removed language from the comment prohibiting contact with constituents having "managerial responsibility," which had frequently been criticized as "vague and overly broad."[4] Language prohibiting contact with constituents "whose statements may constitute an admission on the part of the organization" also was removed. This is because this language originally was intended to protect those jurisdictions that still maintained the old evidentiary rule that statements by an agent bound the principal, in the sense that, when such statements of an agent are admitted into evidence, the principal may not introduce other evidence to contradict the statement.[5] Modern evidence rules, however, while permitting an employee's statement to be admitted as an exception to the hearsay rule, do not bind the employer, who is free to introduce evidence contradicting the employee's statement.[6] Accordingly, that language in the old comment often was misinterpreted to prevent contact with any constituent whose statement may constitute a nonbinding admission.[7] Finally, a sentence was added to the comment to clarify that Rule 4.2 does not prohibit contact with former constituents of an organization, regardless of the position the former constituent once occupied.[8]

Thus, the changes made by the ABA have narrowed the rule's prohibition with respect to constituents of a represented organization. As will be discussed later in this opinion, this is in keeping with the pronounced trend in case law and ethics opinions.

Although often invoked in the context of litigation, SCR 20:4.2 is a *disciplinary* rule and proscribes conduct that can subject a lawyer to professional discipline. The purpose behind this disciplinary rule is to "contribute to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the uncounselled disclosure of information relating to the representation."[9] Put more succinctly, the "(p)urpose of the rule is to protect the attorney-client relationship from intrusion by opposing counsel."[10]

Applying this rule to the representation of an individual is relatively simple. Defining the parameters of the attorney-client relationship with respect to a represented organization proves more difficult. It is clear that when a lawyer represents an organization, the client is the organization itself.[11] It is also clear that an organization acts only through its constituents, some of whom should be afforded the protections of SCR 20:4.2. In determining just which constituents should be protected by SCR 20:4.2, courts have attempted to balance many competing interests. One court described the factors to be balanced as follows:[12]

"Many competing policies must be considered when deciding how to interpret the no-contact rule as applied to organizational clients: protecting the attorney-client relationship from interference; protecting represented parties from overreaching by opposing lawyers; protecting against the inadvertent disclosure of privileged information; balancing on one hand an organization's need to act through agents and employees, and protecting those employees from overreaching and the organization from the inadvertent disclosure of privileged information, and on the other hand the lack of any such protection afforded an individual, whose friends, relatives, acquaintances and co-workers may generally all be contacted freely; permitting more equitable and affordable access to information pertinent to a legal dispute; promoting the court system's efficiency by allowing investigation before litigation and informal information-gathering during litigation; permitting a plaintiff's attorney sufficient opportunity to adequately investigate a claim before filing a complaint in accordance with Rule 11; and enhancing the court's truth-finding role by permitting contact with potential witnesses in a manner that allows them to speak freely."

In balancing these interests, courts have formulated a variety of tests. On one end of the spectrum is an outright ban on contact with any constituent of a represented organization.[13] The advantage of such a bright-line test is clarity and certainty, but this comes at a high cost; an opposing party might have to resort

to filing suit to begin to gather information about the viability of a possible claim, or simply be without the means to informally gather information in transactional or certain administrative proceedings without formal discovery. This involves great expense when compared to informal interviews and clogs the courts with potentially baseless claims. It also gives organizations almost complete control over information in a matter and thus a great advantage over individuals, whose friends, colleagues, and associates are not protected by SCR 20:4.2.

Many courts, therefore, have adopted various tests, such as the *party-opponent admission test*,[14] the *managing-speaking agent test*,[15] the *control group test*,[16] the *case-by-case balancing test*,[17] and the *alter-ego test*,[18] which seek to balance an organization's right to counsel with an opposing party's right to gather information with respect to a matter. The decisions discussing various tests are not entirely consistent in the use of these names, but the fact that such a variety of different tests has developed illustrates the difficulty in reaching an appropriate balance. Because the Wisconsin Supreme Court has adopted the ABA Model Rule and comment, which outlines its own test, the particulars of other such tests need not be discussed here. But it is worth noting that the test adopted in SCR 20:4.2 is very close to the alter-ego test and also very close to the test adopted by the Restatement (Third) of the Law Governing Lawyers, §100.

It is clear from a review of these cases and other sources that courts seek to interpret Rule 4.2 to protect those within an organization who act on behalf of an organization in connection with a matter, that is, those who direct and consult with the organization's lawyer or whose act or omission serves as a basis for the matter in question. These decisions also recognize that Rule 4.2 is not meant to protect an organization from the disclosure or discovery of potentially damaging facts.[19] As one court stated, "(p)reventing the disclosure of unfavorable facts merely because they happen to have occurred in the workplace is not a legitimate organizational interest for purposes of applying rule 4.2."[20] Thus the rule's protection extends to those constituents who may be said to personify the organization as a "client" in a matter, but ordinarily does not extend to constituents of an organization who simply possess relevant facts. With this background information, the committee turns to the questions prompting this opinion.

