IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTY L. WILLIAMS, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION No. 4:15-cv-00241 |
| | § | |
| TARRANT COUNTY COLLEGE | § | |
| DISTRICT | § | |
| | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF DEFENDANT'S BRIEF IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant files this Appendix in support of its Brief in Support of its Second Motion for Summary Judgment.

Respectfully submitted,

By: */s/ Lu Pham*
Lu Pham
State Bar No. 15895430
LPham@dphllp.com
Lauren H. McDonald
State Bar No. 24085357
LMcDonald@dphllp.com

DOWELL PHAM HARRISON,LLP
505 Pecan Street, Suite 200
Fort Worth, Texas 76102
Telephone: (817) 632-6300
Facsimile: (817) 632-6313

Angela H. Robinson
angela.robinson@tccd.edu
State Bar No. 24006655

TARRANT COUNTY COLLEGE
DISTRICT
1500 Houston Street
Fort Worth, Texas 76102
(817) 515-5242
(817) 515-5150 – Fax

ATTORNEYS FOR DEFENDANT
TARRANT COUNTY COLLEGE
DISTRICT

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been sent via electronic filing on the 31st day of May, 2018, to all parties at following address:

Donald E. Uloth
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 #261
Dallas, Texas 75252
(214) 725-0260
(866) 462-6179
Don.uloth@uloth.pro

*/s/ Lu Pham*
Lu Pham

Tarrant County College District

# Instructional Associate

FLSA Status: Nonexempt
Class Code: 51
Job Classification: Instructional Support

## Job Summary

Performs instructional tasks in a laboratory setting. Assists students through tutoring and teaching.

## Essential Duties and Responsibilities

- Discusses assigned teaching area with classroom teacher to coordinate instructional efforts
- Maintains and checks out to students, equipment used for field production
- Plans, prepares, and develops various teaching aids and materials
- Maintains software on lab computers and liason with Academic Computing for lab workstations
- Provides secretarial duties for program bids and purchase orders, program recordkeeping for files and advisory committee minutes
- Assists students, individually or in groups, with lesson assignments to present or reinforce learning concepts
- Researches equipment for purchases
- Delegates work duties to work-study student assistants
- Previews, orders and maintains inventories of equipment, instructional materials and supplies
- Plans, prepares, develops and maintains various teaching aids or materials
- Attends the workplace regularly, reports to work punctually and follows a work schedule to keep up with the demands of the worksite
- Completes all required training and professional development sessions sponsored through the Tarrant County College (TCC) Institute
- Supports the values of the College: diversity, teaching excellence, student success, innovation and creativity and service to the College

## Minimum Requirements

- Bachelor's degree from a regionally accredited college or university
- * Courses in the specialized field or equivalent knowledge and experience
- Two (2) years of work experience
- Proficiency with word processing, spreadsheet and presentation software
- Excellent customer service skills
- Excellent oral and written communication skills
- Experience working with computerized systems

Preferred Qualifications

Physical Demands
The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. While performing the duties of this job, the employee is regularly required to talk or hear. The employee frequently is required to use hands to finger, handle, or feel objects, tools, or controls and reach with hands and arms. The employee is occasionally required to stand; walk; sit; climb or balance; stoop, kneel, crouch, or crawl; and taste or smell. The employee must occasionally lift and/or move up to 40 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus. Requires color, depth, and texture perception.

Work Environment
The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. While performing the duties of this job, the employee occasionally works near moving mechanical parts; in high, precarious places; and with explosives and is occasionally exposed to wet and/or humid conditions, fumes or airborne particles, toxic or caustic chemicals, risk of electrical shock, risk of radiation, and vibration. The noise level in the work environment is usually quiet.

The duties listed are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position. The job description does not constitute an employment agreement between the employer and employee and is subject to change by the employer as the needs of the employer and requirements of the job change.

Reasonable accommodations may be made to enable individuals with disabilities to perform the essential duties and responsibilities.

MEMORANDUM

**TO:** Ricardo Coronado, Associate Vice Chancellor for Human Resources

**FR:** Christine Hubbard, Northwest Campus Humanities Division Dean

**DA:** 2 January 2013

**RE:** Recommendation for Termination of Employment for Northwest Campus Writing Lab Instructional Associate Christy Williams

I am writing to recommend termination of employment for Christy Williams, Northwest Campus Writing Lab Instructional Associate. Ms. Williams is unable to perform the essential functions of her position.

The essential functions of an Instructional Associate in the Northwest Campus Writing Lab include providing feedback for students on writing assignments on a walk-in and scheduled basis, conducting tutoring sessions with students, supervising students working on open-access computers in the writing lab, working effectively with other Writing Lab staff, students, and faculty members whose students are completing writing assignments, and being able to thrive in a fast-paced, flexible work environment where the Instructional Associate may be the only one in the lab and must be able to simultaneously greet students and get them set up on computers, tutor students with scheduled appointments, and address the needs of students requesting walk-in assistance.

Ms. Williams has demonstrated an inability to perform these functions.

- She becomes extremely agitated when trying to multitask. For example, if she is tutoring a student, she becomes frustrated, angry, and stressed when interrupted by students working on computers in the lab.
- She is unwilling to assist walk-in students with questions and instead requires them to leave their essays and schedule a follow-up appointment to receive assistance.
- She has ongoing conflicts with her co-workers in the lab and is insubordinate with her supervisor, Learning Lab Manager Conrad Herrera.
- She has ongoing conflicts with the faculty members who send students to the lab and complains about their assignments and teaching methods.
- She is stressed whenever working in the lab alone and pressures other staff to change their schedules or to come in outside their work hours to assist her.
- She has had several loud outbursts in the lab and in the hallway outside the lab area related to her interpersonal conflicts with student assistants, faculty, and staff. These outbursts have been disruptive to the other staff in the lab and to students working in the lab.
- She has had complaints from students, staff, and faculty regarding her behavior.
- On November 13, 2012, in response to feedback from Academic Foundations Department Chair Anita Biber about a complaint from an instructor who had brought students to the lab, Ms. Williams became angry, agitated, and began crying uncontrollably. She then ranted about her unhappiness in the lab and made comments about her inability to manage the stress she feels

when working in the Writing Lab. She became so distraught that she asked to go home, and then made comments indicating that she might harm herself. She also requested to be allowed to take drugs in her purse. We contacted our nurse, a counselor, and a police officer to monitor her behavior and decide how to proceed. Ms. Williams remained in the Writing Lab break room for several hours with the officer and counselor wailing and ranting so loudly that it was disruptive to the students in the lab and to the other lab staff. Once Ms. Williams left the campus, she was placed on administrative leave pending review of her ability to perform the essential functions of her position.

I have attached documentation from Academic Foundations Chair Anita Biber recounting specific information about issues with Ms. Williams on October 13, 2012, November 6, 2012, and November 13, 2012, as well as her general observations and recommendations concerning this employee.

## PERFORMANCE IMPROVEMENT PLAN

EMPLOYEE: Christy Williams

POSITION: Instructional Assistant ; 301 WHUMN-SS021

DATE: March 28, 2012

SUPERVISOR: Conrad Herrera

**GENERAL INFORMATION:** The supervisor and Dean of Humanities met with the employee in the afternoon of March 26, 2012 to discuss their desire for her to work evening hours in the library. The employee brought up many reasons why it was a bad idea, including negative perceptions of the library staff. The supervisor also brought up that the employee's attendance was an issue because it was increasing the workloads of the other tutors. The employee countered that the supervisor was well aware of obstacles in her personal life that caused her to be absent.

The next day, March 27, 2012, the employee initiated a meeting in the supervisor's office, which began with her claiming the supervisor violated her trust, to which the supervisor denied. When the supervisor attempted to interject with his perspective, the employee grew irritated, raised her voice, and told the supervisor not to interrupt her while she was talking. The supervisor responded that he would discontinue the meeting if their communication was not calm or two-sided. The employee closed the supervisor's door, sat down by his desk, and an intense debate began on perceptions of the other's work responsibilities and performance. The supervisor mentioned the employee had to improve her attendance, promptness, and collaborative efforts with her peers. The employee countered that the supervisor was incompetent and a bad manager because of his limited experience and knowledge base. She concluded by stating that she did not want to work or talk to the supervisor and that she wanted a transfer to another department or campus.

**STATEMENT OF CONCERNS:** (State specific examples and cite relevant policy)

- Concern #1

  The employee often reduces the spirit of teamwork in the Writing Lab and in the Humanities Division. For example, in fall 2011, the supervisor was able to hiring a student worker for Writing Lab. The student had only worked in the Lab for two weeks when he and the employee had an intense confrontation on October 20. The employee stormed to the supervisor's office and angrily stated she had a problem with the student worker. She then yelled for the student worker to come to the office too. Once the supervisor, employee, and student worker were in the office, the employee told the student worker, "I have a problem with you butting in my conversations and being a smart-ass, and you do not want to be a smart-ass with me!" This encounter resulted in the student-worker no longer feeling comfortable to work in the Writing Lab, so he has since worked in the Humanities Division workroom.

  Another example of the employee reducing the spirit of teamwork occurred on March 27, 2012 in the supervisor's office. The employee initiated the meeting with a loud and angry tone of voice, to which the supervisor countered he would not allow her to talk over him. This encounter resulted in the supervisor no longer feeling comfortable to work in the Writing Lab when the employee is present.

  The employee has violated the following TCCD policy:

DH Local; Employees Standards of Conduct; Code of Professional Ethics: Recognize the necessity of many roles in the educational enterprise and work in such a manner as to enhance teamwork and collegiality among students, faculty, administrators, and support staff.

- Concern#2

The supervisor informed the employee in the Writing Lab at the end of January 2012 about the Dean of Humanities' desire to establish evening hours in the NW Library to increase the number of students served in the evening by the Writing Lab. The employee immediately replied with reasons to not move to the library, mostly citing the duplication of reference materials. The supervisor told her to put more thought into the implications of the move before having a follow-up meeting on the subject. One such meeting occurred on March 26, 2012 in the dean's office. The employee brought up many reasons why the move was a bad idea, including negative perceptions of the library staff and the duplication of reference materials. She also countered with disdain over receiving directives from administrators who actually have no idea of what goes on the Writing Lab or what tutors' workloads encompass.