**II. Current Constituents of an Organization**

Comment [7] to SCR 20:4.2 outlines two categories of protected constituents of a represented organization. Any constituents falling within these two categories may not be contacted by opposing counsel without the consent of the organization's lawyer. Conversely, any constituent falling outside these two categories may be contacted without consent of the organization's lawyer. The categories are as follows:

**1) Constituents who supervise, direct, or regularly consult with the organization's lawyer concerning the matter or who have authority to obligate the organization with respect to the matter.** This category clearly applies to those constituents (typically upper-level management) to whom the organization's lawyer looks for decisions with respect to the matter. Thus a senior vice president of a corporation who is directing outside tax counsel about an IRS matter is clearly covered by the rule. Note, however, that the category is specific to the *matter* in question. In large organizations, some management constituents may direct or control counsel for some matters, but not others. The vice president of human resources may direct the corporation's lawyer on an employment discrimination matter and thus be covered by SCR 20:4.2. However, if the chief financial officer was a witness to the alleged act of discrimination, but has no involvement in the direction or control of the organization's lawyer handling the defense of the discrimination claim, the officer would not be protected by SCR 20:4.2. The mere fact that a constituent holds a management position does not trigger the protections of the rule.

This category also includes those constituents who "regularly consult" with the organization's lawyer concerning the matter. This need not be a constituent who also directs the organization's lawyer. So, for example, an engineer employed by a company who works closely with and provides expertise to the lawyer defending the company against a defective product claim, or an employee who is assigned the task of collecting documents and information for the organization's lawyer would both be covered by the rule. However, a constituent who is simply interviewed or questioned by an organization's lawyer about a matter does not "regularly consult" with the organization's lawyer.

Finally, this category includes those constituents who have authority to settle or compromise a matter on behalf of the organization. Such a person obviously acts as an "alter-ego" of the organization and must be protected by the rule. Typically, this category would include members of an organization's upper-level management. Again, it is worth noting that simply the status of being a "manager" does not automatically invoke the protections of the rule. Thus a department manager of an employee who is alleged to have committed a negligent act does not fall within this category if the department manager does not have the authority to settle or compromise the claim on behalf of the organization.

**2) Constituents whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.** This category includes those individuals whose actions or omissions have triggered the matter in question and likely would be a named party but for the fact of their membership in the organization. Typical examples of constituents in this category would

include the truck driver for a company who is alleged to have caused injury while in the course of employment, the manager who is alleged to have sexually harassed an employee, or the machine operator who is alleged to have ignored safety protocols and injured another employee. It is important to note that this category includes constituents who are alleged to have committed acts or omissions that may impute liability to the organization even if the organization or constituent disputes or denies the allegations.[21] This category, however, does not include constituents who are simply witnesses to the alleged act or omission.

Finally, should a current constituent have his or her own counsel in a matter, or be *actually* represented by the organization's lawyer, then SCR 20:4.2 would prohibit contact with that constituent regardless of his or her position within the organization.

**III. Former Constituents of an Organization**

By the plain language in Comment [7] to SCR 20:4.2, "(c)onsent of the organization's lawyer is not required for communication with a former constituent." This is consistent with the long-standing position of the ABA "that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer in the matter may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer."[22] This also is the position of the Restatement (Third) of the Law Governing Lawyers, which states that "(c)ontact with a former employee or agent is ordinarily permitted, even if the person had formerly been within the category of those with whom contact is prohibited. Denial of access to such a person would impede an adversary's search for relevant facts without facilitating the employer's relationship with its counsel."[23]

The vast majority of reported decisions on the question hold that Rule 4.2 does not prohibit or restrict contact with former constituents. While some courts have held otherwise,[24] the great majority of courts considering this issue have followed the recent trend of embracing the position that Rule 4.2 does not prohibit contact with former constituents of an organization.[25] Recent ethics opinions from other states also adhere to this view.[26]

The conclusion that Rule 4.2 does not prohibit contact with former constituents of an organization flows logically from the purpose of the Rule: to protect the attorney-client relationship and not inhibit access to factual information. As expressed by Professors Rotunda and Dzienkowski in *The Lawyer's Deskbook on Professional Responsibility* (ABA 2006-2007), § 4.2-6(c):

"Any other reading of Rule 4.2 is unnatural and strained. It is not the purpose of Rule 4.2 to prevent the disclosure of prejudicial testimony but to protect the client-lawyer relationship. The attorney for the employer does not have a client-lawyer relationship with a former employee. Moreover, to so interpret the Rule would make it more expensive for the lawyer to obtain information about her case, because she would have to proceed by way of deposition rather than interview if the opposing lawyer refused consent. Furthermore, Rule 4.2 protects a person from being damaged by a binding disclosure made without that person's lawyer being present. But former employees are not represented by the employer's lawyer."