The employee has violated the following TCCD policy:

DH Local; Employees Standards of Conduct; Rules of Conduct: In most cases, such as poor work performance, minor infraction of College District regulations, poor attendance, etc., corrective action may be taken in an effort to enable the employee to become a more productive member of the College District. If such action is not effective, the employee may be dismissed. Examples of offenses that may warrant immediate discharge are as follows: (1) Refusal to carry out job duties or reasonable directives of the employee's supervisor.

- Concern #3

As stated in concern #1, the employee has used an angry and loud tone of voice when confronting the supervisor on March 27, 2012 and the student worker on October 20, 2011. She applied offensive conduct by claiming the supervisor was incompetent and a bad manager because of his limited experience and knowledge base. She applied abusive language when she scolded the student worker and told him he was a smart-ass. Furthermore, on October 24, 2011, she scolded a student on September 30, 2011 in the Writing Lab, which happened in the presence of the other two Writing Lab staffers, the supervisor, and several students. The employee confronted the student for not returning a Writing Lab tutoring form, spoke in an angry, loud tone with her, and stood in the student's personal space, towering above her, blocking her from exiting the Writing Lab.

The employee has violated the following TCCD policy:

DH Local; Employees Standards of Conduct; Rules of Conduct: Examples of offenses that may warrant immediate discharge are as follows: (12) Use of offensive or abusive language or conduct toward employees, students, or the public.

**PRIOR RELATED DISCUSSIONS OR WARNINGS:**

On October 27, 2011, the supervisor met with the employee to discuss a support staff performance appraisal. The supervisor instructed the employee to complete two of the five ElementK self-paced courses in three weeks time: Customer Service, Managing Conflict, Positive Work Environment, Working with Difficult People, and Realistic Time Management Goals. The first four courses were recommended because of negative confrontations with a student on September 30, 2011 and the student worker on October 20, 2011. The last course was recommended because of the significant number of tardies and absences the employee

accumulated during the months of September and October. The employee attempted to complete these courses but was never able to access them on ElementK, even with the help of the Director of Professional Development, so the supervisor waived the courses and assigned the employee other professional development activities for the spring 2012 semester.

STATEMENT OF POLICY ON THESE CONCERNS:

**CORRECTIVE ACTION TO BE TAKEN: (Specify timeframe for each action and when follow up meetings to determine progress will occur)**

The employee will collaborate with the supervisor on transitioning evening Writing Lab services to the library. One week after signing this performance improvement plan, the employee should expect to spend two evenings per week working in the library for a 3 week trial period. Afterwards, the employee and supervisor will convene to share notes and decide whether the trial period should continue permanently.

The employee must also complete the two ElementK self-paced courses titled Positive Work Environment and Realistic Time Management Goals within three weeks after signing this performance improvement plan. If the employee is unable to gain access to the courses, the employee should do a web search to find two similar webinars or self-paced courses, which the supervisor must approve, to complete within three weeks.

**CLOSING STATEMENT:** Improvement is expected immediately and must be sustained. Failure to comply may result in disciplinary measures up to and including a recommendation to terminate your employment.

I remain available to assist you with performance improvement in any way that I can.

____________________ ________________

Division Dean Signature Date

I acknowledge that I have read and fully understand the contents of this correspondence.

____________________ ________________

Employee Signature Date

EMPLOYEE COMMENTS:

# Memo

**To:** Sueanne Jones, NW Financial Aid

**From:** Conrad Herrera, Academic Foundations - Department Chair

**Date:** 3/27/2012 — Oct 31, 2011

**Re:** /NW Writing Lab – WCTS 1151

---

On October 20, 2011 at 2:00 pm, instructional assistant Christy Williams marched into my office in WCTS 1206 to make a complaint about work-study n. Ms. Williams, whose face was red with anger, told me in a loud voice that she had a problem with I She then yelled out, ' get over here!" for him to meet with us in my office. calmly walked over and asked what she wanted. Ms. Williams then stated, "I have a problem with you butting in my conversations and being a smart-ass!" She then faced him and said, "And you do not want to be a smart-ass with me. And look at you wearing that hat (point to his Miller Lite baseball cap), you should not be wearing that; you are representing TCC and that is not appropriate!" I then told Ms. Williams that I would handle the situation, so she immediately left.

then gave me some background information after she left. He stated that Ms. Williams was talking about a news story with another Writing Lab tutor, which involved a drunken father having his 9-year-old daughter drive him home. , then overheard their conversation and asked if he could give his opinion. Ms. Williams thought he was joking with his commentary, but informed her that he was serious, which infuriated her and caused her to storm out of the lab to my office.

I told ' that I would try to find another place to work, since he did not feel comfortable returning to the Writing Lab. As for Ms. Williams, I met with her an hour later to hear her side of the story, which completely coincided with ' story. Since then, I have assigned two professional development assignments involving customer service and managing conflict for Ms. Williams to complete by November 15, 2011.

cjh

T-2-1
T-2-2

November 13, 2012

Timeline:

**October 31, 2012**

Christy Williams (Full-time Instructional Assistant in the Writing Center)
Dr. Christine Hubbard (Dean of Humanities)
Anita Biber (Academic Foundations Department Chair)
Conrad Herrera (Learning Lab Manager)

Met to address concerns Ms. Williams had regarding Mr. Herrera, her supervisor.

- Meeting provided Ms. Williams the opportunity to share her concerns.
- To identify areas the department/ writing center could improve
- Communication and the role of the Learning Manager were identified

**November 6, 2012**

Christy Williams, Dr. Christine Hubbard, Anita Biber and Conrad Herrera

The four individuals reconvened, this time to provide Mr. Herrera an opportunity to respond to the concerns.

- He did address several instances as lies.
- He acknowledged the points he intends to improve and listed communication as a primary goal.
- Mr. Herrera and Ms. Williams had a heated disagreement in the spring of 2012
- Mr. Herrera and Ms. Williams had not communicated very well since that date.
- Dr. Hubbard told Mr. Herrera they would work on defining the role of the Learning Lab Manager
- Conrad Herrera would create guides for the tutors.
- Anita Biber later asked Christy Williams if she would mind creating a guide for the new on-call instructional assistants and she agreed.
- Ms. Williams is very detailed oriented, and her involvement would help provide information to the soon to be hired assistants.

**November 13, 2012 at 2PM**

Conrad Herrera met with Christy Williams to review the Annual Administrative Performance Evaluation.

As a result of the previous meetings, it was determined that it would be best if Dr. Hubbard or Anita Biber sat in future conferences between Mr. Herrera and Ms. Williams; therefore, Anita Biber was present.

- Conrad Herrera reviewed tutor trac results and the evaluation process.
- Christy Williams provided the necessary documents.

- Conrad reiterated that communication was a goal as he looked forward to a day when the two of them would be at a point where it was not necessary to require a third party during their conferences.
- To this point, the conversation was pleasant.
- Christy then began referencing the previous meetings. She was most concerned with the following points:

1) How to address concerns without appearing to talk behind someone's back.

- Anita Biber explained that Conrad's initial concern was how she discussed colleagues by making a point to state it was "off the record" then proceeded to demean them.
- Biber explained that it is considered a valid concern when she is willing to speak "on the record" so that is can be addressed as a true issue.

2) Conrad had called some of her allegations "lies" and she was offended that it inferred she was a liar.

- He explained that several of her comments were not true.
- She asked for examples, and he cited three.
- The discussion centered on perceptions.
- Conrad encouraged her to work with him to move forward.

At this point, Anita Biber chose to let Ms. Williams know about a recent concern that was brought to her attention.

- An ESL class was left without an instructor, so another instructor, Helen Yakub brought the small class to the writing center to access the ESL software.
- On November 12, Ms. Yakub approached Ms. Biber in the TCC parking lot to share that Ms. Williams was very put-out and rude when she took the students to the writing center.

Anita Biber considered it appropriate to share this comment with Ms. Williams for the following reasons:

- The conference was regarding employee performance.
- It related to two performance evaluation components identified by Mr. Herrera and Ms. Biber as areas needing improvement.
- There has been a continuous history of unpleasant exchanges between Ms. Williams and colleagues/ students that began even before Ms. Biber's term as Dept. Chair in Aug. 2012. This includes:
  - writing center colleagues
  - her immediate supervisor
  - faculty
  - students (tutees and student tutors)

- Christy Williams became very agitated that Ms. Yakub had brought forth this complaint because the two had a recent and pleasant exchange.
- She was left under the impression that it had been worked out.
- She was deeply hurt then angered that Ms.Yakub was two faced and went behind her back.
- Ms. Williams explained that Ms. Yakub was actually the person who was annoyed by having to work with the students and rudely interrupted her writing center session.
- She became increasingly upset and began crying.

She explained that it pained her not to be able to serve everyone, and she was at a loss as how to handle such a situation when the lab is short handed. She explained that it is her manner to be upfront and forthright. Since asked, Anita Biber shared that in the same situation she would have had a softer reaction and would have quickly explained the situation so that Ms. Yakub could have worked in a "plan b" until assistance was available. As a professional in a service oriented position, it is important to support a welcoming environment even when the lab is short staffed. It was not expected that she drop everything.