As put by one court[27] in holding that Rule 4.2 does not prohibit contact with former employees of a corporation:

"Indeed, exclusion of former employees furthers both the specific and the more general purposes of rule 4.2. It must be remembered that rule 4.2 is but one part of a comprehensive system of laws and regulations designed to hold counsel to the highest professional standards in our adversary system. Within that system, pretrial (including precomplaint) discovery plays an essential role. It is the phase in which material facts are discovered, issues are narrowed as theories of the case are tested, rejected, or refined, and the parties and their attorneys have the opportunity to assess the strengths and weaknesses of their case with an eye toward both trial and the negotiation of settlement. Courts have long recognized that informal interviews are an exceptionally efficient means for the meaningful gathering of facts. They are generally more conducive to full disclosure and far less costly than the more structured processes of formal discovery, or even informal investigation with opposing counsel present. *See Niesig v. Team I,* 76 N.Y.2d 363, 372, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990) (`Costly formal depositions that may deter litigants with limited resources, or even somewhat less formal and costly interviews attended by adversary counsel, are no substitute for such off-the-record private efforts to learn and assemble, rather than perpetuate, information')…

"Former employees may be a useful source of meaningful information, because they may feel less directly tied to the employer's interests and therefore more willing to discuss informally what they know. At the same time, these employees may still have economic and other ties to the organization that would make them reluctant to speak freely in the presence of the organization's attorneys, even in an informal setting. In effect, immunizing former employees from all ex parte interviews would permit the organization to monitor the flow of nonprivileged information to a potential adversary at the expense of uncovering material facts. Fairness in our established system of adversary representation would be the casualty."

Thus, by reference to the plain language of the comment and by looking to the purposes of SCR 20:4.2, the inescapable conclusion is that SCR 20:4.2 does not prohibit contact with former constituents of an organization regardless of the former position held by the former constituent. Of course, if a former constituent currently is represented by his or her own counsel with respect to a matter, or is *actually* represented by the organization's lawyer in the matter (assuming the former constituent consents and such representation does not constitute a conflict of interest, *see* SCR 20:1.7), then SCR 20:4.2 applies.

**IV. Obligations of Lawyer Contacting Current or Former Constituent Not Covered by SCR 20:4.2**

Although SCR 20:4.2 does not prohibit contact with some current and all former constituents of an organization, that does not mean that lawyers contacting such constituents are free from all constraint. Comment [7] to SCR 20:4.2 states, "In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4."

SCR 20:4.4(a) provides as follows:

"In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."

Comment [1] to SCR 20:4.4 provides:

"Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."

Comment [9] to SCR 20:4.2 states, "In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3."

SCR 20:4.3 provides as follows:

"In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall inform such person of the lawyer's role in the matter. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client."

These two rules thus impose the obligation to inform an unrepresented person of the lawyer's role in the matter and to avoid seeking privileged information.[28] Reported decisions and ethics opinions also have cautioned lawyers seeking to informally contact current and former constituents of represented organizations to observe certain guidelines when making such contacts.[29] Some decisions go beyond these two rule-based proscriptions and set forth other guidelines for lawyers in these circumstances.

One of the purposes of imposing such guidelines is to protect the organization's privileged information. In *Upjohn Co. v. United States,*[30] the U.S. Supreme Court held that attorney-client privilege may attach to communications with any employee of a corporation, not simply high-ranking management.[31] A lawyer is thus forbidden by SCR 20:4.4 from seeking to induce disclosure of information protected by the privilege when contacting any constituent of a represented organization.

The mere fact, however, that a constituent is in possession of information protected by the privilege does not mean that the constituent is covered by SCR 20:4.2. It is important to bear in mind that the privilege protects communications, not facts. As the Supreme Court noted in *Upjohn*, "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."[32]

In the wake of *Upjohn*, it was argued that the scope of Rule 4.2 should be extended to all constituents who may be in possession of privileged information, but courts and ethics opinions have rejected such an interpretation as overly broad and unnecessary to protect organizations.[33] As one court noted, if a lawyer violates an organization's attorney-client privilege "the court may disqualify him or her from further participation in the case … and, under certain circumstances, may exclude improperly obtained evidence or take other appropriate measures to achieve justice and ameliorate the effect of improper conduct."[34] Thus, protections such as protective orders, disqualification motions, and motions for sanctions are available to organizations. Furthermore, lawyers who violate an organization's attorney-client privilege may be subject to disciplinary action for violations of SCR 20:4.3 and SCR 20:4.4.

Thus, if a constituent who witnessed an act that serves as a basis for a suit against an organization is interviewed about the matter by the organization's lawyer, and is not otherwise protected by SCR 20:4.2, opposing counsel may contact the constituent with respect to factual information about the matter. There are, however, ethical duties placed on lawyers who seek to contact such a constituent.

To summarize these duties, when contacting a constituent of a represented organization (or any unrepresented person), the applicable Rules mandate:

1) The lawyer must inform the unrepresented constituent of the lawyer's role in the matter (*see* SCR 20:4.3).[35]

2) The lawyer must refrain from giving legal advice to an unrepresented constituent if there is a reasonable possibility that the interests of the client may conflict with those of the unrepresented constituent (*see* SCR 20:4.3).