After this point, Conrad Herrera and Anita Biber listened to Ms. William's comments which included but were not limited to:

1. Ms. Yakub was unprofessional
2. She was very angry with Ms. Yakub and contemplated confronting her, but knew it was best not to
3. Her disappointment in humanity as most people cannot be trusted
4. She offered to have the student who witnessed the interaction write a statement
5. Her former supervisor, Ms. Ornelas, would have never tolerated someone making a complaint about a tutor
6. Ms. Ornelas would not have told her about the complaint in the first place
7. Ms. Ornelas supported the tutors and thought highly of them
8. There was no point to sharing Ms. Yakub's comment
9. Perceptions
10. She has ADHD which makes changing directions difficult (as in tasks)
11. She was being kicked while she was down
12. She was being nit-picked
13. Her colleague, Margaret Levy, is negative
14. The writing center is a very stressful place to work due to the volume
15. She has difficulty managing her stress
16. Her supervisors are not able to understand the stress level
17. She is over qualified and underpaid
18. Anita Biber has scheduled time off 11/15-11/21--She needs her time too
19. She is distraught by her mother's cancer and her limited time to see or speak with her
20. Other events that compound her stress level include an assault, the death of her father two years ago and the death of her cat

21. She had used up her employee assistance support hours
22. She was embarrassed
23. She felt this incident would be used against her to state she is too emotional
24. Based on student feedback, she does not trust our TCC counselors and would not consider using them as a resource

Anita Biber and Conrad Herrera continued to listen. She became very distraught and asked to go home, which was agreed upon.

- Anita Biber excused herself to notify the campus of the situation
- She spoke with Dr. Rode who advised that before Ms. Williams left campus, she needed to confirm that she would not hurt herself
- When asked, Ms. Williams stated that she wished she had her mother's cancer because she didn't care
- Anita Biber offered to bring in the police for support and Christy W. requested Officer George Ginunas or Mindy
- Officer Ginunas was in the hall, so he was invited to speak with Christy
- Conrad Herrera and Anita Biber were not present from this point on
- Dr. Hubbard, who was off campus for district business, was communicating through email and advised requesting the nurse
- As Anita was talking to the nurse, Officer Ginunas came in to request her services
- The nurse was notified that Christy had requested her purse to access her valium
- A TCC counselor, Lily Covio-Calzada, was observed entering the Writing Lab
- Ms. Williams stayed in the writing center break room until all students had left the center at 5
- The writing center was closed to students at 5PM

Anita Biber's general observations:

These are my own thoughts and personal observations:

- Ms. Williams has a very strong skill set and her attention to detail supports her ability to work extremely well with written text in the writing center.
- She has been complimented for the noticeable improvement made by students who attend sessions
- She has a strong sense of right and a conviction to be forthright and stern when anything or anyone conflicts or interrupts her point of view.
- She cannot be convinced to consider other points of view.
- She has difficulty moving forward if she was not declared "right".
- She has difficulty sustaining a pleasant demeanor in social situations involving the management of the writing center, especially if it requires multi-tasking.
- She can form bonds with the individual students who visit her regularly.

- The writing center environment is extremely stressful for her, and she is prone to panic if too many students schedule appointments or come into the room.
- She is agitated and vocal if students who are second language learners/ developmental education students are either referred to her or self-refer themselves to her.
- She consistently points out that she is not trained to work with students who struggle with basic grammar and language components.
- She has stated to Ms.Biber that she has difficulty reading social cues.
    - Ms. Biber suggested making more effort to make small talk with TCC colleagues to build friendly professional relationships so that she would not be so anxious when she needed to speak with them regarding work related issues.
- She has stated that she has preconceived notions that no one is trustworthy and therefore she must remain on the offense.
- She can cite numerous accounts of people being rude or aggressive with her, yet witnesses recount conflicting events. In general, such accounts are very uncommon in the department, although Ms. Williams is the single factor in almost all situations involving the writing center.
- She is unable to see the correlation as she firmly believes she was solely the recipient.
- Her writing lab colleagues are continuously stressed because she creates a negative work environment.
- After a negative experience, Ms. Williams will retell the situation to her writing center colleagues. They become anxious because she focuses on it endlessly; she cannot find closure.
- It was brought to my attention that she steers students/papers to the part-time assistant. It was suggested it was her means of reducing opportunities for conflict.

Ms. William's situation is extremely difficult because she can be very pleasant and likeable. She admits her social difficulties so one can't help but be empathetic to her personal plight, yet, her behaviors are very disruptive to the management of the writing center, students, her fellow tutors and her supervisor.

**FORD, TERRI**

**From:** HUBBARD, CHRISTINE
**Sent:** Wednesday, May 02, 2012 2:31 PM
**To:** COVIO-CALZADA, LILIA
**Cc:** HERRERA, CONRAD
**Subject:** RE: employee conduct

Hello, Lily—

Thank you for letting me know what you witnessed. Conrad came to see me and reported the same thing. I have recently asked all of my writing lab staff to complete Element K courses on Positive Work Environment, and we are about to meet to discuss ways to work well together in the lab and with students. I will take the opportunity to speak with Christy about this incident and to work with her to determine better ways to respond positively to students.

I appreciate your willingness to share this information with me, and I want you to know that I and Conrad share your dedication to professional conduct in the workplace and positive interactions with students.

Best regards,

*Christine Hubbard*

Christine Hubbard, Ph.D.
Division Dean, Humanities

Tarrant County College Northwest Campus
4801 Marine Creek Parkway
Fort Worth, TX 76179-3599
Office: 817-515-7782
Fax: 817-515-7007

---

**From:** COVIO-CALZADA, LILIA
**Sent:** Wednesday, May 02, 2012 2:15 PM
**To:** HUBBARD, CHRISTINE
**Cc:** HERRERA, CONRAD
**Subject:** employee conduct
**Importance:** High

Dr. Hubbard, it disturbs me that I find myself having to write this email regarding one of the Writing Lab employees, Ms. Christy Williams, but feel that I must, as I witnessed her displaying what I feel was inappropriate behavior towards a student last week.

On Friday, April 27th, at approximately 10:40 a.m., I saw Ms. Williams in the west parking lot (closest to 820) having an altercation with a young lady who I believe was a student. Ms. Williams' voice was loud enough (even shouting at times) to where I could hear her from about 10 cars away. I don't know the full details of what exactly happened, but I did hear Ms. Williams shout to the young lady saying "I'm sick of you students…". I also heard Ms. Williams tell the young lady that she (young lady) was parked in faculty parking and that she (Ms. Williams) was calling campus police to report her. At the time, there was plenty of faculty parking available for Ms. Williams to use and Ms. Williams was herself

parked in a visitor spot. The young lady subsequently moved her car to another location, as did Ms. Williams. The young lady did say to Ms. Williams at one point that she (Ms. Williams) was being very rude.

As I stated before, I'm not sure of what the altercation was about, but my main concern was Ms. Williams' aggressive ne of voice and attitude toward the young lady. It was very negative and hostile, I was afraid for the young lady. The young lady seemed to be very intimidated and quite frankly, speechless and overwhelmed by Ms. Williams' rudeness and aggressive behavior. In my opinion, no matter what a person (student or not) does or says, a TCC employee should not display the rude and offensive behavior that Ms. Williams displayed in the parking lot on that day. It is not good practice and gives other employees a very bad name.

Thank you for lending your ear. If I can provide further information, please do not hesitate to contact me.

Lily Calzada, M.Ed., LPC
Coordinator of Special Services
Tarrant County College Northwest Campus
Advising and Counseling Center
WCTS 1112A
817-515-7602

Student Writing Lab Complaint
Notes by Conrad Herrera

September 12, 2012 phone call to Conrad Herrera (12:10 PM)

called to make a complaint about her experience with Christy Williams in the NW Writing Lab yesterday (September 11, 2012) at 7:00 PM. She said Christy was unprofessional and mean and that she would not help her edit or critique her paper. According to Christy's explanation for not helping her was that s paper was not typed and she had to help a student with a previously scheduled appointment. then told her that she would go to a writing lab at another campus and that she would make a complaint because Christy was being "ugly" with her. Also, the student was carrying a folder with Biblical scripture, and Christy looked at the folder then told her to say she needed to follow the words (advice) on her folder. Christy then asked two students in the lab if they were willing to write letters on her behalf saying that she was professional so that she would not get in trouble with her supervisors.

told me that this was her first visit to the Writing Lab and she asked if this was acceptable tutor behavior (to which I responded with a no). She also mentioned she would never return for Christy's help and that she would only come back if we had another tutor. Then, she gave me her phone number ( ) in case I needed anything from her in writing.

CJH

CONFIDENTIAL

## *CHRISTY WILLIAMS – FMLA & WORK PERFORMANCE*

## *DECEMBER 2012*

I spoke with Christy Williams about 10:20 a.m. November 29, 2012; Ms. Williams informed me that she will not be available for a 3:00 meeting today. I asked if she would be available for a conference call instead. She informed me that she has filed for short –term disability and would need to talk with her doctor before talking with HR. White said that she would be unable to reach her doctor today, but could by Monday. I asked her to call me and we would then set an appointment. Williams agreed. Sharion Marshall

12/3/2012, 5:45 pm, Williams called HR and said that her doctor told her not to meet with HR because the meeting would cause additional stress. She could not talk to HR while on short term disability. She could only talk to Kristen White about her FMLA and she did not know what we wanted. She was informed that would discuss her situation and performance. Williams said that she would talk to HR when she felt better.

12/04/2012 Dr. C. suspended leave pay until she is ready to talk to HR. Kristen White was informed to contact Williams and tell her of the suspension of pay and notify her of her remaining sick and vacation pay. Grace period of 30 days before short term will start payments.

12/14/2012 Williams confirmed meeting with Dr. Coronado and S. Marshall to discuss performance.

01/02/2013 During the meeting Williams stated that because of an assault (not work related), the death of father, the death of her cat, her mother's breast cancer, hormonal disorder, medical components and the stress of being the only person on duty in the lab from 5:00 – 8:30 p.m., Monday – Thursday was more than what she could handle. (See attachment- work schedule) She has worked 3.5 years in the lab, 14 years as a publisher and is an English graduate of UTA. She is of the belief that Conrad Herrera, lab manager does not understand the lab. He does have a Master's degree, but lack experience and is a favorite of Dr. LeBlanc. He also does not understand her explanation of how the assault she encountered has affected her life. Williams has offered suggestions to alleviate some of the issues with the lab: Close the lab at 5:00 p.m.; alternate the schedules of her co-workers and manager to work one late night per week. During a March meeting with Conrad, he said he would spend more time in the lab. To this date that has not happened. Williams stated that she was asked to help in making Conrad a better manager. Williams said it is difficult for her to take rest room breaks if she is the only person working in the lab. Williams said that she has been put in an unhealthy circumstance. She has been subjected to: nit picking by Conrad; betrayed by a teacher who showed up at the lab, with no prior notification, with a no- show instructor's class asking for her help, while she was helping a student with a scheduled appointment; Ambushed during a meeting in November, when she decided to leave.