3) The lawyer must not ask any questions reasonably likely to elicit information that the lawyer knows or reasonably should know is privileged and, if necessary, should caution the unrepresented constituent not to reveal such information (*see* SCR 20:4.4).

4) The lawyer must not make any false statements of material fact to or mislead an unrepresented constituent (*see* SCR 20:4.1 and SCR 20:8.4).

These guidelines are derived from the language of the rules themselves and the failure to follow them could result in disciplinary action. As noted above, however, some courts and ethics committees have offered guidelines to lawyers beyond the language of the rules that may be of valuable assistance to lawyers who seek to avoid civil sanction and disciplinary enforcement, and the State Bar of Wisconsin Professional Ethics Committee herein offers similar suggested guidelines:

1) The lawyer should clearly identify the client and the fact that the client is adverse to the organization.

2) The lawyer should inquire as to whether the constituent has counsel of his or her own in the matter.

3) The lawyer should explain the purpose of the interview.

4) The lawyer should inform the constituent that he or she need not speak to the lawyer.

There is no Wisconsin authority mandating this second set of guidelines, but the committee hopes that by following these guidelines, lawyers will avoid grievances and civil litigation concerning the lawyer's conduct.

### V. Obligations of Lawyer Representing Organization

Lawyers representing organizations also have obligations relative to constituents who may be contacted by opposing counsel. These obligations reflect the lawyer's role of representing the organization itself, as opposed to representing the organization's constituents.

1) **A lawyer representing an organization may not assert blanket coverage of all current and former constituents of an organization by SCR 20:4.2 unless the lawyer *actually* represents each and every constituent of the organization**. Courts and ethics opinions have consistently rejected broad assertions of representation of all employees based on nothing more than the fact of employment and this committee agrees with these decisions.[36] As discussed earlier, when a lawyer represents an organization, the client is the organization itself, not its constituents, and SCR 20:4.2 prohibits contact only with certain current constituents. Therefore, there is no basis for asserting such sweeping coverage and lawyers must be mindful of their obligations under SCR 20:4.1(a)(1), which prohibits a lawyer from making a false statement of fact or law to a third person, and SCR 20:3.4(a), which prohibits a lawyer from unlawfully obstructing another party's access to evidence.

Lawyers may, in certain circumstances, represent current or former constituents of an organization in the same matter in which the lawyer represents the organization (*see* SCR 20:1.13(g)), but in seeking to represent a constituent, the lawyer must be mindful of the prohibition on certain types of solicitation (*see* SCR 20:7.3(a)). The lawyer must first obtain the constituent's consent to representation after determining whether a conflict of interest exists and, if so, determining whether the conflict is waivable (*see* SCR 20:1.7). If a waivable conflict exists, the lawyer must obtain in writing the informed consent (*see* SCR 20:1.0(f)) to the conflict of both the constituent and the organization in order to undertake the dual representation. If the lawyer does undertake such dual representation, the lawyer must inform both clients of the implications of dual representation, such as the lack of confidentiality between the clients, the lack of attorney-client privilege with respect to disputes between the clients, and the likelihood that the lawyer may not continue to represent either client in the case of an unwaivable conflict or a conflict to which one client refuses to waive.

2) **Lawyers for organizations may appear on behalf of the organization when a constituent is deposed, but that does not mean that the lawyer represents that constituent as an individual**. This practice is common, but the mere fact that a lawyer accompanies a constituent to a deposition and consults with that constituent does not transform that constituent into a client. As stated in one recent ethics opinion:[37]

"While corporate counsel may certainly consult with the constituent called as a witness in a deposition, this consultation is part of counsel's representation of the corporation and does not render the attorney counsel

to the witness as an individual. Nor does such corporate representation block opposing counsel's ability to attempt to interview such a fact witness separate and apart from formal discovery."

The lawyer's client remains the organization and the lawyer is obligated to protect the interests of the organization first. In such a situation, the lawyer should take care to ensure that the constituent does not misunderstand the lawyer's role (*see* SCR 20:1.13(f) and SCR 20:4.3).

3) **SCR 20:3.4(f) permits a lawyer representing an organization in a matter to *request* that employees or agents of the client refrain from voluntarily giving relevant information to another party.** It is important to note that this rule does not allow a lawyer to *forbid* constituents from speaking to the other side. That being said, this rule would permit a lawyer for an organization to contact employees and ask that they not speak to the lawyer representing a client adverse to the organization. The lawyer should be careful to choose language that makes plain that such request is not an order. This rule also applies only to current employees.