Dr. Coronado provided information to Williams about her work performance, how she is unable to multitask, her uncontrollable crying, how she becomes agitated when dealing with more than one student, her attendance. Management was not satisfied with her work performance. Coronado understood Williams' explanation that she to had been subjected to poor management and the lab is

understaffed. Coronado told Williams that she was being put on leave until further notification from TCC.

Tarrant County College

## Certification of Fitness for Duty

OFFICE OF HUMAN RESOURCES 1500 Houston Street ▪ Fort Worth, Texas ▪ 76102-6524 ▪ (817) 515-5100

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

| EMPLOYEE INFORMATION: For completion by the Employer | |
|---|---|
| Employee: Christy Williams | Colleage ID: 155094 |
| Employee's job title: Instructional Asst. | Department: Humanities NW Campus |

NOTE: This employee has been referred to you for an evaluation and confirmation of fitness for duty. The employee will not be permitted to return to work until this completed evaluation form is received by Tarrant County College District.

| PROVIDER INFORMATION: For completion by the Healthcare Provider | |
|---|---|
| Provider name: RAJU INDUKURI, M.D. | |
| Degree: 2707 AIRPORT FRWY SUITE 206 | Practice/medical specialty: pendiatry |
| Date Licensed: FT. WORTH, TX 76111 | State of Licensure: Texas |
| Address: | Phone: 817. 222. 9907 |

1. Date condition began: 11. 13. 12

2(a) Please indicate the following:

- ☑ I have reviewed this employee's job duties (see attached)
- ☑ The employee is able to work a full, regularly scheduled day with no restrictions beginning 1. 3. 13 (date)
- ☐ The employee is unable to return for any work until ______________ (date)
- ☐ The employee is able to return to work on a reduced schedule for _____ hours per day from ______________ (date) through ______________ (date)
- ☐ The employee is able to return to work with restrictions from ______________ (date) through ______________ (date). Please complete next section (b)

| | |
|---|---|
| 2 (b) | Please indicate restrictions: |
| ☐ | no lifting or carrying objects: _____ max. lbs. Repetitions |
| ☐ | no pushing/pulling objects: _____ max. lbs. Repetitions |
| ☐ | no bending/stooping/squatting/twisting: Repetitions |
| ☐ | no kneeling for more than _____ hours each day |
| ☐ | no crawling for more than _____ hours each day |
| ☐ | no sitting for more than _____ hours each day |
| ☐ | no standing for more than _____ hours each day |
| ☐ | no walking for more than _____ hours each day |
| ☐ | no climbing stairs |
| ☐ | no working/climbing on elevated equipment (ladders, stools, etc.) for more than_____ hours each day |
| ☐ | no reaching above the head or shoulders |
| ☐ | no reaching away from the body greater than with right left arm |
| ☐ | no grasping objects with ☐ right ☐ left hand |
| ☐ | no fine manipulation with ☐ right ☐ left hand |
| ☐ | no assaultive, physical control, and/or arrest situations |
| ☐ | no driving a vehicle |
| ☐ | no operating machinery or equipment |
| ☐ | no working alone |
| ☐ | no use of firearms |
| ☐ | no typing, keyboarding, or entering data for more than _____ hours each day |
| ☐ | no use of a CRT or computer monitor for more than _____ hours each day |
| ☐ | no use, including repetitive, of _______________ (extremity/joint) |
| ☐ | no weight bearing on _______________ (extremity) |
| ☐ | Other restrictions (specify):_______________ |
| 3. | Other instructions: Please make reasonable accommodations. |

**I certify that this accurately reflects my informed professional opinion regarding this individual's ability to return to work and perform job tasks as indicated at this time.**

| Provider Signature: | Date: |
|---|---|
| [signature] | 1-2-13. |

**Please return the completed form to Tarrant County College District Human Resources.**

T-2-3

Tarrant County College District

MAY OWEN CENTER
OFFICE OF HUMAN RESOURCES

1500 Houston Street • Fort Worth, Texas 76102-6524 • 817-515-5234 • Fax 817-515-5350

January 7, 2013

Ms. Christy L. Williams
7808 Arnold Terrace
North Richland Hills, TX 76180

Dear Ms. Williams

Thank you for meeting with Sharion Marshall and me, on January 2, 2013. This letter will notify you that upon recommendation of your supervisors and respective administrators, Tarrant County College is terminating your employment effective January 7, 2013. The termination is based on your past performance. You may contact Dr. Christine Hubbard, Dean, to arrange to pick up your personal belongings, at 817-515-7782. If you should have any additional questions please feel free to call me or Ms. Marshall, at 817-515-5275.

Sincerely

Ricardo Coronado, Ph.D., SPHR
Associate Vice Chancellor for Human Resources

cc Christine Hubbard

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: [X] FEPA [X] EEOC

Agency(ies) Charge No(s): 1A13675 / 31C-2013-00615

Texas Workforce Commission Civil Rights Division and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Christy L. Williams | (817) 707-1223 | 07-27-1965 |

Street Address / City, State and ZIP Code: 7808 Arnold Terr., N. Richland Hills, TX 76180

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Tarrant County College NW Campus | 15 or more | (817) 515-7147 |

Street Address / City, State and ZIP Code: 4801 Marine Creek Pkwy., Ft. Worth, TX 76179

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code:

RECEIVED JUL 08 2013 TWC CRD

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN

[ ] RETALIATION [X] AGE [X] DISABILITY [ ] OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE — Earliest: 01-02-2013 Latest: 01-07-2013

[ ] CONTINUING ACTION

THE PARTICULARS ARE:

Original Received: 06-24-13

I. PERSONAL HARM: I was denied reasonable accommodations on 01-02-13, by Ricardo Coronado and Sharion Marshall, in a meeting, after I provided them with a doctor's note regarding this. I was subsequently terminated on 01-07-13, by Ricardo Coronado.

II. RESPONDENT'S REASON FOR ADVERSE ACTION: Past performance.

III. DISCRIMINATION STATEMENT: I believe I have been discriminated against in violation of Texas Labor Code, Chapter 21, The Age Discrimination in Employment Act of 1967, and The Americans with Disabilities Act of 1990, as amended, because of my age (47 years), and disability.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

7-8-13 [signature]

Date — Charging Party Signature

My name is Christy Leigh Williams (First) (Middle) (Last), my date of birth is 7-27-65 (Date of Birth)

and my address is 7808 Arnold Terr. (Street) N. Richland Hills (City), TX. 76180 (Zip)

USA (Country) I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant (County) County, State of Texas, on the 7 (Day) day of July (Month), 2013 (Year).

TCCD 00002

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

CHRISTY L. WILLIAMS, )
)
Plaintiff, )
)
VS. )CA NO. 4:15-cv-00241-0
)
TARRANT COUNTY COLLEGE )
DISTRICT )
)
Defendant. )

*********************************************

ORAL DEPOSITION OF

CHRISTY L. WILLIAMS

NOVEMBER 23, 2015

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF CHRISTY L. WILLIAMS produced as a witness at the instance of the Defendant, was taken in the above-styled and numbered cause on the 23rd day of November, A.D. 2015, from 10:13 A.M. to 4:37 P.M., before Sharon Kiosse Poulos, CSR in and for the State of Texas, reported by shorthand machine, at the offices of Dowell Pham Harrison, LLP, located at Tindall Square, Building No. 2, 505 Pecan Street, Suite 101, in the City of Fort Worth, County of Tarrant, State of Texas, pursuant to the Federal Rules of Civil Procedure.

COPY

Q. Did you report to and work at the Northwest Campus during your entire tenure at Tarrant County College?
**A. Yes.**
Q. Throughout this deposition, I'm going to call it TCC, if it's okay with you. Otherwise Tarrant County College is kind of a mouthful.
**A. Yes. That's okay.**
Q. And at all times when you were employed by TCC were you -- was your position anything other than an instructional assistant?
**A. I was not aware that my title changed to instructional associate until after I was fired, and then it was provided in some of the documents that TCC gave the Texas Workforce Commission. So apparently my title did change, but I didn't know it while I was working at Tarrant County College.**
Q. I have to object to that response, or part of that response, other than "instructional associate" because it's nonresponsive.
So just for the record, no disrespect to you, I'm just noting my objection to that response as being nonresponsive to the extent -- to the extent it is above and beyond your testimony that you may have been an instructional associate as well while you were



employed at TCC.
But even if you were an instructional associate, was your job duties different than as an instruction assistant?
**A. I'm unsure about if there are differences between the instructional associate position and the instructional assistant position.**
Q. Did your job duties change any from the time that -- during your entire time that you were employed at TCC?
**A. Not to my knowledge.**
Q. And you testified that you were at the Northwest Campus. Did you ever report to any other campus?
**A. Do you mean -- when you say "report," what do you mean?**
Q. Work at, where you work at on a day-to-day basis.
**A. No, sir, I didn't report somewhere else.**
Q. And my understanding is that you also worked at the writing lab at Northwest Campus; is that correct?
**A. Yes.**
Q. Describe for me -- describe for us what a writing lab is.
**A. A writing lab can vary from school to school**