It also is worth noting that neither SCR 20:3.4 nor SCR 20:4.2 prohibit a lawyer for an organization from seeking a protective order from a court restricting access to certain current or former constituents if circumstances warrant. For example, if a vice president, who worked closely with the organization's lawyer on a particular matter but did not witness any of the events underlying the matter, leaves his or her job and becomes a former constituent and thus not covered by SCR 20:4.2, the organization's lawyer might appropriately seek a court order limiting another party's access to the former vice president. Such a former employee clearly has much privileged information and is highly unlikely to possess any relevant factual information. Thus there is little reason for the lawyer opposing the organization to contact such a former employee because the lawyer would be prohibited by SCR 20:4.4 from asking the former employee about anything that the employee would likely know.

### VI. In-house Counsel

Finally, the committee wishes to comment on the status of organizations with permanent in-house counsel. The fact in itself that an organization has in-house counsel, or regularly retains outside counsel, does not render the organization represented with respect to a specific matter.[38] "Similarly, retaining counsel for all matters that might arise would not be sufficiently specific to bring the rule into play. In order for the prohibition to apply, the subject matter of the representation needs to have crystallized between the client and the lawyer."[39]

A lawyer does not violate SCR 20:4.2 by contacting in-house counsel for an organization that is represented by outside counsel in a matter. The retention of outside counsel does not normally transform counsel for an organization into a represented constituent and contact with a lawyer does not raise the same policy concerns as contact with a lay person.[40]

*Ethics Opinions E-82-10 and E-91-01 are hereby withdrawn.*

#### Endnotes

[1]This question most frequently arises with respect to current and former employees of represented corporations. The committee uses the phrase "constituents of a represented organization" to track the language of the comment to SCR 20:4.2, but emphasizes that this opinion applies to represented organization of all types, including corporations. Special considerations apply, however, with respect to constituents of represented governmental entities. *See* ABA Formal Ethics Opinion 97-408; Wisconsin Ethics Opinion E-95-1.

[2]In addition to the language of the rule and comment, the committee also looked to other states for guidance because of the lack of Wisconsin case law on this topic and the age of the previous Wisconsin Ethics Opinions, E-82-10 and E-91-01, which drew on rules that no longer exist.

[3]The applicable language of both the ABA's and Wisconsin's comment to former Rule 4.2 stated, "In the case of an organization, the Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on behalf of the organization."

[4]*See* ABA Model Rule 4.2 - Reporter's Explanation of Changes.

[5]Such statements are often referred to as "judicial admissions."

[6]Wisconsin follows the modern rule - see Wis. Stat. section 908.01(b)4.

[7]*See* ABA Model Rule 4.2 - Reporter's Explanation of Changes.

[8]This recognized the long-standing position of the ABA. *See* ABA Formal Opinion 91-359 (1991).

[9]*See* SCR 20:4.2, Comment [1].

*Palmer v. Pioneer Inn Assocs. Ltd.*, 118 Nev. 943, 948, 59 P.3d 1237 (2002).

[11]*See* SCR 20:1.13.

[12]*Palmer*, 118 Nev. at 951.

[13]*See Public Serv. Elec. & Gas Co. v. Associated Elec. & Gas Ins. Serv. Ltd.*, 745 F. Supp 1037 (D.N.J. 1990).

[14]*See Cole v. Appalachian Power Co.*, 903 F. Supp. 975 (S.D.W.Va. 1995); *Brown v. St. Joseph County,* 148 F.R.D. 246 (N.D. Ind. 1993); *University Patents Inc. v. Kligman*, 737 F. Supp 325 (E.D. Pa. 1990).

[15]*See Chancellor v. Boeing Co.,* 678 F. Supp. 250 (D. Kan.1998); *Wright v. Group Health Hosp.,* 103 Wash. 2d 192, 691 P.2d 564 (1984).

[16]*See Fair Automotive v. Car-X Serv. Sys.,* 128 Ill. App. 3d 763, 471 N.E.2d 554 (1984).

[17]*See B.H. v. Johnson,* 128 F.R.D. 659 (N.D. Ill. 1989).

[18]*See Niesig v. Team I*, 76 N.Y.2d. 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990).

[19]*See, e.g., Aiken v. Business & Indus. Health Group Inc.,* 885 F. Supp 1474 (D. Kan. 1995).

[20]*Messing v. President & Fellows of Harvard Coll.,* 436 Mass. 347, 764 N.E.2d 825 (2002).

[21]*See* Restatement (Third) of the Law Governing Lawyers, §100, comment (d).

[22]ABA Formal Op. 91-359.

[23]Restatement (Third) of the Law Governing Lawyers, §100, Comment g. The Restatement notes, however, that in certain unusual circumstances, such as a former employee consulting regularly with an organization's lawyer about the matter, a former employee may be covered by the no-contact rule.

[24]*Public Serv. Elec. & Gas Co. v. Associated Elec. & Gas Ins. Serv. Ltd.,* 745 F. Supp 1037 (D.N.J. 1990); *Porter v. Arco Metals Co.*, 642 F. Supp. 1116 (D. Mont. 1986); *Amarin Plastics Inc. v. Maryland Cup Corp.,* 116 F.R.D. 36 (D. Mass. 1987). As noted in the Restatement, however, there appear to be no reported decisions since 1990 holding that Rule 4.2 covers former constituents on the basis of the former relationship alone.