**and even from campus to campus. So I will only be able to speak to my writing lab that I worked at.**
Q. Sure.
**A. It was a large room with twelve computers for students to use, two cubicles and one -- no, two -- two desks with computers for other staff to use.**
**And did that answer the whole question, what is a writing lab?**
Q. It did.
So other than you, was there anyone else working inside the writing lab while you were working there?
**A. Yes.**
Q. Who would that be?
**A. Part of the day Lynelle Brown.**
Q. How do you spell that name, please?
**A. L-Y-N, as in Nancy, N, as in Nancy, E-L-L-E, Brown.**
**And for part of the day Margaret Levy, L-E-V, as in Victor, Y.**
Q. What were their job titles?
**A. Margaret was an instructional associate. Lynelle was an instructional assistant. Another person would come into the lab on a volunteer basis, and that -- his name is Dr. Curtis Fukuchi.**



Q. How do you spell that last name?
**A. F, as in Frank, U-K, as in kilo, U-C-H-I.**
Q. You said he was there on a voluntary basis?
**A. Correct. He is a professor of English at that campus.**
Q. Okay. Other than Ms. Brown and Ms. Levy, was there any other employee assigned to work at the writing lab with you?
**A. A couple of times there were part-time people who came and left, were not employed very long.**
Q. Who are they?
**A. Crystal Bravo.**
Q. Anyone else?
**A. Peer tutor, who I cannot remember the name of, a male.**
Q. Oh, peer, as in P-E-E-R?
**A. Correct.**
Q. And a peer tutor would be kind of like a student assistant; is that correct?
**A. From my understanding, a student assistant is a different job.**
Q. Okay.
**A. A peer tutor is someone who's a student who helps other students with something, in this instance writing.**

When students come into the lab, is it part of your job responsibilities to treat those students with respect -- I'm sorry -- professionally?
**A. Yes.**
Q. And in your dealings with all students, whether it's in the lab or outside of the lab, would you agree with me that so long as you're on a TCC campus, it is your job, part of your job responsibility, to interact with students in a professional manner?
**A. Yes.**
Q. Would you also agree with me that part of your job responsibilities as an instructional assistant is to interact with your peers and your supervisors in a professional manner?
**A. Yes.**
Q. Would you agree with me, ma'am, that your job -- it is part of your job as an instructional assistant to treat your superiors or supervisors in a respectful and professional manner?
**A. I would say to the best of my ability.**
Q. Now, what does that mean? Aren't you supposed to treat your superiors with respect and with professionalism at all times?
**A. If my supervisor is yelling at me and insulting me and I feel the need to remove myself from the**



**situation, one person might consider that unprofessional, but I left the situation. I consider it getting away from mistreatment.**
Q. But you would never mistreat a colleague or a superior, even though -- in other words, if a superior or a colleague raised their voice at you, would you raise your voice in kind, or would you just avoid -- walk away and avoid the confrontation altogether?
**A. It's possible that I could raise my voice.**
Q. And did -- when you -- when you were first hired to work for TCC, who was your supervisor, ma'am?
**A. Vera Ornelas.**
Q. And did Ms. Ornelas supervise all three of you; in other words, supervise you, Lynelle and Margaret as well?
**A. Yes.**
Q. Okay. And how long did Ms. Ornelas supervise y'all?
**A. Until, I believe, it was summer of 2010 when she retired after 48 years with TCC.**
Q. Okay. And after she retired -- well, first of all, did you have any issues with Ms. Ornelas?
**A. No.**
Q. Any performance issues with her?
**A. No.**



Q. Did you have any criticism or disagreements with how she managed the writing lab?
**A. No.**
Q. Any disagreements on how she dealt with you or interacted with you?
**A. No.**
Q. So you had no issues with Ms. Ornelas whatsoever; is that correct?
**A. Correct.**
Q. So after Ms. Ornelas retired in the summer of 2010, who did -- who became your supervisor?
**A. Conrad Herrera.**
Q. Okay. And had -- had you met Mr. Herrera before he became your supervisor; in other words, was he already working at the -- at the college?
**A. Yes.**
Q. Okay. And how did you know Mr. Herrera prior to him being your supervisor?
**A. Conrad and I were part of a group of people who would go out on payday Friday and play pool.**
Q. And what was his position when y'all were, I'll say, colleagues? What was his position?
**A. I don't recall.**
Q. Okay. But you didn't work in the same department as he did, or was it a different department?



**A. Gosh. It can be confusing how the departments are aligned. For example, there's student support services. I -- yeah. He and I could have been under the same umbrella, but he wasn't in the writing lab or under Vera's management, so, you know, it wasn't -- it didn't seem like we were in the same department.**
Q. All right.
**A. That's the best I can answer that.**
Q. Before I talk more about Conrad Herrera's position, when you were reporting to Vera Ornelas, who was her boss?
**A. Mike Matthews.**
Q. Two Ts?
**A. Yes.**
Q. And what was his position?
**A. He was the Dean --**
Q. Do you know --
**A. -- over English, but that's where it gets kind of confusing, again, because he was also the Dean over Conrad.**
Q. Okay.
**A. For whatever department or area Conrad was in.**
Q. Okay. And what was Vera's position? What was the title?
**A. I don't remember her specific title.**

Q. But it was --

A. But it was loud.

Q. Okay.

A. And --

Q. What else?

A. Those are the only two things I can remember. I'm not saying that's all he was saying. Those are the two that stand out.

Q. Do you know if anybody witnessed that incident?

A. We were in his office, and the door was closed. So a witness -- when I think witness, I think somebody visually seeing, so there wasn't somebody to see.

Q. Did you report this incident to somebody in Human Resources?

A. I went and talked to Christine Hubbard, the Dean, within a couple of days, I believe.

Q. What did you report to her?

A. I told her what he had said, how he acted, how he had yelled, and how I didn't feel comfortable meeting with him one on one alone anymore.

Q. And after that, you never met with Conrad Herrera by yourself; is that correct?

A. Correct.

Q. Okay. Let's talk about this assault. Tell us what happened -- well, before we talk about that, before



this confrontation or this altercation that you had with Conrad Herrera sometime in March of 2012, did you have any issues with Mr. Herrera between the summer of 2010 and March of 2012 in his treatment of you?

A. Yes.

Q. Okay. What -- what issues did you have with Mr. Herrera prior to this March 2012 incident where he allegedly yelled at you?

A. He would -- he would say -- okay. On one occasion he said, There have been complaints about you.

And I said, From whom?

And he said, Well, I can't say that.

And I said, Well, what are they saying?

And I don't remember clearly what he said. What I took away from it, it was nonspecific and it was nebulous, and it was nothing I could put my finger on that I did this thing or I said that thing. And that made me feel very uncomfortable, but he was saying a critical thing but nonspecifically.

And then maybe a couple of months later in the -- in the hallway outside the lab I was talking to him about something. It was nothing bad, nothing negative. I want to say, you know, just kind of maybe touching base about something. Okay?

And he said, Oh, I've heard more



complaints.

And I said, Well, what -- what now?

Because, see, I had tried not to do anything anybody could complain about.

Q. Yes.

A. And he said, Well, the same kind of thing.

Q. Nonspecific?

A. Exactly.

And so students were walking by, changing class. And I said, Can we go into your office and talk about this?

Because I felt embarrassed to have this discussion in front of the students. And so we went to his office, and he continued with the nonspecific, Well, I can't say who said anything, and I can't say what they said. But it's the same sort of thing, same type of thing.

And I said, Well, how can I fix something if I don't know what it is?

And he couldn't answer that.

There may have been one more time of that kind of nonspecific. It was very frustrating, because I -- I couldn't imagine what somebody would be complaining about me about.

Q. So other than those two or three instances



where Conrad Herrera was giving you nonspecific instances of complaints about you, did you have any issues with him between the summer of 2010 and March 2012?

A. Let me think. For clarity, when you say "issues," are you talking a conflict with him?

Q. Any problems, any issues, any conflicts you had with Conrad Herrera between summer of 2010 and approximately March of 2012, other than those two or three instances where he was giving you nonspecific complaints about you?

A. Okay. At this time I cannot think of any others.

Q. All right. Let's talk about this assault that occurred. Do you recall when it happened?

A. I don't remember the specific date right now.

Q. Approximately is fine.

A. End of February of 2012.

Q. Okay. And it took place outside of TCC?

A. Correct.

Q. You're not alleging that TCC had anything to do with that assault; are you?

A. I am not.

Q. Okay. Could you describe for us what happened.

A. This is still something I have a real hard time

**said it. I don't believe I said it.**
Q. Did you ever tell Mr. Herrera that you did not want to talk or work with him?
**A. I don't believe I said I didn't want to talk to him. I said something along the lines of I don't want to work with you.**
**That was right after he yelled at me that day, and I was trying to be at the office. And that's what I said, but what I meant was I didn't want to work alone with him, which is why I then went to the Dean and said, you know, In the future don't leave me alone with him.**
Q. Sure. But after that one incident where you allege that he yelled at you, you -- TCC never made you meet alone with Conrad Herrera again after that; did you -- did it? I'm sorry.
**A. No. They did not make me.**
Q. In other words, after that one incident in about March of 2012, after that incident, you never worked with Conrad Herrera or met with him one on one?
**A. Correct.**
**(Exhibit No. 6 marked.)**
Q. (BY MR. PHAM) I'm going to show you what's been marked as Exhibit No. 6. This is a memorandum dated March 28, 2012, from Conrad Herrera to Christy Williams,



you, instructional assistant.
Have you -- I ask you, have you ever seen that document before?
**A. To answer your question, no, I've never seen this before.**
Q. Okay.
**A. But I'd like to read it, unless you want to read it to me or something.**
Q. Well, I'm going to ask you some questions about it. Okay? Since you've not seen it before.
It appears at the general information at the top where it says "general information," do you see that?
**A. Yes.**
Q. It says that the supervisor and Dean of Humanities met with the employee in the afternoon of March 26, 2012, to discuss their desire for her to work evening hours in the library.
Do you recall ever having such a meeting with the Dean of Humanities and Conrad Herrera?
**A. Yes.**
Q. Okay. Do you recall when that meeting occurred?
**A. It was -- it was in March. I'm not sure it was this date.**