[25]*Clark v. Beverly Health & Rehab. Servs. Inc.,* 440 Mass. 270, 797 N.E.2d 905 (2003); *Continental Ins. Co. v. Superior Ct.,* 32 Cal. App. 4th 94, 37 Cal. Rptr. 843 (1995); *Niesig v. Team I,* 76 N.Y.2d. 363, 559 N.Y.S.2d. 493 (1990); *H.B.A. Mgmt. Inc. v. Estate of Schwartz*, 693 So. 2d 541 (Fla. 1997); *Smith v. Kalamazoo Ophthalmology,* 322 F. Supp. 2d 883 (W.D. Mich. 2004); *Terra Int'l. v. Mississippi Chem.,* 913 F. Supp. 1306 (N.D. Iowa 1996); *Orlowski v. Dominick's Finer Foods Inc.*, 937 F. Supp. 723 (N.D. Ill.996); *Humco Inc. v. Noble,* 31 S.W.3d 916 (Ky. 2000); *Wright v. Group Health Hosp.*, 691 P.2d 564 (Wash. 1985); *Smith v. Kansas City S. Ry. Co.,* 87 S.W.3d 266 (Mo. App. 2002).

[26]Ohio Ethics Op. 2005-03 (2005); Utah Ethics Advisory Op. No. 04-04 (2004); DC Ethics Op. 287 (1998).

[27]*Clark v. Beverly Health & Rehab. Servs. Inc.,* 440 Mass. 270, 277, 797 N.E.2d 905 (2003).

[28]The prohibition applies only to information protected by fundamental and general law such as the attorney-client privilege, physician-patient privilege, and work-product immunity. It does not extend to duties of confidentiality based on contract, such as confidentiality agreements, which may be of indeterminate scope and of which opposing counsel is unlikely to be aware. Further, if the rule encompassed such contract-based duties, an organization could turn SCRs 20:4.2 and 4.4 into an impenetrable shield by simply requiring its constituents to sign agreements prohibiting them from ever speaking with a lawyer opposing the organization, thus creating the very outcome that courts interpreting the rule consistently reject. *See* Restatement (Third) of the Law Governing Lawyers, §102, comment b.

[29]*See, e.g., Smith v. Kalamazoo Ophthalmology,* 322 F. Supp. 2d 883 (W.D. Mich. 2004); *Niesig v. Team I,* 76 N.Y.2d. 363, 559 N.Y.S.2d. 493 (1990); *Snider v. Superior Ct.,* 113 Cal. App. 4th 1187, 7 Cal. Rptr. 3d 119 (2003); *Midwest Motor Sports Inc. v. Arctic Cat Sales Inc.*, 144 F. Supp. 2d 1147 (D.S.D. 2001); *McCallum v. CSX Transp. Inc.,* 149 F.R.D. 104 (M.D.N.C. 1993); Ohio Ethics Op. 2005-03 (2005); Utah Ethics Advisory Op. No. 04-04 (2004); DC Ethics Op. 287 (1998); South Carolina Ethics Op. 01-01 (2001); Virginia Ethics Op. 1749 (2001).

[30]*Upjohn Co. v. United States,* 449 U.S. 383 (1981).

[31]Commonly referred to as the "litigation control group."

[32]449 U.S. at 395.

[33]*See Snider v. Superior Ct.,* 113 Cal. App. 4th 1187, 7 Cal. Rptr. 3d 119 (2003); *Clark v. Beverly Health & Rehab. Servs . Inc.,* 440 Mass. 270, 797 N.E.2d 905 (2003); *Lang v. Superior Ct.*, 826 P.2d 1228 (Ariz. Ct. App. 1992); Restatement (Third) of the Law Governing Lawyers, §102, comment d.; Virginia Legal Ethics Op. 1749 (2001).

[34]*Triple A Machine Shop Inc. v. State of Calif.,* 213 Cal. App.3d 131, 261 Cal. Rptr. 493 (1989).

[35]This normally means identifying the client. *See* SCR 20:4.3, Comment [2].

[36]*See Harry A. v. Duncan,* 330 F. Supp. 2d 1133 (D. Mont. 2004); *Michaels v. Woodland,* 988 F. Supp 468 (D.N.J. 1997); *Carter-Herman v. City of Philadelphia,* 897 F. Supp. 899 (E.D. Pa. 1995); *Brown v. St. Joseph County,* 148 F.R.D. 246 (N.D. Ind. 1993); ABA Formal Op. 95-396 (1995); Utah Ethics Op. 04-06 (2004).

[37]Utah Ethics Op. 04-06 (2004). *See also Banks v. Office of the Senate Sergeant-at-Arms,* 222 F.R.D. 1 (D.D.C. 2004).