Q. Okay. And isn't it true that during that meeting, the Dean of Humanities, that was Dr. Hubbard; right?
**A. Correct.**
Q. Dr. Hubbard and Mr. Herrera were trying to get -- convince you to move to the -- work out of the library in the evening hours. Do you recall that? It says right here that they discussed with you their desire for you to work evening hours in the library.
Do you recall that topic ever coming up?
**A. It was -- it was a topic, but that was not the motivation or the context in which it was brought up.**
Q. Ma'am, I'm not talking about motivation. I just want to make sure that you recall there being a discussion with Dean Hubbard and Mr. Herrera sometime in March of 2012 wherein they expressed their desire for you to work your evening hours in the library.
**A. It was not their desire. It was their suggestion, based upon the short staffing and the security issues of me being alone in the lab.**
Q. Okay. And because of those issues, they suggested that you might -- that you might want to work out of the library instead of by yourself at the writing lab; right?
**A. Yes.**



Q. And how far away was the library from the writing lab?
**A. It was a separate building and up the -- an elevator. It may have just been one building over or two and up an elevator.**
Q. And at that point in time you rejected their offer or their suggestion that you work out of the library instead of in the writing lab; is that correct?
**A. No.**
Q. You didn't -- you never said no?
**A. Correct. I never said no.**
Q. Okay. It states in here that The employee brought up many reasons why it was a bad idea, including negative perceptions of the library staff.
Did you ever -- do you recall ever expressing a desire not to work out of the library in the evenings?
**A. That's a fair statement.**
Q. Okay. Why?
**A. Okay. So this would just have been from 5:00 to 8:00, Monday through Thursday evenings, and I explained that I did -- I would not have all of my materials that I had in my cubicle, which were extensive; books, handouts I had created. Then there was another resource -- the lab was full of resources.**

STATE OF TEXAS )
)
COUNTY OF TARRANT )

I, Sharon Kiosse Poulos, a Certified Shorthand Reporter in and for Tarrant County, Texas, do hereby certify that the facts stated by me in the caption to the within and foregoing deposition are true; that the deposition was taken before me pursuant to the agreement of the parties; that the within named witness was duly sworn to testify the truth; that the questions asked and the answers given were taken by me and subsequently transcribed by me and reduced to typewriting by me or under my supervision, and that the within and foregoing typewritten pages constitute and contain a full, true, complete and correct transcript of all proceedings had.

I further certify that I am neither attorney for, related to nor regularly employed by any of the parties hereto, and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, and that I am not in any way financially interested in the outcome of said proceedings.

TO CERTIFY WHICH, witness my hand and seal at Fort Worth, Tarrant County, Texas, this 11th day of December 2015.

Sharon Kiosse Poulos

Sharon Kiosse Poulos, CSR, RPR
Cert. No. 1315, Expires 12/31/2016
2820 Harlanwood Drive
Fort Worth, Texas 76109
(817) 239-6109
skiossepoulos@aol.com

Cost: ______________

Paid by: ______________

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

CHRISTY L. WILLIAMS, )
)
Plaintiff, )
)
VS. )CA NO. 4:15-cv-00241-0
)
TARRANT COUNTY COLLEGE )
DISTRICT )
)
Defendant. )

*********************************************

ORAL DEPOSITION OF

CHRISTY L. WILLIAMS

JULY 11, 2016

Volume 2

*********************************************

ORAL DEPOSITION OF CHRISTY L. WILLIAMS, produced as a witness at the instance of the Defendant, was taken in the above-styled and numbered cause on the 11th day of July, A.D. 2016, from 9:50 A.M. to 1:51 P.M., before Sharon Kiosse Poulos, CSR in and for the State of Texas, reported by shorthand machine, at the offices of Dowell Pham Harrison, LLP, located at Tindall Square, Building No. 2, 505 Pecan Street, Suite 101, in the City of Fort Worth, County of Tarrant, State of Texas, pursuant to the Federal Rules of Civil Procedure.

A. No. 9 just says perception.
Q. Right.
A. So I'm not really sure what she's referring to there.
Q. Okay.
A. I don't recall saying No. 10.
Q. You don't recall saying that you had ADHD, which makes changing directions difficult?
A. I don't recall saying that.
Q. Okay. Please go ahead and continue reading.
A. The other items, I don't disagree with.
Q. Okay. Thank you, ma'am. I don't mean to hover over you.
A. No. You're fine.
Q. I'm just standing to the side here reading alongside with you.
On Page 150, after she listed those twenty-four items, she then says: Anita Biber and Conrad Herrera continued to listen. She became very distraught and asked to go home, which was agreed upon.
Did that happen?
A. Yes.
Q. Now, Ms. Biber wrote down on one of the bullet points on Page 150, When asked, Ms. Williams stated that she wished she had her mother's cancer because she

didn't care.
Do you recall saying that at all?
A. No. I recall part of that.
Q. Okay. Share with us, would you, please, what you do recall about --
A. I said I wished I had my mother's cancer so that my mother wouldn't have to suffer.
Q. Okay. And at some point thereafter Lilly Covio-Calzada was called in to assist you?
A. Correct.
Q. Okay. Now, as I understand it, in this report anyway, in Exhibit 7 it says the TCC counselor. Was she a counselor that you had sought counseling with before?
A. No.
Q. Okay. And was she coming to your attention at that point in time? Did -- did you say you didn't want to talk to her, or what -- let me see if I can ask this.
Was she helpful to you -- when Ms. Covio-Calzada came, was she helpful to you?
A. A little bit.
Q. Okay. Did it help you to calm down and kind of calm down the situation for you?
A. The situation had already become calmer earlier, but she continued to help calm the situation.
Q. All right. All right. Now, did there come a

Q. And I appreciate that information, and I want to make sure I understand you clearly. Okay?

You're saying that with regard to your ADHD and/or anxiety, in the evenings when there are multiple students who come in, if they were easy to work with or not demanding, that you drop everything and help them immediately, you're saying that you can manage that workload; is that correct?

A. You threw in there "easy to work with." They don't -- they don't have to be easy to work with.

Q. When I say "easy," I don't mean about the tasks that they were doing, because I think writing is a difficult thing. When I say "easy," it's mannerisms and the demands and the abruptness and the rudeness. All right? So let me see if I can rephrase my question. Okay?

A. Okay.

Q. With regard to your ADHD and/or anxiety, when you had to work by yourself in the evenings, was -- were you capable of doing your job when multiple students came in, but they were not rude to you and were not demanding that you drop everything and to help them at once? Do you need to see that question?

A. I do.

I was capable of doing my job, even if they

were rude, even if they were demanding. It just wasn't -- it was -- it caused me more anxiety inside to -- and I don't know if I said rude or you said rude, but I wouldn't characterize the demeanor of many of the students as rude. I would characterize it more as demanding and angry if they didn't receive what they wanted right when they wanted it.

Q. So if you didn't have to deal with students who were demanding and angry, you think that you can still -- you can perform your job even when there are multiple students in the lab and you were the only one servicing them?

A. I could perform my job even if they were demanding and angry.

Q. Okay.

A. It's that "in" word, inside anxiety, and that would flare up and make me feel sick, you know, like shaking, upset stomach, head start pounding, because I had nobody to help share the workload, and I could only work so fast with so many students. So I was able to do it. I just was in a lot of discomfort.

Q. So if we were to set aside the personal discomfort issue, your testimony is that you can still perform your job and the services that are required despite having your ADHD or anxiety; is that correct?

Q. Concerning the ADHD and anxiety, you had been diagnosed with those two conditions before you started working at TCC; correct?

A. Yes.

Q. And you were able -- and it's your position that you were able to perform your job, with or without accommodation, despite having ADHD and anxiety up through November 13, 2012; right?

A. Yes.

Q. And concerning the other mental or physical conditions, the nine other that we did not delve into detail but you listed, you were diagnosed with those conditions before you came to work at TCC; correct?

A. No.

Q. With which ones were you diagnosed after you came to TCC?

A. The PTSD complex.

Q. I take that back. You were diagnosed with PTSD prior to TCC?

A. Correct.

Q. But then it progressed to PTSD after you came back to -- after you came to work for TCC?

A. To PTSD complex, yes, after I was working with TCC.

Q. And just to close out that thought, it became

really wanted to serve the students to the best of my ability, and to serve them to my standards of excellence, the accommodations were needed. Yeah, I could have done my job, not as well as I would have liked to have done my job and not as well as the students deserved, so --

Q. (BY MR. PHAM) You're right. I have to object to that as being nonresponsive, but I appreciate the information. I don't think you're trying to obstruct me. I think you're trying to be helpful, and I appreciate that. But for the record I have to lodge an objection as being nonresponsive.

So the mental and physical conditions that you have only prevents you from performing this -- in this specific setting in the evenings at TCC; correct?

A. Okay. Now, how did you say that again? Should I reread the screen?

Q. No. Let me see if I can ask it in a better way.

What I'm getting at is: The mental and physical conditions that you had doesn't impair you from working altogether; does it?

A. Correct.

Q. In other words, there are plenty of jobs out there that you're able to perform despite having these

mental and physical conditions; right?
A. Correct.
Q. And your position is that it's the specific setting at TCC that you're being asked to work, especially by yourself in the evenings, that you should not be required to work in that setting; right?
A. It's not me specifically that I shouldn't be required. Nobody was supposed to be required --
Q. Okay.
A. -- to work in that setting.
Q. So regardless of whether or not a person has a disability or not, it's your position that nobody should be required to work in a setting at the lab where they're by theirselves without help; is that your position?
A. It's not my position. It was the standards that the school had set. That was my understanding of what was entailed in the position.
Q. But I'm asking for your personal opinion now.
A. My personal opinion is that it -- it's not down to -- it's not all about what I want. It's about what's right for the students, and --
Q. But -- but I want you to put it in a context of what you want and what you need. Okay? And I understand you're saying that's not what it's about, but

I ask you.
A. Well, I think in any job you have to equip the person with the tools to do the job, the environment to do the job. And so I remember saying to Dr. Coronado, and maybe some other people but I know I said it to Dr. Coronado on January 2, nobody could do the job the way it needs to be done with one person in the lab with the -- the demand of students that there was. It was -- it was more than one person alone could do, me or anybody else, and it wasn't supposed to be one person, so --
Q. So it is your belief or your position that the demands of the lab in the evening were such that no one person should be required to do it themselves?
A. Correct.
Q. Whether or not they have a disability, they shouldn't be required to do it themselves?
A. Right.
Q. And it's your position also that despite having these mental and physical conditions, you were still able to perform those job functions by yourselves in the evening?
A. Correct.
Q. And that the accommodations that you were trying to seek would help you cope with your mental and

physical conditions; correct?