[38]*See Miano v. AC&R Advert. Inc.,* 148 F.R.D. 68 (S.D.N.Y. 1993).

[39]ABA Formal Op. 95-396 (1995).

[40]*See Humco v. Noble*, 31 S.W.3d 916 (Ky. 2000); Restatement (Third) of the Law Governing Lawyers, §100, comment c.; ABA Formal Op. 06-443 (2006).

*Wisconsin Lawyer*

Live 1

**Utah Ethics Opinions**

**2004.**

**04-06.** USB EAOC Opinion No. 04-06

UTAH STATE BAR

Ethics Advisory Opinion Committee

Opinion 04-06

December 2, 2004

**Issue:** Under what circumstances is it permissible for corporate counsel to assert that counsel concurrently represents present and former corporate employees whose testimony is relevant to a claim and ethically preclude opposing counsel's access to those corporate employee witnesses?

**Opinion:** If corporate counsel has actually formed an attorney-client relationship with these employee-witnesses, and has fully complied with Utah Rules of Professional Conduct 1.7 (including obtaining informed consent from all multiple clients to joint representation and informing them of the possible need for withdrawal from representing any of them should an actual conflict arise), this is permissible and opposing counsel may not interview them. However, in the absence of such a fully formed and proper attorney-client relationship, it is improper for corporate counsel to block opposing counsel's access to other current corporate constituents, by asserting an attorney-client relationship unless these individuals were control group members, their acts could be imputed to the organization or their statement would bind the corporation with respect to the matter under Utah Rules of Professional Conduct 4.2. Similarly, it is improper to block opposing counsel's access to any former employee in the absence of a current fully formed and proper attorney-client relationship.

**Facts:** The tort action asserts one corporate employee and an outside individual were negligent, but names only the corporate entity (and the outside individual) as defendants. Counsel for plaintiff seeks to interview other employees who are fact witnesses and who are not alleged to be negligent. Corporate counsel informs plaintiff's counsel that s/he is representing all corporate employees (current as well as former employees) and thus plaintiff's counsel may not informally interview any of these individuals without violating Rule 4.2.

**Analysis:** Whether corporate counsel's actions are proper must be determined by reference to Rule 1.7 regarding conflicts of interest, Rule 4.2 as it governs counsel's ability to interview "represented persons" in the corporate context, and Rule 3.4 as it permits corporate counsel to request that corporate employees not talk with opposing counsel.

Rule 4.2 1 provides in relevant part:

(a) General Rule. A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by [other law or judicial order].

Utah's Rule 4.2 2 expressly addresses "Organizations as Represented Persons" and defines when an individual constituent of that organization, not separately represented, should be considered to be "represented" by corporate counsel. With respect to non-governmental organizations, Rule 4.2 states:

(c)(1)(B) When the represented "person" is an organization, an individual is "represented" by counsel for the organization if the individual is not separately represented . . . and . . . is known by the lawyer to be

(c)(1)(B)(i) a current member of the control group of the represented organization; or

(c)(1)(B)(ii) a representative of the organization whose acts or omissions in the matter may be imputed to the organization under applicable law; or

(c)(1)(B)(iii) a representative of the organization whose statements under applicable rules of evidence would have the effect of binding the organization with respect to proof of the matter.

Accordingly, whether or not the corporate attorney had formed an individualized attorney-client relationship with a particular corporate employee, this rule would prohibit the opposing counsel from interviewing any current member of the "control group" or any current employee whose acts or omissions would be imputed to the corporation or whose statements would be imputed to the corporation. Under these circumstances the employee would be acting and speaking for the corporation.3

Here, however, the opposing attorney posits that the employee is NOT a "person" "represented" by corporate counsel due to any of these factors, but a mere fact witness whom corporate counsel has (inexplicably in opposing counsel's view) undertaken to represent as well.

Utah Rules of Professional Conduct 3.4, "Fairness to opposing party and counsel" must also be consulted. This rule is designed to permit both counsel to have access to relevant evidence in order that the adversary system function appropriately. Under Rule 3.4(f), a lawyer ordinarily may not ask a person who is not the lawyer's client "to refrain from voluntarily giving relevant information to another party" with one exception relevant here. There is an exception to this prohibition if "[t]he person is . . . an employee or other agent of a client; and (2) [t]he lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information."4 Thus, in accordance with this rule, corporate counsel may request any current employee (including fact witnesses) whose interests will not be adversely affected to refrain from informally speaking with opposing counsel. However, corporate counsel may not direct opposing counsel not to contact corporate employees who have the right to talk or to decline to talk to opposing counsel, unless, of course, these corporate employees are actually individually represented by corporate counsel.