A. I don't know if it means the same thing, but I -- I like the word "mitigate."

Q. Okay.

A. You think cope and mitigate are the same?

Q. Yes. For purposes of this question.

So let me see if I can use your term. So the accommodations that you were asking for from TCC was to -- in order to mitigate these mental and physical conditions that you had; right?

A. Correct.

Q. It had nothing to do with whether or not you can perform your job?

A. Right.

Q. The only accommodations that you ever sought from TCC were adequate staffing, not moving you to the library and/or close the lab at 5:00 P.M.; correct?

A. Yes. And to -- to bring back up as part of the adequate staffing we talked about, you know, peer tutors or something. And when you say only accommodations, I sought to discuss other accommodations, but I didn't get to.

Q. The only accommodations that you have verbalized or communicated with TCC are adequate staffing, not moving you to the library and/or thirdly,

closing the lab at 5:00 P.M.; would that be fair to say?
A. Yes.
Q. Okay. And up until September of 2012, despite having these mental and/or physical conditions, it's your position that you're performing your job well, correct, that you were able to perform your job; correct?
A. Yes.
Q. And you were able to do so without accommodation; correct?
A. Yes.
Q. Now, I would like to talk to you about what happened between November 4, 2012, and January 2, January 13; okay?
A. November 4?
Q. November 14.
A. 14th. Okay.
Q. I misspoke. I'm sorry.
A. That's okay.
Q. You took leave really starting the evening of November 13, 2012; correct?
A. Correct.
Q. And from that point in time until January 2, 2012, did you make any requests for an accommodation to TCC?

testified that the accommodations that you sought from TCC would help you mitigate your medical condition; correct?

A. Yes.

Q. Okay. So from that testimony it would then mean that the accommodation would not entirely resolve your medical condition because you -- you continue to have anxiety whenever dealing with rude and demanding students; right?

A. Correct.

Q. So in other words, you're saying that even during the day when you were working alongside other instructional assistants and other instructional associates, that you still had issues dealing with your medical condition whenever confronted with students who are rude and demanding; correct?

A. Again, I don't know so much that "rude" is the right word. Angry.

Q. Angry?

A. Demanding. Sometimes hostile. So, yes, I would have challenges during the day with those same disabilities.

Q. Correct.

And, then, so at night or in the evenings between 5:00 and 8 o'clock, the point I'm trying to get

at is that even if those -- all of those accommodations were made per your request, the anxiety or your medical condition would still persist if a rude, hostile, demanding student came in; correct?

A. Correct.

Q. So there's never a way for us to resolve that anxiety 100 percent; is there?

A. No.

Q. So in other words, there's not a way for us to resolve that anxiety or medical condition a hundred percent; is that correct?

A. That is correct.

Q. Thank you.

A. That would be a cure; right?

Q. Right.

A. And I don't know that there is a cure for it, so --

(Exhibit No. 8 marked.)

Q. (BY MR. PHAM) We were talking earlier about a document that -- I had to take a break in order to get a document, and I'm going to mark this as Deposition Exhibit No. 8.

Can you identify that for the record, please?

A. Are you asking me?

nonresponsive because there was not a question on the table.

A. I know.

Q. But I appreciate the information nonetheless.

With regard to Deposition Exhibit No. 8, it basically is releasing you, or is certifying, that you're able to work a full, regularly scheduled day with no restriction.

Did I read that correctly?

A. I don't know. I can't see it.

Q. Oh, I'm sorry. I'll come around and point to you where I'm referring. It's right here.

A. That is the first part of a two-part question. And, yes, you read that part of it correctly.

Q. So you were able to -- could I have that back?

So you were able to perform your job, at least that's what your doctor was certifying to, that you can perform that job with no restrictions; right?

MR. ULOTH: Objection to the form.

Q. (BY MR. PHAM) That's what it says in 2(a) of Exhibit 8?

A. Right. With no restrictions that are listed in 2(b).

Q. Correct.

A. Which are all like physical maneuvers.

Q. But on Page 2 of Exhibit No. 8, there's a box three that says other instruction, it says, please make reasonable accommodations. Correct?

A. Correct.

Q. And your doctor doesn't specify what reasonable accommodations would be needed in order for you to return to a regularly scheduled day with no restrictions; correct?

A. He does not specify.

Q. And, in fact, you never talked with your doctor about what accommodations you would need in order to perform your job; correct?

A. That is not correct.

Q. Is there any documentation from Dr. Indukuri who certified your fitness for duty that you're aware of, indicating discussions that you had with him about what specific accommodations you would need from TCC when you returned to work so that you can perform your job?

A. There's no documents I'm aware of.

Q. Okay. But your testimony is that you did have discussions with Dr. Indukuri about the reasonable accommodations?

A. Correct.

Q. Do you recall what specific discussions you had

with him about reasonable accommodations that you would need in order -- when you came back to work, in order for you to perform your job?
A. Yes.
Q. Could you share them with us, please?
A. He stated that it would be difficult for him to tell TCC what was and wasn't reasonable accommodations. You know, he wasn't my boss. He didn't -- you know. So he said, That would be something you would need to discuss with them. And I agreed.
Q. I'll object to that as being nonresponsive.
The question that I had was: Did you discuss with Dr. Indukuri the specific accommodations --
A. No.
Q. -- that you would need in order to perform your job?
A. No.
Q. Well, isn't it true that at this January 2, 2013, meeting that you told the EEOC that Dr. Coronado asked you what kind of reasonable accommodations you wanted, and you told him that you weren't sure?
A. No, that's not what I said.
Q. Okay. You never said that to the EEOC?
A. Which -- who EEOC are you referring to?
Q. I'm sorry. The Equal Employment Opportunity

scheduled it, and the purpose of the meeting was to discuss my job.

Q. Okay. And as best as you can tell me, what was discussed during that meeting?

A. Dr. Coronado said (and I may be not be quoting exactly, but I'm close) that he said something like, Apparently you can't do your job.

And I said, Well, that's interesting because I've been doing my job for almost four years.

And then he listed off some things that I think were from Anita Biber's memo or whatever, some of these accusations (I'll use that word) or claims. And I did not agree with them or the characterization that I was not able to do my job.

And I believe I said to him that I had never been written up. My job performance evaluations had always been average or above average.

And he -- he referred -- then he said that, I see here you are wanting reasonable accommodations.

Oh. Oh. I talked with him about the stress of the job, the -- with the increased student traffic, which was significantly greater than when I had started. However, we had no increased staffing from when I had first started working there, and that it was anybody would -- that's what I was saying, anybody would

Q. And the second component of your meeting centers around accommodations, that you thought that -- that he thought you were saying is that extra manpower needed in the evenings; correct?

A. Yes. A cursory discussion of reasonable accommodations would be that second part.

Q. Okay. And other than those two components, was there any other issues that were raised during your meeting with Dr. Coronado?

A. No.

Q. Did Dr. Coronado in that meeting ever say that TCC does not accommodate or work with people with disabilities?

A. He did not say that.

Q. Did he say any words to that effect that made you feel like that that was TCC's position, that they did not work with or accommodate people with disabilities, during that meeting?

A. Let me think. Can I read that question?

Q. Sure.

A. He did not say any words to the effect that TCC doesn't work with people with disabilities.

Q. In any of your meetings with supervisors or administrators of TCC, whether it be Anita Biber, Christine Hubbard, Conrad Herrera, wherein any of those

individuals said that TCC does not work with individuals with disabilities, or words to that effect?

A. They did not say that because they didn't say anything in reply.

Q. In any of those discussions with those individuals or administrators, did they ever say that they will not accommodate individuals with disabilities or mental or physical impairments?

A. They did not say that.

Q. Now, during the time that you worked in the writing lab, were there other individuals who had some sort of medical conditions that TCC accommodated?

A. Margaret Levy had diabetes, and she would go to doctor appointments.

Q. And she was allowed to do that; wasn't she?

A. Correct.

Q. What about Lynell --

A. Brown.

Q. -- Brown, did she have any medical conditions that TCC accommodated?

A. I'm not aware of her having any medical conditions.

Q. Are you aware of any time where Margaret Levy made requests for accommodation as a result of her diabetes where TCC did not accommodate?

A. I'm not aware of any of those.
Q. Are you aware of any policy or any practice, other than your contention about your case, wherein TCC said -- wherein TCC would not accommodate individuals with medical or mental or physical conditions?
A. I heard complaints from students that they were not being accommodated.
Q. Other than students.
A. I'm not aware of any, other than students.
Q. Are you aware of any practice or policy of TCC wherein they would not accommodate employees with disabilities or mental or physical conditions?
A. I'm not aware of any.
Q. Okay. Other than the allegations with regard to your case, are you aware of any instances where you -- you believe that TCC retaliated against individuals for exercising their rights under the Family Medical Leave Act or the Americans with Disabilities Act?
A. I'm not aware of any.
Q. Are you aware of any practice or any policy of TCC that discriminates against individuals who need accommodations who had requested accommodations as a result of a mental or physical condition?
A. Are we talking aside from my own?

Q. Okay. And since -- other than that one week, was it soon after you were told that you were terminated from TCC?

A. No. No.

Q. It had nothing to do with TCC?

A. Correct.

Q. Okay. So since -- other than that one incident, that one week which you testified had nothing to do with TCC, have any of your doctors restricted your ability to work?