The situation posits corporate counsel taking one further step, making all employees who have any information about the issue individual clients, and thus conclusively preventing opposing counsel from informally contacting any of them. The first question in analyzing whether this strategy is ethical is whether these employee-fact-witnesses have actually formed an individual attorney-client relationship with corporate counsel. If they have not, corporate counsel would be guilty of violating Rule 3.4 in unlawfully obstructing access to these witnesses and Rule 4.1 in making a false statement of material fact.5

It is permissible for corporate counsel to undertake to represent an employee opposing counsel believes is a mere fact witness provided there is no actual conflict of interest (Rule 1.7(a)) between the corporation and the employee-witness with respect to the matter and provided corporate counsel fully complies with Rule 1.7(b) regarding potential conflicts of interest. Such compliance would require that all clients (the corporation and each employee-witness) be fully informed as to the implications of common representation, and give consent to common representation after such advice. The advice should include the possibility that if a conflict of interest arises between the corporation and the witness, counsel may be required to withdraw from the representation entirely.6

It may be helpful to illustrate a possible scenario where common representation might be undertaken and a scenario where it should not be. Imagine allegations that the corporation has been negligent due to the acts of one employee, and the named employee, the corporation and all other employee witnesses tell counsel that the alleged negligent act never occurred. Under these circumstances, counsel should be able to obtain informed consent to represent the corporation, the alleged negligent employee and other employee witnesses, should they all desire representation. However, if one employee witness will testify that the negligent act occurred and the employee alleged to be negligent denies the act; then clearly corporate counsel cannot represent both (and might be required to withdraw from the representation entirely if this came to light after common representation had been undertaken).

We also interpret Rule 1.7 to be consistent with Rule 3.4. If an employee's interest might be adversely affected by refraining from giving information to opposing counsel under Rule 3.4, then a conflict of interest exists such that common representation should not be permitted under Rule 1.7. For example, if the corporate employee had suffered the same discrimination as that complained of in the claim against the corporation, it would be impermissible for corporate counsel to undertake to represent this employee fact witness in the case.

While corporate counsel may certainly consult with the corporate constituent called as a witness in a deposition, this consultation is part of counsel's representation of the corporation and does not render the attorney counsel to the witness as an individual. Nor does such corporate representation block opposing counsel's ability to attempt to interview such a fact witness separate and apart from formal discovery.

Finally, we note that, in prohibiting communications with persons represented by counsel, Utah's Rule 4.2(a) provides explicit exceptions: "the lawyer . . . is authorized to do so by: . . . (2) decision . . . of a court of competent jurisdiction; (3) a prior written authorization by a court of competent jurisdiction obtained by the lawyer in good faith. . . ." Accordingly, an attorney who seeks to informally interview employees who are mere fact witnesses has the possibility of having this issue resolved by the court.7

Footnote

1. This portion of Utah Rules of Professional Conduct 4.2 (2004) is identical to ABA Model Rule 4.2 (1993). This Committee has previously opined regarding when Rule 4.2 prohibits or permits contact with various persons in Utah Ethics Advisory Op. No. 04-04, 2004 WL 1921150 (Utah St. Bar) (contact with former employees of opposing party permitted), Utah Ethics Advisory Op. No. 98-07, 1998 WL 493028 (Utah St. Bar) (contact with insurance adjuster), Utah Ethics Advisory Op. No. 96-01, 1996 WL 227376 (Utah St. Bar) (contact with former plaintiffs whose claims have been settled), Utah Ethics Advisory Op. No. 95-05, 1996 WL 73351 (Utah St. Bar) (relationship to U.S. Department of Justice regulation purporting to authorize certain ex parte contacts), and Utah Ethics Advisory Op.

No. 113 (1991), 1991 WL 634794 (Utah St. Bar) (counsel for individual members of tribe communicating with Tribal Counsel). None of these opinions is determinative in this case.

2. The ABA Model Rules include these concepts in the Comment to Rule 4.2, as did Utah before the current version was adopted in 1999. *See Featherstone v. Schaerrer*, 34 P.3d 194 (Utah 2001) interpreting Utah's prior Rule 4.2 to prohibit contacts with the corporation's secretary given this language in the Comment to the rule.

3. This interpretation of prior Utah Rule 4.2, which included these provisions in the Comment rather than in the text of the rule itself, was adopted by the Utah Supreme Court in *Featherstone v. Schearrer*, 34 P.3d 194, 201 (Utah 2001).

4. Utah Rules of Professional Conduct 3.4(f)(1),(2)(2004).

5. Utah Rules of Professional Conduct 4.1(a)(2004) provides: "In the course of representing a client a lawyer shall not knowingly: (a) [m]ake a false statement of material fact or law to a third person."

6. See Utah Rules of Professional Conduct 1.9 and Utah Ethics Advisory Op. No. 96-11, 1996 WL 45138 (Utah St. Bar) (attorney appointed to represent both mother and father in an abuse/neglect proceeding must withdraw from representing either of them after a conflict of interest arises).

7. *See e.g., Shearson Lehman Brothers, Inc. v. Wasatch Bank*, 139 F.R.D. 412 (D. Utah 1991) (brokerage firm sought and obtained court's permission to conduct ex parte interviews with former bank employees where bank was represented by counsel).

Rules Cited:

1. 7

3.4 4.1 4.2