A. No.

Q. Have any of your doctors since January 1 of 2013, other than that one week that you talked about that has nothing to do with TCC, have any of your doctors told you that you had a disability from which your employers would have to accommodate in order for you to perform your job?

A. No doctors have said those things.

Q. Okay. Now, with regard to the physical or mental impairments that you've testified about, when you were -- that you had when you were at TCC, did any of those physical or mental impairments substantially limit a major life activity for you?

MR. ULOTH: Objection to the form of the question.

Q. Okay. And since -- other than that one week, was it soon after you were told that you were terminated from TCC?

A. No. No.

Q. It had nothing to do with TCC?

A. Correct.

Q. Okay. So since -- other than that one incident, that one week which you testified had nothing to do with TCC, have any of your doctors restricted your ability to work?

A. No.

Q. Have any of your doctors since January 1 of 2013, other than that one week that you talked about that has nothing to do with TCC, have any of your doctors told you that you had a disability from which your employers would have to accommodate in order for you to perform your job?

A. No doctors have said those things.

Q. Okay. Now, with regard to the physical or mental impairments that you've testified about, when you were -- that you had when you were at TCC, did any of those physical or mental impairments substantially limit a major life activity for you?

MR. ULOTH: Objection to the form of the question.

A. I'm chuckling because I would say yes.
Q. (BY MR. PHAM) Okay. How so?
A. I don't date anymore.
Q. Okay. Any other -- any other impairments to a substantial major life activity as a result of the physical or mental impairments that you had while you were at TCC?
A. Yes. Also, yeah, I -- I limit my social activities dramatically.
Q. Is that it? Anything else?
A. I think that's it.
Q. So other than dating and limiting your social activities, have your physical or mental impairments substantially limited any other major life activity? And I'm talking at the time that you were employed by TCC and after.
A. Okay. So now we're going back to when I was at TCC?
Q. Yes, ma'am.
A. Okay. Substantial life activities. And can you refresh me on what those are?
Q. Let me see if I can rephrase that. Okay?
In 2012, the entire year of 2012, did you have a physical or mental impairment that substantially limited a major life activity?

STATE OF TEXAS )
)
COUNTY OF TARRANT )

I, Sharon Kiosse Poulos, a Certified Shorthand Reporter in and for Tarrant County, Texas, do hereby certify that the facts stated by me in the caption to the within and foregoing deposition are true; that the deposition was taken before me pursuant to the agreement of the parties; that the within named witness was duly sworn to testify the truth; that the questions asked and the answers given were taken by me and subsequently transcribed by me and reduced to typewriting by me or under my supervision, and that the within and foregoing typewritten pages constitute and contain a full, true, complete and correct transcript of all proceedings had.

I further certify that I am neither attorney for, related to nor regularly employed by any of the parties hereto, and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, and that I am not in any way financially interested in the outcome of said proceedings.

TO CERTIFY WHICH, witness my hand and seal at Fort Worth, Tarrant County, Texas, this 14th day of July 2016.

______________________________

Sharon Kiosse Poulos, CSR, RPR
Cert. No. 1315, Expires 12/31/2016
2820 Harlanwood Drive
Fort Worth, Texas 76109
(817) 239-6109
skiossepoulos@aol.com

Cost: ____________

Paid by: Defendant (Pham)

Subject: FW: On Call Instructional Assistant Posting now available!!!

From: WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To: christyaddress@yahoo.com;

Date: Thursday, December 13, 2012 10:43 PM

---

From: BIBER, ANITA
Sent: Tuesday, October 09, 2012 9:29 PM
To: BROWN, LYNNELLE; WILLIAMS, CHRISTY; LEVY, MARGARET; MANOR, ERIC; WEITHERS, VANITA; TOOLEY, TERI; HUBBARD, CHRISTINE; MCELREE, KAYLEE; JOHNSON1, LESLIE (NW); MASSEY, LORI; MAYNARD, MELINDA; MCKINLEY, JOAN; SPOSATO, BOBBIE; ZIMMER, CAROLYN; BIBER, ANITA; HIGDON, CATHERINE; MANOR, ERIC; ROW, MAGGIE; BROWN, TEENA; HUMPHREY, ALMA; HIX, CAREY; COOK, CHRISTI; BARTHER, DELICIA; ROWE, JACQUELINE; SLAY, LAURA; CERVANTES, MAUREEN; MCCONNELL, MIKE; CORTEZ, ALLYSON; CORTEZ, ALLYSON; BAILEY, KRISLER; BIRMINGHAM, LEA; BORGER, MELODY; CARDER, WILLIAM; CHRESTOPOULOS, ALEX; COX, KIMBERLEY; GRIFFITH, DANIEL; HUMPHREY, ALMA; KRAFELS, SONIA; MINOR, DANA; NEWBERRY, MIRANDA; PORTILLO, PEDRO; JOHNSON, SONJA; Temporary Allyson Cortez; Temporary Lea Birmingham; VARGAS, GUADALUPE (ALEX)
Cc: PIERCE, WENDI; HERRERA, CONRAD; ROW, MAGGIE; BIBER, ANITA
Subject: On Call Instructional Assistant Posting now available!!!

Re: New position/ SUPPORT STAFF

It is here! The job posting is active! If you are a current adjunct, you may apply. If you have qualified acquaintances that you'd strongly recommend, let them know about the new position.

Right now, we need experienced tutors/writing instructors to assist in the writing lab. The increased demand has been in the evenings and weekends.

This is an on-call position, but we'll strive to maintain a consistent schedule as long as demand supports the position(s).

We will begin reviewing & interviewing qualified candidates ASAP.

PS. The hiring software was recently updated, and previously submitted applications did not carry over. If you have trouble accessing it, please let me know. There has been technical difficulties, so we need to provide applicant feedback so that any glitches may be immediately corrected.

Anita Biber, M.Ed.
Department Chair and Instructor of Reading| Academic Foundations Dept. | Humanities Division
Tarrant County College Northwest Campus | Office: WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179

DEFENDANT'S EXHIBIT 10

817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu | www.tccd.edu

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

Subject: FW: Applicant Interviews

From: WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To: christyaddress@yahoo.com;

Date: Thursday, December 13, 2012 10:37 PM

---

From: BIBER, ANITA
Sent: Friday, November 02, 2012 1:38 PM
To: HERRERA, CONRAD; WILLIAMS, CHRISTY; BROWN, LYNNELLE; MCELREE, KAYLEE
Cc: WEITHERS, VANITA; HUBBARD, CHRISTINE; TOOLEY, TERI
Subject: Applicant Interviews

Thank you, everyone, for your input in reviewing applications and suggesting interview questions.

Margaret and I have been working closely to review the needs and to outline the interview process.

We have narrowed it down to 5 candidates. All have various strengths and experience. Since we are hiring an on-call part-time instructional assistant, we are specifically trying to identify applicants who have a good command of English and grammar, great customer service skills, and a willingness to learn. Our assistants will work alongside our writing consultants, so they are indeed writing lab support rather than taking the place of our experts.. you.

Not including the 5 candidates, we ARE in the process of hiring Catherine Higdon. She is a TCC-NW adjunct who has taught full-time on the SO campus and for the Lone Star Community College system. She teaches in both English and Academic Foundations, and she comes with stellar references. Catherine will work on T/TH evenings and on the Saturdays that Margaret currently covers. She will be a wonderful addition.

We will select assistants to work alongside Christy and Catherine on Saturdays and on M/W evenings (and occasional TH). We could potentially hire more than we need so that we have assistants who can assist with subbing and/or Accuplacer (or other types of) workshops.

I thank you in advance for your patience, especially as we bring new assistants on board. They will certainly need time to learn the ins and outs.

Here is our current interview schedule. It was difficult to find times when both Margaret and I were available since she has appts. and my afternoons are typically booked.

If you are available, please feel free to introduce yourself at the conclusion of the interview. :0))

Friday (11/2) 2:40 Cassidy Sedlock
Saturday (11/3) 7:30 Stacy Putz
Monday (11/5) 8:45 Cate Vrba-Christie
Tuesday (11/6) 2:30 Ellie Fowler

TBD – Coral Jones

Anita Biber, M.Ed.
Department Chair and Instructor of Reading| Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office: WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu<mailto:anita.biber@tccd.edu> | www.tccd.edu<http://www.tccd.edu/>

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)

Subject: FW: Writing Lab hiring update

From: WILLIAMS, CHRISTY (CHRISTY.WILLIAMS@tccd.edu)

To: christyaddress@yahoo.com;

Date: Thursday, December 13, 2012 10:33 PM

---

From: BIBER, ANITA
Sent: Tuesday, November 13, 2012 10:11 AM
To: LEVY, MARGARET; MCELREE, KAYLEE; WILLIAMS, CHRISTY; BROWN, LYNNELLE; HERRERA, CONRAD
Cc: ROW, MAGGIE; HUBBARD, CHRISTINE; WEITHERS, VANITA; TOOLEY, TERI
Subject: Writing Lab hiring update

Hello-

Both Catherine Higdon and Eleanor Fowler have been recommended for hire, and both are at the CELT status. Both will be great assets to the writing center.

We had hoped to hire Ms. Vrba-Christie but she declined after accepting because a full-time opportunity came her way. We do have another candidate that we had considered, but she has been very slow with responses, so Margaret and I are leery of moving forward.

So, we still need to find another Saturday person, and we will continue to hunt for the perfect person.

Anita Biber, M.Ed.
Department Chair and Instructor of Reading| Academic Foundations Department | Humanities Division
Tarrant County College Northwest Campus | Office: WCTS 1204A
4801 Marine Creek Parkway | Fort Worth, TX 76179
817-515-7302 | Fax 817-515-7157
anita.biber@tccd.edu<mailto:anita.biber@tccd.edu> | www.tccd.edu<http://www.tccd.edu/>

Office hours:
10:00 a.m. to 12:00 p.m., Monday & Wednesday;
9:00 a.m. to 12:00 p.m., Tuesday & Thursday;
9:00 p.m. to 10:00 p.m., Sunday (on-line only)